## IN THE UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| In re: LARRY ELLIOT KLAYMAN | No: 22-8521 |
| Respondent | (District of Columbia Court of Appeals, No. 20-BG-583) |

### RESPONDENT LARRY KLAYMAN'S MOTION TO RECUSE OR DISQUALIFY THE HONORABLE GREGORY G. KATSAS, NEOMI RAO, AND KAREN LECRAFT HENDERSON PURSUANT TO 28 U.S.C. § 144

Respondent Larry Klayman ("Mr. Klayman") hereby moves this Court for an order recusing or disqualifying the Honorable Gregory G. Katsas ("Judge Katsas"), the Honorable Neomi Rao ("Judge Rao") and the Honorable Karen LeCraft Henderson ("Judge Henderson") (collectively the "Panel") pursuant to 28 U.S.C. § 144[1], which states:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
>
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A

---

[1] Complaints to the Judicial Council for the United States Court of Appeals for the District of Columbia Circuit have also been prepared and are being submitted contemporaneously, along with a letter to Chief Judge Sri Srinivasan.

party may file only one such affidavit in any case. It shall be
accompanied by a certificate of counsel of record stating that it is
made in good faith.

As shown conclusively below, Mr. Klayman has more than met the burden to show
that a strong bias or prejudice by the Panel exists against him, and as such they
must be recused or disqualified, and this matter reassigned. Exhibit A ¶ 2.

## **LEGAL STANDARD**

An impartial judiciary is a fundamental component of the system of justice
in the United States. The right to a "neutral and detached judge" in any proceeding
is protected by the U.S. Constitution and is an integral part of maintaining the
public's confidence in the judicial system. *Ward v. City of Monroeville*, 409 U.S.
57, 61-62 (1972); *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 243 (1980) (The
U.S. Constitution guarantees a party an impartial and disinterested tribunal in civil
cases). To ensure that this right is protected, Congress has sought to secure the
impartiality of judges by requiring them to step aside, or in some circumstances,
disqualify themselves, in various circumstances.

Under 28 U.S.C. § 144:

Whenever a party to any proceeding in a district court makes and files
a timely and sufficient affidavit that the judge before whom the matter
is pending has a personal bias or prejudice either against him or in
favor of any adverse party, such judge shall proceed no further
therein, but another judge shall be assigned to hear such proceeding.

28 U.S.C. § 144. This statute is unambiguous – if the requirements are met, a judge, and in this case the Panel of judges now sitting on this matter - must be recused or disqualified and this matter reassigned to an unbiased Panel. *See* Exhibit A; *Affidavit of Larry Klayman*

> The disqualification statute, 28 U.S.C. §144, is mandatory and automatic, requiring only a timely and sufficient affidavit alleging personal bias or prejudice of the judge. The judge is a silent defendant, unable to make findings on the truth or falsity of the affiant's allegations, and truth must be presumed. *United States v. Hanrahan*, 248 F. Supp. 471, 474 (D.D.C. 1965) (Emphasis added); and the allegations may be based upon information and belief, *Berger v. United States*, 255 U.S. 22, 34, 65 L. Ed. 481, 41 S. Ct. 230 (1920).

*Brotherhood of Locomotive Firemen & Enginemen v. Bangor & Aroostook Railroad Co.*, 380 F.2d 570, 576 (D.C. 1967) (emphasis added). As evidence of the absolute requirement of impartiality from judicial officers, the U.S. Courts of Appeals for the Fifth, First, Sixth, Tenth, and Eleventh Circuits have said that close questions should be decided in favor of recusal. *See Republic of Pan. v. American Tobacco Co.*, 217 F.3d 343, 347 (5th Cir. 2000) (citing *In re Chevron*, 121 F.3d 163, 165 (5th Cir. 1997)); *In re United States*, 158 F.3d 26, 30 (1st Cir. 1998); *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993); *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989).

"The test for personal bias or prejudice in [S]ection 144 is identical to that in section 455(b)(1), and the decisions interpreting this language in [S]ection 144 are controlling in the interpretation of section 455(b)(1)." *United States v. Sibla*, 624 F.2d 864, 867 (9th Cir. Cal. 1980). In *Litecky v. United States*, the U.S. Supreme Court found held that there are possible circumstances where bias can be shown from judicial rulings. "In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; **and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved**." 510 U.S. 540, 555 (1994) (emphasis added). There is here, not just extra-judicial bias and prejudice, as set forth below, but also rank dishonesty and judicial misconduct which is the result of this extra-judicial bias and prejudice, as exhibited and manifested in a judicial ruling in *Klayman v. Fitton et al*, 1:19-cv-02793 (D.D.C.), which flies in the fact of textbook black letter law and Supreme Court precedent.

Thus, judicial rulings coupled with the requisite "**degree of favoritism or antagonism**" can serve as the basis for such a motion even "when no extrajudicial source is involved." *Id*. Lastly, "**judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases…** *may* **[support a challenge of bias] if they reveal an opinion that**

derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id*. (emphasis added).

Courts have found that "**the cumulative effect of the 'repeated misapplication of fundamental, rudimentary legal principles that favor[] [one party] substantively and procedurally' can be the basis for recusal**." *Krohn v. Krohn*, 2015 Tenn. App. LEXIS 766, at \*18 (Ct. App. Sep. 22, 2015); *Hoalcraft v. Smithson*, 2001 Tenn. App. LEXIS 489, at \*52 (Ct. App. July 10, 2001). Thus, in sum, if a jurist's decision is so egregiously wrong and so removed if not defiant from and of the facts and the law, as is true here, bias and prejudice can be presumed. A federal judge is presumed to know and follow the law, and when he or she blatantly defies the law, it is clear that extrajudicial bias and prejudice exists.

## <u>LEGAL ARGUMENT</u>

The Panel's conduct throughout this matter has more than been egregiously shown to manifest the requisite extrajudicial bias and prejudice that mandates recusal or disqualification under 28 U.S.C. § 144. Additionally, there has been a course of conduct which has permeated this Court generally throughout the years that underscores and evidences this extrajudicial bias and prejudice, and which very likely explains what occurred here.

Importantly, the duty to recuse or disqualify oneself is written prominently into the Code of Conduct for United States Judges, which means that Judicial Conference, which adopted this Code, had the foresight to recognized that there would be situations like this instant one where such recusal or disqualification would be necessary to ensure that litigants are afforded their constitutional due process and equal protection rights. Code of Conduct for United States Judges 3(C) states:

> (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:
> (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. Exhibit A ¶ 4

The history between Mr. Klayman and some of the judges of this Court and in this D.C. Circuit is no secret, as at a hearing in an unrelated matter where Mr. Klayman served as counsel, *Arpaio v. Zucker et al*, 18-cv-2894 (D.D.C.), the Honorable Royce Lamberth ("Judge Lamberth") of the district court and a judge in this D.C. Circuit revealed to Mr. Klayman and those who were in the audience, "I haven't had you here in a long time. It's a pleasure to have you again. I know some judges don't say that to you, but I will say it." Exhibit B. This shows that even Judge Lamberth knew of the animus that many of his colleagues on the lower and higher courts in the D.C. Circuit had and continue to have for Mr. Klayman.

<u>Exhibit A</u> ¶ 15. Indeed, Mr. Klayman is the founder of Judicial Watch, Inc, which came into existence on July 29, 1994 – almost 30 years ago – to "watch" judges to promote integrity on the federal bench in particular; thus the name "Judicial Watch."  Mr. Klayman has also been a strong proponent of peaceful January 6, 2021 protesters, which advocacy is at odds with the prevailing pliant and coordinated actions by federal judges in this Circuit in league with the Biden Justice Department and the harsh punishment they are meting out for what is frequently simply alleged trespasses, where what appears to in effect be forced confessions of guilt are necessary to obtain a lesser sentence. Mr. Klayman  has been critical of the actions of certain judges in this Circuit in this regard and has written about this. <u>Exhibit A</u> ¶ 16. In his latest book titled "It Take a Counter-Revolution: Wake Up America!," published by Post Hill Press and widely available online by all major booksellers, Mr. Klayman chronicles the judicial misconduct of several judges in the Circuit. <u>Exhibit A</u> ¶ 17. Federal judges must weather criticism, without fear of retaliation leveled against those lawyers such as Mr. Klayman who feel duty bound in their public interest capacity to make it, just as lawyers must weather criticism from these federal judges. This is a healthy give and take to promote integrity in the legal system. <u>Exhibit A</u> ¶ 18.

Of course, as the Court is well aware, personal feelings towards a litigant are not a proper consideration for any federal judge in making a ruling. This is, in fact,

a key and sacrosanct provision in the oath of office that every federal judge in this Court swore, under oath, prior to taking the bench:

> I do solemnly swear that I will administer justice **without regard to persons**, and do equal right to the poor and to the rich, and that I will impartially discharge and perform all the duties incumbent upon me as judge under the Constitution and laws of the United States. So help me God. 28 U.S.C. § 453 (emphasis added). Exhibit A ¶ 19.

Regrettably, this instant motion has become necessary, as the members of this Panel have conducted themselves in a manner where it is clear that Mr. Klayman does not have any chance at a fair, neutral, and unbiased adjudication, which is guaranteed to him under his due process and equal protection rights under the Constitution.

## I.     Judges Rao, Katsas, and Henderson Were Previously Named as Defendants in a Lawsuit Brought by Mr. Klayman

Each and every member of the Panel, and in particular Judge Rao, who was the lead Defendant, were named as Defendants in a case styled *Klayman v. Rao et al*, 1:21-cv-02473 (D.D.C.), which sought injunctive relief with regard to the judges of this Court mandating that they simply conduct a bona fide review of the record in *Klayman v. Judicial Watch, Inc. et al*, 1:06-cv-00670 (D.D.C). Exhibit A ¶ 20. Although it is indisputable that there is no judicial absolute immunity for claims of injunctive relief, as Mr. Klayman sought there, *Pulliam v. Allen*, 466 U.S. 522 (1984), it appears that the members of the Panel took umbrage at being

named as Defendants in Mr. Klayman's perfectly legal and viable lawsuit in *Rao*, which has informed their conduct in this matter. Exhibit A ¶ 21.

## II.    Judge Katsas' Conduct in *Klayman v. Fitton* Is Also at Issue

Judge Katsas sat on the panel of the appeal of *Klayman v. Fitton*, 1:19-cv-02793 (D.D.C.), a defamation case that was erroneously and egregiously dismissed at the pleading, FRCP 12(b)(6) stage, where the Defendants published the false statement that Mr. Klayman had been "ousted" from Judicial Watch "because of a sexual harassment complaint" to Roger Stone for him to republish on the internet for the world to see. *Fitton* ECF No. 1 at 7. Exhibit A ¶ 21. This appeal was assigned to a Panel that included the Honorable A. Raymond Randolph ("Judge Randolph"), Judge Katsas, and the Honorable Judith Rogers ("Judge Rogers"). Exhibit A ¶ 22.  At the oral argument for this appeal, Judge Randolph abruptly, heatedly and angrily interrupted Mr. Klayman's presentation and outrageously, without any factual basis, falsely accused Mr. Klayman of having been found in *Klayman v. Judicial Watch Inc.*, 06-cv-670 (D.D.C.), presided upon by the Honorable Colleen Kollar-Kotelly ("Judge Kotelly"), to have sexually harassed the office manager of Judicial Watch and also found to have beaten his former wife. Judges Katsas and Rogers did not step in and intervene while Judge Randolph went on this unethical and unhinged extrajudicial tirade, thereby apparently condoning and ratifying the actions of Judge Randolph. Exhibit A ¶ 24.

Mr. Klayman vehemently denied that any jury or Judge Kotelly had made any such findings, or that he had done any such things, and a that a review of the record would bear this out. In any event, as that case involved a jury trial, Judge Kotelly had no authority to make any such findings. Importantly, the jury verdict reflects no such findings and there were no special jury interrogatories given to them by Judge Kotelly. Exhibit A ¶ 25. And, even more importantly, Mr. Klayman reminded the Panel that all of this – regardless of whether it was true or not (again, it was not) -- was simply not at issue and before the Panel. The only issue whether Mr. Klayman had plausibly pled defamation by Thomas Fitton, the Appellee/Defendant, under the following cases and other precedent as set forth in his initial and reply briefs. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). All of this was completely extraneous, irrelevant, incendiary and highly prejudicial. Exhibit A ¶ 26.

Altogether, it is clear that this is exactly what was contemplated by the Supreme Court in *Liteky* that mandates recusal or disqualification: "**judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases…** *may* **[support a challenge of bias] if they reveal an opinion that derives from an extrajudicial source; and they** *will* **do so if they reveal such a high degree of favoritism or**

**antagonism as to make fair judgment impossible**." *Liteky*, 510 U.S. at 555. There is simply no denying that a judge making the allegation that Mr. Klayman was a sexual harasser who had beat his wife during an oral argument which is open to the public and the media – especially when such a false allegation was completely irrelevant and extrajudicial – constitutes "judicial remarks" that "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id*. <u>Exhibit A</u> ¶ 27.

It is clear that this public defamation by Judge Randolph poisoned and prejudiced the rest of the panel, including Judge Katsas, against Mr. Klayman. This prompted and compelled Mr. Klayman to file his Motion to Disqualify the Honorable A. Raymond Randolph Pursuant to 28 U.S.C. § 144. <u>Exhibit C</u>, <u>Exhibit A</u> ¶ 28.  In that motion, Mr. Klayman moved to recuse Judge Randolph due to the clear extrajudicial bias and prejudice that he openly displayed at the oral argument in baselessly and outrageously accusing him of sexual harassment and beating his ex-wife. However, Judge Katsas, who was the chief judge for the appeal, chose not to step and in and do the right thing and as part of the Panel denied Mr. Klayman's recusal motion. <u>Exhibit A</u>  ¶ 29.  Mr. Klayman gave Judge Katsas and the rest of the Panel another chance to do the right thing in his Petition for Rehearing, <u>Exhibit C</u>, where he argued that Judge Katsas should not take part in consideration because he had been clearly prejudiced and poisoned the Panel by Judge Randolph:

And, as it is clear that Judge Randolph's unexplainably prejudicial conduct clearly poisoned the rest of the panel against him, Mr. Klayman respectfully requests that the other two judges on the Panel not take part in the en banc process, in the interest of justice and fundamental fairness. <u>Exhibit C</u>, <u>Exhibit A</u> ¶ 30.

This was once again summarily denied without any explanation. Thus, Judge Katsas, having been given numerous opportunities to step in and do the right thing, chose not to and therefore condoned and ratified the clear misconduct of Judge Randolph, rendering him equally responsible. As a federal judge appointed to sit on the bench at this Court, Judge Katsas has a duty to take action and correct this type of egregious misconduct. Code of Conduct for United States Judges 2(A) provides that:

> a judge should respect and comply with the law and should act at all times in a **manner that promotes public confidence in the integrity and impartiality of the judiciary**. (emphasis added).

Similarly, Code of Conduct for United States Judges provides that :

> an independent and honorable judiciary is indispensable to justice in our society. **A judge should maintain and enforce high standards of conduct and should personally observe those standards, so that the integrity and independence of the judiciary may be preserved**. (emphasis added).

Code of Conduct 3(A)(1) provides that :

> A judge should be faithful to, and maintain professional competence in, the law and should not be swayed by partisan interests, public clamor, or fear of criticism.

Lastly, code of Conduct for United States Judges 3(A)(3) provides that:

> A judge should be **patient, dignified, respectful, and courteous** to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity (emphasis added). Exhibit A ¶ 31.

Instead of following his duty to act pursuant to the Code of Conduct for United States Judges, Judge Katsas felt it was more important to protect a fellow jurist, at the cost of justice, judicial ethics, impartiality, and fairness and in clear violation of these provisions. Exhibit A ¶ 32.

Judge Katsas and the panel subsequently, without any credible basis, affirmed the egregiously wrong and unsupportable lower court dismissal of Mr. Klayman's case, despite Mr. Klayman having clearly pled defamatory statements published by the Defendants-Appellees of and concerning him, more than sufficient to defeat a 12(b)(6) motion to dismiss, which is all that was at issue. Under the facts and the law, where the only question was whether Mr. Klayman had pled what needed to be pled, there was simply no way that this clear-cut case should have been dismissed, so Judge Katsas and the Panel's decision can only be attributed to extrajudicial bias and prejudice. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The Complaint clearly and unequivocally alleged that Roger Stone published the following statement, implicating Defendant Tom Fitton in the defamation.

He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He left because of a sexual harassment complaint. *Fitton*, ECF No. 1 at 7. Exhibit A ¶ 33.

This is so clearly defamatory that there is no possible way that the Panel could have affirmed dismissal at the motion to dismiss stage without having succumbed to extrajudicial bias and prejudice. Exhibit A ¶ 34. Indeed, falsely stating that someone was "ousted" due to "sexual harassment" severely harms that person's reputation, and is even defamatory *per se*, as "impute[s] to him (plaintiff) the commission of some criminal offense for which he may be indicted and punished, if the charge involves moral turpitude and is such as will injuriously affect his social standing." *Farnum v. Colbert*, 293 A.2d 279, 281 (D.C. 1972).

Importantly, Stone directly credits his statement to Fitton, which means that Fitton unequivocally published this statement to Stone for him to republish to the world. Stone says, "[a]sk Tom Fitton why he left." This directly implicates Fitton. If Fitton had not published this false statement to Stone, Stone had no reason to tell the public to "[a]sk Tom Fitton." This, at the very minimum, was enough to deny a motion to dismiss advance this case to the discovery phase, as any unbiased Panel would have found. Exhibit A ¶ 35.

Despite all of this, Judge Katsas and the Panel affirmed the dismissal by the lower court, a decision so blatantly incorrect and flawed that it could only possibly have been the result of bias and prejudice. Even more, Mr. Klayman gave Judge

Katsas and the Panel a chance to correct their manifest error in his Petition for Rehearing En Banc, <u>Exhibit C</u>, but these same judges doubled down and denied that as well, again without a valid basis. Thus, given the outcome of this case, Judge Katsas has clearly more than satisfied the standard for recusal or disqualification under *Liteky*, and he, along with the rest of the Panel presiding over this reciprocal discipline proceeding, must be recused or disqualified. <u>Exhibit A</u> ¶ 36.

## III.    This Course of Conduct Evidences The Extra-Judicial Bias and Prejudice Displayed By the Panel in this Matter

Throughout this matter, even worse, this Panel has displayed the continuing course of extrajudicial bias and prejudice that mandate recusal under 28 U.S.C. § 144. This is shown through the following.

Mr. Klayman very reasonably moved for a stay of proceedings pending the outcome of Mr. Klayman's challenges to the suspension order and judgment of the District of Columbia Court of Appeals in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Suspension Order") pursuant to his complaint filed in the District of Columbia Superior Court pursuant to D.C. Superior Court Civil Rule 60, *Klayman v. Sataki et al*, 22-CAB-5235 (D.C. Sup. Ct.) (the "Rule 60 Complaint") and his pending Petition for Writ of Mandamus that has been submitted to the Supreme

Court. Exhibit A ¶ 5. This simple, logical request was denied by the Panel twice, including on reconsideration. Exhibit A ¶ 6.

Mr. Klayman brought to the Panel's attention that every single other jurisdiction where reciprocal discipline is at issue has ruled that an order staying consideration pending Mr. Klayman's challenges to the Suspension Order is appropriate. Exhibit A ¶ 7.This includes but is not limited to, most recently, the Supreme Court of Pennsylvania, the U.S. Court of Appeals for the Fifth Circuit, the U.S. District Court for the Northern District of Texas. Other courts where Mr. Klayman is a member have also weighed in and found it appropriate it stay consideration pending Mr. Klayman's challenges to the Suspension Order, as this is clearly in the interest of due process, fundamental fairness and in the administration of justice. Exhibit A ¶ 8.

Mr. Klayman pointed out that granting a stay would simply be the function of the Court providing him with the same non-discriminatory treatment that every other jurisdiction has afforded him by issuing an order staying consideration of reciprocal discipline pending his ongoing challenges to the Suspension Order and that a stay would undeniably allow the issue of reciprocal discipline to be decided in a fair and just manner under due process of law, and is in the interest of judicial efficiency, and furthering justice as a whole. Exhibit A ¶ 9.

This decision is particularly egregious and can only be explained by a deep-seated extra-judicial bias and animus, as the Panel is steadfastly determined to go out of their way  to retaliate against Mr. Klayman - and potentially waste their limited time and resources that can be devoted to their undoubtedly high caseloads - solely in order to harm Mr. Klayman. Exhibit A ¶ 10. There is a reason why every single other unbiased Court rationally chose to stay reciprocal discipline: what is the point of adjudicating this matter now, when there when it all could and likely will be mooted out if and when Mr. Klayman succeeds on his challenges to the Suspension Order? Exhibit D-1, Exhibit A ¶ 11.

In short, there is simply no harm in waiting, as Mr. Klayman is not currently even practicing in this Court. Yet, the Panel is steadfast on, in a retaliatory act, in choosing to use its limited time and resources – and forcing Mr. Klayman to expend the same – on this matter immediately. This simply does not make sense, as every other relevant jurisdiction has clearly recognized, but which the Panel refuses to  follow, due to its clear extra-judicial bias and prejudice. *See* Exhibit D, Exhibit A ¶ 12.

Despite these compelling arguments, the Panel refused to grant Mr. Klayman's simple and logical request, denying him the relief that every other jurisdiction where he practices felt was the prudent and just course of action. Exhibit A ¶ 13. This simply reeks of extrajudicial bias and animus, and despite

having been given two chances to remedy this, the Panel has steadfastly refused to do the correct rational thing, simply because Mr. Klayman is involved. Recusal or disqualification is now the only appropriate avenue of relief.

## **CONCLUSION**

Accordingly, at this point, it cannot even be reasonably disputed that the Panel's steadfast refusal to grant the simple, unintrusive, and prudent request to stay this matter was influenced by animosity and other strong indicia of demonstrated  extra-judicial bias and prejudice. Exhibit A ¶ 14. However, this is not a proper consideration for the Panel, and if the Panel is unable to look past this - which it has proven that it cannot - it must be recused or disqualified in order that Mr. Klayman is able to receive a neutral and unbiased adjudication as is required under the due process, equal protection and other rights constitutionally guaranteed to him.

Thus, this reciprocal discipline matter must be stayed, the current briefing schedule vacated,  and the case reassigned to a fair and neutral Panel, which will ethically adhere to and follow the law and not discriminate and retaliate against Mr. Klayman, as the current Panel has done here.

DATED: February 24, 2023                         Respectfully submitted,


                                                  /s/ Larry Klayman
                                                  Larry Klayman, Esq.

Klayman Law Group, P.A.
7050 W. Palmetto Park Road
Boca Raton, FL 33433
Email: leklayman@gmail.com
Tel: 561-558-5336

*Respondent Pro Se*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limits because, excluding the parts of the document exempted, this document contains 4,401 words.

/s/ Larry Klayman

## CERTIFICATE OF COUNSEL

I hereby certify that this motion is being made in good faith.

/s/ Larry Klayman

# EXHIBIT A

**IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| In re: LARRY ELLIOT KLAYMAN | No: 22-8521 |
| Respondent | (District of Columbia Court of Appeals, No. 20-BG-583) |

## AFFIDAVIT OF  LARRY KLAYMAN PURSUANT TO 28 U.S.C. § 144

I, Larry Klayman, being over eighteen years of age, hereby attest under oath as follows:

1.      I am the Respondent in the above attorney reciprocal discipline proceeding.

2.      I hereby incorporate by reference the substance and contents of my Motion to Recuse or Disqualify the Honorable Gregory G. Katsas, Neomi Rao, and Karen LeCraft Henderson Pursuant to 28 U.S.C. § 144 into this affidavit.

3.      The Honorable Gregory G. Katsas ("Judge Katsas"), the Honorable Neomi Rao ("Judge Rao") and the Honorable Karen LeCraft Henderson ("Judge Henderson") (collectively the "Panel") must be  recused or disqualified pursuant to 28 U.S.C. § 144, which mandates:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

1

4.    The Panel's conduct throughout this matter has more than been egregiously shown to manifest the requisite extrajudicial bias and prejudice that mandates recusal or disqualification under 28 U.S.C. § 144. Additionally, there has been a course of conduct which has permeated this Court generally throughout the years that underscores and evidences this extrajudicial bias and prejudice, and which very likely explains what occurred here.

5.    Importantly, the duty to recuse or disqualify oneself is written prominently into the Code of Conduct for United States Judges, which means that the Judicial Conference, which adopted this Code, had the foresight to recognize that there would be situations like this instant one where such recusal or disqualification would be necessary to ensure that litigants are afforded their constitutional due process and equal protection rights. Code of Conduct for United States Judges 3(C) provides:

> A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

6.    In this proceeding, I very reasonably moved for a stay of proceedings pending the outcome my challenges to the suspension order and judgment of the District of Columbia Court of Appeals in *In re Klayman*, 20-BG-583 (D.C.C.A.)

(the "Suspension Order") pursuant to my complaint filed in the District of Columbia Superior Court pursuant to D.C. Superior Court Civil Rule 60, *Klayman v. Sataki et al*, 22-CAB-5235 (D.C. Sup. Ct.) (the "Rule 60 Complaint") and my pending Petition for Writ of Mandamus that has been submitted to the Supreme Court. Exhibit D-1.

7.     This simple, logical, reasonable, and legally sound request was denied by the Panel twice, including on reconsideration.

8.     This denial was despite the fact that I brought to the Panel's attention that every single other jurisdiction where reciprocal discipline is at issue has ruled that an order staying consideration pending my challenges to the Suspension Order is appropriate.

9.     This includes but is not limited to, most recently, the Supreme Court of Pennsylvania, the U.S. Court of Appeals for the Fifth Circuit, the U.S. District Court for the Northern District of Texas. Other courts where I am a member have also weighed in and found it appropriate to stay consideration pending my challenges to the Suspension Order, as this is clearly in the interest of due process, fundamental fairness and the administration of justice.

10.     I pointed out that granting a stay would simply be the function of the Court providing me with the same non-discriminatory treatment that every other jurisdiction has afforded me by issuing an order staying consideration of reciprocal

discipline pending my ongoing challenges to the Suspension Order and that a stay would undeniably allow the issue of reciprocal discipline to be decided in a fair and just manner under due process of law, and is in the interest of judicial efficiency, and furthering justice as a whole.

11.     This decision is particularly egregious and can only be explained by a deep-seated extra-judicial bias and animus, as the Panel is steadfastly determined to go out of their way to retaliate against me - and potentially waste my and their limited time and resources that can be devoted to their undoubtedly high caseloads - solely in order to harm me.

12.     There is a reason why every single other unbiased Court rationally and fairly chose to stay reciprocal discipline: what is the point of adjudicating this matter now, when there when it all could and likely will be mooted out if and when I succeed on my challenges to the Suspension Order?

13.     There is simply no harm in waiting, as I am not currently even practicing in this Court. Yet, the Panel is steadfast on, in a retaliatory act, choosing to use its limited time and resources – and forcing me to expend the same – on this matter immediately. This simply does not make sense, as every other relevant jurisdiction in this country clearly recognized, but which the Panel refuses to follow, due to its clear extra-judicial bias and prejudice. *See* Exhibit D.

14. Despite these compelling arguments, the Panel refused to grant my simple and logical request, denying me the relief that every other jurisdiction where I practice felt was the prudent, fair, and just course of action.

15. Accordingly, at this point, it cannot even be reasonably disputed that the Panel's steadfast refusal to grant the simple, unintrusive, and prudent request to briefly stay this matter was influenced by animosity and other strong indicia of extra-judicial bias and prejudice towards me due to the history between myself and the judges of this Court and that I had been critical of some of the judges in this Court in the past.

16. The history between me and some of the judges of this Court and in this D.C. Circuit, which has prejudicially influenced its other judges, is no secret, as at a hearing in an unrelated matter where I served as counsel, *Arpaio v. Zucker et al*, 18-cv-2894 (D.D.C.), the Honorable Royce Lamberth ("Judge Lamberth") of the district court and a judge in this D.C. Circuit revealed to me and those who were in the audience, "I haven't had you here in a long time. It's a pleasure to have you again. I know some judges don't say that to you, but I will say it." Exhibit B. This shows that even Judge Lamberth knew of the dislike if not animus that many of his colleagues on the lower and higher courts in the D.C. Circuit had and continue to have for me.

17.    I am the founder of Judicial Watch, Inc, which came into existence on July 29, 1994 – almost 30 years ago – to "watch" and police judges to promote integrity on the federal bench in particular; thus the name "Judicial Watch." I have also been a strong proponent of peaceful January 6, 2021 protesters, which advocacy is at odds with the prevailing pliant and coordinated actions in league with the Biden Justice Department and harsh punishment being meted out unjustifiably by federal judges in this Circuit. I have been critical of the actions of certain judges in this Circuit in this regard and have written about this.

18.    In my latest book titled "It Take a Counter-Revolution: Wake Up America!," published by Post Hill Press and widely available online by all major booksellers, I chronicle the judicial misconduct of several judges in this Circuit.

19.    Federal judges must weather criticism, without fear of retaliation leveled against those lawyers such as myself who feel duty bound in their public interest capacity to level criticism when justified, just as lawyers must weather criticism from these federal judges when justified. This is a healthy give and take to promote integrity in the legal system.

20.    Of course, as the Court is well aware, personal feelings towards a litigant are not a proper consideration for any federal judge in making a ruling. This is, in fact, a key and sacrosanct portion of the oath of office that every federal judge in this Court swore prior to taking the bench:

I do solemnly swear that I will administer justice **without regard to persons**, and do equal right to the poor and to the rich, and that I will impartially discharge and perform all the duties incumbent upon me as judge under the Constitution and laws of the United States. So help me God. 28 U.S.C. § 453 (emphasis added).

21.    Each and every member of the Panel, and in particular Judge Rao, who was the lead Defendant, were named as Defendants in a case styled *Klayman v. Rao et al*, 1:21-cv-02473 (D.D.C.), which sought injunctive relief against the judges of this Court mandating that they conduct a bona fide review of the record in *Klayman v. Judicial Watch, Inc. et al*, 1:06-cv-00670 (D.D.C), which they did not.

22.    Although it is indisputable that there is no judicial absolute immunity for claims of injunctive relief, as I had sought there, *Pulliam v. Allen*, 466 U.S. 522 (1984), it appears that the members of the Panel took umbrage and offense at being named as Defendants in my perfectly legal and viable lawsuit in *Rao*, which has informed their conduct in this matter.

23.    Judge Katsas sat on the panel of the appeal of *Klayman v. Fitton*, 1:19-cv-02793 (D.D.C.), a defamation case that was erroneously dismissed at the pleading, FRCP 12(b)(6) stage, where the Defendants published the false statement that I had been "ousted" from Judicial Watch "because of a sexual harassment complaint" to Roger Stone for him to republish on the internet for the world to see. *Fitton* ECF No. 1 at 7.

24.    This appeal was assigned to a Panel that included the Honorable A. Raymond Randolph ("Judge Randolph"), Judge Katsas, and the Honorable Judith Rogers ("Judge Rogers")

25.    At the oral argument for this appeal, Judge Randolph abruptly, heatedly and angrily interrupted my presentation and outrageously without any factual basis falsely and loudly accused me of and stated that I had been found in *Klayman v. Judicial Watch Inc.*, 06-cv-670 (D.D.C.), presided upon by the Honorable Colleen Kollar-Kotelly ("Judge Kotelly"), to have sexually harassed the office manager of Judicial Watch and also found to have beaten my former wife. Judges Katsas and Rogers incredibly did not step in and intervene while Judge Randolph went on this unethical and unhinged extrajudicial tirade, thereby apparently condoning and ratifying the actions of Judge Randolph.

26.    I vehemently denied that any jury or Judge Kotelly had made any such findings and that a review of the record would bear this out. In any event, as that case involved a jury trial, Judge Kotelly had no authority to make any such findings. Importantly, the jury verdict reflects no such findings and there were no special jury interrogatories given to them by Judge Kotelly. And, I vehemently denied that I had sexually harassed the office manager and beaten my ex-wife!

27.    And, even more importantly, I reminded the Panel that all of this – regardless of whether it was true or not (again, it was not) -- was simply not at

issue and before the Panel. The only issue whether I had plausibly pled defamation by Thomas Fitton, the Appellee/Defendant, under the following cases and other precedent as set forth in my initial and reply briefs. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). All of this was completely extraneous, irrelevant, incendiary, and highly prejudicial.

28.     There is simply no denying that a judge making the allegation that Mr. Klayman was a sexual harasser who had beat his wife during an oral argument which is open to the public and the media – especially when such a false allegation was completely irrelevant and extrajudicial – constitutes "judicial remarks" that "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible" and thus the proper basis for recusal. *Litecky v. United States,* 510 U.S. 540, 555 (1994)

29.     It is clear that this public defamation and abhorrent uncalled for hazing  by Judge Randolph prejudiced and poisoned the rest of the panel, including Judge Katsas, against me. This prompted me to file his Motion to Disqualify the Honorable A. Raymond Randolph Pursuant to 28 U.S.C. § 144. Exhibit C.

30.     In that motion, I moved to recuse Judge Randolph due to the clear extrajudicial bias and prejudice that he openly displayed at the oral argument in baselessly and outrageously accusing me of sexual harassment and beating my ex-

wife. However, Judge Katsas, who was the chief judge for the appeal, chose not to step and in and exercise his authority or much less judgment and do the right thing and as part of the Panel denied my recusal motion.

31.    I gave Judge Katsas and the rest of the Panel another chance to do the right thing in his Petition for Rehearing, <u>Exhibit C</u>, where I argued that Judge Katsas should not take part in consideration because he had been clearly prejudiced and poisoned the Panel by Judge Randolph:

> And, as it is clear that Judge Randolph's unexplainably prejudicial conduct clearly poisoned the rest of the panel against him, Mr. Klayman respectfully requests that the other two judges on the Panel not take part in the en banc process, in the interest of justice and fundamental fairness. <u>Exhibit C</u>.

32.    This was once again summarily denied without any explanation. Thus, Judge Katsas, having been given numerous opportunities to step in and do the right thing, abdicated his judicial oath and chose not to and therefore condoned and ratified the clear misconduct of Judge Randolph, rendering him equally responsible. As a federal judge appointed to sit on the bench at this Court, Judge Katsas has a duty to take action and correct this type of egregious misconduct:

> Code of Conduct for United States Judges 2(A) provides that:

> a judge should respect and comply with the law and should act at all times in a **manner that promotes public confidence in the integrity and impartiality of the judiciary**. (emphasis added).

> Similarly, Code of Conduct for United States Judges 1 states that :

an independent and honorable judiciary is indispensable to justice in our society. **A judge should maintain and enforce high standards of conduct and should personally observe those standards, so that the integrity and independence of the judiciary may be preserved**. (emphasis added).

Code of Conduct 3(A)(1) provides that :

A judge should be faithful to, and maintain professional competence in, the law and should not be swayed by partisan interests, public clamor, or fear of criticism.

Lastly, code of Conduct for United States Judges 3(A)(3) provides that:

A judge should be **patient, dignified, respectful, and courteous** to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity (emphasis added).

33.     Instead of following his duty to act pursuant to the Code of Conduct for United States Judges, Judge Katsas felt it was more important to protect a fellow jurist at the cost of justice, judicial ethics, impartiality, and fairness and in clear violation of these provisions.

34.     Judge Katsas and the panel subsequently retaliated, without any credible basis, and affirmed the egregiously wrong and unsupportable lower court dismissal of my case, despite my having clearly pled defamatory statements published by the Defendants-Appellees of and concerning me, more than sufficient to defeat a  12(b)(6) motion to dismiss, which is all that was at issue. Under the facts and the law, where the only question was whether I had pled what needed to be pled, there was simply no way that this clear-cut case should have been

dismissed, so Judge Katsas and the Panel's decision can only be attributed to bias and prejudice. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The Complaint clearly and unequivocally alleged that Roger Stone published the following statement, implicating Defendant Tom Fitton in the defamation:

> He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He left because of a sexual harassment complaint. *Fitton*, ECF No. 1 at 7.

35.    This is so clearly defamatory that there is no possible way that the Panel could have affirmed dismissal at the motion to dismiss stage without having succumbed to extrajudicial bias and prejudice.

36.    Importantly, Stone directly credits his statement to Fitton, which means that Fitton unequivocally published this statement to Stone for him to republish to the world. Stone says, "[a]sk Tom Fitton why he left." This directly implicates Fitton. If Fitton had not published this false statement to Stone, Stone had no reason to tell the public to "[a]sk Tom Fitton." This, at the very minimum, was enough to deny a motion to dismiss advance this case to the discovery phase, as any unbiased Panel would have found.

37.    Despite all of this, Judge Katsas and the Panel dishonestly affirmed the dismissal by the lower court, a decision so blatantly incorrect and flawed that it could only possibly have been the result of bias and prejudice. Even more, I gave Judge Katsas and the Panel a chance to correct their manifest error in my Petition

for Rehearing En Banc, <u>Exhibit C</u>, but these same judges doubled down and denied that as well, again without a valid basis. Thus, given the outcome of this case, Judge Katsas has clearly more than satisfied the standard for recusal under *Liteky*, and he, along with the rest of the Panel presiding over this reciprocal discipline proceeding, must be recused or disqualified.

I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge and belief.

*/s/ Larry Klayman*
Larry Klayman Appellant
/Plaintiff Pro Se

# EXHIBIT B

                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

     * * * * * * * * * * * * * * * *
JOSEPH MICHAEL ARPAIO,            )
                 Plaintiff,       )   Civil Action
vs.                               )   No. 18-2894
                                  )
JEFF ZUCKER, et al.,              )   July 25, 2019
                                  )
                 Defendants.      )   10:36 a.m.
                                  )   Washington, D.C.
                                  )
     * * * * * * * * * * * * * * * *


                 **TRANSCRIPT OF MOTION HEARING**
           **BEFORE THE HONORABLE ROYCE C. LAMBERTH,**
           **UNITED STATES DISTRICT COURT SENIOR JUDGE**

**APPEARANCES:**

**FOR THE PLAINTIFF:**        LARRY E. KLAYMAN
                              2020 Pennsylvania Avenue, NW
                              Suite 800
                              Washington, DC 20006
                              (310) 595-0800
                              Email: Leklayman@gmail.com


**FOR J. ZUCKER,**            STEPHEN J. FUZESI
**C. CUOMO and CNN:**         KEVIN TAYLOR BAINE
                              NICHOLAS G. GAMSE
                              725 12th St. NW
                              Washington, DC 20005
                              (202) 434-5010
                              Email: Sfuzesi@wc.com


**FOR K. ROBILLARD,**         JEAN-PAUL JASSY
**HUFFINGTON POST:**          JASSY VICK CAROLAN LLP
                              800 Wilshire Boulevard, Suite 800
                              Los Angeles, CA 90017
                              310-870-7048

                   **(APPEARANCES CONTINUED)**

**APPEARANCES (continued)**:


-AND-

                    LAURA FRAHER
                    SHAIRPO, LIFSCHITZ & SCHRAM, PC
                    1742 N Street, NW
                    Washington, DC 20036-2912
                    (202) 689-1900
                    Email: Fraher@slslaw.com



**FOR ROLLING STONE,**   ALISON SCHARY
**TESSA STUART:**         Davis Wright Tremaine LLP
                         1919 Pennsylvania Avenue, N.W.
                         Suite 800
                         Washington, DC 20006
                         (202) 973-4248
                         Email: Alisonschary@dwt.com




Court Reporter:        Elizabeth Saint-Loth, RPR, FCRR
                       Official Court Reporter
                       Washington, D.C.  20001



            Proceedings reported by machine shorthand,
        transcript produced by computer-aided transcription.

```
 1                    THE COURT:  Thank you very much, Mr. Jassy.

 2                    MR. JASSY:  Thank you, Your Honor.

 3                    THE COURT:  All right.  Mr. Klayman.

 4                    MR. KLAYMAN:  Thank you, Your Honor.

 5                    THE COURT:  I haven't had you here in a long time.

 6          It's a pleasure to have you again.  I know some judges don't

 7          say that to you, but I will say it.

 8                    MR. KLAYMAN:  Mutual, Your Honor.

 9                    At the outset, Your Honor, I want to point out an

10          inaccuracy by CNN's counsel; perhaps they inadvertently made

11          a mistake.  But, in paragraph 22, we allege:  As of today,

12          the CNN broadcast is still available through defendant's

13          CNN's website, and no efforts have been taken by defendant

14          CNN, defendant Cuomo, or defendant Zucker to correct this

15          false statement.  So, yes, it is in the complaint that this

16          is still up on the website.

17                    THE COURT:  The original?

18                    MR. KLAYMAN:  The original.

19                    THE COURT:  The original four-minute segment --

20                    MR. KLAYMAN:  Which does not have the correction

21          by Chris Cuomo at the end.

22                    THE COURT:  Okay.

23                    MR. KLAYMAN:  Now, let me get into this particular

24          issue, and I will move on generally.

25                    Once something goes up on the Internet, it
```

# EXHIBIT C

CASE NO. 21-7125

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

LARRY KLAYMAN

Plaintiff-Appellant,

v.

THOMAS J. FITTON, *et al*

Defendants-Appellees.

---

ON APPEAL FROM AN ORDER
OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**APPELLANT/PLAINTIFF LARRY KLAYMAN'S MOTION TO
DISQUALIFYTHE HONORABLE A. RAYMOND RANDOLPH
PURSUANT TO 28 U.S.C. § 144**

---

Larry Klayman
7050 W. Palmetto Park Rd
Boca Raton, FL 33433
Tel: (561) 558-5336
Email: leklayman@gmail.com

*Plaintiff-Appellant Pro Se*

Date: October 7, 2022

Appellant/Plaintiff Larry Klayman ("Mr. Klayman"), pursuant to 28 U.S.C. §144 *et. seq*., hereby moves to disqualify the Honorable A. Raymond Randolph ("Judge Randolph").

28 U.S.C. § 144 provides:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

For the compelling reasons set forth in the attached affidavit of Larry Klayman, Judge Randolph must be disqualified from further deliberations in this case and the other two panel members, who may have been tainted by the unjustified and baseless extra-judicial attacks and prejudice exhibited by Judge Randolph at oral argument with regard Mr. Klayman, must consider whether they should not refer this entire appeal to another panel of this Court.

This appeal involves whether Mr. Klayman sufficiently pled defamation in his complaint, and only that. There is no issue before this Court of *res judicata* and/or collateral estoppel based on a case previously administered to by the

Honorable Colleen Kollar-Kotelly in *Klayman v. Judicial Watch Inc*, 06-cv-670 (D.D.C.) and thus the false and highly offensive statements of Judge Randolph at oral argument had no basis other than to exhibit extreme extra-judicial bias and prejudice toward Mr. Klayman.

This Court must not "circle the wagons" and dismiss the substance of this motion because a fellow member or members of its bar are involved, as the integrity of the judicial process is at stake. This is a serious matter that must be confronted and dealt with before further prejudice results to Mr. Klayman. It is not just that Mr. Klayman is outraged by the unjustified attack on him by a member of this Court, but also because he believes in the integrity of the legal system. Indeed, this is why he founded both Judicial Watch and later Freedom Watch and why he has dedicated his career to attempting to further this objective.

Further, Mr. Klayman requests an internal investigation of potential *ex parte* contacts and/or other causes for the extra-judicial prejudice that was manifested at oral argument, and the false statements made in an open courtroom and then also published on the Court's YouTube channel for anti-conservative media to the potentially republish to harm Mr. Klayman, his colleagues and family. This raises the specter of whether these published false statements were intended for this purpose.

As a result, this matter should respectfully also be referred to the Judicial Council and other independent authorities by the other two members of the panel and its findings fully disclosed after a good faith, thorough and neutral investigation.

Dated: October 7, 2022                    Respectfully Submitted,

                                          /s/ Larry Klayman
                                          Larry Klayman, Esq.
                                          7050 W. Palmetto Park Rd
                                          Boca Raton, FL, 33433
                                          Tel: (561) 558-5336
                                          Email: leklayman@gmail.com

                                          *Plaintiff-Appellant Pro Se*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties listed below on October 7, 2022.

                                          /s/ Larry Klayman

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because this document contains 545 words.

2.      This document complies with the typeface and the type-style requirements of Fed. R. App. P. 27(d)(1)(E) because this document has been

prepared in a proportionally spaced typeface using Microsoft Word 15.28 in 14-point Times New Roman.

/s/ Larry Klayman

**<u>CERTIFICATE OF COUNSEL</u>**

I hereby certify that this motion is being made in good faith.

/s/ Larry Klayman

## AFFIDAVIT OF PLAINTIFF LARRY KLAYMAN PURSUANT TO 28 U.S.C. § 144

I, Larry Klayman, being over eighteen years of age, hereby attest under oath as follows:

1.    I am the Appellant/Plaintiff in the above styled lawsuit.

2.    On October 4, 2022, I appeared in person before this honorable Court before a Merits Panel which consisted of the Honorable A. Raymond Randolph ("Judge Randolph"), the Honorable Gregory G. Katsas and the Honorable Judith W. Rogers for oral argument in the above-styled case.

3.    A certified copy of a transcript of this oral argument is attached as Exhibit 1 and its contents are incorporated herein by reference.

4.    Shortly after I began my oral argument, the Judge Randolph abruptly, heatedly and angrily interrupted my presentation and stated I had been found, in a case styled *Klayman v. Judicial Watch Inc.*, 06-cv-670 (D.D.C.), presided upon by the Honorable Colleen Kollar-Kotelly, to have sexually harassed the office manager of Judicial Watch and also found to have beaten my former wife. I vehemently denied that any jury or Judge Kotelly had made any such findings and a review of the record will bear this out. In any event, as this was a jury trial, Judge Kotelly had no authority to make any such findings. Importantly, the jury verdict reflects no such findings and there were no special jury interrogatories given to

them by Judge Kotelly. *See* Exhibit 2, which jury verdict is also incorporated herein by reference.

5.    Judge Randolph clearly and forcefully implied that these alleged false findings were a reason to deny my appeal, which is predicated only on the improper dismissal of the underlying defamation complaint pursuant to Rule 12 (b)(6) of the Federal Rules of Civil Procedure.

6.    I responded that Judge Randolph must have been prejudiced by extrajudicial sources as his unwarranted accusations were false and had no basis in fact and law. He then suggested that they could be found in media publications, as if this means that they are true. And, I have no recollection of any such media publications.

7.    In response, I reminded the Court that this is not what is at issue and before this honorable Court; only whether I had plausibly pled defamation by Thomas Fitton, the Appellee/Defendant, under the following cases and other precedent as set forth in my initial and reply briefs. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).

8.    At the oral argument, I also pointed out how case authority supported the legal principle that at the initial pleading stage I did not have to plead with precise specificity the exact date of the publication under the following precedent,

but that it was plausibly around the time of the republication of Roger Stone. Accordingly, this was sufficient at this stage of the case before any discovery could take place.

9.     In this regard, as courts have ruled, "[m]oreover, it is important to recognize that while some cases appear to state an absolute requirement for time and place allegations, **such requirement is better viewed through the lens of *Twombly* and *Iqbal*.** For instance, the undersigned recognized the requirement in *Mandawala* through reliance on two older cases affirmed by the Fifth Circuit. But the defamation claim failed for lack of any allegation 'that any statement was published to a third party.'…. **The Court thus applied the *Iqbal* and *Twombly* standard without regard to time and place allegations**. **Similarly, the Eastern District of Texas found that the plaintiff had 'pled its defamation claim with sufficient particularity' to put the defendant 'on notice of the claim,' even though 'the allegations relating to the defamation claim do not specify when these alleged statements were made or, with regards to the letters to patients, to whom they were specifically made**.'" *Cantu v. Guerra*, 2021 U.S. Dist. LEXIS 119681, at *41-42 (W.D. Tex. June 28, 2021 (emphasis added)(internal citations omitted).

10.     Furthermore, "[i]t should be understood that Federal Rule of Civil Procedure 9(f) does not require the pleader to set out specific allegations

of time and place; it merely states the significance of these allegations when a pleader actually interposes them in a complaint or answer. Whether statements of time and place are required in a pleading is determined by the substantive nature of the suit, the principles governing the motion for a more definite statement, and the general rules of pleading. Such allegations usually are necessary (only) if without them the statement of a claim is so vague and ambiguous that the other party cannot adequately frame an answer." *Cantu v. Guerra*, 2021 U.S. Dist. LEXIS 119681, at \*42-43 (W.D. Tex. June 28, 2021) quoting 5A Charles Alan Wright et al., Federal Practice and Procedure § 1309 (4th ed. Apr. 2021 update).

11.    The above argument notwithstanding, it is clear that Judge Randolph's factually false and highly prejudicial accusations against me were the result of an extra-judicial source or sources and that the law will likely not be a consideration in his rendering his opinion as a current member of the Merits Panel, but rather his extra-judicial prejudicial animus for me.

12.    Judge Randolph's unjustified, false and highly offensive attack on me has likely tainted the entire proceeding with the other two honorable jurists, and he must be disqualified from further deliberations or participation in this case.

13.    Further, counsel for Appellee/Defendant Richard Driscoll was not honest with his false representation (just the latest as the record below will show others for which I had sought sanctions but which Judge Kotelly refused to order),

that this case initially filed in the U.S. District Court for the Southern District of Florida was dismissed on the merits. In fact, the record shows the opposite and the docket sheet is attached as <u>Exhibit 3</u>. Thus, the record will show that this case was dismissed without prejudice as the Honorable Jose E. Martinez had merely found that the Defendants did not have substantial contacts with Florida. The short two-hour deposition that I took of Mr. Fitton was ordered only to involve the issue of whether there was personal jurisdiction. In any event, if Judge Martinez had reached the merits of the case, Appellees/Defendants would have asserted *res judicata* in seeking to dismiss the case before the Honorable Tonya Chutkan, which they did not. Thus, counsel for Mr. Fitton lied to this honorable Court obviously to deceive the Merits Panel and attempt to have it to rule in his client's favor.

14.    A review of the transcript of the oral argument of October 4, 2022, will bear this out as well.

I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge and belief.

*/s/ Larry Klayman*
Larry Klayman Appellant
/Plaintiff Pro Se

# EXHIBIT 1

UNITED STATES COURT OF APPEALS FOR THE

DISTRICT OF COLUMBIA CIRCUIT

CASE NO. 21-7125


LARRY ELLIOT KLAYMAN, Individually,

     Appellant,

v.

THOMAS J. FITTON, Individually;
JAMES F. PETERSON, PAUL J. ORFANEDES,
Individually; and CHRISTOPHER FARRELL,
Individually.

     Appellees.

_____/



TRANSCRIPTION OF ORAL ARGUMENT HELD BEFORE

JUDGE KATSAS, JUDGE RANDOLPH, AND JUDGE ROGERS

(Pages 1 to 21)


Date:     Tuesday, October 4, 2022
Time:     9:30 a.m. to 9:50 a.m.
Location:  DC Court of Appeals
          430 E St NW
          Washington, DC  20001


Transcription By:  Gail Hmielewski
                  Court Stenographer

```
 1   ALL PARTIES APPEARED VIA VIDEOCONFERENCE:

 2

 3   Appeared for the Appellant:

 4   LARRY E. KLAYMAN, ESQUIRE, PRO SE
     KLAYMAN LAW GROUP, P.A.
 5   7050 West Palmetto Park Road
     Boca Raton, Florida  33433
 6   310-595-0800
     leklayman@gmail.com
 7

 8   Appeared for the Appellees:

 9   RICHARD WAYNE DRISCOLL, ESQUIRE
     DRISCOLL & SELTZER, PLLC
10   2000 Duke Street
     Suite 300
11   Alexandria, VA  22314
     703-822-5001  Phone
12   703-997-4892  Fax

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    INDEX OF PROCEEDINGS

2

3                                                        PAGE

4

PROCEEDINGS                                            4

CERTIFICATE OF REPORTER                                21

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    (This is a transcription of proceedings via a
     YouTube link.  The YouTube link was provided by
2    Larry E. Klayman.)

3                      PROCEEDINGS

4         THE CLERK:  Case No. 21-7125, Larry Elliot

5    Klayman, Individually, Appellant, v. Thomas J.

6    Fitton, Individually, et al.; Mr. Klayman for the

7    appellant, Mr. Driscoll for the appellees.

8         MR. KLAYMAN:  Good morning, Your Honors.  May

9    I ask for leave to remove my mask?  I took a test

10   on Friday, I travelled here over the weekend and I

11   did not get the result until yesterday and I'm

12   negative.

13        THE COURT:  And you're negative?

14        MR. KLAYMAN:  Yes.

15        THE COURT:  All right.

16        MR. KLAYMAN:  Thank you very much.  May it

17   please the Court, a pleasure to appear in front of

18   you, all three.

19        This is a case involving defamation.  The

20   statement at issue is that "He" - Klayman, yours

21   truly - "was ousted at Judicial Watch.  Ask Tom

22   Fitton why he left.  He left because of a sexual

23   harassment complaint."

24        This was allegedly published, as pled in the

25   complaint, by Tom Fitton of Judicial Watch for
```

```
 1        Roger Stone, who then republished it on Info Wars.

 2        The law is clear that it's sufficient just to have

 3        one publication to one person, here we had two.

 4             In fact, the law of defamation in the district

 5        says it simply must be published through a third

 6        party.  That's Competitive Enter. Institute v.

 7        Mann, 180 A.3d 1213, 1240 (D.C. 2016).  As well as

 8        the restatement of torts, it is enough that it's

 9        communicated to a single individual other than the

10        one defamed.  Here you have two publications here.

11             And we also alleged in the complaint that

12        there was a surrogate publication, Stone was

13        publishing it on behalf of Fitton.

14             THE COURT:  What's the basis for your

15        allegation that Fitton was the source of Stone's

16        statement?

17             MR. KLAYMAN:  It says - this was the

18        publication - ask Fitton, so obviously he got it

19        from Tom Fitton.

20             (Inaudible.)

21             THE COURT:  How do we know that?  I mean, this

22        is about the circumstances in which - under which

23        you left Judicial Watch and that had been the

24        subject of a very public trial that had been

25        ongoing for a decade, so --
```

6

```
 1            MR. KLAYMAN:  It has never been proven that I
 2      sexually harassed the office manager.  I
 3      categorically deny that.
 4            But the bottom line here, Your Honor, is, if
 5      it's plausible, it must proceed, under Rule 9 --
 6            THE COURT:  Do you deny --
 7            MR. KLAYMAN:  -- and 8.
 8            THE COURT:  Do you deny that you physically
 9      assaulted your wife?
10            MR. KLAYMAN:  This has nothing to do with this
11      case and I do deny that vehemently.  I deny it --
12            THE COURT:  The jury found --
13            MR. KLAYMAN:  -- vehemently.
14            THE COURT:  The jury found otherwise in the
15      case.
16            MR. KLAYMAN:  The jury never made such a
17      finding, Your Honor.  The jury never made such a
18      finding.  One of the problems that we've had here,
19      this is a --
20            THE COURT:  Why did the jury then award
21      Judicial Watch two point some million dollars
22      against you?
23            MR. KLAYMAN:  That's still being challenged,
24      Your Honor, but the fact is is that there was
25      prejudice because that came in, it never should
```

```
 1    have come in.  I left voluntarily.  There was a

 2    severance agreement that said I left voluntarily.

 3    I was praised.  The parole evidence rule should

 4    never have allowed it in.

 5         THE COURT:  The point is, the point here is

 6    that, and I think this is what Judge Katsas was

 7    asking you about, was that this was spread all over

 8    the newspaper a year before Roger Stone made the

 9    statement you're complaining about - all this

10    information, the jury verdict, the evidence that

11    came in and so on - so it seems to me that your

12    submission that the only way that Stone could have

13    known this is from Fitton is belied by the fact

14    that it was a public trial.

15         MR. KLAYMAN:  First of all, Your Honor, you're

16    getting way beyond this case, okay.  You have been

17    prejudiced yourself here from third parties and

18    other sources.  I'm not saying you're a prejudiced

19    person, but you've been prejudiced.  This case --

20         THE COURT:  Wait a minute.

21         MR. KLAYMAN:  There's no claim of res judicata

22    here.

23         THE COURT:  Wait.  Why have I been prejudiced?

24    You're making an accusation.

25         MR. KLAYMAN:  I'm saying not --
```

```
 1              THE COURT:  Back it up.
 2              MR. KLAYMAN:  I'm not saying that you have
 3     been prejudiced as a person, I'm saying that the
 4     things that you have been, that have been out there
 5     in the alleged media --  And it wasn't even out in
 6     the media, Your Honor, you'd have to go back and
 7     look at that.
 8              THE COURT:  You think because I read an
 9     opinion of our court that that prejudiced me?
10              MR. KLAYMAN:  The opinion did not say that.
11     It did not say that, Your Honor.  It's never been
12     found --
13              THE COURT:  The opinion --
14              MR. KLAYMAN:  -- that I sexually harassed --
15              THE COURT:  The opinion --
16              MR. KLAYMAN:  -- my office manager.
17              THE COURT:  Don't interrupt me when I'm trying
18     to interrupt you.
19              MR. KLAYMAN:  Do I have equal rights?
20              THE COURT:  The opinion said that the big
21     issue before the jury was whether you left Judicial
22     Watch voluntarily.  The opinion said it.
23              MR. KLAYMAN:  The opinion did not say anything
24     about sexually harassing the office manager,
25     Your Honor.  I ask respectfully that you go back
```

9

```
1        and read that.  It did not say that.  In any
2        event --
3              THE COURT:  Well, neither did Roger Stone.
4              MR. KLAYMAN:  I'm entitled to plead in my
5        complaint and make a claim in my complaint there's
6        no defense of res judicata, collateral estoppel or
7        anything.  Under Twombly, as long as it's
8        plausible, the matter has to proceed.
9              And here's what Twombly said:  The complaint
10       must contain enough factual matter, taken as true,
11       to suggest - this is dealing with an agent - an
12       agreement in restraint of trade in an antitrust
13       case.  Asking for plausible grounds to infer an
14       agreement does not impose a probability requirement
15       at the pleading stage; it simply calls for enough
16       facts to raise a reasonable expectation that
17       discovery will provide evidence of an illegal
18       agreement.  You must only plead enough to cause a
19       right to relief above the speculative level.  If
20       given the defendant fair notice of what the claim
21       is and the grounds upon which it rests.
22             It only must be plausible, Your Honor.
23       Plaintiff need not allege specific facts.  The
24       facts alleged must be accepted as true, as the
25       facts need only give the defendant fair notice of
```

```
 1      what the claim and the grounds upon which it rests,
 2      Erikson v. Pardus, 551 U.S. 89, 93.
 3           And then Twombly adds, going back to Twombly,
 4      the well pled complaint may proceed even if it
 5      strikes a savvy judge that actual proof of those
 6      facts is improbable and that a recovery is very
 7      remote and unlikely.
 8           We pled, I pled what needed to be pled,
 9      Your Honor, and I don't mean any disrespect to you,
10      but what has occurred here over the years - and I
11      have a defamation judgment against Judicial Watch
12      going back to Miami in 2014 - has prejudiced me.
13      I'm not saying you're a prejudiced person, not at
14      all.  I've had issues with judges in this court,
15      particularly Judge Kotelli, and I sometimes get the
16      impression that the judges in this court circle the
17      wagon.
18           There was no such finding that I sexually
19      harassed the office manager, even Judicial Watch
20      didn't make that at that trial.  There was no
21      finding that I in any way abused my wife.  I'm
22      desirous of equal rights here.  There's no finding
23      to that effect, and I pled what needed to be pled
24      in this complaint.  The complaint must proceed.
25           You're here with an oath of office to follow
```

```
1            the law.  The law does not enter into what you may

2            think a jury found in another case, because there's

3            no such jury finding.  There are no specific jury

4            interrogatories and, if you want to get back into

5            that case, I don't even know what was given to the

6            jury in terms of the written instructions, but

7            there's no such finding there.  I categorically

8            deny that.  I'm entitled to equal rights here,

9            Your Honor, and the fact that I've been smeared

10           here and there's enough --

11                THE COURT:  The entire subject --

12                MR. KLAYMAN:  There's enough here --

13                THE COURT:  Mr. Klayman, the entire subject

14           came up because you said that the only way that

15           Roger Stone could have possibly come up with the

16           idea that you were - that you left Judicial Watch,

17           that you were ousted, the only way that he could

18           possibly have known that is through Mr. Fitton, but

19           the relevance of the prior decision in this Court

20           and the jury trial was that there was another way -

21           because of your earlier trial.  That was the issue

22           according to the opinion.

23                MR. KLAYMAN:  I wasn't trying that,

24           Your Honor.  That wasn't an allegation in the case.

25           It was brought in trial, Judge Kotelli let it in
```

```
1       out of the blue, it was prejudicial, and even the
2       statement that came in wasn't that I had sexually
3       harassed the office manager.  That was not the
4       statement that came in.
5            And if you're looking at the actual
6       publication here - Klayman was ousted at Judicial
7       Watch, ask Tom Fitton - it's more than plausible
8       that Fitton said that to Stone and that's enough
9       for a defamation case.
10           You are bound under Rule 9 and 8 to allow this
11      to proceed and you're bound under Twombly.  You
12      don't get to decide a case before it goes to
13      discovery and goes to a jury.  You don't get to do
14      that.  That's not a judge's role.
15           And I'm sorry if I'm being emphatic, but this
16      is exactly what's been happening in a lot of
17      different cases, not just with regard to me, but
18      every - judges taking cases away from discovery and
19      from juries, then making a decision, which the
20      constitution gives a party a right to at least
21      plead in a complaint and take discovery.
22           And I would like to get into telephone
23      records, I want to talk to other people here as to
24      what was said.  I have a right to do that, that's
25      my constitutional right.  And I'm sorry if I'm
```

```
 1      upset, but frankly, you know, to rule otherwise is
 2      a severe injustice.
 3            THE COURT:  Judge Rogers, any questions?
 4            JUDGE ROGERS:  No.
 5            THE COURT:  Thank you.  Anything else?
 6            MR. KLAYMAN:  No.  I thought maybe
 7      Judge Rogers wanted to say something.
 8            (Inaudible.)
 9            THE COURT:  Mr. Driscoll, we'll hear from you.
10            MR. DRISCOLL:  Good morning, Your Honors.  May
11      it please the Court, Rich Driscoll on behalf of the
12      appellees, Thomas Fitton, James Peterson, Paul
13      Orfanedes, and Christopher Farrell.
14            Neither party before the Court this morning is
15      arguing for a change in the law.  The issue before
16      the Court is whether the law was properly applied
17      in the lower court.
18            I think the Court needs only look at Page 9 of
19      the joint appendix, in Paragraph 12, to read the
20      allegation regarding who made the alleged
21      defamatory statement, which reads, on information
22      and belief, the defamatory statement alleged herein
23      were made by Defendant Peterson and/or Defendant
24      Fitton at the direction of or directly by the other
25      direction - the other defendants to Stone.
```

```
 1              THE COURT:  Twombly and Iqbal didn't eliminate
 2         pleading on information and belief, right?
 3              MR. DRISCOLL:  No, sir, they did not.
 4              THE COURT:  So why isn't, for that kind of
 5         allegation, why isn't it enough for him just to say
 6         on information and belief Fitton made the
 7         statement?  I mean --
 8              (Inaudible.)
 9              MR. DRISCOLL:  Under the law of this
10         jurisdiction, and I believe the case Franklin v.
11         Pepco Holdings, the standard of allegation for
12         establishing a defamatory statement is that the
13         plaintiff must allege the time, the place, the
14         content, the speaker, and the listener.  And here
15         that may have been done with regard to the
16         statement made by Roger Stone, but it is not done
17         with regard to any of the defendants, and in fact
18         this Court agreed that, at least with regard to
19         Appellants (sic) Peterson, Orfanedes, and Farrell,
20         that that is correct, there was no allegation.  And
21         in the complaint, the only distinction between the
22         allegations against those three defendants and
23         Appellant (sic) Fitton is the allegation "ask Tom
24         Fitton".
25              So the question then becomes does the phrase
```

1      "ask Tom Fitton" push this case over the line from

2      a possible claim to a plausible claim under Twombly

3      and Iqbal.

4          THE COURT:  I understand your argument that

5      that inference is not a plausible one.  I guess I'm

6      asking whether you even need to make that

7      inference.

8          I mean, suppose you were suing Mr. Klayman and

9      you allege that he's a resident of Florida and you

10     don't say anything more, right, and he says, well,

11     what's your basis, what's your basis for saying

12     that?  And your position would be you don't need

13     any more, it's just a historic fact and you allege

14     it.

15         MR. DRISCOLL:  Well, because --

16         THE COURT:  And why isn't that --  I mean,

17     inferring a conspiracy, an antitrust conspiracy,

18     which is Twombly, or inferring discrimination,

19     which is Iqbal, seem a little bit different from

20     just a historic fact that "A" made a statement to

21     "B".

22         MR. DRISCOLL:  Under the law of defamation in

23     the District of Columbia, a blanket statement of

24     "A" said this to "B" without more is insufficient,

25     inadequate, and does not reach the level of

```
 1        plausibility.  It's a possibility, but it's not

 2        plausible because what you must know is who said

 3        the statement, okay?

 4             So let's assume he doesn't know exactly who

 5        said the statement.  Let's assume it's one of the

 6        four appellees.  How does he know it's one of the

 7        four appellees?

 8             In the complaint there's not even an

 9        allegation with regard to three of the appellees

10        and the only specific factual allegation in the

11        complaint is that Roger Stone said "ask Tom

12        Fitton".  Other than that, the complaint is

13        completely rife with conclusions - not facts,

14        conclusions.

15             To say that the defendants acted in concert is

16        a descriptive conclusion, it's not a fact, so you

17        can't allege that without an underlying event of

18        fact or an occurrence to support it, and here the

19        appellees are emphasizing that the complaint lacks

20        those predicate facts on which to build a summary

21        allegation that a defamatory statement was made.

22        Here we're dealing with pure speculation, based on

23        a historical animosity by Mr. Klayman against

24        Mr. Fitton and others at Judicial Watch.

25             It's --  When you look at the complaint and
```

```
 1          you read each paragraph through, the complaint
 2          really boils down to Roger Stone said that and the
 3          only way he could know how to say that is if Tom
 4          Fitton told him, and even that predicate argument
 5          fails because Tom Fitton has admitted under oath in
 6          a deposition that that's not the reason Larry
 7          Klayman was forced out of Judicial Watch.
 8               And Mr. Klayman filed this same lawsuit in the
 9          Southern District of Florida and it was dismissed
10          by Judge Martinez, who found - we've quoted the
11          language in our brief - Judge Martinez found that
12          there was no tortious or wrongful conduct in
13          Florida, and the law of Florida, the long-arm
14          jurisdiction law of Florida, can encompass both an
15          act in Florida or an act outside of Florida
16          directed at Florida.  So at least with regard to
17          Florida, we know, based on Judge Martinez's
18          argument, that there is no wrongful conduct here.
19               But in order to reach that point, Mr. Klayman
20          was allowed to depose Tom Fitton for two hours and
21          ask these questions of him.  He's not here before
22          the Court without having had an opportunity for
23          discovery.  He's deposed Roger Stone, he's deposed
24          Thomas Fitton.  He has nothing.  And there's no
25          reason why he should be given another opportunity
```

```
 1        to harass the defendants in this case.

 2            That's the position that we argued in the

 3        lower court and it was accepted by Judge Chutkan,

 4        and we believe that Judge Chutkan's decision is

 5        correct and should be affirmed.

 6            THE COURT:  Okay.  Judge Rogers?

 7            JUDGE ROGERS:  No.  Thank you.

 8            MALE VOICE:  Thank you.

 9            MALE VOICE:  Okay, thank you.

10            MR. KLAYMAN:  Your Honor, the law is clear

11        that you just have to have a plausible claim and

12        when someone says "ask Tom Fitton", it's

13        plausible.

14            A specific date is likely in and about the

15        time that Roger Stone republished the event, but

16        even that is not required in terms of the eventual

17        pleading, and you can look at the cases that state

18        that - 2020 U.S. Dist., D-i-s-t, Lexis 161295,

19        2020 WL 525024 at 8, wherein it says, and this is a

20        case coming out of the Western District of Texas,

21        "Similarly, the Eastern District of Texas found

22        that plaintiff had 'pled its defamation claim with

23        sufficient particularity' to put defendant 'on

24        notice of the claim,' even though 'the allegations

25        relating to the defamation claim do not specify
```

1      when these alleged statements were made or, with

2      regards to the letters to patients, to whom they

3      were specifically made.'"  Also you can look to the

4      case of Cantu, C-a-n-t-u, v. Guerra, 2021 U.S.

5      Dist. Lexis 119681, at 42 to 43, also Western

6      District of Texas.

7           We pled all that needed to be pled here,

8      Your Honor.  And we also stated, yes, that the

9      defendants made these statements and we pointed

10     out that Fitton was the one who was in fact

11     fingered, for lack of a better word, by Roger Stone

12     for having made it, and that's enough to go

13     forward.

14          In terms of discovery, you know, this was a

15     misstatement by Mr. Driscoll, regrettably, because

16     the case was dismissed in Florida for personal

17     jurisdiction.  The judge never got to the merits.

18          And to have Fitton simply deny it, that's not

19     discovery.  I get to take a look at telephone

20     records, I get to talk to other people, I get to

21     see text messages and other things like that.

22     Obviously people are going to deny it, so that's

23     not demonstrative.

24          So, Your Honor, we ask that you allow the case

25     to proceed forward, respectfully, everybody,

```
 1        including Judge Randolph.  You are required to do

 2        that under Twombly.  Thank you.

 3               THE COURT:  Thank you.  The case is submitted.

 4               (The proceedings concluded at 9:50 a.m.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                C E R T I F I C A T E

 2

 3

 4    DISTRICT OF COLUMBIA COUNTY, D.C.

 5

 6        I, Gail Hmielewski, Court Stenographer, do hereby

 7    certify that the foregoing transcript, Pages 1 to and

 8    including 20, is a true and correct transcript of

 9    audiotape proceedings accessed via YouTube.

10

11        The YouTube link was provided to me by

12    Larry E. Klayman, Esquire, and transcribed to the best

13    of my ability.

14

15        Dated this 5th day of October, 2022.

16

17

18

19    _____

20    Gail Hmielewski, Court Stenographer

21

22

23

24

25
```

## A

**A.3d** 5:7
**a.m** 1:19,19 20:4
**ability** 21:13
**abused** 10:21
**accepted** 9:24
 18:3
**accessed** 21:9
**accusation** 7:24
**act** 17:15,15
**acted** 16:15
**actual** 10:5 12:5
**adds** 10:3
**admitted** 17:5
**affirmed** 18:5
**agent** 9:11
**agreed** 14:18
**agreement** 7:2
 9:12,14,18
**al** 4:6
**Alexandria** 2:11
**allegation** 5:15
 11:24 13:20
 14:5,11,20,23
 16:9,10,21
**allegations**
 14:22 18:24
**allege** 9:23 14:13
 15:9,13 16:17
**alleged** 5:11 8:5
 9:24 13:20,22
 19:1
**allegedly** 4:24
**allow** 12:10
 19:24
**allowed** 7:4
 17:20
**and/or** 13:23
**animosity** 16:23
**antitrust** 9:12
 15:17
**Appeals** 1:1,19
**appear** 4:17
**Appeared** 2:1,3
 2:8
**appellant** 1:6

2:3 4:5,7 14:23
**Appellants**
 14:19
**appellees** 1:11
 2:8 4:7 13:12
 16:6,7,9,19
**appendix** 13:19
**applied** 13:16
**argued** 18:2
**arguing** 13:15
**argument** 1:14
 15:4 17:4,18
**asking** 7:7 9:13
 15:6
**assaulted** 6:9
**assume** 16:4,5
**audiotape** 21:9
**award** 6:20

## B

**B** 15:21,24
**back** 8:1,6,25
 10:3,12 11:4
**based** 16:22
 17:17
**basis** 5:14 15:11
 15:11
**behalf** 5:13
 13:11
**belied** 7:13
**belief** 13:22 14:2
 14:6
**believe** 14:10
 18:4
**best** 21:12
**better** 19:11
**beyond** 7:16
**big** 8:20
**bit** 15:19
**blanket** 15:23
**blue** 12:1
**Boca** 2:5
**boils** 17:2
**bottom** 6:4
**bound** 12:10,11
**brief** 17:11
**brought** 11:25

**build** 16:20

## C

**C** 21:1,1
**C-a-n-t-u** 19:4
**calls** 9:15
**Cantu** 19:4
**case** 1:3 4:4,19
 6:11,15 7:16
 7:19 9:13 11:2
 11:5,24 12:9
 12:12 14:10
 15:1 18:1,20
 19:4,16,24
 20:3
**cases** 12:17,18
 18:17
**categorically** 6:3
 11:7
**cause** 9:18
**CERTIFICATE**
 3:5
**certify** 21:7
**challenged** 6:23
**change** 13:15
**Christopher** 1:9
 13:13
**Chutkan** 18:3
**Chutkan's** 18:4
**circle** 10:16
**CIRCUIT** 1:2
**circumstances**
 5:22
**claim** 7:21 9:5
 9:20 10:1 15:2
 15:2 18:11,22
 18:25
**claim,'** 18:24
**clear** 5:2 18:10
**CLERK** 4:4
**collateral** 9:6
**Columbia** 1:2
 15:23 21:4
**come** 7:1 11:15
**coming** 18:20
**communicated**
 5:9

**Competitive** 5:6
**complaining** 7:9
**complaint** 4:23
 4:25 5:11 9:5,5
 9:9 10:4,24,24
 12:21 14:21
 16:8,11,12,19
 16:25 17:1
**completely**
 16:13
**concert** 16:15
**concluded** 20:4
**conclusion**
 16:16
**conclusions**
 16:13,14
**conduct** 17:12
 17:18
**conspiracy**
 15:17,17
**constitution**
 12:20
**constitutional**
 12:25
**contain** 9:10
**content** 14:14
**correct** 14:20
 18:5 21:8
**COUNTY** 21:4
**court** 1:1,19,24
 4:13,15,17
 5:14,21 6:6,8
 6:12,14,20 7:5
 7:20,23 8:1,8,9
 8:13,15,17,20
 9:3 10:14,16
 11:11,13,19
 13:3,5,9,11,14
 13:16,17,18
 14:1,4,18 15:4
 15:16 17:22
 18:3,6 20:3
 21:6,20

## D

**D-i-s-t** 18:18
**D.C** 5:7 21:4

**Competitive** 5:6

**date** 1:18 18:14
**Dated** 21:15
**day** 21:15
**DC** 1:19,20
**dealing** 9:11
 16:22
**decade** 5:25
**decide** 12:12
**decision** 11:19
 12:19 18:4
**defamation** 4:19
 5:4 10:11 12:9
 15:22 18:22,25
**defamatory**
 13:21,22 14:12
 16:21
**defamed** 5:10
**defendant** 9:20
 9:25 13:23,23
 18:23
**defendants**
 13:25 14:17,22
 16:15 18:1
 19:9
**defense** 9:6
**demonstrative**
 19:23
**deny** 6:3,6,8,11
 6:11 11:8
 19:18,22
**depose** 17:20
**deposed** 17:23
 17:23
**deposition** 17:6
**descriptive**
 16:16
**desirous** 10:22
**different** 12:17
 15:19
**directed** 17:16
**direction** 13:24
 13:25
**directly** 13:24
**discovery** 9:17
 12:13,18,21
 17:23 19:14,19
**discrimination**

15:18
dismissed 17:9
19:16
disrespect 10:9
Dist 18:18 19:5
distinction
14:21
district 1:2 5:4
15:23 17:9
18:20,21 19:6
21:4
dollars 6:21
Driscoll 2:9,9
4:7 13:9,10,11
14:3,9 15:15
15:22 19:15
Duke 2:10

**E**
E 1:20 2:4 4:2
21:1,1,12
earlier 11:21
Eastern 18:21
effect 10:23
eliminate 14:1
Elliot 1:5 4:4
emphasizing
16:19
emphatic 12:15
encompass
17:14
enter 5:6 11:1
entire 11:11,13
entitled 9:4 11:8
equal 8:19 10:22
11:8
Erikson 10:2
Esquire 2:4,9
21:12
establishing
14:12
estoppel 9:6
et 4:6
event 9:2 16:17
18:15
eventual 18:16
everybody 19:25

evidence 7:3,10
9:17
exactly 12:16
16:4
expectation 9:16

**F**
F 1:9 21:1
fact 5:4 6:24
7:13 11:9
14:17 15:13,20
16:16,18 19:10
facts 9:16,23,24
9:25 10:6
16:13,20
factual 9:10
16:10
fails 17:5
fair 9:20,25
Farrell 1:9 13:13
14:19
Fax 2:12
filed 17:8
finding 6:17,18
10:18,21,22
11:3,7
fingered 19:11
First 7:15
Fitton 1:8 4:6,22
4:25 5:13,15
5:18,19 7:13
11:18 12:7,8
13:12,24 14:6
14:23,24 15:1
16:12,24 17:4
17:5,20,24
18:12 19:10,18
Florida 2:5 15:9
17:9,13,13,14
17:15,15,16,17
19:16
follow 10:25
forced 17:7
foregoing 21:7
forward 19:13
19:25
found 6:12,14

8:12 11:2
17:10,11 18:21
four 16:6,7
Franklin 14:10
frankly 13:1
Friday 4:10
front 4:17

**G**
Gail 1:24 21:6
21:20
getting 7:16
give 9:25
given 9:20 11:5
17:25
gives 12:20
go 8:6,25 19:12
goes 12:12,13
going 10:3,12
19:22
Good 4:8 13:10
grounds 9:13,21
10:1
GROUP 2:4
Guerra 19:4
guess 15:5

**H**
happening
12:16
harass 18:1
harassed 6:2
8:14 10:19
12:3
harassing 8:24
harassment 4:23
hear 13:9
HELD 1:14
historic 15:13,20
historical 16:23
Hmielewski 1:24
21:6,20
Holdings 14:11
Honor 6:4,17,24
7:15 8:6,11,25
9:22 10:9 11:9
11:24 18:10

19:8,24
Honors 4:8
13:10
hours 17:20

**I**
idea 11:16
illegal 9:17
impose 9:14
impression
10:16
improbable 10:6
inadequate
15:25
Inaudible 5:20
13:8 14:8
including 20:1
21:8
INDEX 3:1
individual 5:9
Individually 1:5
1:8,9,10 4:5,6
infer 9:13
inference 15:5,7
inferring 15:17
15:18
Info 5:1
information
7:10 13:21
14:2,6
injustice 13:2
Institute 5:6
instructions
11:6
insufficient
15:24
interrogatories
11:4
interrupt 8:17
8:18
involving 4:19
Iqbal 14:1 15:3
15:19
issue 4:20 8:21
11:21 13:15
issues 10:14

**J**
J 1:8,9 4:5
James 1:9 13:12
joint 13:19
judge 1:15,15,15
7:6 10:5,15
11:25 13:3,4,7
17:10,11,17
18:3,4,6,7
19:17 20:1
judge's 12:14
judges 10:14,16
12:18
judgment 10:11
judicata 7:21
9:6
Judicial 4:21,25
5:23 6:21 8:21
10:11,19 11:16
12:6 16:24
17:7
juries 12:19
jurisdiction
14:10 17:14
19:17
jury 6:12,14,16
6:17,20 7:10
8:21 11:2,3,6
11:20 12:13

**K**
Katsas 1:15 7:6
kind 14:4
Klayman 1:5
2:4,4 4:2,5,6,8
4:14,16,20
5:17 6:1,7,10
6:13,16,23
7:15,21,25 8:2
8:10,14,16,19
8:23 9:4 11:12
11:13,23 12:6
13:6 15:8
16:23 17:7,8
17:19 18:10
21:12
know 5:21 11:5

17:3,17 19:14
known 7:13
  11:18
Kotelli 10:15
  11:25

**L**

lack 19:11
lacks 16:19
language 17:11
Larry 1:5 2:4
  4:2,4 17:6
  21:12
law 2:4 5:2,4
  11:1,1 13:15
  13:16 14:9
  15:22 17:13,14
  18:10
lawsuit 17:8
leave 4:9
left 4:22,22 5:23
  7:1,2 8:21
  11:16
leklayman@g...
  2:6
let's 16:4,5
letters 19:2
level 9:19 15:25
Lexis 18:18 19:5
line 6:4 15:1
link 4:1,1 21:11
listener 14:14
little 15:19
Location 1:19
long 9:7
long-arm 17:13
look 8:7 13:18
  16:25 18:17
  19:3,19
looking 12:5
lot 12:16
lower 13:17 18:3

**M**

made.' 19:3
making 7:24
  12:19

MALE 18:8,9
manager 6:2
  8:16,24 10:19
  12:3
Mann 5:7
Martinez 17:10
  17:11
Martinez's
  17:17
mask 4:9
matter 9:8,10
mean 5:21 10:9
  14:7 15:8,16
media 8:5,6
merits 19:17
messages 19:21
Miami 10:12
million 6:21
minute 7:20
misstatement
  19:15
morning 4:8
  13:10,14

**N**

need 9:23,25
  15:6,12
needed 10:8,23
  19:7
needs 13:18
negative 4:12,13
neither 9:3
  13:14
never 6:1,16,17
  6:25 7:4 8:11
  19:17
newspaper 7:8
notice 9:20,25
  18:24
NW 1:20

**O**

oath 10:25 17:5
obviously 5:18
  19:22
occurred 10:10
occurrence

16:18
October 1:18
  21:15
office 6:2 8:16
  8:24 10:19,25
  12:3
okay 7:16 16:3
  18:6,9
ongoing 5:25
opinion 8:9,10
  8:13,15,20,22
  8:23 11:22
opportunity
  17:22,25
ORAL 1:14
order 17:19
Orfanedes 1:9
  13:13 14:19
ousted 4:21
  11:17 12:6
outside 17:15

**P**

P.A 2:4
Page 3:3 13:18
Pages 1:16 21:7
Palmetto 2:5
paragraph
  13:19 17:1
Pardus 10:2
Park 2:5
parole 7:3
particularity'
  18:23
particularly
  10:15
parties 2:1 7:17
party 5:6 12:20
  13:14
patients 19:2
Paul 1:9 13:12
people 12:23
  19:20,22
Pepco 14:11
person 5:3 7:19
  8:3 10:13
personal 19:16

Peterson 1:9
  13:12,23 14:19
Phone 2:11
phrase 14:25
physically 6:8
place 14:13
plaintiff 9:23
  14:13 18:22
plausibility 16:1
plausible 6:5 9:8
  9:13,22 12:7
  15:2,5 16:2
  18:11,13
plead 9:4,18
  12:21
pleading 9:15
  14:2 18:17
please 4:17
  13:11
pleasure 4:17
pled 4:24 10:4,8
  10:8,8,23,23
  18:22 19:7,7
PLLC 2:9
point 6:21 7:5,5
  17:19
pointed 19:9
position 15:12
  18:2
possibility 16:1
possible 15:2
possibly 11:15
  11:18
praised 7:3
predicate 16:20
  17:4
prejudice 6:25
prejudiced 7:17
  7:18,19,23 8:3
  8:9 10:12,13
prejudicial 12:1
prior 11:19
PRO 2:4
probability 9:14
problems 6:18
proceed 6:5 9:8
  10:4,24 12:11

19:25
proceedings 3:1
  3:4 4:1,3 20:4
  21:9
proof 10:5
properly 13:16
proven 6:1
provide 9:17
provided 4:1
  21:11
public 5:24 7:14
publication 5:3
  5:12,18 12:6
publications
  5:10
published 4:24
  5:5
publishing 5:13
pure 16:22
push 15:1
put 18:23

**Q**

question 14:25
questions 13:3
  17:21
quoted 17:10

**R**

R 21:1
raise 9:16
Randolph 1:15
  20:1
Raton 2:5
reach 15:25
  17:19
read 8:8 9:1
  13:19 17:1
reads 13:21
really 17:2
reason 17:6,25
reasonable 9:16
records 12:23
  19:20
recovery 10:6
regard 12:17
  14:15,17,18

16:9 17:16
**regarding** 13:20
**regards** 19:2
**regrettably**
  19:15
**relating** 18:25
**relevance** 11:19
**relief** 9:19
**remote** 10:7
**remove** 4:9
**REPORTER**
  3:5
**republished** 5:1
  18:15
**required** 18:16
  20:1
**requirement**
  9:14
**res** 7:21 9:6
**resident** 15:9
**respectfully** 8:25
  19:25
**restatement** 5:8
**restraint** 9:12
**rests** 9:21 10:1
**result** 4:11
**Rich** 13:11
**RICHARD** 2:9
**rife** 16:13
**right** 4:15 9:19
  12:20,24,25
  14:2 15:10
**rights** 8:19
  10:22 11:8
**Road** 2:5
**Roger** 5:1 7:8
  9:3 11:15
  14:16 16:11
  17:2,23 18:15
  19:11
**Rogers** 1:15
  13:3,4,7 18:6,7
**role** 12:14
**rule** 6:5 7:3
  12:10 13:1

---
**S**
---

**savvy** 10:5
**saying** 7:18,25
  8:2,3 10:13
  15:11
**says** 5:5,17
  15:10 18:12,19
**SE** 2:4
**see** 19:21
**SELTZER** 2:9
**severance** 7:2
**severe** 13:2
**sexual** 4:22
**sexually** 6:2 8:14
  8:24 10:18
  12:2
**sic** 14:19,23
**Similarly** 18:21
**simply** 5:5 9:15
  19:18
**single** 5:9
**sir** 14:3
**smeared** 11:9
**sorry** 12:15,25
**source** 5:15
**sources** 7:18
**Southern** 17:9
**speaker** 14:14
**specific** 9:23
  11:3 16:10
  18:14
**specifically** 19:3
**specify** 18:25
**speculation**
  16:22
**speculative** 9:19
**spread** 7:7
**St** 1:20
**stage** 9:15
**standard** 14:11
**state** 18:17
**stated** 19:8
**statement** 4:20
  5:16 7:9 12:2,4
  13:21,22 14:7
  14:12,16 15:20
  15:23 16:3,5
  16:21

**statements** 19:1
  19:9
**STATES** 1:1
**Stenographer**
  1:24 21:6,20
**Stone** 5:1,12 7:8
  7:12 9:3 11:15
  12:8 13:25
  14:16 16:11
  17:2,23 18:15
  19:11
**Stone's** 5:15
**Street** 2:10
**strikes** 10:5
**subject** 5:24
  11:11,13
**submission** 7:12
**submitted** 20:3
**sufficient** 5:2
  18:23
**suggest** 9:11
**suing** 15:8
**Suite** 2:10
**summary** 16:20
**support** 16:18
**suppose** 15:8
**surrogate** 5:12

---
**T**
---

**T** 21:1,1
**take** 12:21 19:19
**taken** 9:10
**talk** 12:23 19:20
**telephone** 12:22
  19:19
**terms** 11:6 18:16
  19:14
**test** 4:9
**Texas** 18:20,21
  19:6
**text** 19:21
**thank** 4:16 13:5
  18:7,8,9 20:2,3
**things** 8:4 19:21
**think** 7:6 8:8
  11:2 13:18
**third** 5:5 7:17

**Thomas** 1:8 4:5
  13:12 17:24
**thought** 13:6
**three** 4:18 14:22
  16:9
**time** 1:19 14:13
  18:15
**told** 17:4
**Tom** 4:21,25
  5:19 12:7
  14:23 15:1
  16:11 17:3,5
  17:20 18:12
**tortious** 17:12
**torts** 5:8
**trade** 9:12
**transcribed**
  21:12
**transcript** 21:7
  21:8
**transcription**
  1:14,24 4:1
**travelled** 4:10
**trial** 5:24 7:14
  10:20 11:20,21
  11:25
**true** 9:10,24
  21:8
**truly** 4:21
**trying** 8:17
  11:23
**Tuesday** 1:18
**two** 5:3,10 6:21
  17:20
**Twombly** 9:7,9
  10:3,3 12:11
  14:1 15:2,18
  20:2

---
**U**
---

**U.S** 10:2 18:18
  19:4
**underlying**
  16:17
**understand** 15:4
**UNITED** 1:1
**upset** 13:1

---
**V**
---

**v** 1:7 4:5 5:6
  10:2 14:10
  19:4
**VA** 2:11
**vehemently** 6:11
  6:13
**verdict** 7:10
**VIDEOCONF...**
  2:1
**VOICE** 18:8,9
**voluntarily** 7:1,2
  8:22

---
**W**
---

**wagon** 10:17
**Wait** 7:20,23
**want** 11:4 12:23
**wanted** 13:7
**Wars** 5:1
**Washington**
  1:20
**wasn't** 8:5 11:23
  11:24 12:2
**Watch** 4:21,25
  5:23 6:21 8:22
  10:11,19 11:16
  12:7 16:24
  17:7
**way** 7:12,16
  10:21 11:14,17
  11:20 17:3
**WAYNE** 2:9
**we'll** 13:9
**we're** 16:22
**we've** 6:18 17:10
**weekend** 4:10
**West** 2:5
**Western** 18:20
  19:5
**wife** 6:9 10:21
**WL** 18:19
**word** 19:11
**written** 11:6
**wrongful** 17:12
  17:18

| | |
|---|---|
| **X** | **525024** 18:19 |
| | **551** 10:2 |
| **Y** | **5th** 21:15 |
| **year** 7:8 | |
| **years** 10:10 | **6** |
| **yesterday** 4:11 | |
| **YouTube** 4:1,1 | **7** |
| 21:9,11 | **703-822-5001** |
| | 2:11 |
| **Z** | **703-997-4892** |
| | 2:12 |
| **0** | **7050** 2:5 |
| | |
| **1** | **8** |
| **1** 1:16 21:7 | **8** 6:7 12:10 |
| **119681** 19:5 | 18:19 |
| **12** 13:19 | **89** 10:2 |
| **1213** 5:7 | |
| **1240** 5:7 | **9** |
| **161295** 18:18 | **9** 6:5 12:10 |
| **180** 5:7 | 13:18 |
| | **9:30** 1:19 |
| **2** | **9:50** 1:19 20:4 |
| **20** 21:8 | **93** 10:2 |
| **2000** 2:10 | |
| **20001** 1:20 | |
| **2014** 10:12 | |
| **2016** 5:7 | |
| **2020** 18:18,19 | |
| **2021** 19:4 | |
| **2022** 1:18 21:15 | |
| **21** 1:16 3:5 | |
| **21-7125** 1:3 4:4 | |
| **22314** 2:11 | |
| | |
| **3** | |
| **300** 2:10 | |
| **310-595-0800** | |
| 2:6 | |
| **33433** 2:5 | |
| | |
| **4** | |
| **4** 1:18 3:4 | |
| **42** 19:5 | |
| **43** 19:5 | |
| **430** 1:20 | |
| | |
| **5** | |

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN,

      Plaintiff/Counterdefendant,

      v.

JUDICIAL WATCH, INC., *et al.*,

      Defendants/Counterplaintiffs.

Civil Action No. 06-00670

Judge Colleen Kollar-Kotelly

## JURY VERDICT FORM

### WE, THE JURY, UNANIMOUSLY FIND AS FOLLOWS:

Larry Klayman v. Judicial Watch

Plaintiff Larry Klayman:

1.     Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Defendant Judicial Watch, Inc. breached the Confidential Severance Agreement by failing to

make a good faith effort to remove him as the guarantor of a lease for Judicial Watch, Inc.'s

headquarters? (See Claim No. 1 on page 27 of the Jury Instructions.)

          _____ YES      ✗ NO

a.     If yes, designate the type of breach:

          _____ Material     _____ Simple

a.     If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

      Answer: _____

(N)

2.      Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Defendant Judicial Watch, Inc. breached the Confidential Severance Agreement by failing to pay

health insurance for his children? (See Claim No. 2 on page 27.)

            _____ YES            _✗_ NO

a.      If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

        Answer: _____

3.      Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Judicial Watch, Inc. breached the Confidential Severance Agreement by filing a motion to strike

Plaintiff's appearance in a Florida litigation involving Sandra Cobas after Plaintiff left Judicial

Watch, Inc.?(See Claim No. 3 on page 27.)

            _____ YES            _✗_ NO

a.      If yes, designate the type of breach:

                _____ Material       _____ Simple

b.      If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

        Answer: _____

4.      Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Judicial Watch, Inc. breached the Confidential Severance Agreement by failing to provide

Plaintiff with access to documents regarding a client Peter Paul? (See Claim No. 4 on page 27.)

                    _____ YES                    __✗__ NO

a.      If yes, designate the type of breach:

        _____ Material          _____ Simple

b.      If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

        Answer: _____


5.      Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Judicial Watch breached the Confidential Severance Agreement by disparaging him and

misrepresenting the reasons for his departure from Judicial Watch, Inc.? (See Claim No. 5 on

page 27.)

                    _____ YES              ✗ NO

a.      If yes, designate the type of breach:

                _____ Material          _____ Simple

b.      If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

        Answer: _____

Judicial Watch and Thomas Fitton v. Larry Klayman

Counterplaintiff Judicial Watch, Inc.:


1.      Has Counterplaintiff Judicial Watch proved by a preponderance of the evidence its claim

that Counterdefendant Larry Klayman breached the Confidential Severance Agreement by

failing to repay a debt owed by Klayman & Associates? (See Counterclaim No. 1 on page 28.)

          X   YES             _____ NO

a.      If yes, designate the type of breach:

              _____ Material      X  Simple

b.      If yes, what, if any, damages do you award to Counterplaintiff Judicial Watch, Inc.?

        Answer: __$ 200,000. — __


2.      Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its

claim that Counterdefendant Larry Klayman breached his obligation in the Confidential

Severance Agreement to pay costs and expense arising from his failure to make prompt payment

to Judicial Watch in accordance with paragraphs 10 and 11 of the Confidential Severance

Agreement? (See Counterclaim No. 2 on page 28.)

          X  YES             _____ NO

a.      If yes, designate the type of breach:

              _____ Material      X  Simple

b.      If yes, what, if any, damages do you award to Counterplaintiff Judicial Watch, Inc.?

        Answer: __$ 25,000. — __

c.    If you awarded damages, do you find that Counterplaintiff Judicial Watch, Inc. is entitled to prejudgment interest of 6%?

_____ YES        __✗__ NO

3.    Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its claim that Counterdefendant Larry Klayman infringed Judicial Watch, Inc.'s registered trademarks; (1) JUDICIAL WATCH and/or (2)"BECAUSE NO ONE IS ABOVE THE LAW" in violation of the Lanham Act? (See Counterclaim No. 3 on page 28.)

__✗__ YES        _____ NO

a.    If yes, please designate which trademarks (one or both) were infringed.

_____ *Both* _____

b.    What, if any, compensatory damages do you award to Counterplaintiff Judicial Watch, Inc.?

Answer: _$ 750,000.—_

4.    Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its claim that Counterdefendant Larry Klayman engaged in unfair competition by direct mail, email and advertisements including the website supporting the Saving Judicial Watch effort in violation of the Lanham Act by a false and/or misleading affiliation, connection or association between Saving Judicial Watch and Judicial Watch? (See Counterclaim No. 4 on page 29.)

__✗__ YES        _____ NO

5

5.     Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its claim that Counterdefendant Larry Klayman engaged in unfair competition by direct mail, email and advertisements including the website supporting the Saving Judicial Watch effort in violation of the Lanham Act by using false and/or misleading statements?  (See Counterclaim No. 5 on page 29.)

                    $\times$   YES            _____ NO

a.     If yes to either or both of questions no. 4 and 5, what, if any, compensatory damages do you award to Counterplaintiff Judicial Watch, Inc.?

        Answer:  $1,000,000.

6.     Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its claim that Counterdefendant Larry Klayman breached the Confidential Severance Agreement by publishing statements that were disparaging to Judicial Watch, Inc.? (See Counterclaim No. 6 on page 29.)

                    $\times$  YES            _____ NO

a.     If yes, designate the type of breach:

                    _____ Material        $\times$  Simple

b.     If yes, what, if any, compensatory damages do you award to Counterplaintiff Judicial Watch, Inc.?

        Answer:  $250,000.

7.      Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its

claim that Counterdefendant Larry Klayman breached the Confidential Severance Agreement by

using information regarding Judicial Watch, Inc.'s donor or client lists or donor or client data?

(See Counterclaim No. 8 on page 29.)

                              _✗_ YES          _____ NO

a.      If yes, designate the type of breach:

                    _____ Material      _✗_ Simple


b.      If yes, what, if any, compensatory damages do you award to Counterplaintiff Judicial

Watch, Inc.?

            Answer: _$75,000.—_


7

<u>Counterplaintiff Thomas Fitton:</u>

8.      Has Counterplaintiff Thomas Fitton proved by a preponderance of the evidence his claim

that Counterplaintiff Larry Klayman breached the Confidential Severance Agreement by

publishing statements that were disparaging to Mr. Fitton?  (See Counterclaim No. 7 on page

29.)

            _X_ YES          _____ NO

a.      If yes, designate the type of breach:

            _____ Material      _X_ Simple

b.      If yes, what, if any, compensatory damages do you award to Counterplaintiff Thomas

Fitton?

      Answer:  _$500, 000 -_____

      _3/14/18_____              _____

      **DATE**                        **JUROR FOREPERSON**

# EXHIBIT 3

USCA Case #22-8521      Document #1987525         Filed: 02/24/2023      Page 86 of 290

AOR,CLOSED,REF_RR

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:19-cv-20544-JEM

Klayman v. Fitton                               Date Filed: 02/11/2019
Assigned to: Judge Jose E. Martinez             Date Terminated: 10/31/2019
Referred to: Magistrate Judge Alicia M. Otazo-Reyes   Jury Demand: Plaintiff
Cause: 28:1332 Diversity-Libel, Assault, Slander   Nature of Suit: 320 Assault Libel & Slander
                                                Jurisdiction: Diversity

**Plaintiff**

**Larry Klayman**                represented by   **Larry Elliot Klayman**
*Individually*                                   Klayman Law Firm
                                                 7050 W. Palmetto Park Rd, #15-287
                                                 Boca raton, FL 33433
                                                 3105950800
                                                 Email: leklayman@gmail.com
                                                 *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Thomas J. Fitton**             represented by   **Kathleen Marie Merwin**
*Individually*                                   Cole Scott & Kissane
                                                 222 Lakeview Ave., Suite 120
                                                 West Palm Beach, FL 33401
                                                 561-383-9200
                                                 Fax: 561-683-8977
                                                 Email: Katie.Merwin@csklegal.com
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Richard W. Driscoll**
                                                 Driscoll & Selzter, PLLC
                                                 300 N. Washington Street, Suite 610
                                                 Alexandria, VA 22314
                                                 703-822-5001
                                                 Email: rdriscoll@driscollseltzer.com
                                                 *PRO HAC VICE*
                                                 *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 02/11/2019 | 1 | COMPLAINT against All Defendants. Filing fees $ 400.00 receipt number 113C-11384137, filed by Larry Klayman. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Civil Cover Sheet, # 4 Summon(s))(Klayman, Larry) (Entered: 02/11/2019) |
| 02/11/2019 | 2 | Clerks Notice of Judge Assignment to Judge Jose E. Martinez. |

USCA Case #22-8521      Document #1987525        Filed: 02/24/2023      Page 87 of 290

Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Alicia M. Otazo-Reyes is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent.

Pro se (NON-PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (drz) (Entered: 02/11/2019)

| | | |
|---|---|---|
| 02/11/2019 | 3 | Summons Issued as to Thomas J. Fitton. (drz) (Entered: 02/11/2019) |
| 02/13/2019 | 4 | Order Requiring Joint Scheduling Report. Signed by Judge Jose E. Martinez on 2/13/2019. *See attached document for full details*. (dq) (Entered: 02/13/2019) |
| 02/25/2019 | 5 | ORDER OF REFERENCE to Magistrate Judge for all pretrial proceedings. Signed by Judge Jose E. Martinez on 2/25/2019. *See attached document for full details*. (drz) (Entered: 02/26/2019) |
| 03/04/2019 | 6 | Defendant's MOTION to Dismiss for Lack of Jurisdiction 1 Complaint by Thomas J. Fitton. Attorney Kathleen Marie Merwin added to party Thomas J. Fitton(pty:dft). Responses due by 3/18/2019 (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Merwin, Kathleen) (Entered: 03/04/2019) |
| 03/04/2019 | 7 | NOTICE of Attorney Appearance by Kathleen Marie Merwin on behalf of Thomas J. Fitton (Merwin, Kathleen) (Entered: 03/04/2019) |
| 03/18/2019 | 8 | RESPONSE in Opposition re 6 Defendant's MOTION to Dismiss for Lack of Jurisdiction 1 Complaint filed by Larry Klayman. Replies due by 3/25/2019. (Attachments: # 1 Affidavit with Exhibits)(Klayman, Larry) (Entered: 03/18/2019) |
| 03/25/2019 | 9 | REPLY to Response to Motion re 6 Defendant's MOTION to Dismiss for Lack of Jurisdiction 1 Complaint filed by Thomas J. Fitton. (Attachments: # 1 Exhibit, # 2 Exhibit)(Merwin, Kathleen) (Entered: 03/25/2019) |
| 03/26/2019 | 10 | Corrected REPLY to 8 Response in Opposition to Motion by Thomas J. Fitton. (Attachments: # 1 Exhibit Memorandum Opinion and Order, # 2 Exhibit Order)(Merwin, Kathleen) (Entered: 03/26/2019) |
| 04/03/2019 | 11 | PAPERLESS ORDER Setting Hearing on 6 Defendant's MOTION to Dismiss for 4/16/2019 at 1:00 PM in Miami Division before Magistrate Judge Alicia M. Otazo-Reyes. Signed by Magistrate Judge Alicia M. Otazo-Reyes on 4/3/2019. (kmh) (Entered: 04/03/2019) |
| 04/04/2019 | 12 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Richard W. Driscoll. Filing Fee $ 75.00 Receipt # 113C-11531126 by Thomas J. Fitton. Responses due by 4/18/2019 (Attachments: # 1 Text of Proposed Order Proposed Order Granting Motion)(Merwin, Kathleen) (Entered: 04/04/2019) |
| 04/04/2019 | 13 | PAPERLESS ORDER granting 12 Motion to Appear Pro Hac Vice for Attorney Richard W. Driscoll. Signed by Magistrate Judge Alicia M. Otazo-Reyes on 4/4/2019. (kmh) (Entered: 04/04/2019) |
| 04/04/2019 | 14 | Defendant's MOTION to Continue *Hearing Set for April 16, 2019* by Thomas J. Fitton. Responses due by 4/18/2019 (Merwin, Kathleen) (Entered: 04/04/2019) |
| 04/04/2019 | 15 | RESPONSE in Opposition re 14 Defendant's MOTION to Continue *Hearing Set for April 16, 2019* filed by Larry Klayman. Replies due by 4/11/2019. (Attachments: # 1 Exhibit |

USCA Case #22-8521 Document #1987525 Filed: 02/24/2023 Page 88 of 290

| 04/05/2019 | 16 | PAPERLESS ORDER Resetting Hearing on 6 Defendant's MOTION to Dismiss. The Hearing set for 4/16/2019 at 1:00 PM is hereby RESET to 4/30/2019 at 10:00 AM in Miami Division before Magistrate Judge Alicia M. Otazo-Reyes. Signed by Magistrate Judge Alicia M. Otazo-Reyes on 4/5/2019. (kmh) (Entered: 04/05/2019) |
|---|---|---|
| 04/08/2019 | 17 | REQUEST TO RESCHEDULE ORAL ARGUMENT by Larry Klayman re 16 Order Setting Hearing on Motion, (Klayman, Larry) Modified Event Type on 4/8/2019 (ra). (Entered: 04/08/2019) |
| 04/08/2019 | 18 | PAPERLESS ORDER denying without prejudice 17 REQUEST TO RESCHEDULE ORAL ARGUMENT for failure to file a certificate of conferral with opposing counsel as required by Local Rule 7.1(a)(3). Signed by Magistrate Judge Alicia M. Otazo-Reyes on 4/8/2019. (kmh) (Entered: 04/08/2019) |
| 04/08/2019 | 19 | RESPONSE to 18 Order on Motion to Continue, by Larry Klayman. (Klayman, Larry) (Entered: 04/08/2019) |
| 04/12/2019 | 20 | NOTICE by Larry Klayman *of Counsels' Availability for Hearing on Defendant's Motion to Dismiss for Lack of Personal Jurisdiction* (Klayman, Larry) (Entered: 04/12/2019) |
| 04/12/2019 | 21 | PAPERLESS ORDER Setting Telephonic Status Conference for 4/22/2019 at 1:00 PM in Miami Division before Magistrate Judge Alicia M. Otazo-Reyes to discuss resetting the hearing on 6 Defendant's MOTION to Dismiss. Counsel shall call the conference number 1-888-684-8852 at the appointed time, then enter access code 4791317 and security code 0422. Signed by Magistrate Judge Alicia M. Otazo-Reyes on 4/12/2019. (kmh) (Entered: 04/12/2019) |
| 04/22/2019 | 22 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Alicia M. Otazo-Reyes: Telephonic Status Conference held on 4/22/2019 as to 6 Defendant's MOTION to Dismiss for Lack of Jurisdiction Re: 1 Complaint : Motion Hearing reset for 5/21/2019 at 10:00 AM in Miami Division before Magistrate Judge Alicia M. Otazo-Reyes. Total time in court: 7 minutes. Attorney Appearance(s): Plaintiff Larry Elliot Klayman appeared pro se; Kathleen Marie Merwin and Richard W. Driscoll appeared on behalf of the Defendant. (Digital 13:03:59) (sl) (Entered: 04/22/2019) |
| 05/21/2019 | 23 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Alicia M. Otazo-Reyes: Motion Hearing held on 5/21/2019 re 6 Defendant's MOTION to Dismiss for Lack of Jurisdiction 1 Complaint filed by Thomas J. Fitton. Attorney Appearance(s): Kathleen Marie Merwin, Richard W. Driscoll, Larry Elliot Klayman, (Digital 9-55-17) (ch1) (Entered: 05/21/2019) |
| 05/21/2019 | 24 | ORDER re 6 Defendant's MOTION to Dismiss. Signed by Magistrate Judge Alicia M. Otazo-Reyes on 5/21/2019. *See attached document for full details.* (kmh) (Entered: 05/21/2019) |
| 06/03/2019 | 25 | Defendant's MOTION for Protective Order *and Expedited Motion to Stay Depositions* by Thomas J. Fitton. (Attachments: # 1 Text of Proposed Order)(Merwin, Kathleen) (Entered: 06/03/2019) |
| 06/03/2019 | 26 | MEMORANDUM in Support re 25 Defendant's MOTION for Protective Order *and Expedited Motion to Stay Depositions* by Thomas J. Fitton. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit)(Merwin, Kathleen) (Entered: 06/03/2019) |
| 06/03/2019 | 27 | PAPERLESS ORDER requiring a response to 25 Defendant's MOTION for Protective Order. Plaintiff's response due by the close of business on 6/4/2019. Signed by Magistrate Judge Alicia M. Otazo-Reyes on 6/3/2019. (kmh) (Entered: 06/03/2019) |

USCA Case #22-8521      Document #1987525      Filed: 02/24/2023      Page 89 of 290

| 06/04/2019 | 28 | RESPONSE in Opposition re 25 Defendant's MOTION for Protective Order *and Expedited Motion to Stay Depositions* filed by Larry Klayman. Replies due by 6/11/2019. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4)(Klayman, Larry) (Entered: 06/04/2019) |
| 06/04/2019 | 29 | PAPERLESS ORDER denying 25 Defendant's MOTION for Protective Order. The Court will not impose any additional restrictions on the deposition of Defendant Thomas Fitton beyond those set forth in 24 ORDER. The Court cautions the parties to cooperate in good faith on the scheduling of Mr. Fitton's deposition by the previously imposed 6/21/2019 deadline. Failure to do so will result in the imposition of sanctions on the non-cooperating party. Signed by Magistrate Judge Alicia M. Otazo-Reyes on 6/4/2019. (kmh) (Entered: 06/04/2019) |
| 06/11/2019 | 30 | Defendant's MOTION for Sanctions *Pursuant to Fed. Rule. Civ. P. 11* by Thomas J. Fitton. (Merwin, Kathleen) (Entered: 06/11/2019) |
| 06/13/2019 | 31 | MOTION for Sanctions *Pursuant to Fed. R. Civ. P. 11, 28 U.S.C. § 1927 and this Court's Inherent Authority* by Larry Klayman. (Attachments: # 1 Exhibit Amended Counterclaim, # 2 Exhibit Transcript of Deposition)(Klayman, Larry) (Entered: 06/13/2019) |
| 06/13/2019 | 32 | MOTION to Compel *Responses to Deposition Questions* by Larry Klayman. Responses due by 6/27/2019 (Attachments: # 1 Exhibit Deposition Transcript)(Klayman, Larry) (Entered: 06/13/2019) |
| 06/17/2019 | 33 | RESPONSE in Opposition re 6 Defendant's MOTION to Dismiss for Lack of Jurisdiction 1 Complaint *SUPPLEMENTAL OPPOSITION PURSUANT TO COURT'S ORDER* filed by Larry Klayman. Replies due by 6/24/2019. (Attachments: # 1 Deposition Transcript, # 2 Affidavit of Larry Klayman, # 3 Supplemental Affidavit of Larry Klayman)(Klayman, Larry) (Entered: 06/17/2019) |
| 06/18/2019 | 34 | NOTICE by Larry Klayman *of Addendum to Plaintiff's Supplement to His Opposition to Defendant Fitton's Motion to Dismiss with Attached Deposition Transcript Exhibits* re 33 Response (Attachments: # 1 Deposition Transcript with Exhibits) (Klayman, Larry) Modified on 6/18/2019 (kpe). (Entered: 06/18/2019) |
| 06/19/2019 | 35 | NOTICE by Larry Klayman *of Second Addendum to Plaintiff's Supplement to His Opposition to Defendant Fitton's Motion to Dismiss with Attached Deposition Transcript Exhibits* (Klayman, Larry) (Entered: 06/19/2019) |
| 06/21/2019 | 36 | TRANSCRIPT of motion hearing held on 5-21-2019 before Magistrate Judge Alicia M. Otazo-Reyes, 1-24 pages, Court Reporter: Dawn Savino (Whitmarsh), 305-523-5598 / Dawn_Savino@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/12/2019. Redacted Transcript Deadline set for 7/22/2019. Release of Transcript Restriction set for 9/19/2019. (dwh) (Entered: 06/21/2019) |
| 06/21/2019 | 37 | NOTICE by Larry Klayman *Amended Civil Cover Sheet Per Order of the Court* (Klayman, Larry) (Entered: 06/21/2019) |
| 06/24/2019 | 38 | REPLY to Response to Motion re 6 Defendant's MOTION to Dismiss for Lack of Jurisdiction 1 Complaint *Reply to Supplemental Filings D.E. 33-35* filed by Thomas J. Fitton. (Merwin, Kathleen) (Entered: 06/24/2019) |
| 06/25/2019 | 39 | RESPONSE in Opposition re 30 Defendant's MOTION for Sanctions *Pursuant to Fed. Rule. Civ. P. 11 and Request for an Award of Attorneys' Fees and Costs* filed by Larry Klayman. Replies due by 7/2/2019. (Attachments: # 1 Exhibit Driscoll Letter 2012, # 2 Exhibit Jury Instructions, # 3 Exhibit Eleventh Circuit Ruling, # 4 Exhibit Florida Driver's |

| | | |
|---|---|---|
| | | License, # 5 Exhibit Florida Weapon's Permit, # 6 Exhibit Transcript of May 21, 2019 Hearing, # 7 Exhibit Iran Complaint, # 8 Exhibit Vonage Visual Voicemail, # 9 Exhibit Vonage Visual Voicemail)(Klayman, Larry) (Entered: 06/25/2019) |
| 06/27/2019 | 40 | RESPONSE in Opposition re 32 MOTION to Compel *Responses to Deposition Questions* filed by Thomas J. Fitton. Replies due by 7/8/2019. (Merwin, Kathleen) (Entered: 06/27/2019) |
| 06/27/2019 | 41 | RESPONSE in Opposition re 31 MOTION for Sanctions *Pursuant to Fed. R. Civ. P. 11, 28 U.S.C. § 1927 and this Court's Inherent Authority* filed by Thomas J. Fitton. Replies due by 7/8/2019. (Merwin, Kathleen) (Entered: 06/27/2019) |
| 06/27/2019 | 42 | NOTICE by Larry Klayman re 38 Reply to Response to Motion (Klayman, Larry) (Entered: 06/27/2019) |
| 07/02/2019 | 43 | REPLY to Response to Motion re 32 MOTION to Compel *Responses to Deposition Questions* filed by Larry Klayman. (Klayman, Larry) (Entered: 07/02/2019) |
| 07/02/2019 | 44 | NOTICE by Thomas J. Fitton *Motion to Strike Plaintiff's De Facto Sur-Reply* (Merwin, Kathleen) (Entered: 07/02/2019) |
| 07/02/2019 | 45 | MEMORANDUM in Support *of Defendant's Motion for Sanctions* by Thomas J. Fitton. (Merwin, Kathleen) (Entered: 07/02/2019) |
| 07/04/2019 | 46 | REPLY to Response to Motion re 31 MOTION for Sanctions *Pursuant to Fed. R. Civ. P. 11, 28 U.S.C. § 1927 and this Court's Inherent Authority* filed by Larry Klayman. (Attachments: # 1 Exhibit Severance Agreement, # 2 Exhibit Draft Jury Instructions, # 3 Exhibit Court Record re Jury Instructions)(Klayman, Larry) (Entered: 07/04/2019) |
| 07/04/2019 | 47 | NOTICE by Larry Klayman re 44 Notice (Other) *in Opposition to Defendant's Motion to Strike* (Klayman, Larry) (Entered: 07/04/2019) |
| 07/11/2019 | 48 | ORDER denying 32 MOTION to Compel. Signed by Magistrate Judge Alicia M. Otazo-Reyes on 7/11/2019. *See attached document for full details*. (kmh) (Entered: 07/11/2019) |
| 07/11/2019 | 49 | ORDER denying 44 Motion to Strike. Signed by Magistrate Judge Alicia M. Otazo-Reyes on 7/11/2019. *See attached document for full details*. (kmh) (Entered: 07/11/2019) |
| 07/11/2019 | 50 | REPORT AND RECOMMENDATION re 6 Defendant's MOTION to Dismiss. Objections to R&R due by 7/25/2019. Signed by Magistrate Judge Alicia M. Otazo-Reyes on 7/11/2019. *See attached document for full details*. (kmh) (Entered: 07/11/2019) |
| 07/22/2019 | 51 | MOTION for Reconsideration re 50 REPORT AND RECOMMENDATIONS re 6 Defendant's MOTION to Dismiss for Lack of Jurisdiction 1 Complaint filed by Thomas J. Fitton by Larry Klayman. (Klayman, Larry) (Entered: 07/22/2019) |
| 08/05/2019 | 52 | RESPONSE in Opposition re 51 MOTION for Reconsideration re 50 REPORT AND RECOMMENDATIONS re 6 Defendant's MOTION to Dismiss for Lack of Jurisdiction 1 Complaint filed by Thomas J. Fitton filed by Thomas J. Fitton. Replies due by 8/12/2019. (Attachments: # 1 Exhibit)(Merwin, Kathleen) (Entered: 08/05/2019) |
| 08/06/2019 | 53 | REPLY to Response to Motion re 51 MOTION for Reconsideration re 50 REPORT AND RECOMMENDATIONS re 6 Defendant's MOTION to Dismiss for Lack of Jurisdiction 1 Complaint filed by Thomas J. Fitton filed by Larry Klayman. (Klayman, Larry) (Entered: 08/06/2019) |
| 08/12/2019 | 54 | ORDER denying 51 MOTION for Reconsideration. Signed by Magistrate Judge Alicia M. Otazo-Reyes on 8/12/2019. *See attached document for full details*. (kmh) (Entered: 08/12/2019) |

USCA Case #23-8521    Document #1987525    Filed: 02/24/2023    Page 91 of 290

| 08/20/2019 | [55](#) | OBJECTIONS to [50](#) Report and Recommendations by Larry Klayman. (Attachments: # [1](#) Exhibit Plaintiff's Opp to MTD, # [2](#) Exhibit Plaintiff's Supp Opp to MTD, # [3](#) Exhibit Plaintiff's M for Reconsideration, # [4](#) Exhibit Plaintiff's Reply)(Klayman, Larry) (Entered: 08/20/2019) |
| 08/30/2019 | [56](#) | Unopposed MOTION for Extension of Time to Respond to Plaintiff's Objections to Report and Recommendations by Thomas J. Fitton. Responses due by 9/13/2019 (Merwin, Kathleen) (Entered: 08/30/2019) |
| 08/30/2019 | 57 | PAPERLESS ORDER granting [56](#) Defendant's Unopposed Motion for Extension of Time. Defendant shall file a response to Plaintiff's objections on or before September 9, 2019. All other deadlines shall remain unaffected. Signed by Judge Jose E. Martinez on 8/30/2019. (kml) (Entered: 08/30/2019) |
| 09/09/2019 | [58](#) | Defendant's RESPONSE to [55](#) Objections to Report and Recommendations, by Thomas J. Fitton. (Merwin, Kathleen) (Entered: 09/09/2019) |
| 10/31/2019 | [59](#) | ORDER Adopting [50](#) Report and Recommendations. Closing Case. Motions Terminated: [30](#) Defendant's MOTION for Sanctions *Pursuant to Fed. Rule. Civ. P. 11* filed by Thomas J. Fitton, [31](#) MOTION for Sanctions *Pursuant to Fed. R. Civ. P. 11, 28 U.S.C. § 1927 and this Court's Inherent Authority* filed by Larry Klayman, [6](#) Defendant's MOTION to Dismiss for Lack of Jurisdiction [1](#) Complaint filed by Thomas J. Fitton, [50](#) REPORT AND RECOMMENDATIONS re [6](#) Defendant's MOTION to Dismiss for Lack of Jurisdiction [1](#) Complaint filed by Thomas J. Fitton. Signed by Judge Jose E. Martinez on 10/31/2019. *See attached document for full details*. (ra) (Entered: 10/31/2019) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 10/07/2022 16:01:07 | | |
| **PACER Login:** | leklayman | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-20544-JEM |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

**CASE NO. 21-7125**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

LARRY KLAYMAN

Plaintiff-Appellant,

v.

THOMAS J. FITTON, *et al*

Defendants-Appellees.

---

ON APPEAL FROM AN ORDER
OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**PETITION FOR REHEARING EN BANC**

---

Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton, FL 33433
Tel: (561) 558-5336
Email: leklayman@gmail.com

*Plaintiff-Appellant Pro Se*

Date: November 25, 2022

# **TABLE OF CONTENTS**

FEDERAL RULE OF APPELLATE PROCEDURE 35 STATEMENT ................1

STATEMENT OF THE CASE ................................................................1

ARGUMENT ....................................................................................3

    Judge Randolph Should Have Recused Himself and the Panel Should Not Take Part in En Banc Vote and Determination. ...............................................7

    The Complaint Properly Alleges Defamation. ................................................9

        The Complaint Properly Alleges a Defamatory Statement Published by Appellee Fitton.................................................................10

        The Complaint Sufficiently Alleged That Stone Was Working As Appellee Fitton's Surrogate Agent ......................................................12

        The Defamatory Statement Sufficiently Contains an Implied Defamatory Meaning in Addition to Being Plainly Defamatory and Per Se Defamatory ...............................................................13

        Appellees' Statement is Defamatory Per Se .......................................15

    At a Bare Minimum, Leave to Amend Should Have Been Granted ............15

CONCLUSION ...................................................................................16

## Table of Authorities

### *CASES*

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556 (1982)...................12

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .........................................................1, 5

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).....................1, 4, 5, 6, 16, 17

*Cantu v. Guerra,* 2021 U.S. Dist. LEXIS 119681 (W.D. Tex. June 28, 2021).....6, 7

*Devincci Salah Hourani v. Mirtchev*, 796 F.3d 1 (D.C Cir 2015)............................9

*Farnum v. Colbert*, 293 A.2d 279 (D.C. 1972) ......................................................15

*Foman v. Davis*, 371 U.S. 178  (1962) ...................................................................16

*Gordon v. United States Capitol Police*, 778 F.3d 158 (D.C. Cir. 2015)...............16

*Peters v. National R.R. Passenger Corp.*, 966 F.2d 1483 (D.C. Cir. 1992).............4

*Richardson v. United States*, 193 F.3d 545  (D.C. Cir. 1999)................................16

*White v. Fraternal Order of Police*, 285 U.S. App. D.C. 273 (1990) ....................13

### *STATUTES*

Fed. R. Civ. P. 8(a) ............................................................................................4, 16

Fed. R. Civ. P. 12(b)(6)  .........................................................................................4

Fed. R. Civ. P. 15 ...................................................................................................16

### *SECONDARY SOURCES*

Restatement (Second) of Torts, § 577 ...................................................................12

Restatement (Second) of Agency, § 254 ...............................................................13

5A Charles Alan Wright et al., Federal Practice and Procedure § 1309 (4th ed. Apr. 2021 update...............................................................................................................7

## <u>FEDERAL RULE OF APPELLATE PROCEDURE 35 STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 35(b)(1)(B), this proceeding involves questions of exceptional importance that mandate rehearing en banc. Regrettably, the panel has ignored the well-settled and Supreme Court established standard of pleading under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and instead without basis to do so, imposed a heightened pleading standard at the motion to dismiss stage.

Furthermore, at the oral argument in this matter, the Honorable A. Raymond Randolph ("Judge Randolph") made highly prejudicial and completely irrelevant *ad hominem* attacks on Mr. Klayman that more than likely poisoned the rest of the panel against Mr. Klayman. His subsequent refusal to recuse himself also must be addressed.

## <u>STATEMENT OF THE CASE</u>

This case is the continuation of a long-standing pattern and practice of defamatory and otherwise tortious conduct by Defendants-Appellees Thomas Fitton ("Fitton"), James Peterson ("Peterson"), Paul Orfanedes ("Orfanedes") and Christopher Farrell's ("Farrell") (collectively "Defendants-Appellees") since Appellant Larry Klayman ("Mr. Klayman") voluntarily left Judicial Watch in 2003 to run for the U.S. Senate in Florida. App. 007. Prior defamation has resulted in a 2013 federal judgment in the Southern District of Florida in the sum of $181,000,

1

including punitive damages against Judicial Watch for having maliciously defamed Mr. Klayman as being a "convicted felon," which he is not. *Klayman v. Judicial Watch, Inc. et al,* 13-cv-20610 (S.D. Fl.). App. 009.

Now, Defendant-Appellees, most particularly Fitton, have continued a pattern and practice of malicious and defamatory conduct. Perhaps most egregious is the fact that Defendants-Appellees have now perpetrated the published lie that Mr. Klayman did not leave Judicial Watch voluntarily, but was instead "ousted" due to a "sexual harassment complaint." App. 012.

As set forth in the Complaint, Defendants-Appellees have knowingly, intentionally, and maliciously published this lie to Roger Stone ("Stone") with the understanding that Stone, as Fitton's surrogate and agent, would then republish it nationally and  worldwide. This is exactly what has occurred, as set forth in the Complaint:

> Stone made this false, defamatory statement at the direction as the surrogate and agent of the concerted actions of the Defendants, whom he attributes this false and defamatory statement to. App. 011-012.

Indeed, Stone directly attributes this lie to Defendant-Appellee Fitton - and by extension, the rest of the Judicial Watch Defendants – by saying "[a]sk Tom Fitton." App. 012.

Crucially, this case was erroneously disposed of at the motion to dismiss stage, without any discovery. Thus, it was entirely premature for the District Court

to have dismissed Mr. Klayman's complaint, which turns on whether or not Fitton published this defamatory statement to Stone—a purely factual question that could have been confirmed in discovery. Either Fitton did publish this statement to Stone, or he did not. This could have been verified through phone records, text messages, emails, and other records of communications that would have come out in discovery. It was more than enough for Mr. Klayman, at the pleading stage, to make the factual allegation that Fitton, who has tried to harm Plaintiff-Appellee over the years, as he felt competitive with him,  particularly since Fitton is a non-lawyer who as the head of Judicial Watch tries to pass himself off as one -- published this defamatory statement to Stone, as a surrogate agent based on Stone's statement to "[a]sk Tom Fitton," and the pattern and practice of similar conduct over the years since Mr. Klayman left Judicial Watch to run for the U.S. Senate in Florida in 2003. Thus, what the District Court did was to usurp the fact-finding role of the jury, and instead make its own baseless factual findings that contradicted what was pled in the Complaint. This is clearly an egregious, reversible error.

## **ARGUMENT**

Whether the District Court properly granted Appellees Motion to Dismiss and entered judgment on the pleadings in favor of Appellees is a question of law,

which this Court reviews *de novo*. *Peters v. National R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992).

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In several cases, the U.S. Supreme Court addressed the standards for deciding motions to dismiss a complaint for failure to state a claim.

First, in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Court held that facts alleging that companies engaged in parallel business conduct, but not indicating the existence of an actual agreement, did not state a claim under the Sherman Act. The Court stated that in an antitrust action, the complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made," explaining that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading state; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. The Court also explained, more generally, that ". . . a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," yet "must be enough to raise a right to relief above the speculative level" and give the defendant fair notice of what the claim is and the grounds upon which it rests. *Id.* at 555. In other words, Plaintiffs-Appellants here need only allege "enough facts to state a claim to relief that is plausible on its face"

4

and to "nudge[] the[] claims[] across the line from conceivable to plausible." *Id*. at 570.

Subsequently, in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Court elaborated. There, the Court held that a pretrial detainee alleging various unconstitutional actions in connection with his confinement failed to plead sufficient facts to state a claim of unlawful discrimination. The Court stated that the claim for relief must be "plausible on its face," *i.e.*, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 1949. In this regard, determining whether a complaint states a plausible claim for relief is necessarily "a context-specific task." *Id*. at 1950. Therefore, if a complaint alleges enough facts to state a claim for relief that is plausible on its face, such as here, a complaint <u>may not be dismissed</u> for failing to allege additional facts that the plaintiff would need to prevail at trial. *Twombly*, 550 U.S. at 570.

Here, as set forth below, Mr. Klayman's claims are more than plausible—they are indeed highly probably given the plain language of Roger Stone - "ask Tom Fitton" - and pattern and practice of Appellees maliciously defaming Mr. Klayman over the years since he left Judicial Watch, as the young Fitton viewed Mr. Klayman as a competitor either with his Senate campaign or later with the public interest group Freedom Watch, Inc.

Lastly, it is clear that Mr. Klayman pointed out to the panel how case authority supported the legal principle that at the initial pleading stage he did not have to plead with precise specificity the exact date of the publication under the following precedent, but that it was plausibly around the time of the republication of Roger Stone. Accordingly, this was sufficient at this stage of the case before any discovery could take place. In this regard, as courts have ruled, "[m]oreover, it is important to recognize that while some cases appear to state an absolute requirement for time and place allegations, **such requirement is better viewed through the lens of *Twombly* and *Iqbal*.** For instance, the undersigned recognized the requirement in *Mandawala* through reliance on two older cases affirmed by the Fifth Circuit. But the defamation claim failed for lack of any allegation 'that any statement was published to a third party.'…. **The Court thus applied the *Iqbal* and *Twombly* standard without regard to time and place allegations**. **Similarly, the Eastern District of Texas found that the plaintiff had 'pled its defamation claim with sufficient particularity' to put the defendant 'on notice of the claim,' even though 'the allegations relating to the defamation claim do not specify when these alleged statements were made or, with regards to the letters to patients, to whom they were specifically made**.'" *Cantu v. Guerra,* 2021 U.S. Dist. LEXIS 119681, at *41-42 (W.D. Tex. June 28, 2021 (emphasis added)(internal citations omitted).

Furthermore, "[i]t should be understood that Federal Rule of Civil Procedure 9(f) does not require the pleader to set out specific allegations of time and place; it merely states the significance of these allegations when a pleader actually interposes them in a complaint or answer. Whether statements of time and place are required in a pleading is determined by the substantive nature of the suit, the principles governing the motion for a more definite statement, and the general rules of pleading. Such allegations usually are necessary (only) if without them the statement of a claim is so vague and ambiguous that the other party cannot adequately frame an answer." *Cantu v. Guerra*, 2021 U.S. Dist. LEXIS 119681, at *42-43 (W.D. Tex. June 28, 2021) quoting 5A Charles Alan Wright et al., Federal Practice and Procedure § 1309 (4th ed. Apr. 2021 update).

## I. Judge Randolph Should Have Recused Himself And The Panel Should Not Take Part in En Banc Determination

*First*, before delving into the substantive merits of this case, it is clear that Judge Randolph should have recused himself due to his openly exhibited extrajudicial bias and prejudice against Mr. Klayman. On October 4, 2022, Mr. Klayman appeared in person before this honorable Court before a Merits Panel which consisted of Judge Randolph, the Honorable Gregory G. Katsas and the Honorable Judith W. Rogers for oral argument in this appeal. Exhibit 1; *Transcript*. Shortly after Mr. Klayman began his oral argument, the Judge Randolph abruptly, heatedly and angrily interrupted Mr. Klayman's presentation

7

and stated  had he been found, in a case styled *Klayman v. Judicial Watch Inc.*, 06-cv-670 (D.D.C.), presided upon by the Honorable Colleen Kollar-Kotelly, to have sexually harassed the office manager of Judicial Watch and also found to have beaten his former wife. Mr. Klayman vehemently denied that any jury or Judge Kotelly had made any such findings and a review of the record will bear this out. In any event, as this was a jury trial, Judge Kotelly had no authority to make any such findings. Importantly, the jury verdict reflects no such findings and there were no special jury interrogatories given to them by Judge Kotelly. *See* <u>Exhibit 2</u>, which jury verdict is also incorporated herein by reference.

Judge Randolph clearly and forcefully implied that these alleged false findings were a reason to deny Mr. Klayman's appeal, which again, is predicated only on the improper dismissal of the underlying defamation complaint pursuant to Rule 12 (b)(6) of the Federal Rules of Civil Procedure. Even if what Judge Randolph said was true – which again it was not – it would have been completely irrelevant to this case. Thus, Mr. Klayman moved to recuse Judge Randolph pursuant to 28 U.S.C. §144 *et. seq*, which was summarily denied by the panel with no expressed reasoning. <u>Exhibit 3</u>*; Judgment of October 25, 2022*. This was a clear error that must be reversed by the *en banc* panel, as this is clear extrajudicial bias and animus exhibited by Judge Randolph.

8

As set forth above, Mr. Klayman more than met the grounds for recusal. And, as it is clear that Judge Randolph's unexplainably prejudicial conduct clearly poisoned the rest of the panel against him, Mr. Klayman respectfully requests that the other two judges on the Panel not take part in the en banc process, in the interest of justice and fundamental fairness.

## II.     The Complaint Properly Alleges Defamation

Under District of Columbia law, a valid defamation claim must plead only four elements:

> [T]he defendant made a false and defamatory statement concerning the plaintiff"; (2) the defendant published the statement without privilege to a third party; (3) the defendant's fault in publishing the statement amounted to at least negligence; and (4) either the statement was actionable as a matter of law irrespective of special harm, or its publication caused the plaintiff special harm.

*Devincci Salah Hourani v. Mirtchev*, 796 F.3d 1, 16 (D.C Cir 2015) (internal quotations omitted). Here, each of the elements are alleged in the Complaint. *First*, the Complaint alleges that Fitton, "acting in concert individually as joint tortfeasors knowingly published this false and defamatory statement to Stone, who in turn published and republished it during interviews which were broadcast by him and his surrogates in this district, nationally and internationally for the entire world to hear and see." App. 012. *Second*, Fitton asserts no privileges, nor could he, since none remotely apply. *Third*, Fitton published the statement with actual malice to Stone. "Defendants knew that Plaintiff Klayman was not ousted at

Judicial Watch as a result of a sexual harassment complaint, but, in actuality, Plaintiff Klayman left Judicial Watch on his own accord and voluntarily in order to run for U.S. Senate in Florida." App. 012. Actual malice is particularly strong here, since Fitton was personally involved in, and negotiated the Severance Agreement pertaining to Mr. Klayman's departure from Judicial Watch, which set forth that Mr. Klayman left voluntarily and was agreed to and signed by all parties. Thus, Fitton had actual knowledge that Mr. Klayman was not ousted due to a sexual harassment complaint, but instead, left voluntarily to run for U.S. Senate. App. 012. Therefore, to then make this false statement, Fitton acted with actual knowledge of its falsity, and therefore with actual malice. Lastly, Mr. Klayman alleges damages. App. 014.

Thus, it is clear that Mr. Klayman's claims should have proceeded past the motion to dismiss stage, as he has clearly pled all of the elements of defamation.

### A.     The Complaint Properly Alleges a Defamatory Statement Published by Appellee Fitton

As set forth above, the Complaint clearly and expressly alleges that "Defendants acting in concert individually as joint tortfeasors knowingly published this false and defamatory statement to Stone, who in turn published and republished it during interviews which were broadcast by him and his surrogates in this district, nationally and internationally for the entire world to hear and see." Comp. ¶ 24. At the motion to dismiss stage, this is more than sufficient. Any

factual contradictions that Fitton attempted to disingenuously and improperly assert should have been ignored by the District Court at this stage. It is indisputable that, as set forth in the Complaint, Stone stated and republished:

> He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He left because of a sexual harassment complaint. App. 012.

The District Court inserted its own factual determination into this case out of whole cloth when it made the erroneous finding that:

> During his January 18, 2019 interview, Stone did not attribute his statement about Plaintiff to Fitton or any other Defendant. For example, Stone did not say that any Defendant told him that Plaintiff left Judicial Watch because of a sexual harassment complaint, nor did he say that any Defendant "directed" him to relay the message. Instead, Stone merely suggested that Fitton could corroborate his allegations about the circumstances surrounding Plaintiff's departure from Judicial Watch. App. 070.

Again, this contradicts the facts set forth in the Complaint that Stone was acting in concert with Fitton and the other Appellees as a surrogate agent.

The District Court strains to incorrectly find that Mr. Klayman's allegations in this regard were not "reasonable," but this defies not only the facts of the Complaint, but also common logic. While the statement that was published worldwide was made by Stone, the only way that Stone could have received this "information" is from Fitton. It is not as if Stone was a part of Judicial Watch, and was privy to the details of Mr. Klayman's departure. Based on simple logic, the only way that Stone would have made this statement is if he was told so by the

parties involved in Mr. Klayman's departure from Judicial Watch – either Fitton or Mr. Klayman. Mr. Klayman clearly did not fabricate this lie about himself, so the only possible culprit is Fitton. This more than plausible sound reasoning and logic clearly should have been enough to advance this case past the motion to dismiss stage—which once again, must be based only on facts pled in the Complaint—and not on the District Court making its own factual determinations out of thin air.

The bottom line is this—Stone says, "[a]sk Tom Fitton why he left." App. 012. This directly implicates Fitton. If Fitton had not published this false statement to Stone, Stone had no reason to tell the public to "[a]sk Tom Fitton." This, at the very minimum, is enough to deny a motion to dismiss advance this case to the discovery phase. Like Stone said, Mr. Klayman and the District Court should have "[a]sk[ed] Tom Fitton" by having him sit for deposition, and engage in other related discovery along with the rest of the Appellees.

### B.    The Complaint Sufficiently Alleged That Stone Was Working As Appellee Fitton's Agent

Under the agency theory of liability, "[o]ne is liable for the publication of defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter." Restatement (Second) of Torts, § 577, comment f.  This unequivocal principle has been adopted  by the Supreme Court. "Also, if an agent is guilty of defamation, the principal is liable so long as the agent was apparently authorized to make the defamatory statement." *Am. Soc'y*

*of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982); *see also* Restat 2d of Agency, § 254.

As set forth in the Complaint, Appellee Fitton knowingly, intentionally, and maliciously published the defamatory statement at issue herein to Stone with the instruction that Stone as his surrogate agent would then republish it nationally and worldwide. This is exactly what has occurred:

> **Stone made this false, defamatory statement at the direction and as a result of the concerted actions of the Defendants**, whom he attributes this false and defamatory statement to. App. 012. (emphasis added).

Indeed, Stone directly attributes this lie to Defendant-Appellee Fitton - and by extension, the rest of the Judicial Watch Defendants – by saying "[a]sk Tom Fitton."

This is a textbook example of an agency relationship between Appellee Fitton and Stone, with Stone acting as Fitton's agent. Thus, Fitton is equally liable for Stone's statements.

## C.    The Defamatory Statement Sufficiently Contains an Implied Defamatory Meaning in Addition to Being Plainly Defamatory and Per Se Defamatory

"A defamation by implication stems not from what is literally stated, but from what is implied." *White v. Fraternal Order of Police*, 285 U.S. App. D.C. 273, 909 F.2d 512, 518 (1990). "…if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative

evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that meaning." *Id.* at 520.

As set forth above, it is clear that Fitton published the false and defamatory statement contained in paragraph 20 of the Complaint to Stone, who then republished it nationwide and worldwide. Now, analyzing the content of the defamatory statement, there is a readily apparent defamatory implication that Mr. Klayman "has engaged [in or] been subject to a sexual harassment complaint and was ousted from Judicial Watch for this reason and committed criminal sexual offenses, as well as other matters of moral turpitude as set forth in this Complaint." App. 016.

Falsely stating that an individual was ousted from the organization he conceived of and founded due to a sexual harassment complaint clearly carries numerous severe negative implications. *First*, it creates the false implication that Plaintiff did in fact sexually harass someone. Why else would an organization's founder and chairperson be "ousted?" Generally speaking, it would not be due to an unproven much less unverified allegation. Thus, by falsely stating that Mr. Klayman was "ousted" from Judicial Watch due to a "sexual harassment complaint," Appellees are purposefully creating the implication that these fabricated allegations are true.

*Second*, the false allegation that Mr. Klayman was "ousted" from Judicial Watch due to a "sexual harassment complaint" creates, at a minimum, the implication that Mr. Klayman is a sexual deviant or predator, which he is not. By creating this story, Appellees have severely harmed Mr. Klayman's reputation and standing in society, where sexual deviants and predators are – rightfully – vilified. However, in Mr. Klayman's case, where the allegations are false, Mr. Klayman is wrongfully made to suffer the same fate.

### D.    Appellees' Statement is Defamatory Per Se

A statement is defamatory *per se* if it "impute[s] to him (plaintiff) the commission of some criminal offense for which he may be indicted and punished, if the charge involves moral turpitude and is such as will injuriously affect his social standing." *Farnum v. Colbert*, 293 A.2d 279, 281 (D.C. 1972).

As set forth above, Appellees' false statement that Mr. Klayman was "ousted" from Judicial Watch due to a "sexual harassment complaint" creates the false implication that Mr. Klayman is a sexual deviant or predator, both of which are serious criminal offenses that almost universally leads to vilification in society. Thus, this false statement is *per se* defamatory, and requires no pleading of special damage.

### III.    At a Bare Minimum, Leave to Amend Should Have Been Granted

As set forth above, Mr. Klayman's Complaint was more than sufficiently pled, and therefore the District Court fundamentally erred by granting the Appellees'' Motion to Dismiss since it ignored the relevant pleading standards set forth in *Twombly,* made up its own facts, and usurped the fact-finding role of the jury. However, even if the Complaint was not sufficiently pled, the District Court should have, at a bare minimum, granted leave to amend, since such leave should be "freely given." Fed. R. Civ. P. 15(a). Leave to amend a complaint should be freely given in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility." *Richardson v. United States*, 193 F.3d 545, 548-49 (D.C. Cir. 1999). The U.S. Supreme Court has declared that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## **CONCLUSION**

The District Court fundamentally erred by preventing discovery and usurping the fact-finding role of the jury and contravening, without factual bases, the allegations pled in Mr. Klayman's Complaint, something that it was not entitled to do. *Gordon*, 778 F.3d 163-64. This is a clear deviation from the accepted standards of pleading set forth under Fed. R. Civ. P. 8(a).

This case is important because it violates standard plausibility requirements to successfully plead at the initial stage under black letter Supreme Court precedent

in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). And that is why en banc review must respectfully be voted upon and undertaken by the judges of this Court, excluding the three judges on the Merits Panel whose deliberations were prejudicially tainted by the ad hominem, baseless and irrelevant attack on Mr. Klayman. *See* Exhibit 1.

Dated: November 25, 2022                     Respectfully Submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: (561) 558-5336
Email: leklayman@gmail.com

*Plaintiffs-Appellant Pro Se*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Fed. R. App. P. 35 because this document contains 3,885 words.

2.    This document complies with the typeface and the type-style requirements of Fed. R. App. P. 27(d)(1)(E) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 15.28 in 14-point Times New Roman.

/s/ Larry Klayman

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties listed below on November 25, 2022.

<u>/s/ Larry Klayman</u>

# EXHIBIT 1

UNITED STATES COURT OF APPEALS FOR THE

DISTRICT OF COLUMBIA CIRCUIT

CASE NO. 21-7125


LARRY ELLIOT KLAYMAN, Individually,

     Appellant,

v.

THOMAS J. FITTON, Individually;
JAMES F. PETERSON, PAUL J. ORFANEDES,
Individually; and CHRISTOPHER FARRELL,
Individually.

     Appellees.

_____/



TRANSCRIPTION OF ORAL ARGUMENT HELD BEFORE

JUDGE KATSAS, JUDGE RANDOLPH, AND JUDGE ROGERS

(Pages 1 to 21)


Date:     Tuesday, October 4, 2022
Time:     9:30 a.m. to 9:50 a.m.
Location:  DC Court of Appeals
          430 E St NW
          Washington, DC  20001



Transcription By:  Gail Hmielewski
               Court Stenographer

```
 1    ALL PARTIES APPEARED VIA VIDEOCONFERENCE:

 2

 3    Appeared for the Appellant:

 4    LARRY E. KLAYMAN, ESQUIRE, PRO SE
      KLAYMAN LAW GROUP, P.A.
 5    7050 West Palmetto Park Road
      Boca Raton, Florida  33433
 6    310-595-0800
      leklayman@gmail.com
 7

 8    Appeared for the Appellees:

 9    RICHARD WAYNE DRISCOLL, ESQUIRE
      DRISCOLL & SELTZER, PLLC
10    2000 Duke Street
      Suite 300
11    Alexandria, VA  22314
      703-822-5001  Phone
12    703-997-4892  Fax

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     INDEX OF PROCEEDINGS

2

3                                                              PAGE

4

    PROCEEDINGS                                               4
5
    CERTIFICATE OF REPORTER                                   21
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   (This is a transcription of proceedings via a
     YouTube link.  The YouTube link was provided by
 2   Larry E. Klayman.)

 3                    PROCEEDINGS

 4           THE CLERK:  Case No. 21-7125, Larry Elliot

 5       Klayman, Individually, Appellant, v. Thomas J.

 6       Fitton, Individually, et al.; Mr. Klayman for the

 7       appellant, Mr. Driscoll for the appellees.

 8           MR. KLAYMAN:  Good morning, Your Honors.  May

 9       I ask for leave to remove my mask?  I took a test

10       on Friday, I travelled here over the weekend and I

11       did not get the result until yesterday and I'm

12       negative.

13           THE COURT:  And you're negative?

14           MR. KLAYMAN:  Yes.

15           THE COURT:  All right.

16           MR. KLAYMAN:  Thank you very much.  May it

17       please the Court, a pleasure to appear in front of

18       you, all three.

19           This is a case involving defamation.  The

20       statement at issue is that "He" - Klayman, yours

21       truly - "was ousted at Judicial Watch.  Ask Tom

22       Fitton why he left.  He left because of a sexual

23       harassment complaint."

24           This was allegedly published, as pled in the

25       complaint, by Tom Fitton of Judicial Watch for
```

```
 1          Roger Stone, who then republished it on Info Wars.
 2          The law is clear that it's sufficient just to have
 3          one publication to one person, here we had two.
 4               In fact, the law of defamation in the district
 5          says it simply must be published through a third
 6          party.  That's Competitive Enter. Institute v.
 7          Mann, 180 A.3d 1213, 1240 (D.C. 2016).  As well as
 8          the restatement of torts, it is enough that it's
 9          communicated to a single individual other than the
10          one defamed.  Here you have two publications here.
11               And we also alleged in the complaint that
12          there was a surrogate publication, Stone was
13          publishing it on behalf of Fitton.
14               THE COURT:  What's the basis for your
15          allegation that Fitton was the source of Stone's
16          statement?
17               MR. KLAYMAN:  It says - this was the
18          publication - ask Fitton, so obviously he got it
19          from Tom Fitton.
20               (Inaudible.)
21               THE COURT:  How do we know that?  I mean, this
22          is about the circumstances in which - under which
23          you left Judicial Watch and that had been the
24          subject of a very public trial that had been
25          ongoing for a decade, so --
```

```
 1              MR. KLAYMAN:  It has never been proven that I
 2       sexually harassed the office manager.  I
 3       categorically deny that.
 4              But the bottom line here, Your Honor, is, if
 5       it's plausible, it must proceed, under Rule 9 --
 6              THE COURT:  Do you deny --
 7              MR. KLAYMAN:  -- and 8.
 8              THE COURT:  Do you deny that you physically
 9       assaulted your wife?
10              MR. KLAYMAN:  This has nothing to do with this
11       case and I do deny that vehemently.  I deny it --
12              THE COURT:  The jury found --
13              MR. KLAYMAN:  -- vehemently.
14              THE COURT:  The jury found otherwise in the
15       case.
16              MR. KLAYMAN:  The jury never made such a
17       finding, Your Honor.  The jury never made such a
18       finding.  One of the problems that we've had here,
19       this is a --
20              THE COURT:  Why did the jury then award
21       Judicial Watch two point some million dollars
22       against you?
23              MR. KLAYMAN:  That's still being challenged,
24       Your Honor, but the fact is is that there was
25       prejudice because that came in, it never should
```

7

```
1     have come in.  I left voluntarily.  There was a
2     severance agreement that said I left voluntarily.
3     I was praised.  The parole evidence rule should
4     never have allowed it in.
5         THE COURT:  The point is, the point here is
6     that, and I think this is what Judge Katsas was
7     asking you about, was that this was spread all over
8     the newspaper a year before Roger Stone made the
9     statement you're complaining about - all this
10    information, the jury verdict, the evidence that
11    came in and so on - so it seems to me that your
12    submission that the only way that Stone could have
13    known this is from Fitton is belied by the fact
14    that it was a public trial.
15        MR. KLAYMAN:  First of all, Your Honor, you're
16    getting way beyond this case, okay.  You have been
17    prejudiced yourself here from third parties and
18    other sources.  I'm not saying you're a prejudiced
19    person, but you've been prejudiced.  This case --
20        THE COURT:  Wait a minute.
21        MR. KLAYMAN:  There's no claim of res judicata
22    here.
23        THE COURT:  Wait.  Why have I been prejudiced?
24    You're making an accusation.
25        MR. KLAYMAN:  I'm saying not --
```

```
 1              THE COURT:  Back it up.

 2              MR. KLAYMAN:  I'm not saying that you have

 3      been prejudiced as a person, I'm saying that the

 4      things that you have been, that have been out there

 5      in the alleged media --  And it wasn't even out in

 6      the media, Your Honor, you'd have to go back and

 7      look at that.

 8              THE COURT:  You think because I read an

 9      opinion of our court that that prejudiced me?

10              MR. KLAYMAN:  The opinion did not say that.

11      It did not say that, Your Honor.  It's never been

12      found --

13              THE COURT:  The opinion --

14              MR. KLAYMAN:  -- that I sexually harassed --

15              THE COURT:  The opinion --

16              MR. KLAYMAN:  -- my office manager.

17              THE COURT:  Don't interrupt me when I'm trying

18      to interrupt you.

19              MR. KLAYMAN:  Do I have equal rights?

20              THE COURT:  The opinion said that the big

21      issue before the jury was whether you left Judicial

22      Watch voluntarily.  The opinion said it.

23              MR. KLAYMAN:  The opinion did not say anything

24      about sexually harassing the office manager,

25      Your Honor.  I ask respectfully that you go back
```

1       and read that.  It did not say that.  In any

2       event --

3            THE COURT:  Well, neither did Roger Stone.

4            MR. KLAYMAN:  I'm entitled to plead in my

5       complaint and make a claim in my complaint there's

6       no defense of res judicata, collateral estoppel or

7       anything.  Under Twombly, as long as it's

8       plausible, the matter has to proceed.

9            And here's what Twombly said:  The complaint

10      must contain enough factual matter, taken as true,

11      to suggest - this is dealing with an agent - an

12      agreement in restraint of trade in an antitrust

13      case.  Asking for plausible grounds to infer an

14      agreement does not impose a probability requirement

15      at the pleading stage; it simply calls for enough

16      facts to raise a reasonable expectation that

17      discovery will provide evidence of an illegal

18      agreement.  You must only plead enough to cause a

19      right to relief above the speculative level.  If

20      given the defendant fair notice of what the claim

21      is and the grounds upon which it rests.

22           It only must be plausible, Your Honor.

23      Plaintiff need not allege specific facts.  The

24      facts alleged must be accepted as true, as the

25      facts need only give the defendant fair notice of

```
1       what the claim and the grounds upon which it rests,
2       Erikson v. Pardus, 551 U.S. 89, 93.
3            And then Twombly adds, going back to Twombly,
4       the well pled complaint may proceed even if it
5       strikes a savvy judge that actual proof of those
6       facts is improbable and that a recovery is very
7       remote and unlikely.
8            We pled, I pled what needed to be pled,
9       Your Honor, and I don't mean any disrespect to you,
10      but what has occurred here over the years - and I
11      have a defamation judgment against Judicial Watch
12      going back to Miami in 2014 - has prejudiced me.
13      I'm not saying you're a prejudiced person, not at
14      all.  I've had issues with judges in this court,
15      particularly Judge Kotelli, and I sometimes get the
16      impression that the judges in this court circle the
17      wagon.
18           There was no such finding that I sexually
19      harassed the office manager, even Judicial Watch
20      didn't make that at that trial.  There was no
21      finding that I in any way abused my wife.  I'm
22      desirous of equal rights here.  There's no finding
23      to that effect, and I pled what needed to be pled
24      in this complaint.  The complaint must proceed.
25           You're here with an oath of office to follow
```

```
 1        the law.  The law does not enter into what you may

 2        think a jury found in another case, because there's

 3        no such jury finding.  There are no specific jury

 4        interrogatories and, if you want to get back into

 5        that case, I don't even know what was given to the

 6        jury in terms of the written instructions, but

 7        there's no such finding there.  I categorically

 8        deny that.  I'm entitled to equal rights here,

 9        Your Honor, and the fact that I've been smeared

10        here and there's enough --

11            THE COURT:  The entire subject --

12            MR. KLAYMAN:  There's enough here --

13            THE COURT:  Mr. Klayman, the entire subject

14        came up because you said that the only way that

15        Roger Stone could have possibly come up with the

16        idea that you were - that you left Judicial Watch,

17        that you were ousted, the only way that he could

18        possibly have known that is through Mr. Fitton, but

19        the relevance of the prior decision in this Court

20        and the jury trial was that there was another way -

21        because of your earlier trial.  That was the issue

22        according to the opinion.

23            MR. KLAYMAN:  I wasn't trying that,

24        Your Honor.  That wasn't an allegation in the case.

25        It was brought in trial, Judge Kotelli let it in
```

1       out of the blue, it was prejudicial, and even the

2       statement that came in wasn't that I had sexually

3       harassed the office manager.  That was not the

4       statement that came in.

5            And if you're looking at the actual

6       publication here - Klayman was ousted at Judicial

7       Watch, ask Tom Fitton - it's more than plausible

8       that Fitton said that to Stone and that's enough

9       for a defamation case.

10           You are bound under Rule 9 and 8 to allow this

11      to proceed and you're bound under Twombly.  You

12      don't get to decide a case before it goes to

13      discovery and goes to a jury.  You don't get to do

14      that.  That's not a judge's role.

15           And I'm sorry if I'm being emphatic, but this

16      is exactly what's been happening in a lot of

17      different cases, not just with regard to me, but

18      every - judges taking cases away from discovery and

19      from juries, then making a decision, which the

20      constitution gives a party a right to at least

21      plead in a complaint and take discovery.

22           And I would like to get into telephone

23      records, I want to talk to other people here as to

24      what was said.  I have a right to do that, that's

25      my constitutional right.  And I'm sorry if I'm

1        upset, but frankly, you know, to rule otherwise is

2        a severe injustice.

3              THE COURT:  Judge Rogers, any questions?

4              JUDGE ROGERS:  No.

5              THE COURT:  Thank you.  Anything else?

6              MR. KLAYMAN:  No.  I thought maybe

7        Judge Rogers wanted to say something.

8              (Inaudible.)

9              THE COURT:  Mr. Driscoll, we'll hear from you.

10             MR. DRISCOLL:  Good morning, Your Honors.  May

11       it please the Court, Rich Driscoll on behalf of the

12       appellees, Thomas Fitton, James Peterson, Paul

13       Orfanedes, and Christopher Farrell.

14             Neither party before the Court this morning is

15       arguing for a change in the law.  The issue before

16       the Court is whether the law was properly applied

17       in the lower court.

18             I think the Court needs only look at Page 9 of

19       the joint appendix, in Paragraph 12, to read the

20       allegation regarding who made the alleged

21       defamatory statement, which reads, on information

22       and belief, the defamatory statement alleged herein

23       were made by Defendant Peterson and/or Defendant

24       Fitton at the direction of or directly by the other

25       direction - the other defendants to Stone.

```
1              THE COURT:  Twombly and Iqbal didn't eliminate
2         pleading on information and belief, right?
3              MR. DRISCOLL:  No, sir, they did not.
4              THE COURT:  So why isn't, for that kind of
5         allegation, why isn't it enough for him just to say
6         on information and belief Fitton made the
7         statement?  I mean --
8              (Inaudible.)
9              MR. DRISCOLL:  Under the law of this
10        jurisdiction, and I believe the case Franklin v.
11        Pepco Holdings, the standard of allegation for
12        establishing a defamatory statement is that the
13        plaintiff must allege the time, the place, the
14        content, the speaker, and the listener.  And here
15        that may have been done with regard to the
16        statement made by Roger Stone, but it is not done
17        with regard to any of the defendants, and in fact
18        this Court agreed that, at least with regard to
19        Appellants (sic) Peterson, Orfanedes, and Farrell,
20        that that is correct, there was no allegation.  And
21        in the complaint, the only distinction between the
22        allegations against those three defendants and
23        Appellant (sic) Fitton is the allegation "ask Tom
24        Fitton".
25              So the question then becomes does the phrase
```

```
 1        "ask Tom Fitton" push this case over the line from
 2        a possible claim to a plausible claim under Twombly
 3        and Iqbal.
 4             THE COURT:  I understand your argument that
 5        that inference is not a plausible one.  I guess I'm
 6        asking whether you even need to make that
 7        inference.
 8             I mean, suppose you were suing Mr. Klayman and
 9        you allege that he's a resident of Florida and you
10        don't say anything more, right, and he says, well,
11        what's your basis, what's your basis for saying
12        that?  And your position would be you don't need
13        any more, it's just a historic fact and you allege
14        it.
15             MR. DRISCOLL:  Well, because --
16             THE COURT:  And why isn't that --  I mean,
17        inferring a conspiracy, an antitrust conspiracy,
18        which is Twombly, or inferring discrimination,
19        which is Iqbal, seem a little bit different from
20        just a historic fact that "A" made a statement to
21        "B".
22             MR. DRISCOLL:  Under the law of defamation in
23        the District of Columbia, a blanket statement of
24        "A" said this to "B" without more is insufficient,
25        inadequate, and does not reach the level of
```

```
1        plausibility.  It's a possibility, but it's not
2        plausible because what you must know is who said
3        the statement, okay?
4             So let's assume he doesn't know exactly who
5        said the statement.  Let's assume it's one of the
6        four appellees.  How does he know it's one of the
7        four appellees?
8             In the complaint there's not even an
9        allegation with regard to three of the appellees
10       and the only specific factual allegation in the
11       complaint is that Roger Stone said "ask Tom
12       Fitton".  Other than that, the complaint is
13       completely rife with conclusions - not facts,
14       conclusions.
15            To say that the defendants acted in concert is
16       a descriptive conclusion, it's not a fact, so you
17       can't allege that without an underlying event of
18       fact or an occurrence to support it, and here the
19       appellees are emphasizing that the complaint lacks
20       those predicate facts on which to build a summary
21       allegation that a defamatory statement was made.
22       Here we're dealing with pure speculation, based on
23       a historical animosity by Mr. Klayman against
24       Mr. Fitton and others at Judicial Watch.
25            It's --  When you look at the complaint and
```

1    you read each paragraph through, the complaint

2    really boils down to Roger Stone said that and the

3    only way he could know how to say that is if Tom

4    Fitton told him, and even that predicate argument

5    fails because Tom Fitton has admitted under oath in

6    a deposition that that's not the reason Larry

7    Klayman was forced out of Judicial Watch.

8         And Mr. Klayman filed this same lawsuit in the

9    Southern District of Florida and it was dismissed

10   by Judge Martinez, who found - we've quoted the

11   language in our brief - Judge Martinez found that

12   there was no tortious or wrongful conduct in

13   Florida, and the law of Florida, the long-arm

14   jurisdiction law of Florida, can encompass both an

15   act in Florida or an act outside of Florida

16   directed at Florida.  So at least with regard to

17   Florida, we know, based on Judge Martinez's

18   argument, that there is no wrongful conduct here.

19        But in order to reach that point, Mr. Klayman

20   was allowed to depose Tom Fitton for two hours and

21   ask these questions of him.  He's not here before

22   the Court without having had an opportunity for

23   discovery.  He's deposed Roger Stone, he's deposed

24   Thomas Fitton.  He has nothing.  And there's no

25   reason why he should be given another opportunity

18

1         to harass the defendants in this case.

2             That's the position that we argued in the

3         lower court and it was accepted by Judge Chutkan,

4         and we believe that Judge Chutkan's decision is

5         correct and should be affirmed.

6             THE COURT:  Okay.  Judge Rogers?

7             JUDGE ROGERS:  No.  Thank you.

8             MALE VOICE:  Thank you.

9             MALE VOICE:  Okay, thank you.

10            MR. KLAYMAN:  Your Honor, the law is clear

11        that you just have to have a plausible claim and

12        when someone says "ask Tom Fitton", it's

13        plausible.

14            A specific date is likely in and about the

15        time that Roger Stone republished the event, but

16        even that is not required in terms of the eventual

17        pleading, and you can look at the cases that state

18        that - 2020 U.S. Dist., D-i-s-t, Lexis 161295,

19        2020 WL 525024 at 8, wherein it says, and this is a

20        case coming out of the Western District of Texas,

21        "Similarly, the Eastern District of Texas found

22        that plaintiff had 'pled its defamation claim with

23        sufficient particularity' to put defendant 'on

24        notice of the claim,' even though 'the allegations

25        relating to the defamation claim do not specify

```
 1        when these alleged statements were made or, with
 2        regards to the letters to patients, to whom they
 3        were specifically made.'"  Also you can look to the
 4        case of Cantu, C-a-n-t-u, v. Guerra, 2021 U.S.
 5        Dist. Lexis 119681, at 42 to 43, also Western
 6        District of Texas.
 7             We pled all that needed to be pled here,
 8        Your Honor.  And we also stated, yes, that the
 9        defendants made these statements and we pointed
10        out that Fitton was the one who was in fact
11        fingered, for lack of a better word, by Roger Stone
12        for having made it, and that's enough to go
13        forward.
14             In terms of discovery, you know, this was a
15        misstatement by Mr. Driscoll, regrettably, because
16        the case was dismissed in Florida for personal
17        jurisdiction.  The judge never got to the merits.
18             And to have Fitton simply deny it, that's not
19        discovery.  I get to take a look at telephone
20        records, I get to talk to other people, I get to
21        see text messages and other things like that.
22        Obviously people are going to deny it, so that's
23        not demonstrative.
24             So, Your Honor, we ask that you allow the case
25        to proceed forward, respectfully, everybody,
```

1          including Judge Randolph.  You are required to do

2          that under Twombly.  Thank you.

3                    THE COURT:  Thank you.  The case is submitted.

4                    (The proceedings concluded at 9:50 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T E

2

3

4   DISTRICT OF COLUMBIA COUNTY, D.C.

5

6       I, Gail Hmielewski, Court Stenographer, do hereby

7   certify that the foregoing transcript, Pages 1 to and

8   including 20, is a true and correct transcript of

9   audiotape proceedings accessed via YouTube.

10

11       The YouTube link was provided to me by

12   Larry E. Klayman, Esquire, and transcribed to the best

13   of my ability.

14

15       Dated this 5th day of October, 2022.

16

17

18

19   _____

20   Gail Hmielewski, Court Stenographer

21

22

23

24

25

## A

**A.3d** 5:7
**a.m** 1:19,19 20:4
**ability** 21:13
**abused** 10:21
**accepted** 9:24
   18:3
**accessed** 21:9
**accusation** 7:24
**act** 17:15,15
**acted** 16:15
**actual** 10:5 12:5
**adds** 10:3
**admitted** 17:5
**affirmed** 18:5
**agent** 9:11
**agreed** 14:18
**agreement** 7:2
   9:12,14,18
**al** 4:6
**Alexandria** 2:11
**allegation** 5:15
   11:24 13:20
   14:5,11,20,23
   16:9,10,21
**allegations**
   14:22 18:24
**allege** 9:23 14:13
   15:9,13 16:17
**alleged** 5:11 8:5
   9:24 13:20,22
   19:1
**allegedly** 4:24
**allow** 12:10
   19:24
**allowed** 7:4
   17:20
**and/or** 13:23
**animosity** 16:23
**antitrust** 9:12
   15:17
**Appeals** 1:1,19
**appear** 4:17
**Appeared** 2:1,3
   2:8
**appellant** 1:6

2:3 4:5,7 14:23
**Appellants**
   14:19
**appellees** 1:11
   2:8 4:7 13:12
   16:6,7,9,19
**appendix** 13:19
**applied** 13:16
**argued** 18:2
**arguing** 13:15
**argument** 1:14
   15:4 17:4,18
**asking** 7:7 9:13
   15:6
**assaulted** 6:9
**assume** 16:4,5
**audiotape** 21:9
**award** 6:20

## B

**B** 15:21,24
**back** 8:1,6,25
   10:3,12 11:4
**based** 16:22
   17:17
**basis** 5:14 15:11
   15:11
**behalf** 5:13
   13:11
**belied** 7:13
**belief** 13:22 14:2
   14:6
**believe** 14:10
   18:4
**best** 21:12
**better** 19:11
**beyond** 7:16
**big** 8:20
**bit** 15:19
**blanket** 15:23
**blue** 12:1
**Boca** 2:5
**boils** 17:2
**bottom** 6:4
**bound** 12:10,11
**brief** 17:11
**brought** 11:25

**build** 16:20

## C

**C** 21:1,1
**C-a-n-t-u** 19:4
**calls** 9:15
**Cantu** 19:4
**case** 1:3 4:4,19
   6:11,15 7:16
   7:19 9:13 11:2
   11:5,24 12:9
   12:12 14:10
   15:1 18:1,20
   19:4,16,24
   20:3
**cases** 12:17,18
   18:17
**categorically** 6:3
   11:7
**cause** 9:18
**CERTIFICATE**
   3:5
**certify** 21:7
**challenged** 6:23
**change** 13:15
**Christopher** 1:9
   13:13
**Chutkan** 18:3
**Chutkan's** 18:4
**circle** 10:16
**CIRCUIT** 1:2
**circumstances**
   5:22
**claim** 7:21 9:5
   9:20 10:1 15:2
   15:2 18:11,22
   18:25
**claim,'** 18:24
**clear** 5:2 18:10
**CLERK** 4:4
**collateral** 9:6
**Columbia** 1:2
   15:23 21:4
**come** 7:1 11:15
**coming** 18:20
**communicated**
   5:9

**Competitive** 5:6
**complaining** 7:9
**complaint** 4:23
   4:25 5:11 9:5,5
   9:9 10:4,24,24
   12:21 14:21
   16:8,11,12,19
   16:25 17:1
**completely**
   16:13
**concert** 16:15
**concluded** 20:4
**conclusion**
   16:16
**conclusions**
   16:13,14
**conduct** 17:12
   17:18
**conspiracy**
   15:17,17
**constitution**
   12:20
**constitutional**
   12:25
**contain** 9:10
**content** 14:14
**correct** 14:20
   18:5 21:8
**COUNTY** 21:4
**court** 1:1,19,24
   4:13,15,17
   5:14,21 6:6,8
   6:12,14,20 7:5
   7:20,23 8:1,8,9
   8:13,15,17,20
   9:3 10:14,16
   11:11,13,19
   13:3,5,9,11,14
   13:16,17,18
   14:1,4,18 15:4
   15:16 17:22
   18:3,6 20:3
   21:6,20

## D

**D-i-s-t** 18:18
**D.C** 5:7 21:4

**date** 1:18 18:14
**Dated** 21:15
**day** 21:15
**DC** 1:19,20
**dealing** 9:11
   16:22
**decade** 5:25
**decide** 12:12
**decision** 11:19
   12:19 18:4
**defamation** 4:19
   5:4 10:11 12:9
   15:22 18:22,25
**defamatory**
   13:21,22 14:12
   16:21
**defamed** 5:10
**defendant** 9:20
   9:25 13:23,23
   18:23
**defendants**
   13:25 14:17,22
   16:15 18:1
   19:9
**defense** 9:6
**demonstrative**
   19:23
**deny** 6:3,6,8,11
   6:11 11:8
   19:18,22
**depose** 17:20
**deposed** 17:23
   17:23
**deposition** 17:6
**descriptive**
   16:16
**desirous** 10:22
**different** 12:17
   15:19
**directed** 17:16
**direction** 13:24
   13:25
**directly** 13:24
**discovery** 9:17
   12:13,18,21
   17:23 19:14,19
**discrimination**

15:18
**dismissed** 17:9
19:16
**disrespect** 10:9
**Dist** 18:18 19:5
**distinction**
14:21
**district** 1:2 5:4
15:23 17:9
18:20,21 19:6
21:4
**dollars** 6:21
**Driscoll** 2:9,9
4:7 13:9,10,11
14:3,9 15:15
15:22 19:15
**Duke** 2:10

**E**
**E** 1:20 2:4 4:2
21:1,1,12
**earlier** 11:21
**Eastern** 18:21
**effect** 10:23
**eliminate** 14:1
**Elliot** 1:5 4:4
**emphasizing**
16:19
**emphatic** 12:15
**encompass**
17:14
**enter** 5:6 11:1
**entire** 11:11,13
**entitled** 9:4 11:8
**equal** 8:19 10:22
11:8
**Erikson** 10:2
**Esquire** 2:4,9
21:12
**establishing**
14:12
**estoppel** 9:6
**et** 4:6
**event** 9:2 16:17
18:15
**eventual** 18:16
**everybody** 19:25

**evidence** 7:3,10
9:17
**exactly** 12:16
16:4
**expectation** 9:16

**F**
**F** 1:9 21:1
**fact** 5:4 6:24
7:13 11:9
14:17 15:13,20
16:16,18 19:10
**facts** 9:16,23,24
9:25 10:6
16:13,20
**factual** 9:10
16:10
**fails** 17:5
**fair** 9:20,25
**Farrell** 1:9 13:13
14:19
**Fax** 2:12
**filed** 17:8
**finding** 6:17,18
10:18,21,22
11:3,7
**fingered** 19:11
**First** 7:15
**Fitton** 1:8 4:6,22
4:25 5:13,15
5:18,19 7:13
11:18 12:7,8
13:12,24 14:6
14:23,24 15:1
16:12,24 17:4
17:5,20,24
18:12 19:10,18
**Florida** 2:5 15:9
17:9,13,13,14
17:15,15,16,17
19:16
**follow** 10:25
**forced** 17:7
**foregoing** 21:7
**forward** 19:13
19:25
**found** 6:12,14

8:12 11:2
17:10,11 18:21
**four** 16:6,7
**Franklin** 14:10
**frankly** 13:1
**Friday** 4:10
**front** 4:17

**G**
**Gail** 1:24 21:6
21:20
**getting** 7:16
**give** 9:25
**given** 9:20 11:5
17:25
**gives** 12:20
**go** 8:6,25 19:12
**goes** 12:12,13
**going** 10:3,12
19:22
**Good** 4:8 13:10
**grounds** 9:13,21
10:1
**GROUP** 2:4
**Guerra** 19:4
**guess** 15:5

**H**
**happening**
12:16
**harass** 18:1
**harassed** 6:2
8:14 10:19
12:3
**harassing** 8:24
**harassment** 4:23
**hear** 13:9
**HELD** 1:14
**historic** 15:13,20
**historical** 16:23
**Hmielewski** 1:24
21:6,20
**Holdings** 14:11
**Honor** 6:4,17,24
7:15 8:6,11,25
9:22 10:9 11:9
11:24 18:10

19:8,24
**Honors** 4:8
13:10
**hours** 17:20

**I**
**idea** 11:16
**illegal** 9:17
**impose** 9:14
**impression**
10:16
**improbable** 10:6
**inadequate**
15:25
**Inaudible** 5:20
13:8 14:8
**including** 20:1
21:8
**INDEX** 3:1
**individual** 5:9
**Individually** 1:5
1:8,9,10 4:5,6
**infer** 9:13
**inference** 15:5,7
**inferring** 15:17
15:18
**Info** 5:1
**information**
7:10 13:21
14:2,6
**injustice** 13:2
**Institute** 5:6
**instructions**
11:6
**insufficient**
15:24
**interrogatories**
11:4
**interrupt** 8:17
8:18
**involving** 4:19
**Iqbal** 14:1 15:3
15:19
**issue** 4:20 8:21
11:21 13:15
**issues** 10:14

**J**
**J** 1:8,9 4:5
**James** 1:9 13:12
**joint** 13:19
**judge** 1:15,15,15
7:6 10:5,15
11:25 13:3,4,7
17:10,11,17
18:3,4,6,7
19:17 20:1
**judge's** 12:14
**judges** 10:14,16
12:18
**judgment** 10:11
**judicata** 7:21
9:6
**Judicial** 4:21,25
5:23 6:21 8:21
10:11,19 11:16
12:6 16:24
17:7
**juries** 12:19
**jurisdiction**
14:10 17:14
19:17
**jury** 6:12,14,16
6:17,20 7:10
8:21 11:2,3,3,6
11:20 12:13

**K**
**Katsas** 1:15 7:6
**kind** 14:4
**Klayman** 1:5
2:4,4 4:2,5,6,8
4:14,16,20
5:17 6:1,7,10
6:13,16,23
7:15,21,25 8:2
8:10,14,16,19
8:23 9:4 11:12
11:13,23 12:6
13:6 15:8
16:23 17:7,8
17:19 18:10
21:12
**know** 5:21 11:5

17:3,17 19:14
**known** 7:13
  11:18
**Kotelli** 10:15
  11:25

--------

**L**

**lack** 19:11
**lacks** 16:19
**language** 17:11
**Larry** 1:5 2:4
  4:2,4 17:6
  21:12
**law** 2:4 5:2,4
  11:1,1 13:15
  13:16 14:9
  15:22 17:13,14
  18:10
**lawsuit** 17:8
**leave** 4:9
**left** 4:22,22 5:23
  7:1,2 8:21
  11:16
**leklayman@g...**
  2:6
**let's** 16:4,5
**letters** 19:2
**level** 9:19 15:25
**Lexis** 18:18 19:5
**line** 6:4 15:1
**link** 4:1,1 21:11
**listener** 14:14
**little** 15:19
**Location** 1:19
**long** 9:7
**long-arm** 17:13
**look** 8:7 13:18
  16:25 18:17
  19:3,19
**looking** 12:5
**lot** 12:16
**lower** 13:17 18:3

--------

**M**

**made.'** 19:3
**making** 7:24
  12:19

**MALE** 18:8,9
**manager** 6:2
  8:16,24 10:19
  12:3
**Mann** 5:7
**Martinez** 17:10
  17:11
**Martinez's**
  17:17
**mask** 4:9
**matter** 9:8,10
**mean** 5:21 10:9
  14:7 15:8,16
**media** 8:5,6
**merits** 19:17
**messages** 19:21
**Miami** 10:12
**million** 6:21
**minute** 7:20
**misstatement**
  19:15
**morning** 4:8
  13:10,14

--------

**N**

**need** 9:23,25
  15:6,12
**needed** 10:8,23
  19:7
**needs** 13:18
**negative** 4:12,13
**neither** 9:3
  13:14
**never** 6:1,16,17
  6:25 7:4 8:11
  19:17
**newspaper** 7:8
**notice** 9:20,25
  18:24
**NW** 1:20

--------

**O**

**oath** 10:25 17:5
**obviously** 5:18
  19:22
**occurred** 10:10
**occurrence**

16:18
**October** 1:18
  21:15
**office** 6:2 8:16
  8:24 10:19,25
  12:3
**okay** 7:16 16:3
  18:6,9
**ongoing** 5:25
**opinion** 8:9,10
  8:13,15,20,22
  8:23 11:22
**opportunity**
  17:22,25
**ORAL** 1:14
**order** 17:19
**Orfanedes** 1:9
  13:13 14:19
**ousted** 4:21
  11:17 12:6
**outside** 17:15

--------

**P**

**P.A** 2:4
**Page** 3:3 13:18
**Pages** 1:16 21:7
**Palmetto** 2:5
**paragraph**
  13:19 17:1
**Pardus** 10:2
**Park** 2:5
**parole** 7:3
**particularity'**
  18:23
**particularly**
  10:15
**parties** 2:1 7:17
**party** 5:6 12:20
  13:14
**patients** 19:2
**Paul** 1:9 13:12
**people** 12:23
  19:20,22
**Pepco** 14:11
**person** 5:3 7:19
  8:3 10:13
**personal** 19:16

**Peterson** 1:9
  13:12,23 14:19
**Phone** 2:11
**phrase** 14:25
**physically** 6:8
**place** 14:13
**plaintiff** 9:23
  14:13 18:22
**plausibility** 16:1
**plausible** 6:5 9:8
  9:13,22 12:7
  15:2,5 16:2
  18:11,13
**plead** 9:4,18
  12:21
**pleading** 9:15
  14:2 18:17
**please** 4:17
  13:11
**pleasure** 4:17
**pled** 4:24 10:4,8
  10:8,8,23,23
  18:22 19:7,7
**PLLC** 2:9
**point** 6:21 7:5,5
  17:19
**pointed** 19:9
**position** 15:12
  18:2
**possibility** 16:1
**possible** 15:2
**possibly** 11:15
  11:18
**praised** 7:3
**predicate** 16:20
  17:4
**prejudice** 6:25
**prejudiced** 7:17
  7:18,19,23 8:3
  8:9 10:12,13
**prejudicial** 12:1
**prior** 11:19
**PRO** 2:4
**probability** 9:14
**problems** 6:18
**proceed** 6:5 9:8
  10:4,24 12:11

19:25
**proceedings** 3:1
  3:4 4:1,3 20:4
  21:9
**proof** 10:5
**properly** 13:16
**proven** 6:1
**provide** 9:17
**provided** 4:1
  21:11
**public** 5:24 7:14
**publication** 5:3
  5:12,18 12:6
**publications**
  5:10
**published** 4:24
  5:5
**publishing** 5:13
**pure** 16:22
**push** 15:1
**put** 18:23

--------

**Q**

**question** 14:25
**questions** 13:3
  17:21
**quoted** 17:10

--------

**R**

**R** 21:1
**raise** 9:16
**Randolph** 1:15
  20:1
**Raton** 2:5
**reach** 15:25
  17:19
**read** 8:8 9:1
  13:19 17:1
**reads** 13:21
**really** 17:2
**reason** 17:6,25
**reasonable** 9:16
**records** 12:23
  19:20
**recovery** 10:6
**regard** 12:17
  14:15,17,18

16:9 17:16
**regarding** 13:20
**regards** 19:2
**regrettably**
  19:15
**relating** 18:25
**relevance** 11:19
**relief** 9:19
**remote** 10:7
**remove** 4:9
**REPORTER**
  3:5
**republished** 5:1
  18:15
**required** 18:16
  20:1
**requirement**
  9:14
**res** 7:21 9:6
**resident** 15:9
**respectfully** 8:25
  19:25
**restatement** 5:8
**restraint** 9:12
**rests** 9:21 10:1
**result** 4:11
**Rich** 13:11
**RICHARD** 2:9
**rife** 16:13
**right** 4:15 9:19
  12:20,24,25
  14:2 15:10
**rights** 8:19
  10:22 11:8
**Road** 2:5
**Roger** 5:1 7:8
  9:3 11:15
  14:16 16:11
  17:2,23 18:15
  19:11
**Rogers** 1:15
  13:3,4,7 18:6,7
**role** 12:14
**rule** 6:5 7:3
  12:10 13:1

---
**S**

**savvy** 10:5
**saying** 7:18,25
  8:2,3 10:13
  15:11
**says** 5:5,17
  15:10 18:12,19
**SE** 2:4
**see** 19:21
**SELTZER** 2:9
**severance** 7:2
**severe** 13:2
**sexual** 4:22
**sexually** 6:2 8:14
  8:24 10:18
  12:2
**sic** 14:19,23
**Similarly** 18:21
**simply** 5:5 9:15
  19:18
**single** 5:9
**sir** 14:3
**smeared** 11:9
**sorry** 12:15,25
**source** 5:15
**sources** 7:18
**Southern** 17:9
**speaker** 14:14
**specific** 9:23
  11:3 16:10
  18:14
**specifically** 19:3
**specify** 18:25
**speculation**
  16:22
**speculative** 9:19
**spread** 7:7
**St** 1:20
**stage** 9:15
**standard** 14:11
**state** 18:17
**stated** 19:8
**statement** 4:20
  5:16 7:9 12:2,4
  13:21,22 14:7
  14:12,16 15:20
  15:23 16:3,5
  16:21

**statements** 19:1
  19:9
**STATES** 1:1
**Stenographer**
  1:24 21:6,20
**Stone** 5:1,12 7:8
  7:12 9:3 11:15
  12:8 13:25
  14:16 16:11
  17:2,23 18:15
  19:11
**Stone's** 5:15
**Street** 2:10
**strikes** 10:5
**subject** 5:24
  11:11,13
**submission** 7:12
**submitted** 20:3
**sufficient** 5:2
  18:23
**suggest** 9:11
**suing** 15:8
**Suite** 2:10
**summary** 16:20
**support** 16:18
**suppose** 15:8
**surrogate** 5:12

---
**T**

**T** 21:1,1
**take** 12:21 19:19
**taken** 9:10
**talk** 12:23 19:20
**telephone** 12:22
  19:19
**terms** 11:6 18:16
  19:14
**test** 4:9
**Texas** 18:20,21
  19:6
**text** 19:21
**thank** 4:16 13:5
  18:7,8,9 20:2,3
**things** 8:4 19:21
**think** 7:6 8:8
  11:2 13:18
**third** 5:5 7:17

**Thomas** 1:8 4:5
  13:12 17:24
**thought** 13:6
**three** 4:18 14:22
  16:9
**time** 1:19 14:13
  18:15
**told** 17:4
**Tom** 4:21,25
  5:19 12:7
  14:23 15:1
  16:11 17:3,5
  17:20 18:12
**tortious** 17:12
**torts** 5:8
**trade** 9:12
**transcribed**
  21:12
**transcript** 21:7
  21:8
**transcription**
  1:14,24 4:1
**travelled** 4:10
**trial** 5:24 7:14
  10:20 11:20,21
  11:25
**true** 9:10,24
  21:8
**truly** 4:21
**trying** 8:17
  11:23
**Tuesday** 1:18
**two** 5:3,10 6:21
  17:20
**Twombly** 9:7,9
  10:3,3 12:11
  14:1 15:2,18
  20:2

---
**U**

**U.S** 10:2 18:18
  19:4
**underlying**
  16:17
**understand** 15:4
**UNITED** 1:1
**upset** 13:1

---
**V**

**v** 1:7 4:5 5:6
  10:2 14:10
  19:4
**VA** 2:11
**vehemently** 6:11
  6:13
**verdict** 7:10
**VIDEOCONF...**
  2:1
**VOICE** 18:8,9
**voluntarily** 7:1,2
  8:22

---
**W**

**wagon** 10:17
**Wait** 7:20,23
**want** 11:4 12:23
**wanted** 13:7
**Wars** 5:1
**Washington**
  1:20
**wasn't** 8:5 11:23
  11:24 12:2
**Watch** 4:21,25
  5:23 6:21 8:22
  10:11,19 11:16
  12:7 16:24
  17:7
**way** 7:12,16
  10:21 11:14,17
  11:20 17:3
**WAYNE** 2:9
**we'll** 13:9
**we're** 16:22
**we've** 6:18 17:10
**weekend** 4:10
**West** 2:5
**Western** 18:20
  19:5
**wife** 6:9 10:21
**WL** 18:19
**word** 19:11
**written** 11:6
**wrongful** 17:12
  17:18

**X**

**Y**

**year** 7:8
**years** 10:10
**yesterday** 4:11
**YouTube** 4:1,1
 21:9,11

**Z**

**0**

**1**

**1** 1:16 21:7
**119681** 19:5
**12** 13:19
**1213** 5:7
**1240** 5:7
**161295** 18:18
**180** 5:7

**2**

**20** 21:8
**2000** 2:10
**20001** 1:20
**2014** 10:12
**2016** 5:7
**2020** 18:18,19
**2021** 19:4
**2022** 1:18 21:15
**21** 1:16 3:5
**21-7125** 1:3 4:4
**22314** 2:11

**3**

**300** 2:10
**310-595-0800**
 2:6
**33433** 2:5

**4**

**4** 1:18 3:4
**42** 19:5
**43** 19:5
**430** 1:20

**5**

**525024** 18:19
**551** 10:2
**5th** 21:15

**6**

**7**

**703-822-5001**
 2:11
**703-997-4892**
 2:12
**7050** 2:5

**8**

**8** 6:7 12:10
 18:19
**89** 10:2

**9**

**9** 6:5 12:10
 13:18
**9:30** 1:19
**9:50** 1:19 20:4
**93** 10:2

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN,
     Plaintiff/Counterdefendant,
     v.
JUDICIAL WATCH, INC., *et al.*,
     Defendants/Counterplaintiffs.

Civil Action No. 06-00670
Judge Colleen Kollar-Kotelly

### JURY VERDICT FORM

### WE, THE JURY, UNANIMOUSLY FIND AS FOLLOWS:

Larry Klayman v. Judicial Watch

Plaintiff Larry Klayman:

1.    Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Defendant Judicial Watch, Inc. breached the Confidential Severance Agreement by failing to

make a good faith effort to remove him as the guarantor of a lease for Judicial Watch, Inc.'s

headquarters? (See Claim No. 1 on page 27 of the Jury Instructions.)

        _____ YES         <u>✗</u> NO

a.    If yes, designate the type of breach:

        _____ Material     _____ Simple

a.    If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

     Answer: _____

(N)

2.      Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Defendant Judicial Watch, Inc. breached the Confidential Severance Agreement by failing to pay

health insurance for his children? (See Claim No. 2 on page 27.)

                            _____ YES              ⟍╱ NO

a.      If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

        Answer: _____


3.      Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Judicial Watch, Inc. breached the Confidential Severance Agreement by filing a motion to strike

Plaintiff's appearance in a Florida litigation involving Sandra Cobas after Plaintiff left Judicial

Watch, Inc.?(See Claim No. 3 on page 27.)

                            _____ YES              ⟍╱ NO

a.      If yes, designate the type of breach:

                            _____ Material        _____ Simple

b.      If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

        Answer: _____

4.    Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Judicial Watch, Inc. breached the Confidential Severance Agreement by failing to provide

Plaintiff with access to documents regarding a client Peter Paul? (See Claim No. 4 on page 27.)

                        _____ YES                    __✗__ NO

a.    If yes, designate the type of breach:

        _____ Material          _____ Simple

b.    If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

        Answer: _____


5.    Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Judicial Watch breached the Confidential Severance Agreement by disparaging him and

misrepresenting the reasons for his departure from Judicial Watch, Inc.? (See Claim No. 5 on

page 27.)

                        _____ YES              ✗ NO

a.    If yes, designate the type of breach:

                _____ Material          _____ Simple

b.    If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

        Answer: _____

Judicial Watch and Thomas Fitton v. Larry Klayman

Counterplaintiff Judicial Watch, Inc.:

1.    Has Counterplaintiff Judicial Watch proved by a preponderance of the evidence its claim
that Counterdefendant Larry Klayman breached the Confidential Severance Agreement by
failing to repay a debt owed by Klayman & Associates? (See Counterclaim No. 1 on page 28.)

      _X_ YES          ____ NO

a.    If yes, designate the type of breach:

      ____ Material      _X_ Simple

b.    If yes, what, if any, damages do you award to Counterplaintiff Judicial Watch, Inc.?

Answer: _$ 200,000. –_

2.    Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its
claim that Counterdefendant Larry Klayman breached his obligation in the Confidential
Severance Agreement to pay costs and expense arising from his failure to make prompt payment
to Judicial Watch in accordance with paragraphs 10 and 11 of the Confidential Severance
Agreement? (See Counterclaim No. 2 on page 28.)

      _X_ YES          ____ NO

a.    If yes, designate the type of breach:

      ____ Material      _X_ Simple

b.    If yes, what, if any, damages do you award to Counterplaintiff Judicial Watch, Inc.?

Answer: _$ 25,000. –_

c.     If you awarded damages, do you find that Counterplaintiff Judicial Watch, Inc. is entitled
to prejudgment interest of 6%?

_____ YES          ⟋ NO

3.     Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its
claim that Counterdefendant Larry Klayman infringed Judicial Watch, Inc.'s registered
trademarks: (1) JUDICIAL WATCH and/or (2)"BECAUSE NO ONE IS ABOVE THE LAW"
in violation of the Lanham Act? (See Counterclaim No. 3 on page 28.)

⟋ YES          _____ NO

a.     If yes, please designate which trademarks (one or both) were infringed.

_____ Both _____

b.     What, if any, compensatory damages do you award to Counterplaintiff Judicial Watch,
Inc.?

Answer: $ 750, 000.—

4.     Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its
claim that Counterdefendant Larry Klayman engaged in unfair competition by direct mail, email
and advertisements including the website supporting the Saving Judicial Watch effort in
violation of the Lanham Act by a false and/or misleading affiliation, connection or association
between Saving Judicial Watch and Judicial Watch? (See Counterclaim No. 4 on page 29.)

⟋ YES          _____ NO

5.      Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its

claim that Counterdefendant Larry Klayman engaged in unfair competition by direct mail, email

and advertisements including the website supporting the Saving Judicial Watch effort in

violation of the Lanham Act by using false and/or misleading statements?  (See Counterclaim

No. 5 on page 29.)

                    X      YES              _____  NO

a.      If yes to either or both of questions no. 4 and 5, what, if any, compensatory damages do

you award to Counterplaintiff Judicial Watch, Inc.?

        Answer:  $ 1, 000, 000. —


6.      Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its

claim that Counterdefendant Larry Klayman breached the Confidential Severance Agreement by

publishing statements that were disparaging to Judicial Watch, Inc.? (See Counterclaim No. 6 on

page 29.)

                    X   YES              _____  NO

a.      If yes, designate the type of breach:

                    _____  Material        X   Simple

b.      If yes, what, if any, compensatory damages do you award to Counterplaintiff Judicial

Watch, Inc.?

        Answer:  $ 250, 000. —

7.    Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its

claim that Counterdefendant Larry Klayman breached the Confidential Severance Agreement by

using information regarding Judicial Watch, Inc.'s donor or client lists or donor or client data?

(See Counterclaim No. 8 on page 29.)

         $\cancel{\phantom{X}}$ YES      _____ NO

a.    If yes, designate the type of breach:

         _____ Material     $\cancel{\phantom{X}}$ Simple

b.    If yes, what, if any, compensatory damages do you award to Counterplaintiff Judicial

Watch, Inc.?

     Answer: _____ $75,000.— _____

<u>Counterplaintiff Thomas Fitton:</u>

8.      Has Counterplaintiff Thomas Fitton proved by a preponderance of the evidence his claim

that Counterplaintiff Larry Klayman breached the Confidential Severance Agreement by

publishing statements that were disparaging to Mr. Fitton?  (See Counterclaim No. 7 on page

29.)

                        _X_  YES          _____  NO

a.      If yes, designate the type of breach:

                        _____  Material      _X_  Simple


b.      If yes, what, if any, compensatory damages do you award to Counterplaintiff Thomas

Fitton?

        Answer: _$500,000_____


        _3/14/18_____                    _____
        **DATE**                              **JUROR FOREPERSON**

# EXHIBIT 3

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 21-7125

**September Term, 2022**

FILED ON: OCTOBER 25, 2022

LARRY ELLIOTT KLAYMAN, INDIVIDUALLY,
APPELLANT,

v.

THOMAS J. FITTON, INDIVIDUALLY, ET AL.,
APPELLEES.

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02793)

Before: KATSAS, *Circuit Judge*, RANDOLPH and ROGERS, *Senior Circuit Judges*.

## J U D G M E N T

The court has accorded the issues full consideration and has determined that they do not warrant a published opinion.  *See* D.C. Cir. R. 36(d).  For the reasons stated below, it is:

**ORDERED** and **ADJUDGED** that the judgment of the district court be affirmed.

\*   \*   \*

The district court dismissed Larry Klayman's defamation complaint against Thomas Fitton for failure to state a claim.  The complaint alleged that Roger Stone, during an interview on InfoWars, a website, stated: "He [Klayman] was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left.  He left because of a sexual harassment complaint." Klayman alleged, "[o]n information and belief," that Fitton gave this information to Stone while they were working together, that Fitton expected Stone to publish it, and that the information was false and defamatory.

At the motion to dismiss stage, a complaint asserting a defamation claim under D.C. law must plausibly allege that the defendant made a false and defamatory statement.  *Hourani v. Mirtchev*, 796 F.3d 1, 16 (D.C. Cir. 2015).  Klayman's complaint is rife with conclusory allegations

lacking factual support that Fitton made a defamatory statement to Stone.  *See id.* ("The complaint claims that Mirtchev 'published or caused these statements to be published,' but it alleges no factual basis whatsoever for that charge."); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[P]leadings that . . . are no more than conclusions[] are not entitled to the assumption of truth.").

Klayman principally rests on his allegation that Stone and Fitton were working together before the InfoWars broadcast.  Klayman maintains that it follows from this allegation that when Stone said "Ask Tom Fitton" he was referring to information he received from Fitton about the reason for Klayman's departure from Judicial Watch sixteen years earlier, in 2003.   We agree with the district court that on the face of the complaint Klayman's claim is not plausible.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

For one thing the complaint is devoid of any credible allegation that Stone and Fitton worked together, or were in contact, or even knew each other before Stone's January 18, 2019 appearance on InfoWars.  *See Hourani*, 796 F.3d at 16.  According to Klayman's complaint, Stone and Fitton worked together on a complaint relating to the FBI's search of Stone's home and Stone's indictment.  The problem for Klayman is that FBI search took place *after* Stone's InfoWars interview, a fact shown by public records of which the district court properly took judicial notice.[1]

On the other hand, it *is* plausible that Stone got his information about Klayman's departure from public sources.  Klayman's 2003 departure from Judicial Watch became the subject of more than fifteen years of litigation, most notably culminating in a thirteen-day jury trial in the district court, where "[t]he primary factual issue was the reason for Klayman's departure [from Judicial Watch]."  *Klayman v. Jud. Watch, Inc.*, 6 F.4th 1301, 1307, 1309 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 2731 (2022), *reh'g denied*, 2022 WL 3021506 (U.S. Aug. 1, 2022).  As recounted in our opinion affirming the $2.3 million verdict against Klayman, the jury heard evidence that while Klayman was at Judicial Watch, he physically abused his then-wife, *see id.*; that he was pursuing a romantic relationship with a Judicial Watch employee, *id.* at 1307; that his wife had filed a complaint for divorce, *id.*; and that Fitton, upon learning of these matters, told Klayman to resign.  *Id.*  There is no need to determine whether this evidence could be construed as "sexual harassment."  The important point is that a trial involving Klayman took place, and the jury returned its verdict against Klayman, all before Stone's statement on InfoWars.[2]  *See id.* at 1321.

We also sustain the district court's refusal to permit Klayman to amend his complaint.  *See Kowal v. MCI Communications Corporation*, 16 F.3d 1271, 1280 (D.C. Cir. 1994).

Klayman's motion to recuse is denied.

*      *      *

---

[1] *See*, *e.g.*, Sealed Indictment, *USA v. Stone*, Case No. 1:19-cr-00018-ABJ (D.D.C. January 24, 2019), ECF. No. 1.

[2] To the extent Klayman also claims that Stone uttered his statement as Fitton's agent, we conclude that Klayman has failed to plead facts for us to draw a reasonable inference in his favor.

This disposition is unpublished.  *See* D.C. Cir. R. 36(d).  We direct the Clerk to withhold the mandate until seven days after any timely petition for rehearing or rehearing *en banc* is resolved.  *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41(a)(1).

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:     /s/
        Daniel J. Reidy
        Deputy Clerk

# EXHIBIT D

**IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| In re: LARRY ELLIOT KLAYMAN | No: 22-8521 |
| Respondent | (District of Columbia Court of Appeals, No. 20-BG-583) |

### RESPONDENT LARRY KLAYMAN'S MOTION TO STAY

Respondent Larry Klayman ("Mr. Klayman") hereby moves this Court for a stay of proceedings pending the outcome Mr. Klayman's challenges to the suspension order of the District of Columbia Court of Appeals in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Suspension Order") pursuant to his complaint filed in the District of Columbia Superior Court pursuant to D.C. Superior Court Civil Rule 60, *Klayman v. Sataki et al*, 22-CAB-5235 (D.C. Sup. Ct.) (the "Rule 60 Complaint") and his pending Petition for Writ of Mandamus that has been submitted to the Supreme Court. *See Rule 60 Complaint* – Exhibit 1.

This would align with and follow the well-reasoned and logical, and just precedent of the U.S. Court of Appeals for the Fifth Circuit ("Fifth Circuit"), which has correctly issued an order staying consideration of reciprocal discipline pending the outcome of Mr. Klayman's challenges to the Suspension Order of the District of Columbia Court of Appeals. Specifically, the Fifth Circuit ruled:

1

On November 2, 2022 this Court issued an order directing Larry E. Klayman to show cause why his right to practice before this Court should not be suspended reciprocal to a September 15, 2022 order of suspension issued by the District of Columbia Court of Appeals. This Court's self-executing show cause suspension order became effective December 7, 2022. At the direction of the Chief Judge, IT IS ORDERED that the order of suspension hereby is WITHDRAWN. Exhibit 2.

The Fifth Circuit included a cover letter as well, which read:

Further to your response to this Court's Order to Show Cause, please be advised that the order of suspension became final on December 7, 2022. However, the Court has chosen to withdraw the suspension order and hold this Court's reciprocal disciplinary proceeding against you in abeyance pending final disposition of your Superior Court Rule 60 complaint and writ of mandamus or certiorari petition proceedings.

Please advise this Court when the above-referenced proceedings are concluded. Failure to keep this Court informed of the status of the proceedings may result in the imposition of reciprocal discipline without further notice.

Please find enclosed a copy of an order with cover letter withdrawing the order of suspension. Exhibit 2.

Clearly, the Fifth Circuit saw the merits of Mr. Klayman's Rule 60 Complaint, which is why they issued the attached order staying consideration of reciprocal discipline. In the same vein, the U.S. District Court for the Northern District of Texas has also followed suit, staying consideration of any reciprocal discipline until Mr. Klayman's challenges to the Suspension Order have concluded.

Mr. Klayman respectfully requests that this Court follow the Fifth Circuit's decision and also stay consideration of any reciprocal discipline until he has had an

opportunity to fully challenge the Suspension Order through the Rule 60 Complaint as well as through his Petition for Writ of Mandamus to the Supreme Court. This is in the interest of judicial efficiency to preserve the limited resources of both Mr. Klayman and the Court, and more importantly the interests of fundamental fairness and justice, since resolution in favor of Mr. Klayman through either the Rule 60 Complaint or the Petition for Writ of Mandamus would render this proceeding moot.

"A...court has broad discretion to stay all proceedings in an action pending the resolution of independent proceedings elsewhere." *Fonville v. District of Columbia*, 766 F. Supp. 2d 171, 172 (D.D.C. 2011). ""The power to stay proceedings is . . . inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Id*. This is exactly the case here, as a stay to allow the Rule 60 Complaint and the Petition for Writ of Certiorari to run their courses could potentially save both Court and Mr. Klayman's time and resources and is therefore in the interest of economy of time and effort.

More importantly, this is respectfully necessary as a matter of due process, the just administration of justice, and fundamental fairness, as Mr. Klayman's legal practice before this Court is important for the well-being of his colleagues and family as well.

Accordingly, based on the foregoing and the well-reasoned and logical precedent of the Fifth Circuit, this Court's sister federal appellate court, and other tribunals who have stayed consideration of reciprocal discipline especially until Respondent's Rule 60 Complaint is litigated, Mr. Klayman respectfully requests that the Court stay all proceedings in this matter, including the currently scheduled oral argument, pending the outcome of his ongoing challenges to the Suspension Order, as its sister circuit, the Fifth Circuit, has correctly ordered.

DATED: January 25, 2023                    Respectfully submitted,


                                           /s/ Larry Klayman
                                           _____
                                           Larry Klayman, Esq.
                                           7050 W. Palmetto Park Road
                                           Boca Raton, FL 33433
                                           Email: leklayman@gmail.com
                                           Tel: 561-558-5336

                                           *Respondent Pro Se*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limits because, excluding the parts of the document exempted, this document contains 762 words.


                                           /s/ Larry Klayman

4

# EXHIBIT 1

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| LARRY KLAYMAN, an individual<br>7050 W. Palmetto Park Road<br>Boca Raton, FL, 33433<br><br>               Plaintiff,<br><br>v.<br><br>ELHAM SATAKI<br>4141 Crisp Canyon Road #317<br>Sherman Oaks, CA, 91403<br><br>  And<br><br>HAMILTON FOX III<br>c/o 515 Fifth Street NW<br>Building A, Suite 117<br>Washington, DC 20001<br><br>  And<br><br>ELIZABETH HERMAN<br>c/o 515 Fifth Street NW<br>Building A, Suite 117<br>Washington, DC 20001<br><br>  And<br><br>H. CLAY SMITH, III<br>c/o 515 Fifth Street NW<br>Building A, Suite 117<br>Washington, DC 20001<br><br>  And<br><br>JULIA PORTER<br>c/o 515 Fifth Street NW<br>Building A, Suite 117<br>Washington, DC 20001<br><br>  And<br><br>OFFICE OF DISCIPLINARY COUNSEL<br>515 Fifth Street NW<br>Building A, Suite 117<br>Washington, DC, 20001<br><br>  And<br><br>MATTHEW KAISER<br><u>1099 14th St NW</u> | Case No.:<br><br><br>**COMPLAINT** |

Washington DC 20005

  And

MICHAEL E. TIGAR
601 W Rosemary St #317
Chapel Hill, NC, 27516

   And

WARREN ANTHONY FITCH
3930 Georgetown Court NW #602
Washington DC 20007

              Defendants.

## I.    INTRODUCTION

1.    Plaintiff Larry Klayman ("Mr. Klayman") brings this action against individual Defendants Hamilton Fox ("Defendant Fox"), Elizabeth Herman ("Defendant Herman"), H. Clay Smith III ("Defendant Smith"), Julia Porter ("Defendant Porter"), Office of Disciplinary Counsel ("ODC"), Matthew Kaiser ("Defendant Kaiser), Michael Tigar ("Tigar"), and Warren Anthony Fitch ("Fitch") pursuant to D.C. Superior Court Civil Rule 60(d) which states that "[t]his rule does not limit a court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding; or (2) set aside a judgment for fraud on the court." (hereinafter "Rule 60").

## II.    PARTIES

2.    Plaintiff Larry Klayman is an individual, a natural person. Mr. Klayman is at all relevant times a citizen and resident of the state of Florida.

3.    Defendant Sataki is an individual, a natural person. Defendants Sataki is a citizen and resident of California.

4.      Defendant Hamilton Fox is an individual, a natural person. At all material times, Defendant Fox was employed by ODC as Bar Disciplinary Counsel. Defendant Fox is a citizen and resident of the District of Columbia.

5.      Defendant Elizabeth Herman is an individual, a natural person. At all material times, Defendant Herman was employed by ODC. Defendant Herman as a Deputy Bar Disciplinary Counsel and  is a citizen and resident of the District of Columbia

6.      Defendant H. Clay Smith III is an individual, a natural person. At all material times, Defendant Smith was employed by ODC as Assistant Bar Disciplinary Counsel Defendant Smith is a citizen and resident of the District of Columbia

7.      Defendant Julia Porter is an individual, a natural person. At all material times, Defendant Porter was employed by ODC as Deputy Bar Disciplinary Counsel. Defendant Porter is a citizen and resident of the District of Columbia

8.      Defendant Office of Bar Disciplinary Counsel serves as the chief prosecutor for attorney disciplinary matters, and purports to have a dual function: "to protect the public and the courts from unethical conduct by members of the D.C. Bar and to protect members of the D.C. Bar from unfounded complaints."

9.      Defendant Tigar is an individual, natural person. Defendant Tigar was at all material times a member of the Ad Hoc Hearing Committee ("AHHC") in the disciplinary proceeding styled *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"). Defendant Tigar is a citizen and resident of North Carolina.

10.      Defendant Fitch is an individual, natural person. Defendant Fitch was at all material times a member and chairperson of the AHHC in the Sataki Matter. Defendant Fitch is a citizen and resident of Washington D.C.

11.     Defendant Kaiser is an individual, natural person. Defendant Kaiser was at all material times the chairperson of the District of Columbia Board on Professional Responsibility ("Board."), which oversees ODC and the AHHC. Defendant Kaiser is a citizen and resident of the District of Columbia

## III.    STANDING

12.     Mr. Klayman has standing to bring this action because he has been directly affected by the unlawful conduct complained herein.  His injuries are proximately related to the conduct of Defendants. Mr. Klayman has standing under Rule 60 to challenge the Suspension Order and Judgment of September 15, 2022 issued by the District of Columbia Court of Appeals.

## IV.    FACTS

13.     On September 15, 2022, the District of Columbia Court of Appeals ("DCCA") suspended Mr. Klayman for a period of eighteen (18) months with a reinstatement provision (the "Suspension Order" or "Judgment") - notwithstanding the fact that Mr. Klayman had already been serving an unwarranted and unconstitutional "temporary suspension" for the twenty (20) prior months – stemming from his representation of Defendant Sataki back in 2010. This Suspension Order and Judgment was the direct and proximate result of fraud by Defendant Sataki and the ODC Defendants – Defendants ODC, Fox, Porter, Herman, and Smith – at every single level of this disciplinary proceeding that mandate action under Rule 60. This fraud was furthered by Defendants Tigar, Fitch, and Kaiser. Defendants were driven by an extrajudicial bias and animus based on both ideology, politics and gender and their singular and admitted goal to remove Mr. Klayman from the practice of law.

14.     This instant action is therefore a continuation of *In re Klayman*, 20-BG-583 (D.C.C.A), as Mr. Klayman is simply seeking relief from judgment under Rule 60, and is therefore not a new action.

15.     Notwithstanding the egregious fraud that has infected this proceeding that mandate vacatur under Rule 60, it is also important for the Court to understand that the completely frivolous and meritless nature of Defendant Sataki's Complaint.

16.     *First,* Defendant Sataki had filed identical bar complaints in Florida and Pennsylvania in or around October of 2011, and both of these jurisdictions summarily dismissed the complaints as entirely frivolous and meritless.

17.     *Second*, Mr. Klayman provided ODC with an opinion from one of the preeminent legal scholars and experts on the subject of legal ethics, the late Ronald Rotunda, that clearly showed (1) that Defendant Sataki's allegations were frivolous and meritless, and (2) that in any event, the extreme delay from ODC in instituting this matter – the Specification of Charges was filed on July 20, 2017, approximately seven years after the events in question – ODC was time barred from pursuing Defendant Sataki's Complaint against Mr. Klayman. Exhibit 1; *Opinion of Ronald Rotunda*.

### *Facts Pertaining to Mr. Klayman's Representation of Defendant Sataki*

18.     On November 2, 2010, exactly 12 years ago, a Complaint was filed against Mr. Klayman with the ODC, styled *In re: Klayman*, Bar Docket No. 2011-D028. (the "Sataki Complaint").

19.     The Sataki Complaint was implemented as the result of a complaint  prepared and filed by non-lawyers on by or on behalf, one of which was a convicted felon by the name of Sam Razavi.

20.     Defendant Sataki did not identify who prepared and filed her operative complaint, but later it was disclosed that it was filed by Sam Razavi, her cousin, who uses many aliases and is a convicted felon over gambling fraud in Las Vegas, Nevada.

21.     The Sataki Complaint was based on Mr. Klayman's representation of Defendant Sataki's interests in an alleged sexual harassment and workplace retaliation action against her former employer, Voice of America ("VOA Lawsuit") in case styled *Sataki v. Broadcasting Board of Governors, et al*, 1:10-cv-00534 (D.D.C). This was a lawsuit brought pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), against the governors of the Broadcasting Board of Governors ("BBG").

22.     The scope of Mr. Klayman's services, performed along with Defendant Sataki's union representative and president, Mr. Tim Shamble ("Mr. Shamble") included, *inter alia*, attempted settlement discussions,  the filing of an administrative EEO/VOA Office of Civil Rights ("OCR") complaint, lobbying congressmen and senators to intervene on Defendant Sataki's behalf, engaging in approved publicity by Defendant Sataki to try to coax a settlement, and filing the VOA Lawsuit in the U.S. District Court for the District of Columbia ("District Court") to preserve the "status-quo" while the EEO/OCR complaint proceeded administratively.

23.     The VOA Lawsuit, which was also filed with Defendant Sataki's knowledge and consent, and which sought to ask the District Court to put Defendant Sataki to work at another VOA office in Los Angeles - away from her alleged harasser – was eventually improperly dismissed by the District Court, without even providing an evidentiary hearing.

24.     Furthermore, the EEO/OCR administrative complaint was ultimately not successful, as after a thorough investigation, the OCR found that Defendant Sataki's allegations of sexual harassment and workplace retaliation never actually occurred. Of course, Mr. Klayman did not know this at the time, and therefore believed her and agreed to represent her.

25.     Prior to and during the course of Mr. Klayman's representation of Defendant Sataki, he developed a close friendship with her, within the bounds of the relevant rules of professional responsibility and ethics.

26.     At the time, Mr. Klayman sympathized with Defendant Sataki's apparent plight, as she had claimed to be destitute and stuck in an untenable work situation. Mr. Klayman was himself going through a difficult time in his life, and therefore identified with Defendant Sataki's alleged problems. This motivated Mr. Klayman to work extremely diligently on Defendant Sataki's behalf, pro bono.

27.     As a close friendship developed further during the course of the legal representation, Mr. Klayman took it upon himself to help Defendant Sataki, including moving her out to Los Angeles to escape her alleged harasser, paying for her apartment, and other expenses, at a personal cost of about $ 30,000, and even finding psychologists for her and paying for some of her psychological counseling, for which she was otherwise insured.

28.     Defendant Sataki, however, began to exploit and take advantage of her close friendship with Mr. Klayman, at one point asking Mr. Klayman to purchase a car for her. Mr. Klayman declined to do so.

29.     Specifically, as a "final straw," Defendant Sataki's requested that Mr. Klayman purchase a car for her and her other actions led Mr. Klayman to realize that he could not continue legal representation of Defendant Sataki. Mr. Klayman thus suggested that it would be best if Defendant Sataki found new counsel to represent her in her claims against VOA.

30.     Mr. Klayman even referred Defendant Sataki to his personal friend, Gloria Allred, Esq., a famous, accomplished and highly successful women's rights legal advocate, as well as

Tim Shea, Esq., legal specialist in VOA matters, who had come suggested by Mr. Shamble. Defendant Sataki however insisted that Mr. Klayman continue to represent her.

31.    When Defendant Sataki's complaints against VOA did not yield immediate results, Defendant Sataki became more difficult, demanding, belligerent, frequently disrespectful, and hard to reach.

32.    Due to this, Mr. Klayman suggested that they memorialize their attorney-client relationship with a contingent fee agreement, but no agreement was ever reached in this regard, meaning that at all times, Mr. Klayman represented Defendant Sataki *pro bono*.

33.    Mr. Klayman and Mr. Shamble were unable to reach Defendant Sataki after this point, and in an abundance of caution, Mr. Klayman filed at his further expense on Defendant Sataki's behalf, an appeal to the U.S. Court of Appeals to the District of Columbia Circuit, regarding the District Court's dismissal of the VOA Lawsuit in order to ensure that Defendant Sataki's right of appeal was protected and not lost.

34.    At the end of the day, Defendant Sataki was not able to obtain relief through either the EEO/OCR process or the District Court, but not due to lack of effort from Mr. Klayman, who worked extremely diligently on her behalf, even on a *pro bono* basis.

35.    Ultimately, OCR, which did a thorough investigation of Defendant Sataki's sexual harassment and workplace retaliation claims, made the finding that this alleged sexual harassment and workplace retaliation never occurred, and therefore was simply made up by Defendant Sataki – the first in a series of proven false statements by Defendant Sataki.

***Facts Pertaining to Defendant Sataki's Complaint Against Mr. Klayman***

36.     On November 2, 2010,  exactly twelve years ago, Defendant Sataki  filed and later supplemented with ODC a complaint against Mr. Klayman  – as set forth previously - regarding the VOA lawsuit ("Sataki Complaint") pertaining to his other pro bono representation.

37.     Again, of great import, Defendant Sataki filed her bar complaint in November 2010 which was later supplemented by non-lawyers, with identical corresponding  complaints sent to The Florida Bar and the Pennsylvania Bar at that time, both of which were summarily dismissed about eleven years ago because they were not based upon fact or law, much less the clear and convincing evidence required to substantiate these types of claims.

38.     Nevertheless, ODC sent Defendant Sataki a letter dated July 7, 2011 containing Mr. Klayman's response, with explicit instructions that "[i]f we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations."

39.     Afterwards, Defendant Sataki abandoned the Sataki Complaint, as evidenced by ODC's own internal correspondence, admissions and policy.

40.     On January 15, 2014, Defendant Smith sent an email to ODC investigators Chuck Anderson and Kevin O'Connell, stating, "I am trying to locate a complainant [Defendant Sataki] that has dropped off the map…She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she filed."

41.     Then, Defendants, for their own unethical, unconstitutional, illegal, and tactical reasons, outrageously and incredibly resurrected Defendant Sataki's complaint seven (7) years later, waiting until July 20, 2017 to file the Specification of Charges in this case. During this time period, believing that the Complaints before ODC had also been dismissed, as they had been in Florida and Pennsylvania, Mr. Klayman understandably did not retain the files necessary to

defend himself. In addition, during this interim time period, relevant documents were discarded, witnesses moved, and memories faded.

42.    A draft of the Specification of Charges was prepared even before Mr. Klayman was given an opportunity to file a supplemental response, which evidence ODC's punitive and biased mindset and improper, unethical, unconstitutional and illegal motivations, all in violation of accepted norms concerning statutes of limitations, laches, and other laws.

43.    Before the Specification of Charges was filed on July 20, 2017, Mr. Klayman received a phone call from Defendant Smith where Defendant Smith informed him that ODC was likely be going to institute  the Sataki Complaint. Mr. Klayman was shocked, as he believed that ODC had dismissed the Sataki Complaint, much like what The Florida Bar and Pennsylvania Bar had done since he had not heard from them in the intervening seven year period. Mr. Klayman had already discarded crucial documents pertaining to his representation of Defendant Sataki, as he believed the matter was behind him.

44.    Defendant Smith was sympathetic to Mr. Klayman and said that pursuing the Sataki Complaint was "out of his hands," and therefore appeared to be doing the bidding of his superiors at ODC, which Mr. Klayman at the time believed to be Deputy Disciplinary Counsel, Defendant Herman. Mr. Klayman therefore set a meeting with Defendant Herman and Mr. Smith in order to discuss the Sataki Complaint.

45.    On July 28, 2017, Mr. Klayman met with Defendant Herman and Defendant Smith in order to try to explain his position in a polite and civil manner. However, he was met with an extremely hostile and disrespectful demeanor by Defendant Herman, who clearly had no interest in resolving the issues. Defendant Herman abruptly and in a hostile voice refused to say

whether she had had contact and/or met with Ms. Sataki. In fact, she told Mr. Klayman that this was "none of his business."

46.    Furthermore, Defendant Herman's brazenly and openly admitted her bias and animus against Mr. Klayman due to his political beliefs, activism, free speech, and gender, which explains her participation in her baseless prosecution against him, when she curtly and in a hostile manner, on more than one occasion, stated to Mr. Klayman, "I [we] don't like the way you practice law."

47.    Furthermore, when Mr. Klayman advised Defendant Herman at the same meeting that The Florida Bar and the Pennsylvania Bar had summarily dismissed Ms. Sataki's claims, she on behalf of Defendants stated that "we could care less."

48.    Pursuant to the District of Columbia's one-party consent laws, Mr. Klayman recorded this meeting with Defendant Herman. Seeing that he was not going to be able to get anywhere by speaking with Defendant Herman, Mr. Klayman then sought a meeting with Disciplinary Counsel, Defendant Fox, who was Defendant Herman's superior. Mr. Klayman believed at the time that Defendant Herman was solely behind the baseless resurrection of Defendant Sataki's Complaint, and that by speaking with Defendant Fox he would be able to resolve the issues.

49.    On September 29, 2017, Mr. Klayman was finally able to meet with Defendant Fox, where Defendant Fox set the tone of the meeting by refusing to hear from Mr. Klayman why the Sataki complaint should not be instituted.

50.    Then, in a subsequent meeting on May 11, 2018 to discuss the Sataki Complaint, which Mr. Klayman had asked for to disclose evidence of bias and misconduct by Deputy Bar

Counsel Herman Defendant Fox acted with extremely hostility towards Mr. Klayman and shouted that he had no interest in discussing anything.

51.    Mr. Klayman was surprised to find that both Defendant Deputy Bar Counsel, Defendant Porter, and ODC's described investigator, Kevin O'Connell would be present in the meeting, which had not been disclosed previously.

52.    From the outset, Defendant Fox immediately and belligerently stated that he was not going to hear anything about or discuss dismissal of the Specification of Charges

53.    Mr. Klayman calmly responded that he would not be dictated to as to what he could discuss. This prompted Defendant Fox to stand up threateningly and scream "this meeting is over" and that Mr. Klayman "should leave [his] office."

54.    When Mr. Klayman got up from his chair, he indicated that this gross prosecutorial misconduct would leave him no recourse but to resort to legal action.

55.    Defendant Fox then charged at Mr. Klayman at the door of his office as Mr. Klayman was leaving, as if to physically assault him and screamed, "I welcome your complaint," adding in a hostile voice, "do you seriously believe that I would not welcome the opportunity through discovery to show how you practice law."

56.    This more than confirmed to Mr. Klayman that each and every ODC Defendant, acting at the direction of Defendant Fox, harbored improper motivations towards Mr. Klayman and that they had decided that they were going to try to unlawfully attempt to remove Mr. Klayman from the practice of law, by whatever unprofessional, unethical, unconstitutional, and illegal means are used to "justify" these ends.

### *Facts Pertaining to Defendants' Highly Politicized Motivations*

57.    ODC had previously been run by Bar Disciplinary Counsel Wallace "Gene" Shipp prior to his retirement in 2017. During Mr. Shipp's tenure, ODC had been what it was supposed to be – a fair, unbiased, and neutral body. Once Defendant Fox took over, everything changed, and ODC became weaponized ad morphed into a highly politicized tool to remove conservative and Republican activist attorneys like Mr. Klayman from the practice of law.

58.    This explains why Defendant Sataki's Complaint sat dormant and thus abandoned for seven years until Defendant Fox took over. It is clear that Defendant Fox ordered ODC and his deputies Herman and Porter, as well as Assistant Bar Disciplinary Counsel Clay Smith, to revive the abandoned Sataki Complaint in order to try to remove Mr. Klayman from the practice of law.

59.    The ODC Defendants, since Defendant Fox arrived, have engaged in a pattern and practice of abusing and exceeding their position of authority, which is granted under state law, which authority is not to act outside the scope of their official duties and intentionally to violate the constitutional and other rights of bar members such as Mr. Klayman by selectively prosecuting them because of their political activism and free speech as well as other bases such as gender.

60.    Mr. Klayman is a prominent conservative and non-partisan attorney and public interest activist who has brought lawsuits against Hillary Clinton, Barack Obama, George W. Bush, and other politicians and government officials. He conceived of and founded the prominent public interest watchdogs, Judicial Watch, Inc. and Freedom Watch, Inc., and is a former U.S. Department of Justice federal prosecutor, having been on the trial team which broke up the AT&T monopoly during the Reagan administration. In 2003-2004, he ran for the U.S. Senate in the Florida Republican Primary. Mr. Klayman is also the only lawyer to ever have a

court rule that a president, former President Bill Clinton, had committed a crime, when he illegally released the Privacy Act protected White House government file of a woman he had allegedly sexually abused and harassed in the Oval Office. Her name is Kathleen Willey. Mr. Klayman has also represented Juanita Broaddrick, Gennifer Flowers, Paula Jones, Dolly Kyle Browning, and other Bill Clinton female victims, who Hillary Clinton is alleged to have retaliated against and tried to destroy to advance her and her husband's political interests. Mr. Klayman is a supporter of and legal advocate for women's rights. At Freedom Watch, which he founded, he successfully enjoined the National Security Agency during the Obama administration over its unconstitutional mass surveillance and later played a prominent role in invalidating President Obama's illegal executive order granting amnesty to over 5 million illegal aliens. This latter case went all the way to the U.S. Supreme Court. In sum, Mr. Klayman has had a very successful career as a public interest legal advocate.

61.    On the other hand, even a quick search of FEC records shows that Defendant Fox, as well as Defendant Herman both donated significant sums of monies to Hillary Clinton and Barack Obama as well as other liberal Democrats, many of whom Mr. Klayman brought suit against as a public interest advocate.

62.    ODC, especially during the Trump years and thereafter in the wake of the 2020 presidential election in particular, filed, accepted and initiated ethics complaints against Trump White House Counsellor Kellyanne Conway[1] over remarks she made on cable news, against former Trump Attorney General William Barr[2] (this partisan complaint was incredibly filed by all four (4) prior presidents of the District of Columbia Bar as well as a former Senior Bar

---

[1] https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html

[2] https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag

Counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[3] and Josh Hawley[4] over their role in advocating for President Trump in the last election, and of course former U.S. Attorney Rudy Giuliani, who was temporarily suspended without even a hearing,[5] over his representation of President Trump, to name just a few. And, Defendant Fox himself personally charged former Justice Department attorney Jeffrey Clark with disciplinary action stemming from his relationship with Donald Trump. Exhibit 7. To the contrary, and as just one of many examples of selective prosecution, when an ethics complaint was filed against Defendants counsel, Mark MacDougall, for making false statements in court pleadings, and  fellow leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's 33,000 emails illegally retained on a private server, which complicity is not even in dispute, the ODC, under the "leadership" of Defendant Fox,  turned a blind eye toward their ideological "soul brothers."   The MacDougall complaint and the Kendall complaints thus were characteristically dismissed. Most notably and telling,  the ODC summarily and quickly rejected the complaint filed by conservative lawyer and public interest advocate Ty Clevenger against Hillary Clinton.  The ODC then sought to disbar Mr. Clevenger – that is until they drove him into submission due to the cost of defending himself, and he simply resigned.[6]

---

[3] https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/

[4] https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

[5] https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

[6] Ty Clevenger, State bar prosecutors are flouting the law, protecting Hillary Clinton and her lawyers, LawFlog, available at: https://lawflog.com/?p=1389

63.     The highly politicized nature of ODC lends itself to only one possible conclusion; that Defendants "packed" the Ad Hoc Hearing Committee with persons that were ideological foes to Mr. Klayman. This included Defendant Tigar – a proud and avowed communist, Exhibit 2 – and Defendant Fitch, was openly deferential to Defendant Tigar and himself highly politicized and leftist.

64.     Bob Woodward wrote in his book about the Supreme Court, titled *The Brethren,* that Defendant Tigar in his early career had been fired, at the urging of J. Edgar Hoover, from his High Court clerkship by Justice William Brennan for his subversive communist ties. Exhibit 2.

65.      Defendant Tigar's book, *Mythologies of State and Monopoly Power*, a Marxist rant against capitalist law, relishes his time with Fidel and the Castro brothers. His proud thank you letters from Fidel and a photo with his revolutionary brother Ramon is even housed in the archives of the University of Texas School of Law. Exhibit 2.

66.     Then after ensuring that Mr. Klayman stood no chance at the AHHC level, the Sataki Complaint went to the Board, whose president, Defendant Kaiser, has openly publicized his political beliefs, having penned articles for the leftist legal publication "Above the Law," extolling the virtues of Hillary Clinton and trashing Donald Trump.[7]

67.     As conclusive evidence of the fact that the Defendants are driven by their political ideology and affiliations, the Report and Recommendation of the Board was hyper-fixated on and incredibly angered and offended by the fact that the lawsuit that Mr. Klayman filed on behalf of Defendant Sataki named Hillary Clinton as a Defendant, despite the fact that it was a *Bivens* Complaint against all of governors of the BBG, and also included a conservative and Mr. Klayman's personal friend, Blanquita Collum, as a Defendant. Thus, it was clear that

---

[7] https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/; https://abovethelaw.com/2016/07/trump-and-tyranny/

Clinton was not included for political purposes, but out of necessity. This did not stop the Defendants from taking great umbrage, however.

68.    Furthermore, as the as the final "nail in the coffin," confirming the Defendants' politically motivated bias and prejudice, the Court need not look any further than the completely disparate "selective prosecutorial" treatment afforded by the Defendants to one Kevin Clinesmith in handling *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.).

69.    In that case, Kevin Clinesmith—the former senior FBI lawyer who dishonestly falsified a surveillance document which helped trigger the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC, and only temporarily suspended for <u>five months</u> after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. Clinesmith also did not submit any affidavit under Rule 14(g) for five (5) months after he was suspended. Despite this, not only did the D.C. attorney disciplinary apparatus fast-track if not whitewash his case—clearly in order to minimize his temporary suspension period —the D.C. Court of Appeals let Clinesmith off with "time served" in just seven (7) months. And importantly, the Court imposed no reinstatement provision on Clinesmith, despite him literally being a convicted felon. Attached hereto as <u>Exhibit 3</u> is an article detailing this cover-up and the D.C. Court of Appeals' opinion in *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.). Had Clinesmith been treated in an unbiased and non-preferential fashion by the D.C. Bar disciplinary apparatus, run by Defendant Fox at ODC, and Defendant Kaiser of the Board of Professional Responsibility, he would have surely been permanently disbarred as the convicted dishonest felon was convicted to be.

***Facts Pertaining to Fraudulent Misconduct***

70.     At the disciplinary hearing in the Sataki Matter, the ODC Defendants and Defendant Sataki conspired and worked together in concert to suppress material evidence and suborned and provided perjurious testimony to the AHHC.

71.     These fraudulent actions tainted and infected the entire disciplinary proceeding, as they were allowed to remain on the record due to the actions of Defendants Tigar, Fitch, and Kaiser.  These fraudulent actions therefore directly and proximately caused the entire Suspension Order and Judgment, and therefore the only possible remedy is to "throw the baby out with the bathwater," or in other words, to vacate the Suspension Order and Judgment in its entirety.

72.     This was furthered by Defendants Tigar and Fitch on the AHHC, as they repeatedly denied Mr. Klayman leave to conduct discovery, which allowed the ODC Defendants and Defendant Sataki to suppress material evidence and provide perjurious testimony, as Mr. Klayman did not have the benefit of discovery to uncover suppressed evidence and obtain the truth.

73.     Then, when exculpatory material evidence was independently discovered by Mr. Klayman's legal team after the disciplinary hearing, the head of the Board on Professional Responsibility, Defendant Kaiser played his part by refusing to reopen the record or to even consider the newly discovered exculpatory evidence in order to ensure that the ODC Defendants and Defendant Sataki would not be held accountable for their illegal and unethical conduct.

74.     The suppression of exculpatory material evidence and perjurious testimony is set forth herein.

75.     *First*, Ms. Sataki gave the fraudulent testimony that she had not approved of engaging in publicity. On May 31, 2018, Ms. Sataki gave the following fraudulent testimony to the AHHC (Exhibit 4) :

Mr. Klayman: And that we agreed we would get some positive publicity here to

18

try to coerce VOA into a favorable settlement so you could be in LA, correct?
Defendant Sataki*: Correct.
Mr. Klayman*: And –
Defendant Sataki*: **But I didn't agree to do it. You explained all this to me.** Ex

Chairman Fitch: Did he send you copies of some articles that he had written?
Defendant Sataki: Yes, he did.
Mr. Klayman: At that time you did not tell me, "Don't write any more."
Defendant Sataki:  **I did.**
Mr. Klayman: There's nothing in writing that you presented to that effect at that time, did you?
Defendant Sataki:. **We talked to each other. I explained to you on the phone why I don't want articles out there.**

76.    Defendant Sataki further fraudulently testified that she did not approve of

publicity because of how sexual harassment was perceived in the Persian community:

Defendant Sataki: So sexual harassment, in the Persian community, is rape. It's the actual act of  intercourse and rape. So to this day I have to answer all those questions
                                     ….
That I want this to be handled as quiet as possible, so nobody finds out. And I did this complaint because I -- I still wanted to keep my image. My image was just this person that – I didn't want it to change and I didn't want too much talk regarding about my personal life. I wanted people to look at the Sataki that is covering the stories and not know about my private life. Because I was not open about my private life in front of the camera. People would ask me, I would never answer. I would always leave it without answer when they asked me about my private life. Exhibit 4.

77.    However this conflicts with the testimony of numerous material witnesses who

testified on Mr. Klayman's behalf, including Mr. Shamble, as set forth above, that Ms. Sataki

personally participated in publicizing her case!

78.    The record clearly showed that Defendant Sataki agreed to this publicity, with Mr.

Klayman writing positive and complimentary articles and arranging for interviews with major

publications, such as the Los Angeles Times. Indeed, a crucial piece of evidence  is an email

which Mr. Klayman sent to the LA Times, copying both Defendant Sataki and Mr. Shamble,

attempting to arrange such an interview. Exhibit 5.

79.    This was consistent with Defendant Sataki being provided contemporaneously with all the articles and publicity that Mr. Klayman, who along with Mr. Shamble, he had generated for her. At no time did Defendant Sataki object and instead approved, and there is no contemporaneous written record of any objection.

80.    In fact, Defendant Sataki personally engaged in the publicizing of her case by personally handing out copies of one the articles written by Mr. Klayman on Capitol Hill. Extensive efforts to lobby politicians were made, often with Defendant Sataki present, but always with her informed consent.

81.    And, as the final "nail in the coffin," Mr. Klayman uncovered evidence that was fraudulently hidden by Ms. Sataki and ODC in September of 2019—after the AHHC hearing had concluded—that Ms. Sataki had even participated in making a widely aired and publicized public video broadcast on Persian television about her case, with intimate personal details about her personal life, discussing her sexual harassment and workplace retaliation complaint against VOA and others, which further undercuts and totally refutes any possible false claim that Ms. Sataki did not agree to publicize her case.[8]    The video, which is in Ms. Sataki's native language Farsi, was translated by one of Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. Exhibit 6. To be certain of and confirm the content, Mr. Klayman had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. Exhibit 6. Mr. Moslehi translates this "smoking gun" as follows:

> Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.
> (displaying Elham [Sataki]'s photo) former broadcaster of VOA.

---

[8] https://www.youtube.com/watch?v=e3g5f61muZ4

Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.

(displaying photo of Mehdi Falahati) broadcaster for the VOA network VOA: Voice of America

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty. This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner·. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.

Caption displaying Falahati and [Sataki] with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this

network.

Display of Mehdi Falahati laughing loud.

82.     Unsurprisingly, Ms. Sataki and ODC Defendants – which on information and belief knew about this video - did not disclose this to the AHHC and Mr. Klayman's defense team had to find this themselves. This clearly fraudulent conduct was obviously done in concert with the ODC Defendants, who must have known about this crucial evidence and chose not to disclose it in order to further their goal to attempt to remove Mr. Klayman from the practice of law. This clear fraud grossly prejudiced Mr. Klayman because it was not part of the record at the Hearing Committee or the Board level. That the D.C. Court of Appeals denied a motion to remand this matter back to the Board to open the record to review this video shows its inherent bias on this and other issues – a clear violation of Mr. Klayman's due process and other rights. Thus, Mr. Klayman was never even given a chance to use this clearly relevant evidence that completely undercut any possible assertion that Defendant Sataki did not agree to use publicity and herself publicize detailed personal details about her case—one of the key "violations" found by the D.C. Court of Appeals in suspending him for eighteen months.

83.     Because Mr. Klayman knew that Defendant Sataki had a propensity for untruthfulness, he prior to the disciplinary hearing moved to take discovery and depositions of Defendant Sataki as well as her psychiatrist, Arlene Aviera ("Dr. Aviera") on February 15, 2018.

84.     Even this simple request was tellingly vehemently opposed by the ODC Defendants, and then denied by the AHHC (Defendants Tigar and Fitch), despite discovery clearly being allowed and an integral part of the attorney discipline process, particularly in a case such as this one where ODC delayed seven years to even file a Specification of Charges, resulting in passage of time causing memories to fade, documents to be discarded and lost, and witnesses to become unavailable. *See* Board on Professional Responsibility Rules, Chapter 3.

85.    Then, the ODC Defendants – on the first day of the hearing (!) – sought to and was allowed to introduce into evidence a slew of "new" emails into evidence that they clearly coached Defendant Sataki into perjuriously stating that she had just "discovered."

86.    Even then, when Mr. Klayman renewed his request to take discovery, he was still denied by Defendants Tigar and Fitch. This allowed the ODC Defendants and Defendant Sataki to put perjurious testimony onto the record and suppress the exculpatory evidence of Defendant Sataki's video interview publicizing her case without being caught.

87.    This is especially important as the AHHC had said prior to the hearing that Mr. Klayman would be able to renew his request for discovery at the hearing if necessary. Discovery was clearly necessary, as Mr. Klayman would have been able to (1) discover the fraudulently withheld exculpatory video evidence had he been able to depose Defendant Sataki, and (2) would have been able to elicit testimony from Dr. Aviera that Mr. Klayman had competently and diligently represented Defendant Sataki to the best of his abilities, as she had contemporaneous personal knowledge and records of the details of Mr. Klayman's representation of Defendant Sataki.

88.    As set forth above, only after the disciplinary hearing, once the matter was before the Board, did Mr. Klayman's legal team independently discover and unearth Defendant Sataki's video interview publicizing her case – clearly exculpatory material evidence. However, despite being faced with this clear illegal, unethical and fraudulent conduct by the ODC Defendants and Defendant Sataki, Defendant Kaiser still without any bases, refused to open the record or even consider this new exculpatory evidence, thereby ensuring that the ODC Defendants and Defendant Sataki were allowed to suppress exculpatory material evidence and give perjurious testimony without repercussions.

89.    *Second*, on May 31, 2018, Ms. Sataki gave further perjurious and fraudulent testimony, at the instruction of the ODC Defendants, that she never wanted to move to Los Angeles, and that somehow Mr. Klayman had made the decision for her and forced her to move out to Los Angeles – in order fraudulently and falsely create the impression that Mr. Klayman was controlling her:

> Ms. Sataki: Well, in the beginning when he – when  I moved -- **he moved me to Los Angeles** and he paid for everything. Exhibit 4 at 83:17-19

90.    However, this false and fraudulent testimony was also exposed by numerous other witnesses, including Mr. Shamble, as well as Ms. Sataki herself being forced to admit that it was false.

91.    On May 31, 2018, Mr. Klayman was able to show that the decision to move to Los Angeles was collective, and part of a legal strategy to have her assigned there due to having a medical exemption:

> Mr. Klayman: And we decided that, if we could show that you had a medical reason why you had to be in  Los Angeles, that we could qualify for a reasonable medical accommodation move to Los Angeles.

> Defendant Sataki: Yes.

> Mr. Klayman: And therefore we submitted documentation from Dr. Aviera, from the prior psychologist that you saw, and also from a doctor  named Long, an internist, to Voice of America with various documentation arguing that you needed to be in Los Angeles because those were where your  physicians were, that's where your family was,  that's where your friends were, and besides, you could do your work out of the Persia News Network on Wilshire Boulevard at the federal building, which was run by Voice of America. Do you remember that?

> Defendant Sataki: Yes. Exhibit 4 at 351.

92.    *Third*, Defendant Sataki, at the direction of the ODC Defendants, perpetuated the fraudulent notion that she had wanted Mr. Klayman to dismiss her cases, which was completely contradicted by her own actions where she (1) filed *pro se* a notice of appeal after the fact and (2) when ODC hunted her down years after the fact, she even asked them if they could still

prosecute her sexual harassment and workplace retaliation claims for her, despite the fact that the

Office of Civil Rights had thoroughly investigated her claims and found them to be meritless:

> Mr: Klayman: That you wanted Bar Counsel to file a sexual harassment case for you. You asked them that within the last year, against VOA.
> Defendant Sataki: I asked if it's doable.
> Mr. Klayman: And you asked Bar Counsel to do it for you, correct?
> Defendant Sataki: I asked if it's doable…. Exhibit 4 at 489:3-10 (May 31, 2018).

93.     The actions of Defendants Tigar, Fitch, and Kaiser, the ODC Defendants and

Defendant Sataki, resulted in fraud on the court, with imperviousness and without and

repercussions. This fraud on the court directly and proximately led to the Suspension Order and

Judgment at the DCCA.

## FIRST CAUSE OF ACTION
### *Relief from Judgment Pursuant D.C. Superior Court Rule 60(d)*

94.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety

of this Complaint, including, but not limited to, the Introduction and the exhibits to this

Complaint, with the same force and effect, as if fully set forth herein again at length.

95.     D.C. Superior Court Civil Rule 60(d) states that "[t]his rule does not limit a

court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or

proceeding; or (2) set aside a judgment for fraud on the court."

96.     The ODC Defendants and Defendant Sataki have committed a fraud on the court

by willfully suppressing exculpatory evidence and suborning and committing perjury at the

disciplinary hearing.

97.     These fraudulent statements include:

> Mr. Klayman: And that we agreed we would get some positive publicity here to try to coerce VOA into a favorable settlement so you could be in LA, correct?
> Defendant Sataki: Correct.
> Mr. Klayman*:* And –
> Defendant Sataki: **But I didn't agree to do it. You explained all this to me.** Ex

> Chairman Fitch: Did he send you copies of some articles that he had written?

<u>Defendant Sataki</u>: Yes, he did.

<u>Mr. Klayman</u>: At that time you did not tell me, "Don't write any more."

<u>Defendant Sataki:</u> **I did.**

<u>Mr. Klayman:</u> There's nothing in writing that you presented to that effect at that time, did you?

<u>Defendant Sataki:</u>. **We talked to each other. I explained to you on the phone why I don't want articles out there.**

<u>Defendant Sataki:</u> So sexual harassment, in the Persian community, is rape. It's the actual act of intercourse and rape. So to this day I have to answer all those questions

....

That I want this to be handled as quiet as possible, so nobody finds out. And I did this complaint because I -- I still wanted to keep my image. My image was just this person that – I didn't want it to change and I didn't want too much talk regarding about my personal life. I wanted people to look at the Sataki that is covering the stories and not know about my private life. Because I was not open about my private life in front of the camera. People would ask me, I would never answer. I would always leave it without answer when they asked me about my private life. <u>Exhibit 4</u>.

<u>Ms. Sataki</u>: Well, in the beginning when he – when I moved -- **he moved me to Los Angeles** and he paid for everything. <u>Exhibit 3</u> at 83:17-19

98.    Also included are fraudulent statements that Defendant Sataki wanted Mr. Klayman to drop and dismiss her cases.

99.    Defendants Tigar and Fitch furthered this fraud on the court by refusing to allow Mr. Klayman leave to conduct discovery which clearly would have unearthed this exculpatory material evidence and prevented perjurious statements from being put on the record, which directly and proximately resulted in the September 15, 2022 Suspension Order and Judgment in its entirety.

100.    Defendant Kaiser and the Board then furthered this fraud on the court by refusing to open the record and refusing to even consider the buried exculpatory evidence when it was independently discovered by Mr. Klayman's legal team, which directly and proximately resulted in the September 15, 2022 Suspension Order and Judgment in its entirety.

26

101.    As a direct and proximate result of Defendants' fraud, misrepresentations and misconduct, including but not limited to perjury and subornation of perjury, Rule 60's requirement for relief from a judgment or order come into play.

102.    Plaintiff prays that this Court set aside and vacate the DCCA's Suspension Order and Judgment as it was a direct and proximate result of fraud on the court.

## SECOND CAUSE OF ACTION
### *Civil Conspiracy*

103.    Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

104.    Each and every one of the Defendants conspired to enter into an agreement to participate in committing fraud on the court in the Sataki Matter.

105.    The Defendants did, in fact, commit a fraud on the court. The ODC Defendants and Defendant Sataki buried and suppressed exculpatory evidence and suborned and committed perjury. Defendants Tigar, Fitch, and Kaiser then furthered this fraud by refusing to hold the ODC Defendants and Defendant Sataki accountable for their fraud, allowing for routine discovery under the circumstances of extreme delay in the prosecution which would have disclosed the fraud in full detail, and ensuring that the fraud remained  on the record when presented to the DCCA, which then directly and proximately caused the issuance of the September 15, 2022 Suspension Order and Judgment.

106.    As a direct and proximate result of this, Mr. Klayman has suffered an injury in the form of being suspended from the practice of law in the District of Columbia for eighteen (18) months with a reinstatement provision as well as the possibility of reciprocal discipline, however unwarranted,  in other jurisdictions.

## THIRD CAUSE OF ACTION
### *Laches*

107.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

108.     There was an undue, egregious and highly prejudicial delay of seven years by the ODC Defendants in instituting the Specification of Charges on July 20, 2017, approximately seven (7) years after the underlying events in question – Mr. Klayman's representation of Defendant Sataki – had occurred.

109.     Mr. Klayman was grossly and severely prejudiced by this undue, egregious delay because (1) he believed that this matter had been dismissed and therefore destroyed records pertaining to his representation of Defendant Sataki, (2) memories had faded, and (3) witnesses were unavailable to testify, as material witnesses Professor Rotunda passed away in the interim period and Dr. Aviera was diagnosed with cancer, among other areas of fatal prejudice resulting from this delay.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Klayman prays that the DCCA's September 15, 2022 Suspension Order and Judgment be vacated pursuant to Rule 60 for the Defendants' fraud and related egregious misconduct, including but not limited to perjury and the suborning of perjury, before and on the court.  Mr. Klayman also seeks attorney fees and costs for having to defend the meritless Sataki Complaint and for having to bring this instant action.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts, as to all issues so triable.

DATED: November 4, 2022                                   Respectfully submitted,

/s/ Larry Klayman

Larry Klayman
7050    W.Palmetto    Park    Road
Boca Raton, FL 33433
Email: leklayman@gmail.com
Tel: 561-558-5336
*Plaintiff Pro Se*

# EXHIBIT 1

**CHAPMAN UNIVERSITY** | FOWLER SCHOOL OF LAW

ONE UNIVERSITY DRIVE
ORANGE, CALIFORNIA 92866
WWW.CHAPMAN.EDU

Ronald D. Rotunda
*The Doy & Dex Henley Chair and
Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/
www.ronaldrotunda.com

19 December 2016

Larry Klayman, Esq.
Klayman Law Firm
c/o 2020 Pennsylvania Ave., N.W.
#800
Washington, D.C. 20006

> RE: Bar Complaint of Oct. 20, 2011
> VIA: Email, leklayman@gmail.com

Dear Mr. Klayman:

You have asked me to evaluate the Office of Bar Counsel Complaint dated October 20, 2011. Despite the fact that it is dated about six years ago, you received it only recently. Perhaps that is because the Office of Bar Counsel (OBC) sent it to the wrong address. OBC may have sent it to 2000 Pennsylvania Ave. N.W., Suite 345, while your office is at 2020 Pennsylvania Ave, NW, Suite 345.

I have evaluated the OBC Complaint of Oct. 20, 2011, and discussed the matter with you. You should feel free to show this letter to the OBC if you wish.

A very surprising item about this complaint is that it was filed over five years ago about alleged events that occurred in December 2009 and shortly thereafter. The complainant, Elham Sataki, made similar complaints to the Pennsylvania Bar and the Florida Bar, both of which dismissed the complaint years ago. For some reason, the OBC sat on this complaint for years and now is resurrecting it.

Because of the passage of time — the reasons for this delay are unknown — relevant evidence cannot be found and memories fade.

> For example, you told me that you recall a phone voice mail from someone speaking in a belligerent tone who claimed to be speaking for Ms. Sataki. This person said that you should not contact her. You had been trying, unsuccessfully, to contact Ms. Sataki to see if she wanted to appeal, and you filed a notice of appeal

- 2 -

to protect her rights. The union representative, who was representing Ms. Sataki in her employment dispute, also was unsuccessful in contacting her. Shortly after that, Ms. Sataki did so and you and her Union Representative, Mr. Shamble, did not pursue the appeal. You have moved since then and you are unable to find this voice mail. The tone and substance of this voice mail is very relevant to the complaint, but it no longer exists (or, you cannot find it) because of the passage of time.

The caselaw shows that OBC is subject to laches. In *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 11978)(per curiam), the Florida supreme court threw out charges because the prosecutor because of the Bar's delay in violation of the Florida rules.[1] One can summarize this case as the Bar delaying finalization of two cases (where the Bar was disappointed with the recommended discipline) because it was confident it would secure a conviction in a third case still in the pipeline in the hope of securing greater overall discipline. The Court said,

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the "agonizing ordeal" of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate.

*The Florida Bar v. Rubin*, 362 So. 2d 12, 15 (footnotes omitted)(emphasis added). As *Rubin* concluded, "The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct." 362 So. 2d 12, 16.

*Rubin* is no judicial orphan. Later, *The Florida Bar v. Walter*, 784 So. 2d 1085, 1087 (Fla. Sup. Ct. 2001) ruled that a *seven-year interim* between the lawyer's alleged misconduct and the filing of the Bar's complaint, makes "it 'unjust or unfair' to require Walter [the lawyer] now to answer the Bar's charges in this matter. That the Bar may have diligently pursued Chesnoff's statement does not render this seven-year interim a "reasonable time," especially considering that

---

[1]    "On January 6, 1978 fourteen months after the Bar received referee White's report and eight months after it had received referee Carey's the Bar filed both referees' reports with the Court." "Referee White's report, which recommended a public reprimand, was not filed with us until fourteen months after its receipt by the Bar. Rubin contends that this filing clearly was not prompt, and that the Bar's violation of the rule denies him due process" *The Florida Bar v. Rubin*, 362 So. 2d 12, 14 (Fla. 1978)(footnote omitted).

- 3 -

the delay is not attributable to Walter." The court ruled that the lawyer does not have "to defend against the Bar's charges after so many years have passed. [2]

See also, *In re Grigsby*, 815 N.W.2d 836 (Minn. 2012), concluding that a discipline prosecutor's failure to charge out a matter for an unreasonably long time violates the ethics rules. *Grigsby* involved a case where the lawyer did not even dispute the facts. and the lawyer's violations were "obvious," yet the court rejected the disciplinary hearing:

> Finally, it is also worth noting the procedural irregularities in this discipline matter. Grigsby was suspended for 60 days on April 16, 2009. Grigsby's single instance of misconduct resulting in this disciplinary proceeding took place sometime during April and May 2009, and the Assistant County Attorney informed the Director of it on June 3, 2009. T*he facts of this case are simple and undisputed, Grigsby's violations are obvious*, and Grigsby complied with the Director's investigation. The Director *did not file a petition for disciplinary action until May 31, 2011, 727 days after notice of the misconduct*. Because Grigsby, understandably, did not seek readmission while under investigation for practicing law while suspended, he has effectively been suspended from the practice of law since April 16, 2009, or for over 3 years. The purpose of any disciplinary proceeding, as noted earlier, is to protect the public; *the delay here tends to weaken the Director's argument that protection of the public requires a reinstatement hearing* and we decline to do so notwithstanding the legitimate concerns discussed earlier.

*In re Disciplinary Action against Grigsby*, 815 N.W.2d 836, 846–47, 2012 WL 2814088 (Minn.), *reinstatement granted sub nom. In re Disciplinary Action Against Grigsby*, 822 N.W.2d 291, 2012 WL 5355573 (Minn. 2012)(emphasis added).

In evaluating Minnesota cases, William J. Wernz, Minnesota Legal Ethics: A Treatise (6th ed. 2016) reviews the cases concludes that the Office of Bar Counsel is subject to a "Special Promptness Requirement?" Rule 3.2 of the Rules of Professional Conduct applies to Bar Counsel and that "general delay in investigation" could violate Rule 3.2. [3]

---

[2]    Cited and quoted with approval in, *The Florida Bar v. Kane*, 202 So.3d 11, 19 (Fla. Sup. Ct. 2016):

> The Court has made clear that the Bar has an obligation to process disciplinary cases in a fair and just manner. *See Fla. Bar v. Rubin*, 362 So.2d 12, 16 (Fla.1978) ("The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct.").

[3]    Wernz, Minnesota Legal Ethics; A Treatise 779-80, § II(D) (2016).

- 4 -

Rule 3.2 ("Expediting Litigation"), Model Rules of Professional Conduct, corresponds to Rule 3.2 of the D.C. Rules of Professional Conduct. As Comment 1 to the D.C. Rules asks, "The question is whether a competent lawyer acting in good-faith would regard the course of action as having some substantial purpose other than delay."[4]

In this case, OBC should explain why any competent Bar Counsel, acting in good faith, would regard the delay of 6 years since the complaint was filed and 7 years since the alleged violation occurred would this delay "as having some substantial purpose other than delay." Why has OBC waited so long?

In Indiana, when the Bar Counsel did not act with reasonable promptness, the Court imposed a new rule making clear what states like Minnesota and Florida thought were already clear. Rule 23, Disciplinary Commission and Proceedings now provides, Section 10(h):

> *Limitation on time to complete investigation.* Unless the Supreme Court permits additional time, any investigation into a grievance *shall be completed and action on the grievance shall be taken within twelve (12) months from the date grievance is received* (or the date a response is demanded to a Disciplinary Commission grievance). The purpose of the deadline is to enable the Supreme Court to promote a fair and efficient process and not to create substantive or procedural rights. Requests for additional time shall be submitted to the Supreme Court and shall briefly describe the circumstances necessitating the request. No response or objection shall be allowed. Delays caused by a respondent's noncooperation or requests for extensions of time, and periods during which the respondent is suspended from practice, shall not be counted toward the 12-month period. *If the Disciplinary Commission does not file a Disciplinary Complaint within this time, the grievance shall be deemed dismissed.*[5]

The Virgin Islands also recognizes laches applied to Bar Counsel. No "legal authority precludes this Court or the EGC from applying the common law doctrine of laches to a grievance. 'Laches, an equitable defense, is distinct from the statute of limitations, a creature of law,' and precludes an action if 'an omission to assert a right for an unreasonable and unexplained length of 'time and under circumstances prejudicial to the adverse party.' Thus, "[l]aches ... may be found even if the applicable statute of limitations has not yet run.' *In Matter of Joseph*, 60 V.I. 540, 558–59, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014)(internal citations omitted). Thus, the "laches defense may apply to attorney discipline proceedings in certain very narrowly defined circumstances, such as when the delay in instituting the disciplinary proceedings results in prejudice to the respondent." *Id.*

---

[4]    http://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule3-02.cfm

[5]    http://www.in.gov/judiciary/files/order-rules-2016-1103-adm-disc.pdf    (last two emphases added).

31

- 5 -

That is what is occurring hear because memories have faded and some evidence cannot be found. The evidence collected by the Pennsylvania and Florida Bars — both of which dismissed the complaint — no longer exists. Perhaps the D.C. Bar has some evidence, but it has not given it to Mr. Klayman. One of the papers in the files the D.C. Bar refers to a draft complaint and an opinion from a lawyer who practices in the employment area, but neither the Bar Counsel nor the expert have reviewed all of the relevant files and documents of Ms. Sataki's case. Mr. Klayman has sent you a copy.

The Virgin Islands Supreme Court sets out a test that *presumes* prejudice in a case like this: "we shall only presume prejudice with respect to the laches defense when there is a substantial delay in the initiation of disciplinary proceedings." *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at \*7 (V.I. Feb. 11, 2014). Here there is a substantial delay.

See also, *id.*, *Joseph, id.,* citing, *In re Wade*, 814 P.2d 753, 764 (Ariz. 1991); *In re Siegel*, 708 N.E.2d 869, 871 (Ind. 1999) ("There may be factual situations in which the expiration of time destroys the fundamental fairness of the entire proceeding."); *Anne Arundel County Bar Ass'n, Inc. v. Collins*, 325 A.2d 724, 728 (Md. 1974) (laches applicable to attorney discipline proceedings if "prejudice or circumstances making it inequitable to grant the relief sought"). *Tennessee Bar Ass'n v. Berke,* 344 S.W.2d 567, 571–72 (Tenn. 1961) (dismissing disciplinary proceedings for laches when grievance filed nine years after alleged misconduct occurred with no explanation for the delay and respondent was not responsible for the delay). *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at \*7 (V.I. Feb. 11, 2014).

Similarly., in *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791 (Ala. 1998), the State Bar suspended lawyers convicted of misdemeanors for "serious crimes" and charged them with additional rules infractions. The Supreme Court held, inter alia, that the State Bar's delay in pursuing remaining formal charges following resolution of criminal proceedings warranted dismissal.[6]

---

[6]    *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791, 1998 WL 321956 (Ala. 1998)(footnote omitted)(emphasis added):

In *Noojin* [*Noojin v. Alabama State Bar*, 577 So.2d 420 (Ala.1990),], this Court examined an attorney's contentions that the Alabama State Bar had erred in delaying disciplinary proceedings against him. It held that the culmination of a federal criminal matter was not "good cause" for *delaying disciplinary proceedings for nearly a year*, and it barred the Alabama State Bar from proceeding on the charges pending against the attorney. As in *Noojin,* we consider in the present case whether the Bar had "good cause" to defer or delay the disciplinary proceedings against the attorneys. Rule 14, Ala.R.Disc.P. The Bar asserts that it "stayed" the proceedings on the formal charges based on the attorneys' alleged attempts to obtain discovery for their criminal cases. Aside from this assertion, the Bar has not attempted to provide a reason for its continued delay in regard to the formal charges against the attorneys.[5] Therefore, if we accept the Bar's only explanation of "good

- 6 -

Let me now leave the subject of laches and turn to the actual complaint, filed in 2011. Ms. Sataki makes several complaints.

FIRST, she claims that Mr. Klayman was not competent to handle her case and thus violated RULE 1.1. Pennsylvania and Florida have already rejected that claim. In addition, Ms. Sataki has never filed any lawsuit claiming that there was malpractice or sexual harassment by Mr. Klayman. She also claims that he used incorrect procedures and failed to make deadlines. She does not indicate what deadlines he missed. He did tell me that he filed a notice of appeal to protect her rights when she did not bother to respond to his requests asking her if she wanted to appeal. Her union representative also could not get in contact with her. Eventually, she bothered to respond and ordered him and Mr. Shamble (her Union Representative) not to pursue appeals, so they complied. If an error was made below, the normal way we correct it is by appeal.

The OBC says that it has an opinion by a lawyer as to the alleged malpractice, but OBC has not disclosed it to Mr. Klayman so neither he nor anyone else could answer it. OBC also says that it has a complaint, which suggests OBC has prejudged the matter, by showing its complaint to someone who is not part of the Office of Bar Counsel.

SECOND, she claims Mr. Klayman violated RULE 1.3 by revealing information to the public that was not secret client information and not confidential client information. Mr. Klayman told me that when he wrote to talked about the case it was only after his client's prior permission. She and Mr. Shamble thought that publicity would help her case by encouraging the Voice of America to settle rather than suffer bad publicity.

THIRD, she claims that Mr. Klayman did not disclose the fee until several months after the case began, and thus violated RULE 1.5. Mr. Klayman tells me that he did disclose the fee when they first talked about the case. The fee was zero — he did it as a pro bono matter. Several months later, when the case got more difficult than either of them expected, he told the client that he would have charge a fee. Or, of course, she would retain another lawyer and he could transfer the files to that other lawyer. She chose not to hire a new lawyer and he proposed a contingent fee. She never signed a fee agreement because she was hard to contact and the case ended at her request. He never charged her any fee.

FOURTH, she claims a violation of RULE 1.6, by disclosing client confidences. Mr. Klayman has told me that he had her permission before he disclosed anything. She and her Union

cause" for delay, there remains a period of over a year, from February 14, 1997, to now, during which the Bar has taken no action to proceed on the merits of the formal charges. Under our *Noojin* analysis, we find that this delay in proceeding on the remaining formal charges is excessive. Therefore, because of the inordinate delay on the part of the Bar in pursuing the remaining formal charges against the attorneys, those charges are dismissed.

- 7 -

Representative, Mr. Shamble, thought that publicity would help her case, and she was probably right — although not pursuing an appeal undercut her case.

FIFTH, she claims that Mr. Klayman violated RULE 1.7 because he used her case for his purposes. Leaving aside the rather vague nature of those charges, Mr. Klayman says that his only motivation was to help her as a friend because she was in trouble and had other problems. He would be willing to disclose these other problems to you if Ms. Sataki waives her attorney-client privilege. After all, we do not want a situation where the OBC seeks to discipline Mr. Klayman in this case because he used what the OBC later claims is information protected by Rule 1.6. Since Mr. Klayman will not be talking to Ms. Sataki about this case, the OBC should ask for this waiver.

Sixth, Ms. Sataki says Mr. Klayman violated RULE 3.3 because he was dishonest in telling people he was her lawyer when he was not her lawyer. Mr. Klayman has told me that he never told people he was her lawyer after she discharged him. He (and her union representative) tried to contact her unsuccessfully to ask her if he wanted to appeal. Her complaint[7] says that her brother told Mr. Klayman to terminate the representation, but the caller did not identify himself as her brother, Mr. Klayman would not recognize the brother's voice, and her brother did not represent that he was her agent with authority.[8]

I am troubled that the OBC has sat on this case for nearly six years and another one involving Mr. Klayman for nearly eight years. In my view, the complaint of Oct. 20, 2011 should be dismissed, particularly under these circumstances. The OBC has not even asserted that it learned something in the intervening years to justify reopening this old complaint.

Sincerely,

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Law

---

[7]     I refer to the complaint as "her complaint" but I do not mean to imply that she wrote it. Mr. Klayman tells me that when he knew her, her English was not good enough to draft a complaint like this one.

[8]     Mr. Klayman has met her brother once, but does not know him well enough to recognize her voice, and he has met her mother once. Both times, he met them at the residence of Ms. Sataki, because the mother and the brother invited him — they wanted to meet the lawyer who was representing their sister/daughter. Ms. Sataki claims that he showed up "unannounced." If she is telling the truth it is only because she did not talk to her brother or mother on this matter.

34

RONALD D. ROTUNDA                                                    May 2, 2014
Email: rrotunda@chapman.edu                    Home Page ✆ http://www1.chapman.edu/~rrotunda

**Office Address:**

Chapman University
Dale E. Fowler School of Law
Room 406
One University Drive
Orange, CA  92866-1005
☎:      (714) 228-2698
Fax:   (714) 228-2576

**Experience:**

| | |
|---|---|
| Since August, 2008 | DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, CHAPMAN UNIVERSITY |
| June 17, 2009 – Jan. 31, 2013 | COMMISSIONER, Fair Political Practices Commission a regulatory body of the State of California, |
| 2006- August 2008 | UNIVERSITY PROFESSOR AND PROFESSOR OF LAW, George Mason University |
| 2002-2006 | THE GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW, George Mason University School of Law |
| Nov. to Dec. 2002 | Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law, Leuven, Belgium |
| May 2004 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| June 2004-May 2005 | Special Counsel to Department of Defense, The Pentagon |
| December 2005 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| 1993 - 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, University of Illinois College of Law |
| Since 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, EMERITUS, University of Illinois College of Law |
| Fall, 2001 | Visiting Professor, George Mason University School of Law |

- 2 -

Ronald D. Rotunda

| | |
|---|---|
| Spring & Fall 2000 | Cato Institute, Washington, D.C.; Senior Fellow in Constitutional Studies [Senior Fellow in Constitutional Studies, 2001-2009] |
| Spring, 1999 | Visiting Professor, holding the JOHN S. STONE ENDOWED CHAIR OF LAW, University of Alabama School of Law |
| August 1980 - 1992 | Professor of Law, University of Illinois College of Law |
| March 1986 | Fulbright Professor, Maracaibo and Caracas, Venezuela, under the auspices of the Embassy of the United States and the Catholic University Andres Bello |
| January – June, 1981 | Fulbright Research Scholar, Italy |
| Spring 1981 | Visiting Professor of Law, European University Institute, Florence, Italy |
| August 1977 – August, 1980 | Associate Professor of Law, University of Illinois College of Law |
| August 1974 – August 1977 | Assistant Professor of Law, University of Illinois College of Law |
| April 1973 - July 1974 | Assistant Counsel, U.S. Senate Select Committee on Presidential Campaign Activities |
| July 1971 - April, 1973 | Associate, Wilmer, Cutler & Pickering Washington, DC |
| August 1970 – July 1971 | Law Clerk to Judge Walter R. Mansfield, Second Circuit, New York, N.Y. |

**Education:**

**Legal:**   HARVARD LAW SCHOOL      (1967- 1970)
Harvard Law Review, volumes 82 & 83
J.D., 1970 Magna Cum Laude

**College:**   HARVARD COLLEGE      (1963- 1967)
A.B., 1967 Magna Cum Laude in Government

**Member:**

American Law Institute (since 1977); Life Fellow of the American Bar Foundation (since 1989); Life Fellow of the Illinois Bar Foundation (since 1991); The Board of Editors, The Corporation Law Review (1978-1985); New York Bar (since 1971); Washington, D.C. Bar and D.C. District Court Bar (since 1971); Illinois Bar (since 1975); 2nd Circuit Bar (since 1971); Central District of Illinois (since 1990); 7th Circuit (since 1990); U.S. Supreme Court Bar (since 1974); 4th Circuit, since 2009. Member: American Bar Association, Washington, D.C. Bar Association, Illinois State Bar

- 3 -

Ronald D. Rotunda

Association, Seventh Circuit Bar Association; The Multistate Professional Responsibility Examination Committee of the National Conference of Bar Examiners (1980-1987); AALS, Section on Professional Responsibility, Chairman Elect (1984-85), Chairman (1985-86); Who's Who In America (since 44th Ed.) and various other Who's Who; American Lawyer Media, L.P., National Board of Contributors (1990-2000).

**Scholarly Influence and Honors:**

Symposium, *Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000), sought to determine the influence, productivity, and reputation of law professors. Under various measures, Professor Rotunda scored among the highest in the nation. *E.g.*, scholarly impact, most-cited law faculty in the United States, 17th (p. 470); reputation of judges, legal scholars, etc. on Internet, 34th (p. 331); scholar's non-scholarly reputation, 27th (p. 334); most influential legal treatises since 1978, 7th (p. 405).

In May 2000, *American Law Media*, publisher of *The American Lawyer*, the *National Law Journal*, and the *Legal Times,* picked Professor Rotunda as one of the ten most influential Illinois Lawyers. He was the only academic on the list. He was rated, in 2014, as one of "The 30 Most Influential Constitutional Law Professors" in the United States.

- 2012, Honored with, THE CHAPMAN UNIVERSITY EXCELLENCE IN SCHOLARLY/CREATIVE WORK AWARD, 2011-2012.
- Appointed UNIVERSITY PROFESSOR, 2006, George Mason University; Appointed 2008, DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, Chapman University.
- The 2002-2003 *New Educational Quality Ranking* of U.S. Law Schools (EQR) ranks Professor Rotunda as the eleventh most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml
- Selected UNIVERSITY SCHOLAR for 1996-1999, University of Illinois.
- 1989, Ross and Helen Workman Research Award.
- 1984, David C. Baum Memorial Research Award.
- 1984, National Institute for Dispute Resolution Award.
- Fall, 1980, appointed Associate, in the Center for Advanced Study, University of Illinois.

Ronald D. Rotunda

LIST OF PUBLICATIONS:

BOOKS:

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> CALIFORNIA SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> 1978 SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1978) (with Thomas D. Morgan).

> 1979 PROBLEMS, CASES AND READINGS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1980 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

> 1980 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

> 1978 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (with John E. Nowak and J. Nelson Young).

> 1979-1980 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1979) (with John E. Nowak and J. Nelson Young).

> 1982 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982) (with John E. Nowak and J. Nelson Young).

**MODERN CONSTITUTIONAL LAW:  CASES & NOTES** (West Publishing Co., St. Paul, Minnesota, 1981).

1981 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1981).

1982 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982).

1983 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1983).

1984 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1984).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 2d ed. 1981) (with Thomas D. Morgan).

1981 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1981) (with Thomas D. Morgan).

1983 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1983) (with Thomas D. Morgan).

**THE UNITED STATES FEDERAL SYSTEM:  LEGAL INTEGRATION IN THE AMERICAN EXPERIENCE** (Giuffrè, Milan, 1982) (with Peter Hay).

**SIX JUSTICES ON CIVIL RIGHTS** (Oceana Publications, Inc., Dobbs Ferry, N.Y., 1983) (edited and with introduction).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1983) (with John E. Nowak and J. Nelson Young) (a one volume treatise on Constitutional Law).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., 1984, Black Letter Series).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 3d ed. 1984) (with Thomas D. Morgan).

1984 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1984) (with Thomas D. Morgan).

1985 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1985) (with Thomas D. Morgan).

Ronald D. Rotunda

1986 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1986) (with Thomas D. Morgan).

1987 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1987) (with Thomas D. Morgan).

MODERN CONSTITUTIONAL LAW:  CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 2d ed. 1985).

1985 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1985).

1986 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1986).

1987 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1987).

1988 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1988).

THE POLITICS OF LANGUAGE:  LIBERALISM AS WORD AND SYMBOL (University of Iowa Press, 1986) (with an Introduction by Daniel Schorr).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (West Publishing Co., St. Paul, Minnesota, 1986) (*three volume treatise*) (with John E. Nowak and J. Nelson Young).

1987 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1987) (with John E. Nowak).

1988 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

1989 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1989) (with John E. Nowak).

1990 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1990) (with John E. Nowak).

1991 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1991) (with John E. Nowak).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 3d ed. 1986) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

1988 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

**JOSEPH STORY'S COMMENTARIES ON THE CONSTITUTION** (Carolina Academic Press, Durham, N.C. 1987) (with introduction) (with John E. Nowak).

**CONSTITUTIONAL LAW: PRINCIPLES AND CASES** (West Publishing Co., St. Paul, Minnesota, 1987).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 4th ed. 1987) (with Thomas D. Morgan).

1988 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1988) (with Thomas D. Morgan).

1989 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1989) (with Thomas D. Morgan).

1990 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1990) (with Thomas D. Morgan).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1988, Black Letter Series).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1989).

1989 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1989).

1990 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1990).

1991 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1991).

1992 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1992).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, N.Y., 5th ed. 1991) (with Thomas D. Morgan).

1991 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1991) (with Thomas D. Morgan).

1992 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1992) (with Thomas D. Morgan).

1993 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1993) (with Thomas D. Morgan).

1994 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1994) (with Thomas D. Morgan).

1995 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1995) (with Thomas D. Morgan).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1991) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1992, Black Letter Series).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1992) (*four volume treatise*) (with John E. Nowak).

1993 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993) (with John E. Nowak).

1994 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994) (with John E. Nowak).

1995 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

1996 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996) (with John E. Nowak).

1997 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997) (with John E. Nowak).

1998 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998) (with John E. Nowak).

1999 POCKET PART TO CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 1999) (with John E. Nowak).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1993).

1993 S<small>UPPLEMENT TO</small> M<small>ODERN</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., St. Paul, Minnesota, 1993).

1994 SUPPLEMENT <small>TO</small> M<small>ODERN</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., St. Paul, Minnesota, 1994).

1995 S<small>UPPLEMENT TO</small> M<small>ODERN</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., St. Paul, Minnesota, 1995).

1996 S<small>UPPLEMENT TO</small> M<small>ODERN</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., St. Paul, Minnesota, 1996).

**C<small>ONSTITUTIONAL</small> L<small>AW</small>** (West Publishing Co., St. Paul, Minnesota, 5th ed. 1995) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**P<small>ROBLEMS AND</small> M<small>ATERIALS ON</small> P<small>ROFESSIONAL</small> R<small>ESPONSIBILITY</small>** (Foundation Press, Westbury, N.Y., 6th ed. 1995) (with Thomas D. Morgan).

1996 S<small>ELECTED</small> S<small>TANDARDS ON</small> P<small>ROFESSIONAL</small> R<small>ESPONSIBILITY</small> (Foundation Press, Westbury, N.Y. 1996) (with Thomas D. Morgan).

1997 S<small>ELECTED</small> S<small>TANDARDS ON</small> P<small>ROFESSIONAL</small> R<small>ESPONSIBILITY</small> (Foundation Press, Westbury, N.Y. 1997) (with Thomas D. Morgan).

1998 S<small>ELECTED</small> S<small>TANDARDS ON</small> P<small>ROFESSIONAL</small> R<small>ESPONSIBILITY</small> (Foundation Press, Westbury, N.Y. 1998) (with Thomas D. Morgan).

1999 S<small>ELECTED</small> S<small>TANDARDS ON</small> P<small>ROFESSIONAL</small> R<small>ESPONSIBILITY</small> (Foundation Press, New York, N.Y. 1999) (with Thomas D. Morgan).

2000 S<small>ELECTED</small> S<small>TANDARDS ON</small> P<small>ROFESSIONAL</small> R<small>ESPONSIBILITY</small> (Foundation Press, New York, N.Y. 2000) (with Thomas D. Morgan).

**P<small>ROFESSIONAL</small> R<small>ESPONSIBILITY</small>** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1995, Black Letter Series) (with computer disk).

**Treatise on Constitutional Law:  Substance and Procedure** — E<small>XPANDED</small> CD R<small>OM</small> E<small>DITION</small> (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

**M<small>ODERN</small> C<small>ONSTITUTIONAL</small> L<small>AW</small>: C<small>ASES AND</small> N<small>OTES</small>** (West Publishing Co., St. Paul, Minnesota, 5th ed. 1997).

1997 S<small>UPPLEMENT TO</small> M<small>ODERN</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., St. Paul, Minnesota, 1997).

1998 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998).

1999 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1999).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Group, St. Paul, Minnesota, 3d ed. 1999) (*five volume treatise*) (with John E. Nowak).

2000 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2000) (with John E. Nowak).

2001 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2001) (with John E. Nowak).

2002 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2002) (with John E. Nowak).

2003 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2003) (with John E. Nowak).

2004 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2004) (with John E. Nowak).

2005 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2005) (with John E. Nowak).

2006 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2006) (with John E. Nowak).

헌법: 개인의 자유와 절차를 [AMERICAN CONSTITUTIONAL LAW: INDIVIDUAL LIBERTIES AND PROCEDURE; published in Korean] (Korean Constitutional Court, 1999) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, NY, 7th ed. 2000) (with Thomas D. Morgan).

2001 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2001) (with Thomas D. Morgan).

2002 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2002) (with Thomas D. Morgan).

2003 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2003) (with Thomas D. Morgan).

Ronald D. Rotunda

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn. 2000) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Group, St. Paul, Minnesota, 6th ed. 2000).

> 2000 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000).

> 2001 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2001).

> 2002 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2002).

CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 5th ed. 2001, Black Letter Series).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2001).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn., 2nd ed. 2002) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2nd ed. 2002).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 6th ed. 2002, Black Letter Series).

LEGAL ETHICS IN A NUTSHELL (West Group, St. Paul, Minnesota, 1st ed. 2003, Nutshell Series) (with Michael I. Krauss).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 7th ed. 2003).

> 2003 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2003).

> 2004 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2004).

2005 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2005).

2006 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2006).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 8th ed. 2003) (with Thomas D. Morgan).

2004 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2004) (with Thomas D. Morgan).

2005 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2005) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2004) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 7th ed. 2004, Black Letter Series).

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 1st ed. 2004) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2nd ed. 2005) (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 2nd ed. 2006, Nutshell Series) (with Michael I. Krauss).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 9th ed. 2006) (with Thomas D. Morgan).

2006 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2006) (with Thomas D. Morgan).

2007 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2007) (with Thomas D. Morgan).

2008 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2008) (with Thomas D. Morgan).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (Thomson/West, St. Paul, Minnesota, 8th ed. 2007).

2007 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2007).

2008 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2008).

**TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 4th ed. 2007) *(first two volumes of six volume treatise)* (with John E. Nowak).

2007 Pocket PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2007) (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007, Nutshell Series).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

언론의 자유와 미국 헌법, **FREEDOM OF SPEECH AND THE AMERICAN CONSTITUTION** (Korean Studies Information Co. Ltd.  Publishers, Korea, 2007) (translated into Korean by Professor Lee Boo-Ha, Yeungnam University College of Law and Political Science), coauthored with Professor John E. Nowak.

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007) (with John E. Nowak).

**TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 4th ed. 2008) *(last four volumes of six volume treatise)* (with John E. Nowak).

2008 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2008) (with John E. Nowak).

2009 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2009) (with John E. Nowak).

2010 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2010) (with John E. Nowak).

2011 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2011) (with John E. Nowak).

2012 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2012) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 10th ed. 2008) (with Thomas D. Morgan).

2009 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2009) (with Thomas D. Morgan).

2010 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2010) (with Thomas D. Morgan).

2011 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2011) (with Thomas D. Morgan).

**PROFESSIONAL RESPONSIBILITY** (Thomson/West, St. Paul, Minnesota, 8th ed. 2008, Black Letter Series).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Thomson Reuters, St. Paul, Minnesota, 9th ed. 2009).

2009 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul,

Minnesota, 2009).

2010 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2010).

2011 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2011).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2010) (a one volume treatise on Constitutional Law) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (West-Thomson/Reuters, St. Paul, Minnesota, 4th ed. 2010) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 11th ed. 2011) (with Thomas D. Morgan & John S. Dzienkowski).

2012 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2012) (with Thomas D. Morgan).

2013 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2013) (with Thomas D. Morgan).

2014 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, West Academic, St. Paul, MN 2014) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY (West: A Thomson-Reuters Co., St. Paul, Minnesota, 9th ed. 2011, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION (Foundation Press, New York, N.Y., 11th ed. 2012) (with Thomas D. Morgan & John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 10th ed. 2012).

2012 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2012).

2013 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2013).

概論 アメリカの法曹倫理 第3版——事例解説 [INTRODUCTION TO AMERICAN LEGAL ETHICS] (translated by Naoyuki Toyama) (Thomson Reuters, Japan UNI Agency, Inc. Tokyo, 2012).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2012) *(first three volumes of six volume treatise)* (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 4th ed. 2013, Nutshell Series).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2013) *(last three volumes of six volume treatise)* (with John E. Nowak).

2013 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2013) (with John E. Nowak).

- 17 -

Ronald D. Rotunda

2014 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2014) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**ARTICLES:**

*The "Liberal" Label:  Roosevelt's Capture of a Symbol*, 17 PUBLIC POLICY 377 (Harvard University Press, 1968).

*Reform of the Presidential Nominating Conventions*, 56 VIRGINIA LAW REVIEW 179 (1970) (with Reid Chambers).

*The Public Interest Appellant:  Limitations on the Right of Competent Parties to Settle Litigation Out of Court*, 66 NORTHWESTERN UNIVERSITY LAW REVIEW 199 (1971).

*The Combination of Functions in Administrative Actions:  An Examination of European Alternatives*, 40 FORDHAM LAW REVIEW 101 (1971).

*Star Gallery '74,* 2 ASTRONOMY MAGAZINE 57 (Feb. 1974) (Photographs of Mercury Transit of the Sun).

*Presidents and Ex-Presidents as Witnesses:  A Brief Historical Footnote*, 1975 UNIVERSITY OF ILLINOIS LAW FORUM 1 (1975).

*Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda*, 53 TEXAS LAW REVIEW 935 (1975).

*Sponsors of Real Estate Partnerships as Brokers and Investment Advisors*, 23 UNIVERSITY OF CALIFORNIA-LOS ANGELES LAW REVIEW 322 (1975) (with Robert C. Hacker).

*Book Review of Freedman's "Lawyers' Ethics in An Adversary System,"* 89 HARVARD LAW REVIEW 622 (1976).

*Congressional Power to Restrict the Jurisdiction of the Lower Federal Courts and the Problem of School Busing*, 64 GEORGETOWN UNIVERSITY LAW JOURNAL 839 (1976).

*Comment*, 27 HARVARD LAW BULLETIN 4 (No. 3, 1976).

*Conforming Stock Ownership Plans with the Securities Acts*, 45 GEORGE WASHINGTON UNIVERSITY LAW REVIEW 34 (1976) (with Robert C. Hacker).

*The Commercial Speech Doctrine in the Supreme Court*, 1976 UNIVERSITY OF ILLINOIS LAW FORUM 1080 (1976).

*Commercial Speech and the First Amendment*, 1 THE COLLEGIATE FORUM 8 (Fall 1977) (published by Dow Jones & Co., Inc.).

*The First Amendment Now Protects Commercial Speech*, 10 THE CENTER MAGAZINE:  A PUBLICATION OF THE CENTER FOR THE STUDY OF DEMOCRATIC INSTITUTIONS 32 (May/June 1977).

*The Word "Profession" is Only a Label — And Not a Very Useful One*, 4 LEARNING AND THE LAW 16 (Summer 1977) (publication of the American Bar Association Section of Legal Education and Admissions to the Bar).

*The SEC's Ectoplasmic Theory of an Issuer as Applied to Educational and Charitable Institutions, Bank Trustees, and Other Exempt Issuers*, 65 CALIFORNIA LAW REVIEW 1181 (1977) (with Robert C. Hacker) (published by University of California-Berkeley Law School).

*Law, Lawyers and Managers*, in, THE ETHICS OF CORPORATE CONDUCT, pp. 127-45 (Clarence Walton, ed. 1977) (published by Prentice-Hall, Inc., Englewood Cliffs, N.J., for the American Assembly of Columbia University).

*When the Client Lies:  Unhelpful Guidelines from the ABA*, 1 CORPORATION LAW REVIEW 34 (1978).

*SEC Registration of Private Investment Partnerships after Abrahamson v. Fleschner*, 78 COLUMBIA LAW REVIEW 1471 (1978) (with Robert C. Hacker).

*The Reliance of Counsel Defense in Securities Cases:  Damage Actions versus Injunctive Actions*, 1 CORPORATION LAW REVIEW 159 (1978) (with Robert C. Hacker).

*Liability for the Misuse of Nonpublic, Material Inside Information:  The Duty to Convey and the Duty to Inquire*, 1 CORPORATION LAW REVIEW 376 (1978) (with Robert C. Hacker).

*Running Out of Time:  Can the E.R.A. Be Saved,* 64 AMERICAN BAR ASSOCIATION JOURNAL 1507 (1978).

*The Duty to Take Remedial Action*, 2 CORPORATION LAW REVIEW 159 (1979) (with Robert C. Hacker).

*Waiver of Attorney Client Privilege*, 2 CORPORATION LAW REVIEW 250 (1979) (with Robert C. Hacker).

*Attorney Conflicts of Interest*, 2 CORPORATION LAW REVIEW 345 (1979) (with Robert C. Hacker).

*Standing, Waiver, Laches, and Appealability in Attorney Disqualification Cases*, 3 CORPORATION LAW REVIEW 82 (1980) (with Robert C. Hacker).

*Short-Swing Profits, Section 16(b), and Nonstatutory Insiders*, 3 CORPORATION LAW REVIEW 252 (1980) (with Robert C. Hacker).

*Restrictions on Agency and Congressional Subpoenas Issued for an Improper Purpose*, 4 CORPORATION LAW REVIEW 74 (1981) (with Robert C. Hacker).

*The Extraterritorial Regulation of Foreign Business under the U.S. Securities Laws*, 59 NORTH CAROLINA LAW REVIEW 643 (1981) (with Robert C. Hacker), reprinted in 24 CORPORATE PRACTICE COMMENTATOR 233 (1982).

*Ethical Restraints on Communications with Adverse Expert Witnesses*, 5 CORPORATION LAW REVIEW 348 (1982) (with Robert C. Hacker).

*A Comment on the Creation and Resolution of a "Nonproblem": Dames & Moore v. Regan, the Foreign Affairs Power, and the Role of the Court*, 29 UNIVERSITY OF CALIFORNIA - LOS ANGELES LAW REVIEW 1129 (1982) (with John E. Nowak).

*Corporate Confidences and the Duty to Refrain from Insider Trading*, 6 CORPORATION LAW REVIEW 53 (1983) (with Robert C. Hacker).

*Representing the Corporate Client and the Proposed Rules of Professional Conduct*, 6 CORPORATION LAW REVIEW 269 (1983) (with Robert C. Hacker).

*Ethics*, USA Today, Feb. 15, 1983, at p. 10A.

*Teaching Ethics under the New Model Rules*, 14 SYLLABUS 1 (No. 3, Sept. 1983) (a publication of the American Bar Association Section on Legal Education and Admissions to the Bar).

*Usery in the Wake of Federal Energy Regulatory Commission v. Mississippi*, 1 CONSTITUTIONAL COMMENTARY 43 (1984).

*The Doctrine of Conditional Preemption and Other Limitations on Tenth Amendment Restrictions*, 132 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 289 (1984).

*Ethics*, 12 STUDENT LAWYER 14 (May 1984).

*Debate Over Model Rules Moves to the States*, 130 CHICAGO LAW BULLETIN 3, 8 (June 12, 1984).

*The Notice of Withdrawal and the New Model Rules of Professional Conduct: Blowing the Whistle and Waiving the Red Flag*, 63 OREGON LAW REVIEW 455 (1984), reprinted in, 1985 CRIMINAL LAW REVIEW 533, and excerpted in 34 LAW REVIEW DIGEST 14 (Mar./Apr. 1985).

*Instruments for Legal Integration in the European Community — A Review* (with Peter Hay and Giorgio Gaja), in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 113 (Mauro Cappelletti, Monica Seccombe & Joseph Weiler, Eds.) (Walter de Gruyter, Berlin, 1986).

*Conflict of Laws as a Technique for Legal Integration* (with Peter Hay and Ole Lando) in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 161 (M. Cappelletti, M. Seccombe, & J. Weiler, eds.) (Walter de Gruyter, Berlin, 1986).

*The Doctrine of the Inner Political Check, the Dormant Commerce Clause, and Federal Preemption*, 53 TRANSPORTATION PRACTITIONERS JOURNAL 263 (1986).

*The Role of Law Reviews:  The Extreme Centrist Position*, 62 INDIANA LAW JOURNAL 1 (1986).

*Intergovernmental Tax Immunity and Tax Free Municipals After Garcia*, 57 U. COLORADO LAW REVIEW 849 (1986).

*Sales and Use Tax Credits, Discrimination against Interstate Commerce, and the Useless Multiple Taxation Concept*, 20 UNIVERSITY OF CALIFORNIA-DAVIS LAW REVIEW 273 (1987) (with John E. Nowak).

*Ethical Problems in Federal Agency Hiring of Private Attorneys*, 1 GEORGETOWN JOURNAL OF LEGAL ETHICS 85 (1987).

*Bicentennial Lessons from the Constitutional Convention of 1787*, 21 SUFFOLK UNIVERSITY LAW REVIEW 589 (1987) (the Twentieth Donahue Lecture).

*Remembering Judge Walter R. Mansfield*, 45 BROOKLYN LAW REVIEW 1 (1987).

*Professionals, Pragmatists or Predators,* Part I, 75 ILLINOIS BAR JOURNAL 420, Part II, 482, Part III, 540 (1987).

*Life Under the Articles of Confederation*, 75 ILLINOIS BAR JOURNAL 544 (1987).

*Lawyers and Professionalism:  A Commentary on the Report of the American Bar Association Commission on Professionalism*, 18 LOYOLA UNIVERSITY OF CHICAGO LAW JOURNAL 1149 (1987) (the Baker-McKenzie Foundation Lecture).

*The Constitutional Future of the Bill of Rights:  A Closer Look at Commercial Speech and State Aid to Religiously Affiliated Schools*, 65 NORTH CAROLINA LAW REVIEW 917 (1987).

*Bork's Firing of Cox:  What Really Happened*, WALL STREET JOURNAL, Sept. 9, 1987, p. 32.

*An Essay on the Constitutional Parameters of Federal Impeachment*, 76 KENTUCKY LAW REVIEW 707 (1988).

*Contract Rights, Property Rights and Constitutional Restrictions on Federal Limitations of Private Claims Against Foreign Governments*, in,  LEGAL ESSAYS IN HONOR OF JOHN E. CRIBBET, pp 151-68 (Peter Hay & Michael Hoeflich, eds., U. of Ill. Press, 1988).

*Learning the Law of Lawyering,* 136 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1761 (1988).

*Original Intent, The View of the Framers, and the Role of the Ratifiers*, 41 VANDERBILT LAW REVIEW 507 (1988).

*The Confirmation Process for Supreme Court Justices in the Modern Era*, 37 EMORY LAW JOURNAL 559 (1988).

*Sheathing the Sword of Federal Preemption*, 5 CONSTITUTIONAL COMMENTARY 311 (1988).

*Is Lawyer Professionalism Declining or Advancing* (3-Part Series) 134 CHICAGO DAILY LAW BULLETIN, Mar. 5, 1988 at 2, 14 (*Part I*); Mar. 16, 1988 at 2, 14 (*Part II*); Mar. 17, 1988 at 2, 10 (*Part III*).

*Challenging the Ethics Myths*, 10 LEGAL TIMES (OF WASHINGTON, D.C.) 16-17 (Mar. 21, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 4 (Apr. 13, 1988) (Georgia), 4 TEXAS LAWYER 20-21 (April 18, 1988), 1 MANHATTAN LAWYER, 12, 33 (Mar. 29 - Apr. 4, 1988), 14 CONNECTICUT LAW TRIBUNE 10-11 (Aug. 15, 1988).

*The Litigator's Professional Responsibility*, 77 ILLINOIS BAR JOURNAL 192 (1988), reprinted in, 25 TRIAL MAGAZINE 98 (March 1989), and in, 30 LAW OFFICE ECONOMICS AND MANAGEMENT 61 (1989).

*Race to Courthouse — Or Walk?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Aug. 15, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 2 (Aug. 11, 1988) (Georgia), 1 MANHATTAN LAWYER 12 (Aug. 16-22, 1988).

*State Bars Reluctant to Hear Any Evil*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Dec. 12, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 8 (Dec. 12, 1988) (Georgia), THE RECORDER OF SAN FRANCISCO 4 (Dec. 22, 1988).

*The Court: A Decade of Stability and Change*, 11 NATIONAL LAW JOURNAL 34-36 (Sept. 26, 1988).

*Client Fraud: Blowing the Whistle, Other Options*, 24 TRIAL MAGAZINE 92 (Nov. 1988).

*The Lawyer's Duty To Report Another Lawyer's Unethical Violations in the Wake of Himmel*, 1988 UNIVERSITY OF ILLINOIS LAW REVIEW 977 (1988).

*Runyon v. McCrary and the Mosaic of State Action*, 67 WASHINGTON UNIVERSITY LAW QUARTERLY 47 (1989).

*Interpreting an Unwritten Constitution*, 12 HARVARD JOURNAL OF LAW & PUBLIC POLICY 15 (1989).

*Line-Item Veto: Best Budget Fix?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 15 (Mar. 27, 1989), reprinted in, *e.g.*, 100 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 23, 1989) (Georgia), 2 MANHATTAN LAWYER 12 (Apr. 4 - Apr. 10, 1989).

*Impeaching Federal Judges: Where Are We and Where Are We Going?*, 72 JUDICATURE: THE JOURNAL OF THE AMERICAN JUDICATURE SOCIETY 359 (1989) (transcript of edited remarks).

*Cautionary Lessons from American Securities Arbitration: Litigation versus Arbitration*, 5 ARBITRATION INTERNATIONAL 199 (London Court of International Arbitration, Issue 2, 1989).

*The Impairments Clause and the Corporation: A Comment on Professors Butler's and Ribstein's Thesis*, 55 BROOKLYN LAW REVIEW 809 (1989) (Symposium).

*Eschewing Bright Lines*, 25 TRIAL MAGAZINE 52 (Dec. 1989).

*Meanwhile, Back in Mother Russia*, LEGAL TIMES (OF WASHINGTON, D.C.), Oct. 2, 1989, at 35 (with Peter B. Maggs).

*A Tribute to Eugene F. Scoles*, 1989 ILLINOIS LAW REVIEW 835 (1989).

*The Case Against Special Prosecutors*, WALL STREET JOURNAL, Jan. 15, 1990, at p. A8.

*Jurisprudent: ABA Model Rules on Client Secrets No Help*, 13 CHICAGO LAWYER 12, 56 (Feb. 1990).

*The New Illinois Rules of Professional Conduct: A Brief Introduction and Criticism*, 78 ILLINOIS BAR JOURNAL 386 (1990).

*Beholden to None, Justices Often Cut Their Own Paths*, LOS ANGELES TIMES, July 27, 1990, at p. B7.

*Predicting the Views of Supreme Court Nominees*, 26 TRIAL MAGAZINE 42 (Nov. 1990).

*Judicial Conference — Second Circuit: RICO and the Proposed Restatement of the Law Governing Lawyers* (Sept. 7, 1990), 136 FEDERAL RULES DECISIONS 233, 266-71 (1991).

*War Dissenters Reflect Freedom's Power*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 24 (Feb. 4, 1991).

*Joseph Story: A Man for All Seasons*, 1990 JOURNAL OF SUPREME COURT HISTORY: YEARBOOK OF THE SUPREME COURT HISTORICAL SOCIETY 17 (1990) (with John E. Nowak).

*When Rough Justice Rides Roughshod*, 13 LEGAL TIMES (of Washington, D.C.) 26 (April 1, 1991), reprinted in, 102 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 29, 1991), 32 BROWARD REVIEW (Fort Lauderdale, Florida) 11 (April 1, 1991), 37 PALM BEACH (FLORIDA) REVIEW 11 (April 1, 1991), 65 MIAMI REVIEW 11 (April 1, 1991), 77 NEW JERSEY LAW JOURNAL 9, 24 (April 4, 1991), 65 THE RECORDER 4, 5 (April 4, 1991).

*Nici o constitutie . . .*, 18 LUMEA AZI 4 (May 2, 1991) (published in Romanian).

*Public Executions: Should the Imposition of the Death Sentence Be Televised*?, 4 ILLINOIS QUARTERLY 36 (July 1991) (panel discussion).

*One Potato, Two Potato, Three Potato, Four*, 14 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (Aug. 12, 1991) (reprinted in various legal newspapers).

*Abuse of Ethics Rule Hinders Prosecutors*, CHICAGO SUN-TIMES, Aug. 24, 1991, at p. 12, col. 1-2.

*Commercial Speech and the Platonic Ideal: Libre expression et libre enterprise*, in, FREEDOM OF EXPRESSION AND THE CHARTER 319   (David Schneiderman, ed. Carswell, Canada 1991), a collection of papers presented at the Edmonton, Alberta Conference on the Canadian Constitution, of the Centre for Constitutional Studies/Centre d'études constitutionnelles.

*Thomas' Ethics and the Court*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Aug. 26, 1991).

*A Red Herring Confirmation Issue*, THE INDIANAPOLIS STAR, Sept. 10, 1991, at p. A7, col. 1-3.

*Celebrating the Bicentennial of the Bill of Rights,* 79 ILLINOIS BAR JOURNAL 608 (1991).

*Exporting the American Bill of Rights: The Lesson from Romania*, 1991 UNIVERSITY OF ILLINOIS LAW REVIEW 1065 (1991).

*The Welfare State and the Constitution*, in THE ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 571 (Macmillan Pub. Co., Inc., K. Karst & L. Levy, Eds., Supplement I, 1992).

*The Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 896 (Oxford University Press, Kermit L. Hall, ed. 1992).

*Legal Ethics*, 45 SOUTHWESTERN LAW JOURNAL [Southern Methodist University] 2035 (1992).

*The Best Response to Speech We Don't Like Is More Speech*, CHICAGO SUN-TIMES, May 16, 1992, at p.14, col. 1-6.

*Foreword: The Role of the Modern Supreme Court*, 26 U. RICHMOND LAW REVIEW 433 (1992).

*Simon Greenleaf on Desuetude and Judge-Made Law:  An Unpublished Letter to Francis Lieber*, 10 CONSTITUTIONAL COMMENTARY 93 (1993) (with Michael H. Hoeflich).

*Roe v. Wade: Reading It Right,* 15 LEGAL TIMES [OF WASHINGTON, D.C.] 36, 40 (Jan. 25, 1993) (reprinted in various publications, *e.g.*, TEXAS LAWYER. Feb. 8, 1993, at 16-17).

*No Impediment to Term Limits*, THE WASHINGTON POST, Feb. 13, 1993, at A31, col. 1.

*The Civil Rights Act of 1991: A Brief Introductory Analysis of the Congressional Response to Judicial Interpretation*, 68 NOTRE DAME LAW REVIEW 923 (1993) (Symposium).

*A Brief Comment on Politically Incorrect Speech in the Wake of R.A.V.*, 47 SOUTHERN METHODIST UNIVERSITY LAW REVIEW 9 (1993).

*Juggling for Power Over NAFTA: A Simple Cure for a Big Problem*, 16 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (July 19, 1993).

*Free Trade's Political Alchemy,* 9 TEXAS LAWYER 10 (July 26, 1993).

*Roadblock to Mexico,* THE WASHINGTON POST, Sept. 21, 1993, at A19, col. 6.

*Impeachment Showdown: Congress vs. Judges,* 16 LEGAL TIMES (OF WASHINGTON, D.C.) 37 (Nov. 1, 1993) (reprinted, *e.g.,* in 19 THE CONNECTICUT LAW TRIBUNE 24, Nov. 8, 1993).

*The Case Against Permanent Disbarment,* 5 THE PROFESSIONAL LAWYER 22 (A.B.A., No. 2, Feb. 1994).

*Paula Jones Day in Court,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) 24, 27 (May 30, 1994), *reprinted, e.g.,* 10 TEXAS LAWYER 24, 27 (June 13, 1994).

*Is the President Above the Law?*, CHICAGO TRIBUNE, June 1, 1994, § 1, at 21, col. 3 - 4.

*"Richard" Case Defies the Law As Well As the Logic,* CHICAGO TRIBUNE, July 17, 1994, § 4, at 3, col. 4.

*Setting Timer on Congressional Terms,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) S31, S33 (Oct. 3, 1994).

*A Commentary on the Constitutionality of Term Limits*, in THE POLITICS AND LAW OF TERM LIMITS 141 (Edward H. Crane & Roger Pilon, eds., Cato Institute 1994).

*The Constitution Lets States Impose Term Limits,* WALL STREET JOURNAL, Nov. 30, 1994, at A21, col. 3-6 (Midwest ed.).

*Can You Say That?,* 30 TRIAL MAGAZINE 18 (December 1994).

*Rolls Royce and the Case Law,* LAKE MICHIGAN LADY, at 34-36 (Issue No. 37, 1994).

*Rethinking Term Limits for Federal Legislators in Light of the Structure of the Constitution*, 73 OREGON LAW REVIEW 561 (1994).

*Racist Speech and Attorney Discipline,* 6 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 6, 1995).

Ronald D. Rotunda

*Returning Art to the People: No Subsidies and No Strings*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 43 (Mar. 6, 1995).

*Term Limits and Lessons from Our Past,* HEARTLAND POLICY STUDY, No. 66 (HEARTLAND INSTITUTE, June 28, 1995).

*Cases Refine Definition of Federal Powers,* 17 NATIONAL LAW JOURNAL C9, C12 (July 31, 1995).

*Computerized Highways and the Search for Privacy in the Case Law: A Comment,* 11 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 119 (1995) (part of a Conference and Symposium on Intelligent Vehicle Highway Systems).

*Fixing the War Powers Act,* THE HERITAGE LECTURES, No. 529 (The Heritage Foundation, 1995).

*What Next? Outlawing Lawyer Jokes?,* WALL STREET JOURNAL, Aug. 8, 1995, at A12, col. 3-5 (Midwest ed.).

*Innovations Disguised as Traditions: An Historical Review of the Supreme Court Nominations Process*, 1995 UNIVERSITY OF ILLINOIS LAW REVIEW 123 (1995).

*Flat Taxes: A Progressive Way to Go*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Nov. 27, 1995).

*Embattled Clintons Should Note Watergate Lessons*, NEWSDAY, Feb. 28, 1996, A32.

*Rotunda on Travel: A Wet Toast to Limp Bacon, Loose Clothing*, 36 ILLINOIS STATE BAR NEWS 4 (No. 16, Mar 1, 1996).

*The Aftermath of Thornton*, 13 CONSTITUTIONAL COMMENTARY 201 (1996).

*A Czech Window on Ethics*, 18 NATIONAL LAW JOURNAL, at A15 (July 22, 1996).

*Legal Ethics, the Czech Republic, and the Rule of Law*, 7 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 8, 1996).

*Sister Act*: *Conflicts of Interest with Sister Corporations*, in, LEGAL ETHICS: THE CORE ISSUES (1996) (Hofstra University School of Law Conference on Legal Ethics), 1 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 215 (1996).

*The Warren Court and Freedom of the Press,* in THE WARREN COURT: A 25 YEAR RETROSPECTIVE 85 (Bernard Schwartz, ed. Oxford University Press 1996).

*Judgeships Trapped in a Political Snare?*, WASHINGTON TIMES, Oct. 29, 1996, at A15, col. 1-6.

*Nová pravidla profesního jednání advokátu v Ceské republice (v komparaci s kodexy USA a EU)* [The New Rules of Professional Conduct for Advocates in the Czech Republic], 5 EMP: Evropské a mezinárodní právo 58 (Císlo 3-4, 1996) (published in Czech and English).

*Dealing with the Media: Ethical, Constitutional, and Practical Parameters*, 84 Illinois Bar Journal 614 (December 1996).

*An Essay on Term Limits and a Call for a Constitutional Convention*, 80 Marquette University Law Review 227 (1996) (with Stephen J. Safranek).

*Heiple's Burdens*, Chicago Tribune, January 29, 1997, at § 1, p. 11, col.  4 [reprinted in, Belleville News-Democrat, February 2, 1997, at § A, p. 4A, col.  4-6].

*When Duty Calls, Courts Can Be Flexible,* Washington Post, January 29, 1997, at p. A21, col. 2-3.

*Professionalism, Legal Advertising, and Free Speech In the Wake of Florida Bar v. Went For It, Inc.*, 49 Arkansas Law Review 703 (1997) (Symposium), reprinted in, 12 Lawyers' Liability Review 2 (No. 10, Oct. 1998) (part I), 12 Lawyers' Liability Review 2 (No. 11, Nov. 1998) (part II), 12 Lawyers' Liability Review 2 (No. 12, Oct. 1998) (part III).

*Conflict Problems When Representing Members of Corporate Families*, 72 Notre Dame Law Review 655 (1997).

*Judges as Ambulance Chasers*, 8 The Professional Lawyer 14 (A.B.A., No. 8, 1997).

*West Virginia Provides Model for Legal Discipline Across State Lines*, 7 Legal Opinion Letter 1 (Washington Legal Foundation, No. 15, May 16, 1997).

*The Influence of the American Law Institute's Proposed Restatement of the Law Governing Lawyers*, 1 Professional Responsibility, Legal Ethics, and Legal Education News 1, 4 (Federalist Society, No. 2, 1997).

*Handed a Lesser Veto*, 20 Legal Times (of Washington, D.C.) 27, 28 (May 26, 1997).

*Lips Unlocked: Attorney-Client Privilege and the Government Lawyer*, 20 Legal Times (of Washington, D.C.) 21-22, 28 (June 30, 1997).

*The War Powers Act in Perspective*, 2 Michigan Law & Policy Review 1 (1997).

*The True Significance of Clinton vs. Jones*, Chicago Tribune, July 8, 1997, at 12, col. 1-6.

*Can a President Be Imprisoned?*, 20 Legal Times (of Washington, D.C.) 22-23, 28 (July 21, 1997).

Ronald D. Rotunda

*The Americans with Disabilities Act, Bar Examinations, and the Constitution: A Balancing Act*, 66 THE BAR EXAMINER 6 (No. 3, August, 1997).

*Permanent Disbarment: A Market Oriented Proposal*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No. 9, Nov. 1997) (with Mary Devlin).

*White House Counsel and the Attorney Client Privilege*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 3, 1997).

*When Witnesses Are Told What to Say,* WASHINGTON POST, January 13, 1998, at A15, col. 2-4 (with Lester Brickman).

*Eastern European Diary: Constitution-Building in the Former Soviet Union*, 1 THE GREEN BAG, 2d SERIES 163 (Winter 1998).

*The Chemical Weapons Convention: Political and Constitutional Issues*, 15 CONSTITUTIONAL COMMENTARY 131 (1998).

*Reporting Sensational Trials: Free Press, a Responsible Press, and Cameras in the Courts*, 3 COMMUNICATIONS LAW AND POLICY 295 (No. 2, Spring, 1998).

*Gauging the Impact of the Proposed Restatement of the Law Governing Lawyers*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No.2, 1998).

*Is the Flat Tax Dead?,* CHICAGO TRIBUNE, April 15, 1998, at § 1, p. 17, col. 1-3.

*Epilogue,* in PRIME TIME LAW: FICTIONAL TV LAWYERS AND THEIR IMPACT ON AMERICA — FROM *PERRY MASON* AND *L.A. LAW* TO *LAW & ORDER* AND *ALLY MCBEAL* 265 (Robert M. Jarvis & Paul R. Joseph, eds., Carolina Academic Press, 1998).

*New Respectability, New Freedom*, 144 CHICAGO DAILY LAW BULLETIN 25, 35 (April 25, 1998).

*Resurrecting Federalism Under the New Tenth and Fourteenth Amendments*, 29 TEXAS TECH LAW REVIEW 953 (1998).

*Competitive Bidding Would End 'Pay-to-Play,'* 20 NATIONAL LAW JOURNAL A23 (June 29, 1998).

*Remarks on School Choice*, in Marshall J. Breger & David M. Gordis, eds., VOUCHERS FOR SCHOOL CHOICE: CHALLENGE OR OPPORTUNITY? — AN AMERICAN JEWISH REAPPRAISAL 82 (Wilstein Institute of Jewish Policy Studies, 1998).

*The Power of Congress Under Section 5 of the Fourteenth Amendment after City of Boerne v. Flores*, 32 INDIANA LAW REVIEW 163 (1998).

*Innovative Legal Billing, Alternatives to Billable Hours, and Ethical Hurdles,* published in, LEGAL ETHICS: ACCESS TO JUSTICE (1998) (Hofstra University School of Law Conference on Legal Ethics), 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 1701 (1999).

*The Legal Profession and the Public Image of Lawyers*, 23 THE JOURNAL OF THE LEGAL PROFESSION 51 (1999).

*Moving from Billable Hours to Fixed Fees: Task-Based Billing and Legal Ethics*, 47 UNIVERSITY OF KANSAS LAW REVIEW 819 (1999).

*Multidisciplinary Practice: An Idea Whose Time Has Come,* 3 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 2, 1999).

*Subsidized Speech for the Rich*, CHICAGO TRIBUNE, Dec. 12, 1999, at § 1, p.23.

*Presidential Pardon for Elian?*, WASHINGTON TIMES, Dec. 28, 1999, at A17.

*Independent Counsel and the Charges of Leaking:  A Brief Case Study*, 68 FORDHAM LAW REVIEW 869 (1999).

*Let Nothing You Display*: *Making Room for Religion in Public Forums*, LEGAL TIMES (OF WASHINGTON, D.C.), Jan. 3, 2000, at pp. 43, 45.

*Another Clinton Victim: The Integrity of the Federal Courts*, WALL STREET JOURNAL, March 20, 2000, at p. A35, reprinted in, volume 6, WHITEWATER: IMPEACHMENT AFTERMATH, ELECTION 2000 (Dow Jones & Co., 2001), at 145.

*Teaching Legal Ethics a Quarter of a Century After Watergate*, 51 HASTINGS LAW JOURNAL 661 (2000).

*The Long Gavel: In Class Actions, State Judges Are Trumping Other Jurisdictions' Laws*, LEGAL TIMES (of Washington, D.C.), May 15, 2000, at 67, 69.

*Making Work for Lawyers*, THE SCRIPPS HOWARD NEWS SERVICE (distributed to over 400 subscriber newspapers), Friday, July 7, 2000.

*Rated V for Violence*, LEGAL TIMES (of Washington, D.C.), August 14, 2000, at p. 68.

*The FTC Report on Hollywood Entertainment*, 1 FREE SPEECH & ELECTION LAW GROUP NEWS (Federalist Society, Sept. 15, 2000), http://www.fed-soc.org/Publications/practicegroupnewsletters/PG%20Links/rotunda.htm

*Constitutional Problems with Enforcing the Biological Weapons Convention*, CATO FOREIGN POLICY BRIEFING (No. 61, September 28, 2000), http://www.cato.org/pubs/fpbriefs/fpb-061es.html .

*The Bar and the Legal Academy*, in THE RULE OF LAW IN THE WAKE OF CLINTON 207-29 (Roger Pilon, ed. Cato Institute 2000).

*Should States Sue the Entertainment Industry as They Did Big Tobacco?*, 16 INSIGHT ON THE NEWS 41, 43 (Oct. 30, 2000) (debate with Charlie Condon, the Attorney General of South Carolina).

*The Benefits of School Vouchers*, NATIONAL LAW JOURNAL, Oct. 23, 2000, at A17.

*How the Electoral College Works, and Why It Works Well*, KNIGHT-RIDDER NEWSPAPER CHAIN (distributed to over 400 subscriber newspapers), Friday, Nov. 15, 2000; *e.g.*, *Electoral College Works Well*, THE PRESS OF ATLANTIC CITY, Nov. 15, 2000, at p. A13, 2000 (Westlaw) WLNR 7545816.

*The Equal-Protection Clause: A Field Day for Misleading Statistics,* in NATIONAL REVIEW ON LINE, Nov. 15, 2000,  http://www.nationalreview.com/comment/comment111500f.shtml .

*Simply Unconstitutional: How Hand Counting Violates Due Process*, in NATIONAL REVIEW ON LINE, Nov. 16, 2000,  http://www.nationalreview.com/comment/comment111600f.shtml

*Let Legislature Decide*, USA TODAY, November 21, 2000, at 16A.

*What it Takes to Win: Using the Psychic Hotline to Decide Contested Races*, CHICAGO TRIBUNE, November 26, 2000, at § 1, p. 19.

*Don't Blame Movies*, WASHINGTON POST, Dec. 1, 2000, at A35.

*From the Supremes to Seminole*, in NATIONAL REVIEW ON LINE, Dec. 5, 2000, http://www.nationalreview.com/comment/comment120500a.shtml

*Changing the Election Law, Again*, in NATIONAL REVIEW ON LINE, Dec. 9, 2000, http://www.nationalreview.com/comment/comment120800c.shtml

*Rubbish about Recusal*, WALL STREET JOURNAL, December 13, 2000, at A26.

*The Partisanship Myth*, THE CHRISTIAN SCIENCE MONITOR, December 15, 2000, at 11.

*Court Correctly Overrules Granholm*, DETROIT NEWS, Jan. 30, 2001, at p. 11A.

*A Few Modest Proposals to Reform the Law Governing Federal Judicial Salaries*, 12 THE PROFESSIONAL LAWYER 1 (A.B.A., Fall 2000).

*The New States' Rights, the New Federalism, the New Commerce Clause, and the Proposed New Abdication*, 25 OKLAHOMA CITY UNIVERSITY LAW REVIEW 869 (2000).

Ronald D. Rotunda

*Judicial Comments on Pending Cases: The Ethical Restrictions and the Sanctions – A Case Study of the Microsoft Litigation*, 2001 UNIVERSITY OF ILLINOIS LAW REVIEW 611 (2001).

*Lawyer Advertising and the Philosophical Origins of the Commercial Speech Doctrine,* 36 UNIVERSITY OF RICHMOND LAW REVIEW 91 (2002) (Allen Chair Symposium of 2001).

*No POWs: Unlawful Combatants, American Law, and the Geneva Convention*, NATIONAL REVIEW ONLINE, Jan. 29, 2002, http://www.nationalreview.com/comment/comment-rotunda012902.shtml .

*The Role of Ideology in Confirming Federal Court Judges*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 127 (2001).

*The Commerce Clause, the Political Question Doctrine, and Morrison*, 18 CONSTITUTIONAL COMMENTARY 319 (2001).

*ABA-Recommended Nominees Deserve Hearings*, CHICAGO SUN-TIMES, May 5, 2002, at 37.

*Monitoring the Conversations of Prisoners*, 13 THE PROFESSIONAL LAWYER 1 (ABA, No. 3, 2002).

*City's O'Hare Strategy Flouts Constitution,* CHICAGO DAILY LAW BULLETIN, June 14, 2002, at p. 5.

*Federalizing the Windy City,* NATIONAL REVIEW ONLINE, June 18, 2002, http://www.nationalreview.com/comment/comment-rotunda061802.asp

*The Eleventh Amendment, Garrett, and Protection for Civil Rights*, 53 ALABAMA LAW REVIEW 1183 (2002).

*Statement before the Senate Committee Hearings on the Judicial Nomination Process*, 50 DRAKE LAW REVIEW 523 (2002).

*Judicial Campaigns in the Shadow of Republican Party v. White*, 14 THE PROFESSIONAL LAWYER 2 (ABA, No. 1, 2002).

*Judicial Elections, Campaign Financing, and Free Speech*, 2 ELECTION LAW JOURNAL 79 (No.1, 2003).

*The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Revolutionary Court?,* 55 ARKANSAS LAW REVIEW 795 (2003).

*Pravo na svobody slova v voennoe vremiz v knostitutsii SShA: istoki i evoliutsiia*, PRAVO I ZAKONODATEL'STVO, 2003, No. 2, c. 63-65; *The Right of Freedom of Speech in Wartime*

*in the Constitution of the USA: Sources And Evolution*, LAW AND LEGISLATION, 2003, No. 2, pp. 63-65.

*Before Changing the Law, Look at SBC's Record and Credibility*, CHAMPAIGN NEWS-GAZETTE, April 13, 2003, at B1, B4.

*Yet Another Article on Bush v. Gore*, 64 OHIO STATE LAW JOURNAL 283 (2003).

*SBC's Secessionist Gambit Deserved to Fail*, CHICAGO TRIBUNE, June 15, 2003, at p. C9.

*A Preliminary Empirical Inquiry into the Connection between Judicial Decision Making and Campaign Contributions to Judicial Candidates*, 14 THE PROFESSIONAL LAWYER 16 (ABA, No. 2, 2003).

*Senate Rules to Keep Filibusters*, CHICAGO SUN-TIMES, July 4, 2003, at p. 29.

*The Perceived Connection between Judicial Decision Making and Judicial Campaign Contributions*: *Some Preliminary Data*, THE REPUBLICAN LAWYER (July, 2003), http://www.rnla.org/rotunda.doc

*Book Review: Democracy by Decree*, 23 CATO JOURNAL: AN INTERDISCIPLINARY JOURNAL OF PUBLIC POLICY ANALYSIS 155 (No. 1, Spring-Summer 2003).

*Appearances Can Be Deceiving: Should the Law Worry About Campaign Money Looking Dirty When the Facts Show That the System's Clean?*, THE LEGAL TIMES, Sept. 15, 2003, at p. 84.

*Found Money*: *IOLTA, Brown v. Legal Foundation of Washington, and the Taking of Property without the Payment of Compensation*, 2002-2003 CATO SUPREME COURT REVIEW 245 (2003).

*SBC Tries Time-Worn Corporate Power Grab*, CHICAGO SUN-TIMES, Nov. 22, 2003, p. 16.

*Media Accountability in Light of the First Amendment*, 21 SOCIAL PHILOSOPHY & POLICY 269 (Cambridge University Press, No. 2, 2004), *reprinted in*, ELLEN FRANKEL PAUL, FRED D. MILLER JR., & JEFFREY PAUL, eds., FREEDOM OF SPEECH (Cambridge U. Press 2004).

*Duck Hunting Benchmarks*, THE WASHINGTON TIMES, March 28, 2004, at B4.

*Election-Year Hunting: Should Scalia Recuse Himself from Cheney-Related Cases?*, NATIONAL REVIEW ONLINE, March 30, 2004, http://nationalreview.com/comment/rotunda200403300900.asp

*To Hasten Iraq Democracy, Put Wells in People's Hands*, ATLANTA JOURNAL-CONSTITUTION, May 14, 2004, at A19.

*Judicial Impartiality and Judicial Campaign Contributions: Evaluating the Data*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 1, April 2004).

*Due Process and the Role of Legal Counsel in the War on Terror*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 131 (Issue 2, October 2004).

*The Political Question Doctrine in the United States,* in GRENZEN AAN DE RECHTSPRAAK? POLITICAL QUESTION, ACTE DE GOUVERNEMENT EN RECHTERLIJK INTERVENTIONISME 1-38, vol. 9, Publikaties Van De Staatsrechtkring Staatsrechtsconferenties (P.P.P. Bouvend'Eert, P.M. van den Eijndem, & C.A.J.M. Kortmann, eds.) (Kluwer, 2004).

*Is There Hope for Iraq's Post-Occupation Government?*, 13 COSMOS: JOURNAL OF THE COSMOS CLUB OF WASHINGTON, D.C. 65 (2004).

*Iraq on the Way to Its New Constitution*, 8 THE GREEN BAG, 2D SERIES 163 (Autumn 2004).

*Symposium*, IRAQ AND ITS NEW CONSTITUTION 23, 53, 76 (Bilkent University & Foreign Policy Institute, Ankara, 2004).

*Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1047 (Oxford U. Press, 2nd ed. 2005).

*A Shaky Ethics Charge*, WASHINGTON POST, September 6, 2005, at p. A25.

*The Privileges and Immunities Clause*, in THE HERITAGE GUIDE TO THE CONSTITUTION, p. 269 (Regnery Publishing, Inc. Washington, DC 2005) (member of Editorial Advisory Board).

*Opinion Letter on Judicial Ethics*, 6 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 2, October 2005).

*Alleged Conflicts of Interest Because of the "Appearance of Impropriety,"* 33 HOFSTRA L. REV. 1141 (2005).

*Frische Datteln für die Häftlinge*, SUEDDEUTSCHE ZEITUNG (Germany), January 2, 2006, at p. 2.

*Guantanamo, Another Story*, The Republican Lawyer (January 15, 2006), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=179

*Click for Collected Wisdom*, THE LEGAL TIMES, May 8, 2006, at 46.

*The Propriety of a Judge's Failure to Recuse When Being Considered for Another Position*, 19 GEORGETOWN JOURNAL OF LEGAL ETHICS 1187 (2006).

*There's No Future in the Past of Campaign Finance: The Latest Decision Displays A Badly Fractured Court*, NATIONAL REVIEW ONLINE, June 28, 2006,

http://article.nationalreview.com/?q=NDE1MjZhZWNiMWIyNDhlMzI5MzE4YjFkYm
QxNzc4ZGY .

*CMS Information Policy Under Medicare "Part D" Creates 1st Amendment Problems*, 21 LEGAL BACKGROUNDER (Washington Legal Foundation, No. 21, July 7, 2006).

*Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code* (The Howard Lichtenstein Lecture in Legal Ethics), 34 HOFSTRA LAW REVIEW 1337 (2006).

*The Courts Need This Watchdog*, WASHINGTON POST, Dec. 21, 2006, at A29.

*The Detainee Cases of 2004 and 2006 and their Aftermath*, 57 SYRACUSE LAW REVIEW 1 (2006).

*The Case for a Libby Pardon*, WALL STREET JOURNAL, March 7, 2007, at A17.

*Income Mobility and Income Tax Revenue Since the Tax Cuts*, THE REPUBLICAN LAWYER (April 2007), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=232 .

*Remembering Father Robert F. Drinan, S.J.,* 20 GEORGETOWN JOURNAL OF LEGAL ETHICS 203 (2007).

*Holding Enemy Combatants in the Wake of Hamdan*, 8 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 52 (Issue 3, June 2007).

*Teaching Professional Responsibility and Ethics*, 51 ST. LOUIS UNIVERSITY LAW JOURNAL 1223 (2007).

*Rudy Thinks FAST*, THE AMERICAN SPECTATOR, January 25, 2008, http://www.spectator.org/dsp_article.asp?art_id=12633

*Age Has Not Withered Him*, THE LEGAL TIMES, July 7, 2008, at 46.

*Teaching Professional Responsibility and Ethics*, in P. L. Jayanthi Reddy, ed., BENCH AND BAR ETHICS 3 (Amicus Books, Icfai University Press, Hyderabad, India 2007-2008).

*Foreword*, in Paul Benjamin Linton, ABORTION UNDER STATE CONSTITUTIONS: A STATE-BY-STATE ANALYSIS xix –xxi (Carolina Academic Press, Durham, N.C., 2008).

*Impact*, in Sandarshi Gunawardena & Karen Rosenblum, DIVERSITY AT MASON 14 (George Mason U. 2008).

*Simplify, Simply: A Mantra for Transcendentalists and Tax Reformers Alike*, LOS ANGELES DAILY JOURNAL, Oct. 1, 2008, at p. 6.

*Dormant Commerce Clause*, 2 ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (Ed., David S. Tanenhaus) (Detroit: Macmillan Reference USA, 2009), at pp. 52-54.

*A Modern Day Bleak House: The Legal Inheritance of Anna Nicole Smith*, THE AMERICAN SPECTATOR, March 2009, at 32-36.

*Some Strings Attached: Is the Stimulus Law Constitutional?*, CHICAGO TRIBUNE, March 15, 2009, at 29.

*The Right of Free Speech, Regardless Of What Is Spoken*, THE PANTHER (Chapman University Newspaper), at p. 13 (March 23, 2009).

*Was Madoff Good for the Economy?*, CHICAGO TRIBUNE, April 3, 2009, at 49.

*The Orange Grove: U.S. Imports of Lawsuits Rising*, ORANGE COUNTY REGISTER, June 30, 2009.

*Kenneth W. Starr: A Biography*, THE YALE BIOGRAPHICAL DICTIONARY OF AMERICAN LAW 510 (Roger K. Newman, ed., Yale U. Press, 2009).

*An Unconstitutional Nobel*, THE WASHINGTON POST, Oct. 16, 2009, at A23 (with J. Peter Pham).

*Judicial Transparency, Judicial Ethics, and a Judicial Solution: An Inspector General for the Courts*, 41 LOYOLA U. CHICAGO L.J. 301 (2010).

*Judicial Disqualification in the Aftermath of Caperton v. A.T. Massey Coal Co.*, 60 SYRACUSE LAW REVIEW 247 (2010).

*Campaign Disclosure Can Go too Far*, SACRAMENTO BEE, February 6, 2010, at p. 11A.

*The Efforts to Disbar Bush Lawyers*, in NATIONAL REVIEW ON LINE, March 4, 2010, http://bench.nationalreview.com/post/?q=ZjhiMTk2MGY0ZjFiOTczZjg4ODhhODI5MDQwMzczYWU=

*Repealing the First Amendment*, WASHINGTON EXAMINER, April 14, 2010, http://www.washingtonexaminer.com/opinion/columns/OpEd-Contributor/Repealing-the-First-Amendment-90851704.html#ixzz0l6TO2qIK

*What Can Congress Make You Do?*, ORANGE COUNTY REGISTER, May 23, 2010, at p. C2, http://www.ocregister.com/articles/congress-75386-ocprint-buy-insurance.html

*Birthright Citizenship Benefits the Country*, CHICAGO TRIBUNE, Sept. 16, 2010, at p. 21, http://www.chicagotribune.com/news/opinion/ct-oped-0916-birthright-20100916,0,4594378.story

*What Are D.C. Police Doing Enforcing Shariah Law?*, PAJAMAS MEDIA, Sept. 16, 2010, http://pajamasmedia.com/blog/what-are-d-c-police-doing-enforcing-sharia-law/?singlepage=true

*A New Look at the Federal Suit against Arizona's Immigration Law*, Pajamas Media, Oct. 5, 2010, http://pajamasmedia.com/blog/a-new-look-at-the-federal-suit-against-arizonas-immigration-law/?singlepage=true

*The Point of No Return*, Washington Times, Oct. 10, 2010, at p. B3.

*Can Congress Ban People from Threatening to Burn The Quran*?, Atlanta Journal-Constitution, Oct. 14, 2010, at p. 21A.

*Congressional Silence Hurts Immigrants*, The Panther (Chapman University Newspaper), at p. 11 (October 25, 2010).

*Justice O'Connor's Robo Call Apology*, AOL News, Oct. 28, 2010, http://www.aolnews.com/discuss/opinion-justice-oconnors-robo-call-apology-isnt-enough/19693741#gcpDiscussPageUrlAnchor .

*What's Wrong with Oklahoma's Shariah Amendment*?, AOL News, Nov. 30, 2010, http://www.aolnews.com/opinion/article/opinion-whats-wrong-with-oklahomas-shariah-amendment/19737155

*Judicial Disqualification When a Solicitor General Moves to the Bench*, 11 Engage: The Journal of the Federalist Society's Practice Groups 94 (Issue 3, Nov. 2010), http://www.fed-soc.org/publications/pubid.2067/pub_detail.asp

*Eat Your Spinach, Says Nanny State*, 33 National Law Journal 39 (#19, Jan. 10, 2011), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202477337422&Each_your_spinach_says_nanny_state

*Trying to Codify Caperton*, 42 McGeorge Law Review 95 (2010)(Judicial Ethics Symposium).

*Equal Employment Opportunities for Female Prison Guards*, National Law Journal, Feb. 7, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202480379005&rss=nlj&slreturn=1&hbxlogin=1

*Stern v. Marshall, and the Power of Bankruptcy Courts to Issue Final Orders on All Compulsory Counterclaims*, 23 BNA Bankruptcy Law Reporter 230 (Feb. 24, 2011)

*Resolving Client Conflicts by Hiring "Conflicts Counsel,"* 62 Hastings Law Journal 677 (2011).

*We Do Declare: Libya and the United States Constitution,* National Review Online, March 24, 2011, http://www.nationalreview.com/articles/262940/we-do-declare-kathryn-jean-lopez?page=7 .

*Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party v. White, Caperton, and Citizens United*, 64 U. ARKANSAS LAW REV. 1 (2011)(Hartman-Hotz Distinguished Lecture).

*Transparenţa Judiciară, Etica Judiciară şi o Soluţie Judiciară,* REVISTA FORUMUL JUDECĂTORILOR 16 (No. 2, 2011).

*The Intellectual Forebears of Citizens United*, 16 NEXUS 113 ((2010-2011).

*Are Capitalists Happier*?, REUTERS, Aug. 12, 2011, http://blogs.reuters.com/great-debate/2011/08/12/are-capitalists-happy/ (co-authored with Vernon Smith, 2002 Nobel Laureate in Economics, & Bart Wilson), *reprinted in, e.g.,* THE DAILY STAR (Dhaka, Bangladesh), Aug. 15, 2011; ETHIOPIAN REVIEW, Aug. 12, 2011.

*Lawyers: Why We Are Different and Why We Are the Same*: *Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior – In-House Ethics Counsel, Bill Padding, and In-House Ethics Training,* 44 AKRON LAW REV. 679 (2011)(Miller-Becker Professional Responsibility Distinguished Lecture Series), reprinted in, 61 DEFENSE LAW JOURNAL (Aug. 2012).

*Does ObamaCare, As Written, Prevent Congress From Repealing It?*, FOXNEWS.COM (Oct. 28, 2011, http://www.foxnews.com/opinion/2011/10/27/does-obamacare-prevent-congress-from-repealing-it/

*Perry Is Right on Immigration*, NATIONAL REVIEW ONLINE, http://www.nationalreview.com/corner/281735/perry-right-immigration-ronald-d-rotunda (Oct. 31, 2011).

*Kagan's Recusal from ObamaCare,* WASHINGTON TIMES, Dec. 15, 2011, http://www.washingtontimes.com/news/2011/dec/15/kagan-must-recuse-from-obamacare-case/ .

*Evidence Mounts against Justice Kagan for Recusal in ObamaCare Suit*, FOXNEWS.COM (Jan. 26, 2012), http://www.foxnews.com/opinion/2012/01/26/evidence-mounts-against-justice-kagan-for-recusal-in-obamacare-suit/

*Kagan Should Recuse from ObamaCare Case*, WASHINGTON EXAMINER, Feb. 14, 2012, http://washingtonexaminer.com/kagan-should-recuse-from-obamacare-case/article/269386

*Supreme Court Justice Elena Kagan and the Obamacare Constitutional Challenge*, JUDICIAL WATCH SPECIAL REPORT, March 2012.

*Obamacare vs. Conscientious Beliefs*, ORANGE COUNTY REGISTER, March 28, 2012, http://www.ocregister.com/opinion/government-346533-religious-federal.html

*Lessons of Watergate*, 54 ORANGE COUNTY LAWYER 19 (April 2012).

*Prosecutorial and Judicial Misconduct*, NATIONAL LAW JOURNAL, p. 42 (April 30, 2012)(with Alan Dershowitz), *reprinted in*, THE JERUSALEM POST, May 13, 2012.

*The Wrong Legal "Help" for NY's Poor*, NEW YORK POST, June 1, 2012.

*ObamaCare Legal Battles Not Over*, ORANGE COUNTY REGISTER, Sept. 27, 2012, at p. 9, http://www.ocregister.com/opinion/ipab-372820-congress-proposal.html

*Obama Tax-raising Against JFK precedent: Hiking Rates Will Lose Money*, WASHINGTON TIMES, Dec. 13, 2012, http://www.washingtontimes.com/news/2012/dec/12/obama-tax-raising-against-jfk-precedent/

*Geithner's "Story of Inflation,"* ORANGE COUNTY REGISTER, Jan. 5, 2013, http://www.ocregister.com/opinion/inflation-382532-comic-geithner.html

*Blaming Hollywood for Gun Violence Doesn't Work*, WASHINGTON TIMES, Feb. 20, 2013, http://www.washingtontimes.com/news/2013/feb/20/blaming-hollywood-for-gun-violence-doesnt-work/

*Exporting American Freedoms*, in MODEL, RESOURCE, OR OUTLIER? WHAT EFFECT HAS THE U.S. CONSTITUTION HAD ON THE RECENTLY ADOPTED CONSTITUTIONS OF OTHER NATIONS?, at 12 (Heritage Foundation, May 17, 2013), http://www.heritage.org/research/lecture/2013/05/model-resource-or-outlier-what-effect-has-the-us-constitution-had-on-the-recently-adopted-constitutions-of-other-nations

'*What* did he know, and when did he know it?', WASHINGTON TIMES, June 5, 2013, http://www.washingtontimes.com/news/2013/jun/5/what-did-he-know-and-when-did-he-know-it/?utm_source=RSS_Feed&utm_medium=RSS

*Egypt's Constitutional Do-Over*: *This Time Around, Take a Closer Look at America's Bill of Rights*, WALL STREET JOURNAL, JULY 17, 2013, at p. A13, http://online.wsj.com/article/SB10001424127887323740804578601383340547860.html?mod=WSJ_Opinion_LEFTTopOpinion#articleTabs%3Darticle

*On the Health-Care Mandate, Obama Reaches Beyond the Law*, WASHINGTON POST, July 18, 2013, http://www.washingtonpost.com/opinions/on-the-health-care-mandate-obama-reaches-beyond-the-law/2013/07/18/d442aefc-efb4-11e2-a1f9-ea873b7e0424_story.html

*The Boston Strangler, the Classroom and Me*, WALL STREET JOURNAL, JULY 26, 2013, http://online.wsj.com/article/SB10001424127887324783204578623714232084132.html?KEYWORDS=rotunda

Ronald D. Rotunda

*Generous Pensions Give New Meaning to 'If It's too Good to Be True,'* FORBES MAGAZINE, Sept. 27, 2013, http://www.forbes.com/sites/realspin/2013/09/27/generous-pensions-give-new-meaning-to-if-its-too-good-to-be-true/

*Applying the Revised ABA Model Rules in the Age of the Internet: The Problem of Metadata*, 52 HOFSTRA LAW REVIEW 175 (2013).

*On Deep Background 41 Years Later*: *Roe v. Wade*, CHICAGO TRIBUNE, Jan. 22, 2014.

*Congress Cannot Stop the Exporting of American Oil*, THE HILL: THE HILL'S FORUM FOR LAWMAKERS AND POLICY PROFESSIONALS, Jan. 27, 2014.

*Congress and Lois Lerner in Contempt,* DAILY CALLER, April 10, 2014.

*Using the State to Bully Dissidents*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 24, 2014.

*Endangering Jurors in a Terror Trial*, WALL STREET JOURNAL, May 2, 2014, at p. A13.

## Other Activities:

March-April, 1984, Expert Witness for State of Nebraska on Legal Ethics at the Impeachment Trial of Nebraska Attorney General Paul L. Douglas (tried before the State Supreme Court; the first impeachment trial in nearly a century).

July 1985, Assistant Chief Counsel, State of Alaska, Senate Impeachment Inquiry of Governor William Sheffield, (presented before the Alaskan Senate).

Speaker at various ABA sponsored conferences on Legal Ethics; Speaker at AALS workshop on Legal Ethics; Speaker on ABA videotape series, "Dilemmas in Legal Ethics."

Interviewed at various times on Radio and Television shows, such as MacNeil/Lehrer News Hour, Firing Line, CNN News, CNN Burden of Proof, ABC's Nightline, National Public Radio, News Hour with Jim Lehrer, Fox News, etc.

1985--1986, Reporter for Illinois Judicial Conference, Committee on Judicial Ethics.

1981-1986, Radio commentator (weekly comments on legal issues in the news), WILL-AM Public Radio.

1986-87, Reporter of Illinois State Bar Association Committee on Professionalism.

1987-2000, Member of Consultant Group of American Law Institute's RESTATEMENT OF THE LAW GOVERNING LAWYERS.

1986-1994, Consultant, Administrative Conference of the United States (on various issues relating to conflicts of interest and legal ethics).

1989-1992, Member, Bar Admissions Committee of the Association of American Law Schools.

1990-1991, Member, Joint Illinois State Bar Association & Chicago Bar Association Committee on Professional Conduct.

1991-1997, Member, American Bar Association Standing Committee on Professional Discipline.
    CHAIR, Subcommittee on Model Rules Review (1992-1997). [The subcommittee that I chaired drafted the MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT that the ABA House of Delegates approved on August 11, 1993.]

1992, Member, Illinois State Bar Association [ISBA] Special Committee on Professionalism; CHAIR, Subcommittee on Celebration of the Legal Profession.

Spring 1993, Constitutional Law Adviser, SUPREME NATIONAL COUNCIL OF CAMBODIA. I traveled to Cambodia and worked with officials of UNTAC (the United Nations Transitional Authority in Cambodia) and Cambodian political leaders, who were

charged with drafting a new Constitution to govern that nation after the United Nations troop withdrawal.

1994-1997, LIAISON, ABA Standing Committee on Ethics and Professional Responsibility.

1994-1996, Member, Illinois State Bar Association [ISBA] Standing Committee on the Attorney Registration and Disciplinary Commission.

Winter 1996, Constitutional Law Adviser, SUPREME CONSTITUTIONAL COURT OF MOLDOVA.

Under the auspices of the United States Agency for International Development, I consulted with the six-member Supreme Constitutional Court of Moldova in connection with that Court's efforts to create an independent judiciary.  The Court came into existence on January 1, 1996.

Spring 1996, Consultant, CHAMBER OF ADVOCATES, of the CZECH REPUBLIC.

Under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for all lawyers in the Czech Republic.  I also drafted the first Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of the Court to create an independent judiciary.

Consulted with (and traveled to) various counties on constitutional and judicial issues (*e.g.*, Romania, Moldova, Ukraine, Cambodia) in connection with their move to democracy.

1997-1999, Special Counsel, Office of Independent Counsel (Whitewater Investigation).

Lecturer on issues relating to Constitutional Law, Federalism, Nation-Building, and the Legal Profession, throughout the United States as well as Canada, Cambodia, Czech Republic, England, Italy, Mexico, Moldova, Romania, Scotland, Turkey, Ukraine, and Venezuela.

1998-2002, Member, ADVISORY COUNCIL TO ETHICS 2000, the ABA Commission considering revisions to the ABA Model Rules of Professional Conduct.

2000-2002, Member, ADVISORY BOARD TO THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS (This Board was charged with removing any remaining vestiges of organized crime to influence the Union, its officers, or its members.)  This Board was part of "Project RISE" ("Respect, Integrity, Strength, Ethics").

2001-2008, Member, Editorial Board, CATO SUPREME COURT REVIEW.

2005-2006, Member of the Task Force on Judicial Functions of the Commission on Virginia Courts in the 21st Century: To Benefit All, to Exclude None

July, 2007, Riga, Latvia, International Judicial Conference hosted by the United States Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. I was one of the main speakers along with Justice Samuel Alito, the President of Latvia, the Prime Minister of Latvia, the Chief Justice of Latvia, and the Minister of Justice of Latvia

Since 1994, Member, Publications Board of the ABA Center for Professional Responsibility; vice chair, 1997-2001.

Since 1996, Member, Executive Committee of the Professional Responsibility, Legal Ethics & Legal Education Practice Group of the Federalist Society; Chair-elect, 1999; Chair, 2000

Since 2003, Member, Advisory Board, the Center for Judicial Process, an interdisciplinary research center (an interdisciplinary research center connected to Albany Law School studying courts and judges)

Since 2012, *Distinguished International Research Fellow* at the World Engagement Institute, a non-profit, multidisciplinary and academically-based non-governmental organization with the mission to facilitate professional global engagement for international development and poverty reduction, http://www.weinstitute.org/fellows.html

Since 2014, *Associate Editor* of the Editorial Board, THE INTERNATIONAL JOURNAL OF SUSTAINABLE HUMAN SECURITY (IJSHS), a peer-reviewed publication of the World Engagement Institute (WEI)

Since 2014, Member, Board of Directors of the Harvard Law School Association of Orange County

Since 2014, Member, Editorial Board of THE JOURNAL OF LEGAL EDUCATION (2014 to 2016).

EXHIBIT 2



...utation for a rebuttal. Douglas called his close friend, Clark ...ford, a former Secretary of Defense under President Johnson. ...on has sicked his gorillas on me," he told him. It was the work ...xon and Mitchell, and Ford was the front man. Douglas knew ...administration was willing to play politics with the Court and ...it had used "friendly persuasion" to get Fortas off the bench. ...asked Clifford to lead the defense. Clifford declined. He rea-...ed that he was too closely identified with the Democratic Party; ...whole thing would look too much like a political brawl. ...glas finally engaged Simon Rifkind, a onetime classmate at ...lumbia Law School. Rifkind was also a Democrat, but had ...ed as a federal judge for years.

...he attacks and investigations preoccupied Douglas. He was ...e determined to outlast the Nixon presidency. But since there ...as no forum for him as a Supreme Court Justice to defend him-...lf he declined public comment. He turned inward and brooded, ...alling friends late at night. If they succeeded in impeaching and ...onvicting him, what would be left of all the values and freedoms ...e had fought for all his life? How could the Court remain inde-...endent? His "side," already damaged by the departure of Warren ...nd Fortas, would be irreparably weakened. The liberals were in ...rouble. Black, old and slowing up, had good and bad days. His ...emory problems cropped up at unpredictable times. Even ...orse, as Black aged he was becoming more conservative. He was ...o longer a certain liberal vote.

...Marshall was weak—a correct vote, a follower, but no leader, no ...fighter. He was not one to speak up articulately or forcefully. That ...eft Brennan. "Bill's not a troublemaker," Douglas told an associate. ...rennan was indeed a true friend, another correct vote, but really ...a man of the center, an organizer for the moderate-liberal position. ...rennan was too willing to compromise. When things got tough, ...Douglas felt, Brennan did not stand up for his principles. In 1966, ...rennan hired a University of California at Berkeley law gradu-...ate, Michael Tigar, as a clerk. Tigar had been a leading radical ac-...tivist. When conservative columnists attacked Brennan, it became ...a political issue. Brennan fired Tigar the week he arrived to start ...work. As Douglas saw it, Brennan sacrificed the clerk to protect his

90   BOB WOODWARD & SCOTT ARMSTRONG

personal position and his relationships with the moderate and conservative Justices. Douglas called it "scandalous," a "shocking cave-in."

During the impeachment investigation, friends and advisers from the old days would come to have lunch with Douglas, to help develop strategy and to offer suggestions. Douglas was often near tears of outrage. He felt powerless. Always suspicious, he was sure that the investigators would resort to any tactic, no matter how low or even illegal. He was more than ever convinced that his phone was tapped, that his office and perhaps even the conference room were bugged. (Even before Nixon's arrival, he had persuaded Earl Warren to have the conference room checked for listening devices. None was found.)

"Let's take a walk in the hall," Douglas told a friend who had come to discuss strategy. Many times during that year, Douglas came to Brennan's chambers and asked him to walk in the halls to discuss something privately. "I've got to go meet Bill out in the hall," Brennan would say to his clerks, his eyes twinkling. None of the other Justices seemed to take the investigation seriously enough, Douglas thought. Everyone seemed unconcerned.

Nixon wasn't sure that impeachment of Douglas was a very good idea. The evidence was thin, and Burger had signaled him that the attack was not good for the Court. Also, the President was more concerned with foreign affairs, particularly with the military escalation in Southeast Asia.

Later, when Nixon called Mitchell and said Ford should be told to "turn it off," Mitchell indicated that it would be difficult, since he himself had supplied Ford with some ammunition.* But he could put some distance between the administration and the impeachment move in a speech he was about to give to the Bar Association of the District of Columbia.

Mitchell's draft, condemning "irresponsible and malicious" criticism of the Court, was sent to Nixon, who forwarded it to Burger. Burger found it perfectly appropriate. When Burger tried to call

* See William Safire: *Before the Fall: An Inside View of the Pre-Watergate White House.*

USCA Case #22-8521    Document #1987525    Filed: 02/24/2023    Page 242 of 290



REPUBLICA DE CUBA

PRESIDENTE DEL CONSEJO DE ESTADO Y DEL GOBIERNO

Ciudad de la Habana,
6 de diciembre de 1979

Sr. Michael Tigar
Washington, D.C.

Muy estimado amigo Tigar:

Me siento verdaderamente apenado con usted. Hubiese deseado escribirle de inmediato para expresarle mi más profundo agradecimiento por su gesto amistoso y sincero de enviar a nuestro país un magnífico ejemplar Santa Gertrudis. Puedo asegurarle que múltiples obligaciones y responsabilidades han ocupado mi atención y todo mi tiempo durante estos meses, lo que impidió expresarle de manera personal mi mayor reconocimiento ¿Podré pedirle aún la generosidad de que nos disculpe por esta demora involuntaria?

Como ya conocerá, el toro "Phoenix", que nos envió, llegó a Cuba con buenas condiciones, después de varios largos e inevitables períodos de cuarentena. Su estado de salud es satisfactorio, se adapta favorablemente, y pensamos que pronto estará en condiciones de entrar en producción. Creo que será un aporte de gran valor al desarrollo de nuestra masa de Santa Gertrudis, que cuidamos con esmero, y padre de animales de gran calidad. Estoy informado de todo el esfuerzo y las preocupaciones que le ocasionó el hacer llegar a nuestro país a este semental tan selecto. Por eso, aunque su obsequio es valiosísimo, todavía más valioso y más importante es para nosotros su gesto de amistad y de simpatía. Créame que me siento en una deuda de profunda y sincera gratitud hacia usted.

Habría deseado saludarle personalmente, junto a otros distinguidos amigos, en mi reciente visita a Nueva York, pero, como sabe, las circunstancias no fueron entonces las más propicias. Confío en que hallaremos la oportunidad para sostener este encuentro. Quizás sea en su propio país. ¿Y por qué no en Cuba?

Reciba el más cordial saludo de su amigo,

Fidel Castro Ruz

Sr. Michel Tigar
Esq. 1308 18 St. N.W.
Washington, D.C.
EE. UU.

REPUBLICA DE CUBA
PRESIDENTE DEL CONSEJO DE ESTADO Y DEL GOBIERNO

# 'Free speech' advocate works to silence Larry Klayman

**Exclusive: Jack Cashill exposes radical ideology of lawyer pushing punishment**

 **By [Jack Cashill](#)**

**Published January 1, 2020 at 5:38pm**

In July of 2019, a hearing committee of the District of Columbia Bar Board of Professional Responsibility made a recommendation that Judicial Watch founder Larry Klayman be suspended, a recommendation now under appeal, from the practice of law in the district for 33 months.

The three-person committee strangely and inexplicably included only two attorneys, both of whom are of the left, and one of whom, Michael Tigar, is proudly far left.

How far left? Consider the following review on the jacket of Tigar's most recent book: "'An incisive, unsparing, creative, brilliant critique of capitalist law and its dire human consequences.' – BERNARDINE DOHRN, co-editor with Bill Ayers, Race Discourse: Against White Supremacy."

In the book, "Mythologies of State and Monopoly Power," Tigar emphasizes the Marxist notion that "the law is not what is says but what it does." Not liking the "dire human consequences" of the law as it exists, Tigar is not above twisting the law to his own ends.

Klayman suspects that Tigar, something of a superstar in Marxist circles, was recruited by the committee chairman, Anthony Fitch to sit on the committee with him. The two appeared chummy throughout the proceeding, and Fitch seemed downright deferential.

Throughout the proceeding, Tigar could barely conceal his disdain for the conservative, pro-capitalist, pro-Israel, pro-Trump activist Klayman.

In testifying as to why he founded Judicial Watch, Klayman explained his objections to the fact that federal judges were often chosen on the basis of political contributions by their law firms, labor unions or corporations.

As a result, said Klayman, "the best and the brightest" do not always make their way onto the bench. At this, Tigar grew visibly angry and shot back that his son, Jon Tigar, also a graduate of Berkeley Law School, was a federal judge.

President Barack Obama had appointed young Tigar to the federal bench in San Francisco. Klayman said he did not mean to impugn Tigar's son, but Judge Tigar deserved impugning. Tigar is the same federal judge who willy-nilly enjoined President Trump's asylum policy for illegal immigrants.

In its [article on Klayman's recommended suspension,](#) the Washington Post observed, that the "conservative" Klayman "is a notably combative litigant whose no-holds-barred tactics and robust use of the Freedom of Information Act have made him a dreaded – and sometimes loathed – inquisitor."

The Post also noted that Klayman writes for "WorldNetDaily, a right-wing news aggregator site." As to the left-wing politics of Fitch and Tigar, the Post predictably made no mention at all and failed to take seriously Klayman's claim that "It was a very politicized hearing committee."

The case itself has little to do with politics. It involves Klayman's pro-bono defense of a female Persian broadcaster at Voice of America. When she did not get the result she wanted, she turned on Klayman.

Both the Florida and Pennsylvania Bars dismissed identical complaints six years earlier. Following Trump's election, the head of the D.C. Bar Disciplinary Counsel resurrected the complaint six years after the woman had abandoned it.

Klayman believes that it was his high-profile legal advocacy on Trump's behalf that awakened legal radicals to the political potential of what is now a 10-year-old case.

"For Tigar, I am a conservative scalp," says Klayman, who is still able to practice law in D.C. during the appeal, "and one that he obviously harbors an animus toward, particularly given my support of Trump."

The 78-year-old Tigar has been an unapologetic disciple of the hard left from his student days. In his memoir, he boasts of his fond feelings for the brothers Castro and his attendance at the notorious Soviet-sponsored World Festival of Youth and Students in Helsinki in 1962.



Tigar's radicalism alarmed even liberal Supreme Court Chief Justice Earl Warren. According to Tigar, in 1965 Warren ordered Justice William Brennan to fire Tigar, then clerking for Brennan, and Brennan did just that.

Michael Tigar with Ramon Castro, the oldest of the Castro brothers, in 1978.

Tigar has not mellowed as he has grown older.
In fact, he has turned as the larger progressive movement has from defending free speech to suppressing it.

"Of all the remarkable developments of the past decade," argues British author Frank Furedi, "none has been more sinister than the West's gradual surrender of mankind's most important values: the twin ideals of freedom of speech and expression."

In Washington, that "surrender" has been imposed almost exclusively on the political right. Enforcing it are attorneys like Tigar and Fitch, the Democrats in Congress, federal judges of the Jon Tigar mold, and the intel agencies, all with the indispensable support of an increasingly leftist media.

The same Michael Tigar who supported the free speech movement while a law student at Berkeley in the 1960s is now working actively to silence Larry Klayman. It is hard to interpret Tigar's behavior otherwise.

EXHIBIT 3

USCA Case #22-8521     Document #1987525     Filed: 02/24/2023     Page 249 of 290

# RealClear Investigations



# DC Bar Restores Convicted FBI Russiagate Forger to 'Good Standing' Amid Irregularities and Leniency

By Paul Sperry, RealClearInvestigations
December 16, 2021

DC Bar

A former senior FBI lawyer who falsified a surveillance document in the Trump-Russia investigation has been restored as a member in "good standing" by the District of Columbia Bar Association even though he has yet to finish serving out his probation as a convicted felon, according to disciplinary records obtained by RealClearInvestigations.



Kevin Clinesmith, convicted ex-FBI lawyer: Allowed to negotiate a light sentence.

**YouTube/Fox News**

The move is the latest in a series of exceptions the bar has made for Kevin Clinesmith, who pleaded guilty in August 2020 to doctoring an email used to justify a surveillance warrant targeting former Trump campaign adviser Carter Page.

Clinesmith was sentenced to 12 months probation last January. But the D.C. Bar did not seek his disbarment, as is customary after lawyers are convicted of serious crimes involving the administration of justice. In this case, it did not even initiate disciplinary proceedings against him until February of this year — five months after he pleaded guilty and four days after RealClearInvestigations first reported he had not been disciplined. After the negative publicity, the bar temporarily suspended Clinesmith pending a review and

hearing. Then in September, the court that oversees the bar and imposes sanctions agreed with its recommendation to let Clinesmith off suspension with time served; the bar, in turn, restored his status to "active member" in "good standing."

Before quietly making that decision, however, records indicate the bar did not check with his probation officer to see if he had violated the terms of his sentence or if he had completed the community service requirement of volunteering 400 hours.

To fulfill the terms of his probation, Clinesmith volunteered at Street Sense Media in Washington but stopped working at the nonprofit group last summer, which has not been previously reported. "I can confirm he was a volunteer here," Street Sense editorial director Eric Falquero told RCI, without elaborating about how many hours he worked. Clinesmith had helped edit and research articles for the weekly newspaper, which coaches the homeless on how to "sleep on the streets" and calls for a "universal living wage" and prison reform.

From the records, it also appears bar officials did not consult with the FBI's Inspection Division, which has been debriefing Clinesmith to determine if he was involved in any other surveillance abuses tied to Foreign Intelligence Surveillance Act warrants, in addition to the one used against Page. Clinesmith's cooperation was one of the conditions of the plea deal he struck with Special Counsel John Durham. If he fails to fully cooperate, including turning over any relevant materials or records in his possession, he could be subject to perjury or obstruction charges.

Clinesmith — who was assigned to some of the FBI's most sensitive and high-profile investigations — may still be in Durham's sights regarding others areas of his wide-ranging probe.

The scope of his mandate as special counsel is broader than commonly understood: In addition to examining the legal justification for the FBI's "Russiagate" probe, it also includes examining the bureau's handling of the inquiry into Hillary Clinton's use of an unsecured email server, which she set up in her basement to send and receive classified information, and her destruction of more than 30,000 subpoenaed emails she generated while running the State Department. As assistant FBI general counsel in the bureau's national security branch, Clinesmith played an instrumental role in that investigation, which was widely criticized by FBI and Justice Department veterans, along with ethics watchdogs, as fraught with suspicious irregularities.



John Durham, Trump-Russia special counsel: He may still have Clinesmith in his sights.

**Department of Justice via AP**

Clinesmith also worked on former Special Counsel Robert Mueller's probe into the 2016 Trump campaign as the key attorney linking his office to the FBI. He was the only headquarters lawyer assigned to Mueller. Durham's investigators are said to be looking into the Mueller team's actions as well.

The D.C. Bar's treatment of Clinesmith, a registered Democrat who sent anti-Trump rants to FBI colleagues after the Republican was elected, has raised questions from the start. Normally the bar automatically suspends the license of members who plead guilty to a felony. But in Clinesmith's case, it delayed suspending him on even an interim basis for several months and only acted after RCI revealed the break Clinesmith was given, records confirm.



It then allowed him to negotiate his fate, which is rarely done in any misconduct investigation, let alone one

USCA Case #22-8521        Document #1987525        Filed: 02/24/2023        Page 251 of 290



Hamilton "Phil" Fox: Disciplinary counsel who handled Clinesmith is a major donor to Democrats.

**Facebook/D.C. Bar**

involving a serious crime, according to a review of past cases. It also overlooked violations of its own rules: Clinesmith apparently broke the bar's rule requiring reporting his guilty plea "promptly" to the court — within 10 days of entering it — and failed to do so for five months, reveal transcripts of a July disciplinary hearing obtained by RCI.

"I did not see evidence that you informed the court," Rebecca Smith, the chairwoman of the D.C. Bar panel conducting the hearing, admonished Clinesmith.

"[T]hat was frankly just an error," Clinesmith's lawyer stepped in to explain.

Smith also scolded the bar's Office of Disciplinary Counsel for the "delay" in reporting the offense, since it negotiated the deal with Clinesmith, pointing out: "Disciplinary counsel did not report the plea to the court and initiate a disciplinary proceeding." Bill Ross, the assistant disciplinary counsel who represented the office at the hearing, argued Clinesmith shouldn't be held responsible and blamed the oversight on the COVID pandemic.

The Democrat-controlled panel, known as the Board on Professional Responsibility, nonetheless gave Clinesmith a pass, rubberstamping the light sentence he negotiated with the bar's chief prosecutor, Disciplinary Counsel Hamilton "Phil" Fox, while admitting it was "unusual." Federal Election Commission records show Fox, a former Watergate prosecutor, is a major donor to Democrats, including former President Obama. All three members of the board also are Democratic donors, FEC data reveal.

While the D.C. Bar delayed taking any action against Clinesmith, the Michigan Bar, where he is also licensed, automatically suspended him the day he pleaded guilty. And on Sept. 30, records show, the Michigan Bar's attorney discipline board suspended Clinesmith for two years, from the date of his guilty plea through Aug. 19, 2022, and fined him $1,037.

"[T]he panel found that respondent engaged in conduct that was prejudicial to the proper administration of justice [and] exposed the legal profession or the courts to obloquy, contempt, censure or reproach," the board ruled against Clinesmith, adding that his misconduct "was contrary to justice, ethics, honesty or good morals; violated the standards or rules of professional conduct adopted by the Supreme Court; and violated a criminal law of the United States."

Normally, bars arrange what's called "reciprocal discipline" for unethical attorneys licensed in their jurisdictions. But this was not done in the case of Clinesmith. The D.C. Bar decided to go much easier on the former FBI attorney, further raising suspicions the anti-Trump felon was given favorable treatment.

In making the bar's case not to strip Clinesmith of his license or effectively punish him going forward, Fox disregarded key findings by Durham about Clinesmith's intent to deceive the FISA court as a government attorney who held a position of trust.



Clinesmith confessed to creating a false document by changing the wording in a June 2017 CIA email to state Page was "not a source" for the CIA when in fact the agency had told Clinesmith and the FBI on multiple occasions Page had been providing information about Russia to it for years — a revelation that, if disclosed to the Foreign Intelligence Surveillance Court, would have undercut the FBI's case for electronically monitoring

Carter Page: FBI lawyer Clinesmith

USCA Case #22-3521    Document #1987525    Filed: 08/24/2023    Page 252 of 290

Page as a supposed Russian agent and something that Durham noted Clinesmith understood all too well.

Bar records show Fox simply took Clinesmith's word that he believed the change in wording was accurate and that in making it, he mistakenly took a "shortcut" to save time and had no intent to deceive the court or the case agents preparing the application for the warrant.

misled the surveillance court when he falsified a document to say Page was "not a source" who had helped the CIA, when in fact he was.

**FNC**

Durham demonstrated that Clinesmith certainly did intend to mislead the FISA court. "By his own words, it appears that the defendant falsified the email in order to conceal [Page's] former status as a source and to avoid making an embarrassing disclosure to the FISC," the special prosecutor asserted in his 20-page memo to the sentencing judge, in which he urged a prison term of up to six months for Clinesmith. "Such a disclosure would have drawn a strong and hostile response from the FISC for not disclosing it sooner [in earlier warrant applications]."

As proof of Clinesmith's intent to deceive, Durham cited an internal message Clinesmith sent the FBI agent preparing the application, who relied on Clinesmith to tell him what the CIA said about Page. "At least we don't have to have a terrible footnote" explaining that Page was a source for the CIA in the application, Clinesmith wrote.

The FBI lawyer also removed the initial email he sent to the CIA inquiring about Page's status as a source before forwarding the CIA email to another FBI agent, blinding him to the context of the exchange about Page.

Durham also noted that Clinesmith repeatedly changed his story after the Justice Department's watchdog first confronted him with the altered email during an internal 2019 investigation. What's more, he falsely claimed his CIA contact told him in phone calls that Page was not a source, conversations the contact swore never happened.

Fox also maintained that Clinesmith had no personal motive in forging the document. But Durham cited virulently anti-Trump political messages Clinesmith sent to other FBI employees after Trump won in 2016 – including a battle cry to "fight" Trump and his policies – and argued that his clear political bias may have led to his criminal misconduct.

"It is plausible that his strong political views and/or personal dislike of [Trump] made him more willing to engage in the fraudulent and unethical conduct to which he has pled guilty," Durham told U.S. District Judge Jeb Boasberg.



Boasberg, a Democrat appointed by President Obama, spared Clinesmith jail time and let him serve out his probation from home. Fox and the D.C. Bar sided with Boasberg, who accepted Clinesmith's claim he did not intentionally deceive the FISA court, which Boasberg happens to preside over, and even offered an excuse for his criminal conduct.

"My view of the evidence is that Mr. Clinesmith likely believed that what he said about Mr. Page was true," Boasberg said. "By altering the email, he was saving himself some work and taking an inappropriate shortcut."

Fox echoed the judge's reasoning in essentially letting Clinesmith off the hook. (The deal they struck, which the U.S. District Court of Appeals that oversees the bar

5/2/22, 5:43 PM      DC Bar Restores Convicted FBI Russiagate Forger to 'Good Standing' Amid Irregularities and Leniency | RealClearInvestigations

USCA Case #22-8521    Document #1987525    Filed: 02/24/2023    Page 253 of 290



James E. "Jeb" Boasberg: Obama appointee spared Clinesmith jail time.
**DC District Court**

approved in September, called for a one-year suspension, but the suspension began retroactively in August 2020, which made it meaningless.)

Boasberg opined that Clinesmith had "already suffered" punishment by losing his FBI job and $150,000 salary.

But, Boasberg assumed, wrongly as it turned out, that Clinesmith also faced possible disbarment. "And who knows where his earnings go now," the judge sympathized. "He may be disbarred or suspended from the practice of law."

Anticipating such a punishment, Boasberg waived a recommended fine of up to $10,000, arguing that Clinesmith couldn't afford it. He also waived the regular drug testing usually required during probation, while returning Clinesmith's passport. And he gave his blessing to Clinesmith's request to serve out his probation as a volunteer journalist, before wishing him well: "Mr. Clinesmith, best of luck to you."

Fox did not respond to requests for comment. But he argued in a petition to the board that his deal with Clinesmith was "not unduly lenient," because it was comparable to sanctions imposed in similar cases. However, none of the cases he cited involved the FBI, Justice Department or FISA court. One case involved a lawyer who made false statements to obtain construction permits, while another made false statements to help a client become a naturalized citizen – a far cry from falsifying evidence to spy on an American citizen.

Durham noted that in providing the legal support for a warrant application to the secret FISA court, Clinesmith had "a heightened duty of candor," since FISA targets do not have legal representation before the court.

He argued Clinesmith's offense was "a very serious crime with significant repercussions" and suggested it made him unfit to practice law.

"An attorney – particularly an attorney in the FBI's Office of General Counsel – is the last person that FBI agents or this court should expect to create a false document," Durham said.

The warrant Clinesmith helped obtain has since been deemed invalid and the surveillance of Page illegal. Never charged with a crime, Page is now suing the FBI and Justice Department for $75 million for violating his constitutional rights against improper searches and seizures.





Rudolph Giuliani, Trump lawyer: Facing bar discipline, even though he's not charged with a crime.

USCA Case #22-8521    Document #1987525    Filed: 02/24/2023    Page 254 of 290

PBS

Michael Sussmann, ex-Hillary Clinton
lawyer: Not facing bar discipline,
despite being charged with a crime.

**perkinscoie.com**

Explaining the D.C. Bar's disciplinary process in a 2019
interview with Washington Lawyer magazine, Fox said
that "the lawyer has the burden of proving they are fit to
practice again. Have they accepted responsibility for
their conduct?" His office's website said a core function is
to "deter attorneys from engaging in misconduct."

In the same interview, Fox maintained that he tries to insulate his investigative decisions from political
bias. "I try to make sure our office is not used as a political tool," he said. "We don't want to be a political
tool for the Democrats or Republicans."

Bar records from the Clinesmith case show Fox suggested the now-discredited Trump-Russia "collusion"
investigation was "a legitimate and highly important investigation."

One longstanding member of the D.C. Bar with direct knowledge of Clinesmith's case before the bar
suspects its predominantly Democratic board went soft on him due to partisan politics. "The District of
Columbia is a very liberal bar," he said. "Basically, they went light on the him because he's also a
Democrat who hated Trump."

Meanwhile, the D.C. Bar has not initiated disciplinary proceedings against Michael Sussmann,
another Washington attorney charged by Durham. Records show Sussmann remains an "active member"
of the bar in "good standing," which also has not been previously reported. The former Hillary Clinton
campaign lawyer, who recently resigned from Washington-based Perkins Coie LLP, is accused of lying to
federal investigators about his client while passing off a report falsely linking Trump to the Kremlin.

While Sussmann has pleaded not guilty and has yet to face trial, criminal grand jury indictments usually
prompt disciplinary proceedings and interim suspensions.

Paul Kamenar of the National Legal and Policy Center, a government ethics watchdog, has called for the
disbarment of both Clinesmith and Sussmann. He noted that the D.C. Court of Appeals must
automatically disbar an attorney who commits a crime of moral turpitude, which includes crimes involving
the "administration of justice."

"Clinesmith pled guilty to a felony. The only appropriate sanction for committing a serious felony that also
interfered with the proper administration of justice and constituted misrepresentation, fraud and moral
turpitude, is disbarment," he said. "Anything less would minimize the seriousness of the misconduct" and
fail to deter other offenders.

Disciplinary Counsel Fox appears to go tougher on Republican bar members. For example, he recently
opened a formal investigation of former Trump attorney Rudy Giuliani, who records show Fox put under
"temporary disciplinary suspension" pending the outcome of the ethics probe, which is separate from the
one being conducted by the New York bar. In July, the New York Bar also suspended the former GOP
mayor on an interim basis.

Giuliani has not been convicted of a crime or even charged with one.

*This and all other original articles created by RealClearInvestigations may be republished for*
*free with attribution. (These terms do not apply to outside articles linked on the site.)*

USCA Case #22-5521    Document #1987525    Filed: 02/24/2023    Page 255 of 290

*We provide our stories for free but they are expensive to produce. Help us continue to publish distinctive journalism by making a contribution today to RealClearInvestigations.*

**Support RealClearInvestigations →** 

# In re Clinesmith

District of Columbia Court of Appeals

September 2, 2021, Decided

No. 21-BG-18

**Reporter**

2021 D.C. App. LEXIS 253 *; 258 A.3d 161; 2021 WL 4074424

IN RE KEVIN E. CLINESMITH, RESPONDENT. A Suspended Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 984265).

**Notice:** THIS OPINION IS SUBJECT TO FORMAL REVISION BEFORE PUBLICATION IN THE ATLANTIC AND MARYLAND REPORTERS. USERS ARE REQUESTED TO NOTIFY THE CLERK OF THE COURT OF ANY FORMAL ERRORS SO THAT CORRECTIONS MAY BE MADE BEFORE THE BOUND VOLUMES GO TO PRESS.

**Prior History:** [*1] (DDN 305-19).

**Judges:** Before GLICKMAN and DEAHL, Associate Judges, and NEBEKER, Senior Judge.

# Opinion

On Report and Recommendation of the Board on Professional Responsibility Hearing Committee Number Four Approving Petition for Negotiated Discipline

PER CURIAM: This decision is non-precedential. Please refer to D.C. Bar R. XI, § 12.1(d) regarding the appropriate citation of this opinion.

In this disciplinary matter, Hearing Committee Number Four (the Committee) recommends approval of an amended petition for negotiated attorney discipline. *See* D.C. Bar R. XI, § 12.1(c). The amended petition is based on Respondent's guilty plea to one count of making a false statement in violation of 18 U.S.C. § 1001(a)(3) for his actions in modifying a document while employed by the Federal Bureau of Investigation (FBI) as Assistant General Counsel in the National Security and Cyber Law Branch of the FBI's Office of General Counsel. The Committee determined this was a serious crime in violation of D.C. Bar R. XI, § 10(d), but not one involving moral turpitude, either per se or on the specific facts. The Committee concluded that Respondent's misconduct violated Rule 8.4(b) and (c) of the District of

Columbia Rules of Professional Conduct. The Committee determined that the negotiated discipline of a one-year suspension nunc pro tunc to August 25, 2020—the date he self-reported his conviction [*2] to Disciplinary Counsel—was not unduly lenient.

Having reviewed the Committee's recommendation in accordance with our procedures in uncontested disciplinary cases, *see* D.C. Bar R. XI, § 12.1(d), we agree this case is appropriate for negotiated discipline and the proposed sanction is not unduly lenient or inconsistent with dispositions imposed for comparable professional misconduct. Accordingly, it is

ORDERED that Respondent Kevin E. Clinesmith is hereby suspended from the practice of law in the District of Columbia for one year nunc pro tunc to August 25, 2020.

*So ordered.*

---

**End of Document**

EXHIBIT 4

Page 489

1      MR. KLAYMAN:  Ok.
2  BY MR. KLAYMAN:
3      Q.   That you wanted Bar Counsel to file a
4  sexual harassment case for you.  You asked them
5  that within the last year, against VOA.
6      A.  I asked if it's doable.
7      Q.   And you asked Bar Counsel to do it for
8  you, correct?
9      A.  I asked if it's doable.
10         I asked, once this is over, can I
11  take -- once I prove --
12      THE WITNESS:  Can I say exactly what
13  I -- I don't know.
14         Is it just yes or no, or I can say what
15  I asked?
16      I asked, once this is over, and so we
17  can prove and show why I couldn't have him as my
18  attorney any more, that he was not capable to work
19  as my attorney any more because he had more
20  interest, so, then is there any way that I can
21  pick the VOA case up, because then we can show
22  that I didn't fail to apply.  It was that I had

Page 490

1  this problem that I had to resolve before I go
2  back to VOA.
3  BY MR. KLAYMAN:
4      Q.   What did Bar Counsel tell you?
5      A.   He said he doesn't know.  He can't
6  advise me on that.
7      Q.   So you think that this case right now
8  that you're here on today is going to somehow
9  revive your sexual harassment claim against VOA?
10      A.   No, I don't think that.  It was just
11  asking I asked.  That's not why I'm here.
12      Q.   You also told Bar Counsel that you
13  wanted to pursue the case now because you wanted
14  to be able to say to future employers, or explain
15  to them, why your career had not gone as well as
16  you had wanted, correct?
17      A.   Correct.
18      Q.   So basically you want, as you testified
19  yesterday, revenge against me and Mr. Falahati to
20  explain why you're unhappy with your professional
21  and personal life?
22      A.   No, I did not say that.

Page 491

1      I said, when I was in a bad state of
2  mind, in a hole eight years ago, I was so angry
3  and hurt for what Mr. Klayman did and before.
4      So, in that state of mind, I was going
5  to take my life and then everybody would find out
6  what happened.
7      Because, to this day, I haven't been
8  able to tell anyone that -- anyone what Mr.
9  Klayman did to me and why I couldn't have him
10  represent me any more.
11      To this day, everybody's asking me,
12  "Did you wrongly accuse your coworker for sexual
13  harassment?  How come that he's still working
14  there and you're not?"  People are still wondering
15  why.
16      But I cannot go and say that my own
17  attorney that's representing me for a sexual
18  harassment case is suddenly falling in love with
19  me and cannot at all, as you said yourself,
20  several times, that "a car cannot run on empty
21  fuel" and you cannot represent me because you're
22  too in love with me and you're feelings are coming

Page 492

1  in the middle of this.
2      I can't say that, because it's -- I
3  always think what people are going to think and
4  say that, "So, her own lawyer now?"
5      So therefore, I wanted this to be
6  resolved here.
7  BY MR. KLAYMAN:
8      Q.   Over the lunch break you talked about
9  your testimony, not with Mr. Smith, but with some
10  other people, didn't you?
11      A.   Over what?
12      Q.   Over our lunch today, you talked about
13  your testimony, not with Mr. Smith, but with some
14  other people.
15         You talked with Sam?
16      A.   No, I didn't.
17      Q.   You talked with Kathleen?
18      A.   No, I didn't.
19      Q.   Now, assuming what you say is correct,
20  you're aware that I advised you --
21      A.   I didn't.  That is correct.
22      Q.   That's your opinion.

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 349

1  sir.
2      Q.   And we decided not to use -- you
3  decided not to use that psychologist, and then I
4  found the name of another psychologist through a
5  former client of mine, Alice Elise.
6          Do you remember that?
7      A.  I don't remember.
8      Q.   You did meet Alice, though?  You
9  remember her?
10      A.  I remember my two -- at that point I
11  was very sick, so, I remember that I saw a few
12  doctors, yes.
13      Q.  Yes.  And I took you to see -- I got
14  the name of a psychologist from Alice, you
15  remember that, and then that psychologist, because
16  she was representing Alice -- because Alice had
17  been a sexual harassment victim, as well, I had
18  represented her -- represented that someone else
19  could perhaps help, you and that person was Arlene
20  Aviera.
21          Do you remember that?
22      A.  Yes.

Page 350

1      Q.   And then I took you to Arlene Aviera?
2      A.  Yes.
3      Q.   I believe that we sat down with Arlene,
4  we'll call her Arlene, and you explained your
5  situation and started crying and sobbing again?
6      A.  Yes.
7      Q.   You remember that?
8      A.  Yes.
9      Q.   And I asked Arlene in front of you,
10  "Can you please help Elham."
11          Do you remember that?
12      A.  Yes.
13      Q.   And I said, "If she can't pay the fees,
14  Dr. Aviera, don't worry about it, I'll pay them."
15      A.  Yes.
16      Q.   You then began to see Dr. Aviera?
17      A.  I'm sorry, what?
18      Q.   You then set up a schedule to be
19  counseled by Dr. Aviera?
20      A.  Yes.
21      Q.   And I was not present during those
22  counseling sessions.  That was with you and Dr.

Page 351

1  Aviera?
2      A.  You "were" present or "not present"?
3      Q.  Not.
4      A.  Not, yes.
5      Q.   And in and around this time period we
6  had discussions with Tim Shamble, your union
7  represent, president for the AFL-CIO, Voice of
8  America, as to what we now could do to get you
9  back to work in Los Angeles at the Persia News
10  Network.
11      A.  Yes.
12      Q.   And we decided that, if we could show
13  that you had a medical reason why you had to be in
14  Los Angeles, that we could qualify for a
15  reasonable medical accommodation move to Los
16  Angeles.
17      A.  Yes.
18      Q.   And therefore we submitted
19  documentation from Dr. Aviera, from the prior
20  psychologist that you saw, and also from a doctor
21  named Long, an internist, to Voice of America with
22  various documentation arguing that you needed to

Page 352

1  be in Los Angeles because those were where your
2  physicians were, that's where your family was,
3  that's where your friends were, and besides, you
4  could do your work out of the Persia News Network
5  on Wilshire Boulevard at the federal building,
6  which was run by Voice of America.
7          Do you remember that?
8      A.  Yes.
9      Q.   One of the reasons why there is a
10  Persia News Network division in Los Angeles is
11  because Los Angeles has a very big Persian
12  population, correct?
13      A.  Correct.
14      Q.   You're aware of that, there's over one
15  million Persians, or Iranians, however you want to
16  say it?
17      A.  Yes.
18      Q.   Los Angeles.  And sometimes people joke
19  about it, they call Los Angeles "Tehrangeles"
20  rather than Los Angeles, because it's so heavily
21  populated.
22      A.  Correct.

Page 82

1  helped me to send -- to send her an email. I'm
2  trying to remember her name now. She's always on
3  TV with this kind of cases.
4      I can't remember her name now.
5      Q. Ok. So, at this dinner that you --
6      A. Gloria Allred.
7      Q. Ok. So at this dinner that you had
8  with Mr. Klayman, you discussed your case but you
9  did not hire him at that time?
10     A. Right.
11     MR. KLAYMAN: Leading, objection,
12  leading. You gave her testimony.
13     CHAIRMAN FITCH: I would be careful of
14  that, Mr. Smith.
15  BY MR. SMITH:
16     Q. Did there come a time that you did hire
17  Mr. Klayman to be your lawyer in this matter?
18     A. I think it was sometime in the
19  beginning of 2010, I want to say in January that
20  we talked about this and I started seriously
21  working on, yes, me hiring him.
22     In February I sent an email to Mr.

Page 83

1  Shamble with information about Mr. Klayman, that
2  he's going to be representing me.
3      Q. Did you have a fee agreement with Mr.
4  Klayman?
5      A. I'm sorry?
6      Q. Did you have a fee agreement or
7  arrangement with Mr. Klayman?
8      A. Well, we talked about that, at the end,
9  whatever it is, that it's going to be 40 percent
10  goes to him.
11     Q. Ok, were --
12     A. Which he later changed it to 50
13  percent.
14     Q. Were there any other arrangements you
15  had with respect to the representation, financial
16  arrangements?
17     A. Well, in the beginning when he -- when
18  I moved -- he moved me to Los Angeles and he paid
19  for everything.
20     Q. Ok. Was that part of the
21  representation agreement?
22     A. Well, that's what he said, that he --

Page 84

1  because I told him that I can't afford moving to
2  LA, and he said he's going to pay for everything,
3  but then he gets his money back when he gets his
4  40 percent. All that's going to be included
5  there, on top of that.
6      Q. Did you ever have a writing from Mr.
7  Klayman reflecting the terms of this
8  attorney/client relationship?
9      A. I don't understand the question.
10     Q. Did Mr. Klayman give you a written
11  agreement, representation agreement?
12     A. I don't believe so. I don't know. I
13  really don't know.
14     I know we had emails going back and
15  forth later regarding this, but I don't remember
16  that now. I don't know.
17     In my mind I don't remember.
18     Q. Let me ask you to look at what has been
19  marked in Bar Counsel's book of exhibits as
20  Exhibit Number 1. It is the blue book before you.
21  I'll come over.
22

Page 85

1      CHAIRMAN FITCH: What exhibit number?
2      MR. SMITH: Bar Exhibit Number 1. For
3  the record it is an Office of Bar Counsel
4  complaint form dated November 2nd, 2010.
5      (Witness peruses document.)
6  BY MR. SMITH:
7      Q. Have you had a chance to look at this?
8      A. Yes.
9      Q. Did you mail this correspondence to the
10  Office of Disciplinary Counsel at or about --
11     MR. SUJAT: A leading question. I
12  object, your Honor.
13     MR. SMITH: I'm laying a foundation to
14  introduce the document.
15     CHAIRMAN FITCH: Overruled.
16  BY MR. SMITH:
17     Q. Did you mail this letter to the Office
18  of Bar Counsel on or about November 2nd, 2010?
19     A. Yes.
20     Q. Was this your handwriting on the second
21  page of this document?
22     A. No.

22 (Pages 82 to 85)

Page 397

1  because people in administrative agencies and
2  judges tend to react to cases that are known and
3  are out there for the public to know about."
4  BY MR. KLAYMAN:
5       Q.  I told you that, right?
6       A.  You told me that and I responded that I
7  don't want it to be --
8       CHAIRMAN FITCH:  Ma'am --
9       THE WITNESS:  Yes?
10      CHAIRMAN FITCH:  I asked did he tell
11 you that.
12      THE WITNESS:  Yes, he told me that.
13      CHAIRMAN FITCH:  You said yes.
14      THE WITNESS:  Yes, he told me that.
15 BY MR. KLAYMAN:
16      Q.  And we talked about that in the
17 presence of Mr. Shamble as well, correct?
18      A.  Correct.
19      Q.  And that we agreed we would get some
20 positive publicity here to try to coerce VOA into
21 a favorable settlement so you could be in LA,
22 correct?

Page 398

1       A.  Correct.
2       Q.  And --
3       A.  But I didn't agree to do it.  You
4  explained all this to me.
5       CHAIRMAN FITCH:  Ok, that's his only
6  question.
7       THE WITNESS:  Ok.  Sorry.  I'm sorry.
8  BY MR. KLAYMAN:
9       Q.  You are aware that, and you testified
10 to this yesterday, that I believed that you had
11 agreed to that and I wrote articles that were very
12 favorable to you.
13      You're aware of that?
14      A.  Yes.
15      Q.  And I sent you copies of them at the
16 time.
17      A.  Yes.
18      Q.  Emailed them to you.
19      A.  Yes, you did.
20      Q.  And there's nothing in writing that
21 ever tells me at the time that you didn't want me
22 to do that, correct?

Page 399

1       A.  Not correct.
2       Q.  The only time that comes up --
3       CHAIRMAN FITCH:  Wait a minute.  The
4  problem with the question is "at that time" is
5  unclear.
6       Are you talking about before you filed
7  the superior court complaint on March 1, if that's
8  when it was filed?
9       MR. KLAYMAN:  Yes.
10      CHAIRMAN FITCH:  Or are you talking
11 about --
12      MR. KLAYMAN:  Yes, around the time
13 period of these filings of complaints.
14      CHAIRMAN FITCH:  Ok.  And your
15 question is...
16 BY MR. KLAYMAN:
17      Q.  That I sent you copies of some of the
18 columns I had written that were very favorable to
19 you and you did not tell me that you didn't like
20 them or I shouldn't have done it.
21      CHAIRMAN FITCH:  Well, that's a
22 compound question.

Page 400

1       Did he send you copies of some articles
2  that he had written?
3       THE WITNESS:  Yes, he did.
4       CHAIRMAN FITCH:  Ok.  Go ahead.
5  BY MR. KLAYMAN:
6       Q.  At that time you did not tell me,
7  "Don't write any more."
8       A.  I did.
9       Q.  There's nothing in writing that you
10 presented to that effect at that time, did you?
11      A.  We talked to each other.  I explained
12 to you on the phone why I don't want articles out
13 there.
14      Q.  But you are aware that I copied you on
15 an email to Los Angeles Times where I was trying
16 to get an interview for you?
17      You're aware of that, I copied you on
18 that email with Mr. Shamble?
19      A.  I don't remember it, but, yes.  If you
20 say so, then that's correct.
21      Q.  Turn to Exhibit D, in the beginning of
22 your counsel's -- not your counsel's, but Bar

Page 86

1    Q.   Whose handwriting is that?

2    A.   The person who helped me writing this.

3    Q.   Who is that person?

4    A.   I don't remember now.

5    Q.   Before you sent this letter in --

6        CHAIRMAN FITCH:  What was the answer of

7    that question?

8        MR. SMITH:  She does not remember.

9        THE WITNESS:  I don't remember who

10   helped me writing it.

11   BY MR. SMITH:

12   Q.   Before you mailed this letter in, did

13   you read what was written here?

14   A.   Yes.

15   Q.   Did you talk to the person who was

16   writing this to tell them what was going on in

17   your case?

18   A.   Yes.

19   Q.   And you agree with everything that's

20   written down in here?

21   A.   Yes.

22   Q.   In the first sentence of the letter it

Page 87

1    says, "He does not represent me and he keeps

2    calling me and texting me."

3        Would you tell the hearing committee

4    briefly what you're referring to there.

5    A.   Well, I asked him, I told him that I

6    don't want to -- I don't want him to represent me

7    any more, but after I -- after I asked him not to

8    represent me any more, I don't want him to

9    represent me any more, he wouldn't stop calling,

10   texting and emailing me.  He would still calling,

11   texting, emailing me regarding the case, or

12   regarding other things.

13   Q.   I'd like to go back to the

14   representation when you first hired Mr. Klayman to

15   represent you in the matter.

16       What discussions did you have with Mr.

17   Klayman about how he was going to pursue your case

18   against Voice of America?

19   A.   Well, there was -- he told me that he's

20   going to try to settle with them and talk to them.

21       You know, I mean, it was so much legal

22   stuff that he would tell me that "I'm going to

Page 88

1    talk to this person and talk to that person," and,

2    you know, it was letters that he was sending in.

3    Q.   Have you ever had any legal training?

4    Have you ever had any legal training in the law?

5    A.   No.

6    Q.   Did you understand any of the legal

7    terms or conversations that Mr. Klayman was

8    telling you about how he was proceeding with your

9    case?

10       CHAIRMAN FITCH:  I'm going to strike

11   that question.  No foundation yet for that.

12       There is no foundation for -- there

13   hadn't been a discussion.

14       MR. SMITH:  Ok.

15   BY MR. SMITH:

16   Q.   What did you tell Mr. Klayman about how

17   you wanted to proceed in this case?

18   A.   Well, because it was a sexual

19   harassment case, and because of the community and

20   my background, I wanted it to be very quietly

21   handled.  I even, the first time when I went to my

22   executive producer and I told my executive

Page 89

1    producer what my co-host did to me, I asked him to

2    keep it off the record, because I didn't want

3    anybody to know.  I just needed help.

4        Because just -- the way it is, the

5    sexual harassment is just something that it's not

6    fun to be out there and everybody find out about

7    it, so.

8    Q.   Tell me about your community and how

9    they perceive, in the context of what you were

10   saying -- what is the --

11   A.   Well, regarding the sexual harassment

12   case, to this day they're still asking me "Was I

13   raped by Mr. Falahati"?  "How was I raped by Mr.

14   Falahati?"  "Where was I raped by Mr. Falahati?"

15   "What did he do?"

16       So sexual harassment, in the Persian

17   community, is rape.  It's the actual act of

18   intercourse and rape.

19       So to this day I have to answer all

20   those questions.

21   Q.   So describe for the committee the

22   conversation you had with Mr. Klayman about these

23  (Pages 86 to 89)

**Page 90**

1  concerns.

2  A.  That I want this to be handled as quiet

3  as possible, so nobody finds out.  And I did this

4  complaint because I -- I still wanted to keep my

5  image.  My image was just this person that -- I

6  didn't want it to change and I didn't want too

7  much talk regarding about my personal life.  I

8  wanted people to look at the Sataki that is

9  covering the stories and not know about my private

10  life.

11  Because I was not open about my private

12  life in front of the camera.  People would ask me,

13  I would never answer.  I would always leave it

14  without answer when they asked me about my private

15  life.

16  Q.  Did Mr. Klayman respond to you when you

17  said that you wanted to proceed with the case

18  quietly?

19  A.  Yes.  He did.  I mean, that's what he

20  was supposed to do in the beginning, yes.

21  Q.  He --

22  A.  But then it changed later.

**Page 91**

1  Q.  How did it change?

2  A.  He started writing articles, and so it

3  came out in the internet regarding the case.

4  Q.  Did you ever have conversations with

5  Mr. Klayman about publicizing your case?

6  A.  I did.  I asked him not to do it, but

7  then later I -- when he explained to me how much

8  it's going to help my case -- because he was going

9  back and forth with the people, the VOA management

10  and the stuff that he said that, "It's going to

11  take, say, no-brainer.  It's very easy.  It's only

12  going to take two weeks," or whatever, and it's

13  going to be easy, a task, like you said to me, he

14  said how easy it's going to be to transfer me from

15  DC to LA and work out of the LA office.

16  All of those stuff that I listen to him

17  because he's the attorney, he knows best, and none

18  of that happened.

19  So then he -- I mean, the complaint

20  from the person, the person -- the sexual

21  harassment person, my boss, his boss and all that,

22  it went up to Board of Governors and suing

**Page 92**

1  everybody, and the case got so big that all this

2  he said that it's just in my benefit.

3  So, I started listening to him.

4  May I add something?

5  Q.  Please.

6  CHAIRMAN FITCH:  Wait a minute.  With

7  respect to what?

8  MR. SMITH:  To the last question I

9  would imagine.

10  CHAIRMAN FITCH:  Do you have something

11  to add to your last answer?

12  THE WITNESS:  Yes.

13  CHAIRMAN FITCH:  That relates to that

14  question?

15  THE WITNESS:  Yes.

16  CHAIRMAN FITCH:  Go ahead.

17  THE WITNESS:  That the reason that I

18  didn't want this to get so huge and so public is

19  just the Persian community and how they react to

20  it.

21  Just to give you an example, after that

22  it got so public and everybody found out, they

**Page 93**

1  opened Facebook pages, fake Facebook pages under

2  my name with pornographic pictures in it, which,

3  together, with Mr. Klayman, we went to FBI to shut

4  it down.  But in there they were threatening me,

5  threatening my life and all that.

6  So that was one of the reasons that I

7  didn't -- I wanted to keep this case so private,

8  because I didn't want all this to get so huge and

9  so big and hit everywhere.

10  MR. KLAYMAN:  Objection, your Honor.  A

11  lot of that was hearsay.  No foundation.

12  MR. SMITH:  So, just --

13  CHAIRMAN FITCH:  Wait a minute.  Mr.

14  Klayman raises a perfectly good question.  I'm

15  trying to decide how to deal with this.

16  Give us a moment.

17  (Off-the-record discussion amongst

18  hearing committee members.)

19  CHAIRMAN FITCH:  I think that we are

20  going to strike that answer as hearsay.  That's

21  too far removed.

22  If you want to ask a different question

EXHIBIT 5

Print

*verizon*

Subject **LA Times**
From:   **Larry Klayman <leklayman@gmail.com>**
Sent:   **Jun 10, 2010 01:53:38 PM**
To:     *tshamble@verizon.net*
CC:     **elliesataki@yahoo.com, mahmonirrahimi@gmail.com, jamshidch@gmail.com**

Tim:

Please call Paul Richter of the LA Times, DC Bureau. He is the top Iran reporter for the newspaper.

His number is 202 824 8300 and his email address is paul.richter@latimes.com.

If we can get one national story, this can help move things along.

Thanks

Larry

# EXHIBIT 6

USCA Case #22-8521      Document #1987525      Filed: 02/24/2023      Page 267 of 290

 Gmail

Oliver Peer <oliver.peerfw@gmail.com>

## Fwd: Sataki Documentary

**Larry Klayman** <klaymanlaw@gmail.com>            Mon, Oct 12, 2020 at 9:35 AM
To: Oliver Peer <oliver.peerfw@gmail.com>

---------- Forwarded message ---------
From: **Keya Dash** <keyadash@gmail.com>
Date: Sat, Aug 24, 2019 at 6:20 AM
Subject: Re: Sataki Documentary
To: Larry Klayman <leklayman@gmail.com>

Hi Larry,

It jumps right into some clips in Ellie's voice referring to VOA. They are kind of disjointed. The format is like an interview but you don't hear the questions, you only hear the answers. She never names you or refers to you. The only time she talks about lawyers she says no lawyer would take her case. It could be there are more parts that aren't included in this edit. Clearly this is heavily edited. I think the intended audience is the general Iranian public.

Following are the things she says.

She says when she's behind her desk and not posting attention she's getting harrassed. She says VOA is known to be the worst American government agencies, that the people there protect each other and they is a dirty setting.

She says that the show on VOA that she shared with Falahati was created by both of them but he often tried to make her go out with him which she didn't want to do. To go out with him would have been unprofessional because they were doing the show together and the relationship would affect the show. What if they'd argued one day and it was obvious to viewers they were going out?

The problem is that he didn't know how to accept no for an answer. She says she stopped showing up to work because each time he'd say tonight let's have coffee or tonight let's have dinner. She was exhausted for having to say no to him.

She says she complained to Susan, their executive producer, she told Susan that she doesn't know what more to do at this point, that he's taking liberties with her when she's behind the desk not paying attention. She asked Susan to privately handle the issue and Susan said that she couldn't, that Ellie needed to file a public complaint.

Two times, Fallahati came to her when she was behind the desk not paying attention and, she says the clothes that she was wearing and her bra strap--and then everything is bleeped out. She says she yelled at him--and it's bleeped again. She then says "unfortunately..."--and an echo effect is used before the sentence can be continued.

After a clip of her holding her head in her hand with music playing, she then resumes talking, dug that she laughed that no one saw, that she was seeing a psychiatrist, that she was not feeling good, and that that is all documented. She was going to a doctor and taking mood stabilizers.

Fallahati is a sick man and he didn't only harass Ellie. The system in VOA has problems. James d Chalangi supported her story, and he beared witness as to what happened. Another lady named Mahmunir also beared witness in her favor and incurred problems. Mr. Sajadi and Mr. Falahati were friends and at the time Sajadi had a lot of authority there. They were holding each other's hands (a Persian expression meaning helping each other, conspiring, working together in an effort) and Susan fell into their team.

No attorney would accept her case because her case had gotten very big. When the case for very big, when the issue became the board of governors, the board had to cover for itself. In defending themselves, they said Elham left and Fallahati stayed. As for Fallahati, she wasn't the only girl and there are a number of others.

I'm sorry for the delay. I've been traveling and didn't see the email.

Best,

App.0119

Keya

Thank you,

**Keya Dash**

 +1 (703) 963-7531

 +1 (703) 962-1707

 +1 (703) 962-1726

 keyadash@gmail.com

Sent from my iPhone

On Aug 21, 2019, at 1:40 PM, Larry Klayman <leklayman@gmail.com> wrote:

> This is the video. Thanks Keya
>
> ---------- Forwarded message ---------
> From: **Barbara Nichols** <ban@bogoradrichards.com>
> Date: Wed, Aug 21, 2019 at 10:25 AM
> Subject: Sataki Documentary
> To: Larry Klayman <leklayman@gmail.com>
>
> Larry,
>
> The YouTube video at the link below is some kind of documentary about Ms. Sataki's case which was uploaded 11/5/2016, around the time you were gathering files and providing them to Bar Counsel. From the comments, I can see that she is discussing her case and from what I can tell she never mentions you but who knows. We were just wondering if you had a friend who could watch this and let us know what this is saying and if anything she said might be a "smoking gun" since the video is not in English.
>
> https://www.youtube.com/watch?v=e3g5f61muZ4
>
> <image002.png>
>
> [Quoted text hidden]

Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.

(displaying Elham Sattaki's photo)
former broadcaster of VOA

Mr. Falahati, Asal has written this for us,
Well: let us answer the first caller (by the name of - Translator) Hossein from Kerman. Hello, go ahead please.

(displaying photo of Mehdi Falahati)
broadcaster for the VOA network
VOA: Voice of America

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one.   Nobody can talk with anybody. Everybody makes insinuations against one another.   The environment is very dirty.
This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham Sattaki will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner.   And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired.   I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham Sattaki) don't know what to do at this point.   Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know??   That day she told me that "Legally I cannot do it and you must formally file a complaint."

2

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so.   As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord.   I hollered at him (audio censored) he laughed and said "don't tell anybody."   I was not feeling well.
I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot.   Mr. Ali Sajjadi and Mr. Falahati were friends.   At that time Mr. Sajjadi was very powerful there.   They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them.   And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big.   And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me.   And they say that Elham left, Falahati stayed.   When they fired me, I was not the only girl. There are a number of others.

Caption dispalying Falahati and Sattaki with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and Elham Sattaki was fired from this network..
After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

Certified to be a true translation from the Farsi video and audio original


_____
Mohammad T Moslehi


State of MD  County of Montgomery
Subscribed and sworn before me on 9/12/20a
_____ (Date)
(Notary Signature)

# EXHIBIT 7

USCA Case #22-8521        Document #1987525        Filed: 02/24/2023        Page 272 of 290

**USA TODAY**

---

**POLITICS**

# Jeffrey Clark, ex-Trump DOJ official, faces disciplinary charges for election misstatements

 **Erin Mansfield**
USA TODAY

Published 12:24 p.m. ET July 22, 2022 | **Updated 1:44 p.m. ET July 22, 2022**

Former Justice Department lawyer Jeffrey Clark, a central player in Donald Trump's effort to overturn the 2020 presidential election, faces disciplinary proceedings from the District of Columbia's chief investigator of attorney misconduct.

Hamilton P. Fox, III, the disciplinary counsel for the District of Columbia Bar, has charged Clark with attempting to engage in dishonest conduct and "conduct that would seriously interfere with the administration of justice," according to a copy of July 19 filing.

Fox said Clark was served Friday morning. Clark's attorney did not immediately respond to a request for comment.

Rachel Semmel, a spokesperson for the conservative Center for Renewing America, where Clark is a senior fellow, said Clark was "one of the only lawyers at the DOJ who had the interests of the American people at heart."

The charges center around a letter Clark drafted that urged officials in Georgia to convene a special session in the state legislature relating to the 2020 election. Clark sought to get deputy attorney general Jeffrey Rosen and colleague Richard Donoghue to sign the letter, according to the filing.

That letter, called a  proof of concept letter, claimed the Department of Justice had "identified significant concerns that may have impacted the outcome of the election in multiple states, including the state of Georgia," according to the filing.

In truth, the Justice Department was not aware of any election fraud allegations in Georgia that would have affected the results of the presidential election, the filing said.

Feds search home of Jeffrey Clark, ex-DOJ official at center of Trump's effort to overturn election

After then-Attorney General William Barr resigned from his position, Trump sought to install Clark as acting attorney general, an idea that many Department of Justice employees opposed. At one point, according to the filing, Clark sought in a private meeting to get Donoghue to sign the letter, and in the same meeting offered Donoghue a position as his deputy. Donoghue refused.

An environmental lawyer in the Department of Justice's Civil Division, Clark briefly oversaw the division during the final days of the Trump administration because of a vacancy. Lawmakers on the House committee investigating the Jan. 6, 2021 attack on the U.S. Capitol say Clark repeatedly attempted to use his position to try to overturn the 2020 election and "interrupt the peaceful transfer of power."

The Jan. 6 committee also aired testimony from three former top Justice officials, including Rosen, about Clark's efforts surrounding the proof of concept letter.

During a recorded video interview with the Jan. 6 committee, Clark declined to answer questions.

Asked about the letter intended for Georgia officials, Clark invoked his Fifth Amendment protection against self incrimination.

"Fifth," he said.

In June, federal authorities searched Clark's suburban Virginia home.

*Contributing: Kevin Johnson*

Jan. 6 committee subpoenas former DOJ official Jeffrey Clark, accused of attempting to overturn 2020 election

# EXHIBIT 2

# United States Court of Appeals
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

TEL.  504-310-7799
600 S. MAESTRI PLACE
NEW ORLEANS, LA  70130

December 8, 2022

Larry Klayman
7050 W. Palmetto Park Road
Boca Raton, FL 33433

Dear Mr. Klayman:

Further to your response to this Court's Order to Show Cause, please be advised that the order of suspension became final on December 7, 2022. However, the Court has chosen to withdraw the suspension order and hold this Court's reciprocal disciplinary proceeding against you in abeyance pending final disposition of your Superior Court Rule 60 complaint and writ of mandamus or certiorari petition proceedings.

Please advise this Court when the above-referenced proceedings are concluded. Failure to keep this Court informed of the status of the proceedings may result in the imposition of reciprocal discipline without further notice.

Please find enclosed a copy of an order withdrawing the order of suspension.

Very truly yours,

LYLE W. CAYCE, Clerk

By _____

Melissa Shanklin, Deputy Clerk

Enclosure

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
December 8, 2022
Lyle W. Cayce
Clerk

## ORDER

On November 2, 2022 this Court issued an order directing Larry E. Klayman to show cause why his right to practice before this Court should not be suspended reciprocal to a September 15, 2022 order of suspension issued by the District of Columbia Court of Appeals. This Court's self-executing show cause suspension order became effective December 7, 2022.

At the direction of the Chief Judge, IT IS ORDERED that the order of suspension hereby is WITHDRAWN.

LYLE W. CAYCE, Clerk
United States Court of Appeals for the Fifth Circuit

By _Melissa Shanklin_____

Melissa Shanklin, Deputy Clerk

**A True Copy**
**Certified Dec 08, 2022**

_Lyle W. Cayce_

**Clerk, U.S. Court of Appeals, Fifth Circuit**

FOR THE COURT - BY DIRECTION
Address:
Clerk of Court,
U.S. Court of Appeals for the Fifth Circuit
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130

## IN THE UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| In re: LARRY ELLIOT KLAYMAN | No: 22-8521 |
| Respondent | (District of Columbia Court of Appeals, No. 20-BG-583) |

## RESPONDENT LARRY KLAYMAN'S MOTION FOR RECONSIDERATION

Respondent Larry Klayman ("Mr. Klayman") hereby moves this Court for reconsideration of the order denying his previously filed motion a stay of proceedings pending the outcome Mr. Klayman's challenges to the suspension order and judgment of the District of Columbia Court of Appeals in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Suspension Order") pursuant to his complaint filed in the District of Columbia Superior Court pursuant to D.C. Superior Court Civil Rule 60, *Klayman v. Sataki et al*, 22-CAB-5235 (D.C. Sup. Ct.) (the "Rule 60 Complaint") and his pending Petition for Writ of Mandamus that has been submitted to the Supreme Court.

Every single other jurisdiction where reciprocal discipline is at issue has ruled that an order staying consideration pending Mr. Klayman's challenges to the Suspension Order is appropriate. This includes but is not limited to, most recently, the Supreme Court of Pennsylvania, the U.S. Court of Appeals for the Fifth

Circuit, the U.S. District Court for the Northern District of Texas. Other courts where Mr. Klayman is a member have also weighed in and found it appropriate it stay consideration pending Mr. Klayman's challenges to the Suspension Order, as this is clearly in the interest of due process, fundamental fairness and in the administration of justice. Exhibit 1.

It would therefore appear that this Court's initial order denying Mr. Klayman's motion to stay was likely was influenced by animosity toward Mr. Klayman, as he has been critical of some of the judges in this Court and D.C. Circuit, and on this panel, in the past.

The history between Mr. Klayman and some of the judges of this Court and in this D.C. Circuit is no secret, as at a hearing in an unrelated matter where Mr. Klayman served as counsel, *Arpaio v. Zucker et al*, 18-cv-2894 (D.D.C.), the Honorable Royce Lamberth ("Judge Lamberth") of the district court and a judge in this D.C. Circuit revealed to Mr. Klayman and those who were in the audience, "I haven't had you here in a long time. It's a pleasure to have you again. I know some judges don't say that to you, but I will say it." Exhibit 2. This shows that even Judge Lamberth knew of the dislike if not animus that many of his colleagues on the lower and higher courts in the D.C. Circuit had and continue to have for Mr. Klayman. Indeed, Mr. Klayman is the founder of Judicial Watch, Inc, which came into existence on July 29, 1994 – almost 30 years ago – to "watch" judges to

2

promote integrity on the federal bench in particular; thus the name "Judicial Watch." Mr. Klayman has also been a strong proponent of peaceful January 6, 2021 protesters, which advocacy is at odds with the prevailing mood and harsh punishment being meted out by federal judges in this Circuit. He has been critical of the actions of certain judges in this Circuit in this regard,

Of course, as the Court is well aware, personal feelings towards a litigant is not a proper consideration for any federal judge in making a ruling. This is, in fact, a significant portion of the oath of office that every federal judge in this Court swore prior to taking the bench:

> I do solemnly swear that I will administer justice **without regard to persons**, and do equal right to the poor and to the rich, and that I will impartially discharge and perform all the duties incumbent upon me as judge under the Constitution and laws of the United States. So help me God. 28 U.S.C. § 453 (emphasis added).

Accordingly, Mr. Klayman respectfully requests that the Court grant his motion for reconsideration and provide him with the same non-discriminatory treatment that every other jurisdiction has afforded him by issuing an order staying consideration of reciprocal discipline and resetting the briefing schedule pending his ongoing challenges to the Suspension Order.

This will allow the issue of reciprocal discipline to be decided in a fair and just manner under due process of law, and is in the interest of judicial efficiency, and furthering justice as a whole.

DATED: February 16, 2023                    Respectfully submitted,

                                            /s/ Larry Klayman
                                            _____
                                            Larry Klayman, Esq.
                                            Klayman Law Group, P.A.
                                            7050  W.  Palmetto  Park  Road
                                            Boca Raton, FL 33433
                                            Email: leklayman@gmail.com
                                            Tel: 561-558-5336

                                            *Respondent Pro Se*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limits because, excluding the parts of the document exempted, this document contains 679 words.


                                            /s/ Larry Klayman

EXHIBIT 1

**IN THE SUPREME COURT OF PENNSYLVANIA**

| | |
|---|---|
| In the Matter of | : No. 2918 Disciplinary Docket No. 3 |
| | : |
| LARRY ELLIOT KLAYMAN | : No. 141 DB 2022 |
| | : |
| | : (District of Columbia Court of Appeals, No. |
| | : 20-BG-583) |
| | : |
| | : Attorney Registration No. 54628 |
| | : |
| | : (Out of State) |

**ORDER**

**PER CURIAM**

     **AND NOW**, this 2nd day of February, 2023, the Motion to Stay is granted. Respondent shall keep this Court informed of the status of the proceedings before the Superior Court of the District of Columbia.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

TEL.   504-310-7799
600 S. MAESTRI PLACE
NEW ORLEANS, LA  70130

December 8, 2022

Larry Klayman
7050 W. Palmetto Park Road
Boca Raton, FL 33433

Dear Mr. Klayman:

Further to your response to this Court's Order to Show Cause, please be advised that the order of suspension became final on December 7, 2022. However, the Court has chosen to withdraw the suspension order and hold this Court's reciprocal disciplinary proceeding against you in abeyance pending final disposition of your Superior Court Rule 60 complaint and writ of mandamus or certiorari petition proceedings.

Please advise this Court when the above-referenced proceedings are concluded. Failure to keep this Court informed of the status of the proceedings may result in the imposition of reciprocal discipline without further notice.

Please find enclosed a copy of an order withdrawing the order of suspension.

Very truly yours,

LYLE W. CAYCE, Clerk

By _____
    Melissa Shanklin, Deputy Clerk

Enclosure

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 8, 2022

Lyle W. Cayce
Clerk

## ORDER

On November 2, 2022 this Court issued an order directing Larry E. Klayman to show cause why his right to practice before this Court should not be suspended reciprocal to a September 15, 2022 order of suspension issued by the District of Columbia Court of Appeals. This Court's self-executing show cause suspension order became effective December 7, 2022.

At the direction of the Chief Judge, IT IS ORDERED that the order of suspension hereby is WITHDRAWN.

LYLE W. CAYCE, Clerk
United States Court of Appeals for the Fifth Circuit

By _Melissa Shanklin_____

Melissa Shanklin, Deputy Clerk

**A True Copy**
**Certified Dec 08, 2022**

_Lyle W. Cayce_

**Clerk, U.S. Court of Appeals, Fifth Circuit**

FOR THE COURT - BY DIRECTION
Address:
Clerk of Court,
U.S. Court of Appeals for the Fifth Circuit
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: LARRY E. KLAYMAN             §        Misc. No. 3:20-MC-043-B

Before FITZWATER, Senior District Judge, and BOYLE and O'CONNOR, District Judges.

## ORDER

The hearing in this reciprocal discipline matter set for Tuesday, February 21, 2023, at 10:00 a.m. is vacated.

Respondent Larry E. Klayman, Esquire is directed to provide this panel with copies of any materials that he hereafter provides to the United States Court of Appeals for the Fifth Circuit in response to the December 8, 2022 letter to him from the clerk of that court directing that he advise that court when the proceedings in the District of Columbia Court of Appeals are concluded and that he keep the Fifth Circuit informed of the status of the proceedings in the District of Columbia Court of Appeals.

**SO ORDERED**.

January 11, 2023.

FOR THE PANEL

_____
SIDNEY A. FITZWATER
SENIOR JUDGE

# EXHIBIT 2

```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
JOSEPH MICHAEL ARPAIO,              )
                 Plaintiff,         )  Civil Action
vs.                                 )  No. 18-2894
                                    )
JEFF ZUCKER, et al.,                )  July 25, 2019
                                    )
                 Defendants.        )  10:36 a.m.
                                    )  Washington, D.C.
                                    )
    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE ROYCE C. LAMBERTH,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

**APPEARANCES:**

**FOR THE PLAINTIFF:**          LARRY E. KLAYMAN
                                2020 Pennsylvania Avenue, NW
                                Suite 800
                                Washington, DC 20006
                                (310) 595-0800
                                Email: Leklayman@gmail.com


**FOR J. ZUCKER,**              STEPHEN J. FUZESI
**C. CUOMO and CNN:**           KEVIN TAYLOR BAINE
                                NICHOLAS G. GAMSE
                                725 12th St. NW
                                Washington, DC 20005
                                (202) 434-5010
                                Email: Sfuzesi@wc.com


**FOR K. ROBILLARD,**           JEAN-PAUL JASSY
**HUFFINGTON POST:**            JASSY VICK CAROLAN LLP
                                800 Wilshire Boulevard, Suite 800
                                Los Angeles, CA 90017
                                310-870-7048

**(APPEARANCES CONTINUED)**

**APPEARANCES (continued):**


-AND-

     LAURA FRAHER
     SHAIRPO, LIFSCHITZ & SCHRAM, PC
     1742 N Street, NW
     Washington, DC 20036-2912
     (202) 689-1900
     Email: Fraher@slslaw.com



**FOR ROLLING STONE,** ALISON SCHARY
**TESSA STUART:**   Davis Wright Tremaine LLP
     1919 Pennsylvania Avenue, N.W.
     Suite 800
     Washington, DC 20006
     (202) 973-4248
     Email: Alisonschary@dwt.com




Court Reporter:  Elizabeth Saint-Loth, RPR, FCRR
     Official Court Reporter
     Washington, D.C.  20001


   Proceedings reported by machine shorthand,
  transcript produced by computer-aided transcription.

```
 1                THE COURT:  Thank you very much, Mr. Jassy.

 2                MR. JASSY:  Thank you, Your Honor.

 3                THE COURT:  All right.  Mr. Klayman.

 4                MR. KLAYMAN:  Thank you, Your Honor.

 5                THE COURT:  I haven't had you here in a long time.

 6      It's a pleasure to have you again.  I know some judges don't

 7      say that to you, but I will say it.

 8                MR. KLAYMAN:  Mutual, Your Honor.

 9                At the outset, Your Honor, I want to point out an

10      inaccuracy by CNN's counsel; perhaps they inadvertently made

11      a mistake.  But, in paragraph 22, we allege:  As of today,

12      the CNN broadcast is still available through defendant's

13      CNN's website, and no efforts have been taken by defendant

14      CNN, defendant Cuomo, or defendant Zucker to correct this

15      false statement.  So, yes, it is in the complaint that this

16      is still up on the website.

17                THE COURT:  The original?

18                MR. KLAYMAN:  The original.

19                THE COURT:  The original four-minute segment --

20                MR. KLAYMAN:  Which does not have the correction

21      by Chris Cuomo at the end.

22                THE COURT:  Okay.

23                MR. KLAYMAN:  Now, let me get into this particular

24      issue, and I will move on generally.

25                Once something goes up on the Internet, it
```