**CASE NO. 22-8521**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

In Re: Larry Klayman

*Respondent*

---

ATTORNEY RECIPROCAL DISCIPLINE PROCEEDING

---

**RESPONDENT'S BRIEF**

---

Larry Klayman, Esq.
Klayman Law Group, P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL 33433
Tel: (561) 558-5336
Email: leklayman@gmail.com

*Respondent Pro Se*

Date: March 15, 2023

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................1

STATEMENT OF THE CASE ...................................................................1

    Procedural History and Background of This Reciprocal Discipline
    Proceeding Mandate That a Stay Be Issued, or at a Minimum, this Matter Be
    Transferred to Another Panel and Court in the Interests of Justice ..............1

    Procedural History and Background of the Underlying Disciplinary
    Action ........................................................................................6

SUMMARY OF THE ARGUMENT .....................................................11

ARGUMENT......................................................................................11

    There Was a Significant Deprivation of Due Process Under the Doctrine of
    Laches and the Statue of Limitations ...........................................12

    The Imposition of Reciprocal Discipline Would Result in a Grave and
    Manifest Injustice ....................................................................20

    There Was No Clear and Convincing Evidence of Any Misconduct ..........34

        There Was No Failure to Abide By Ms. Sataki's Wishes..................34

        There Was No Conflict of Interest .......................................41

        Mr. Klayman Did Not Reveal Any Client Confidences. ...................45

        Mr. Klayman Kept Ms. Sataki Informed Every Step of the Way .......45

        Absence of a Written Fee Agreement .................................45

        There Was No Failure to Cease Representation ................................46

CONCLUSION ......................................................................................47

# Table of Authorities

**Cases**

*Gamez v. State Bar of Tex.*, 765 S.W.2d 827 (Tex. App. 1988 ................................18

*In re Cerroni*, 683 A.2d 150 (D.C. 1996) ................................................10

*In re Ekekwe-Kauffman*, 210 A.3d 775 (D.C. 2019) ................................18

*In re Iulo*, 564 Pa. 205 (2001) ..............................................................18

*In re Reciprocal Discipline of Rokahr*, 2004 S.D. 66 (2004). ....................9, 10, 11

*In re Vohra*, 68 A. 3d 766 (D.C. 2013 .................................................7, 21

*In re Williams*, 513 A.2d 793 (D.C. 1986) ............................................18

*In The Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.). .................32, 33

*Liapis v. Second Judicial Dist. Court*, 128 Nev. 414, 420-21 (2012 .................41

*Selling v. Radford*, 243 U.S. 46 (1917) ...........................................11, 12, 47

*The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001) ...................18

**Rules**

Board on Professional Responsibility Rules, Chapter 3 ...........................14

Board on Professional Responsibility Rules, Rule 11.5 ..........................21

28 U.S.C. § 144 .....................................................................3, 47

28 U.S.C. § 455 .........................................................................3

28 U.S.C. § 453 .........................................................................5

Fla. Bar Rule 3-7.16(a)(1). ............................................................18

Fl. St. Bar Rule 4-8.4 .................................................................42

Pennsylvania Disciplinary Board Rules and Procedures 85.10 ..................18

Pa. R. Prof'l Cond. 1.8 ................................................................42

## **STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1.    Should this entire matter be stayed pending Mr. Klayman's challenges to the order of suspension from the District of Columbia Court of Appeals in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Suspension Order") as well as his challenges to the  Honorable Gregory G. Katsas ("Judge Katsas"), the Honorable Neomi Rao ("Judge Rao") and the Honorable Karen LeCraft Henderson ("Judge Henderson") (collectively the "Panel") presiding over this matter.

2.    Should the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") impose reciprocal discipline pursuant to the Suspension Order.

## **STATEMENT OF THE CASE**

**I.    Procedural History and Background of This Reciprocal Discipline Proceeding Mandate That a Stay Be Issued, or at a Minimum, this Matter Be Transferred to Another Panel and  Court in the Interests of Justice**

From the very outset of this proceeding, Mr. Klayman has put the Court on notice that he was still in the process of challenging the Suspension Order pursuant to his complaint filed in the District of Columbia Superior Court pursuant to D.C. Superior Court Civil Rule 60, *Klayman v*. *Sataki et al*, 22-CAB-5235 (D.C. Sup. Ct.) (the "Rule 60 Complaint") and his pending Petition for Writ of Mandamus that has been submitted to the Supreme Court. App. 127 – 242.

Every single other jurisdiction where reciprocal discipline is at issue has ruled that an order staying consideration pending Mr. Klayman's challenges to the

Suspension Order is appropriate. This includes but is not limited to, most recently, the Supreme Court of Pennsylvania, the U.S. Court of Appeals for the Fifth Circuit, the U.S. District Court for the Northern District of Texas.  Other courts where Mr. Klayman is a member have also weighed in and found it appropriate it to stay consideration pending Mr. Klayman's challenges to the Suspension Order, as this is clearly in the interest of due process, fundamental fairness and in the administration of justice. App. 495 - 498.

Thus, Mr. Klayman very reasonably and respectfully  moved this Court to simply afford him the same non-discriminatory treatment that every single other jurisdiction provided and stay proceedings pending the outcome of his challenges to the Suspension Order. This course of action was the only possible rational one, which explains again why <u>every single other jurisdiction</u> chose to take it. It is obvious that there is absolutely no prejudice or downside to staying consideration of reciprocal discipline, as a successful challenge to the Suspension Order would render the issue of reciprocal discipline moot. These other courts obviously saw the potential, if not likelihood, for Mr. Klayman's legitimate legal actions to vacate the Suspension Order based on fraud and other prosecutorial misconduct, and thus correctly allowed him to fully exercise his constitutional due process rights.

Despite this undisputable reasoning, the three-judge panel (hereafter Panel") consisting of Judge Katsas, Judge Rao and the Judge Henderson steadfastly refused

to stay this proceeding, and even doubled down on this decision in denying Mr. Klayman's motion for reconsideration.

This extremely discriminatory, unethical  and retaliatory conduct by the Panel forced Mr. Klayman to file his Motion to Recuse or Disqualify the Honorable Gregory G. Katsas, Neomi Rao, and Karen LeCraft Henderson Pursuant to 28 U.S.C. § 144 (the "Disqualification Motion"), as the Panel's steadfast refusal to take the only rational, reasonable, and prudent course of action and stay this matter can only be explained by a deep-seated extrajudicial bias and prejudice against Mr. Klayman.  Tellingly, on March 13, 2023, the Panel issued a *per curiam* order denying Mr. Klayman's Disqualification Motion without any legal reasoning beyond merely citing 28 U.S.C. § 455, App. 520, which forced Mr. Klayman to file a Notice of Intent to File Petition for Rehearing En Banc and if Necessary Petition for Writ of Mandamus to the Supreme Court and Motion to Stay. Unsurprisingly, the Panel denied this motion just one day later, again with no reasoning or analysis. App. 521.

In this regard, Mr. Klayman is also petitioning to the Chief Judge of this Court, the Honorable Sri Srinivasan ("Judge Srinivasan") to investigate, take action against and remedy the conduct of the Panel, and will be timely filing a Petition for Rehearing En Banc and a Petition for Writ of Mandamus with the Supreme Court if necessary to remedy the conduct of the Panel.

All this goes to show that a stay is necessary pending the outcome of these forthcoming challenges to the Panel's order of March 13, 2023 denying the Disqualification Motion, as well as the pending Complaints before the Judicial Council and the letters to Judge Srinivasan requesting a thorough investigation. This is the only way to ensure that Mr. Klayman receives a fair, neutral, and unbiased adjudication in the matter pursuant to his sacrosanct due process rights. App. 315.

Indeed, the history between Mr. Klayman and some of the judges of this Court and in this D.C. Circuit is no secret, as at a hearing in an unrelated matter where Mr. Klayman served as counsel, *Arpaio v. Zucker et al*, 18-cv-2894 (D.D.C.), the Honorable Royce Lamberth ("Judge Lamberth") of the district court and a judge in this D.C. Circuit revealed to Mr. Klayman and those who were in the audience, "I haven't had you here in a long time. It's a pleasure to have you again. I know some judges don't say that to you, but I will say it." App. 502. This shows that even Judge Lamberth knew of the animus that many of his colleagues on the lower and higher courts in the D.C. Circuit had and continue to have for Mr. Klayman. Mr. Klayman is the founder of Judicial Watch, Inc, which came into existence on July 29, 1994 – almost 30 years ago – to "watch" judges to promote integrity on the federal bench in particular; thus the name "Judicial Watch." Mr. Klayman has also been a strong proponent of peaceful January 6, 2021 protesters,

which advocacy is at odds with the prevailing pliant and coordinated actions by federal judges in this Circuit in league with the Biden Justice Department and the harsh punishment they are meting out for what is frequently simply alleged trespasses, where what appears to in effect be forced confessions of guilt are necessary to obtain a lesser sentence. Mr. Klayman has been critical of the actions of certain judges in this Circuit in this regard and has written about this. In his latest book titled "It Take a Counter-Revolution: Wake Up America!," published by Post Hill Press and widely available online by all major booksellers, Mr. Klayman chronicles the judicial misconduct of several judges in the Circuit. This, however, cannot be the basis upon which the Panel rules, as personal feelings towards a litigant are not a proper consideration for any federal judge in making a ruling. This is, in fact, a key and sacrosanct provision in the oath of office that every federal judge in this Court swore, under oath, prior to taking the bench:

> I do solemnly swear that I will administer justice **without regard to persons**, and do equal right to the poor and to the rich, and that I will impartially discharge and perform all the duties incumbent upon me as judge under the Constitution and laws of the United States. So help me God. 28 U.S.C. § 453 (emphasis added).

In sum, federal judges must weather criticism, without fear of retaliation leveled against those lawyers such as Mr. Klayman who feel duty bound in their public interest capacity to make it, just as lawyers must weather criticism from these federal judges. This is a healthy give and take to promote integrity in the legal

system. Regrettably, however, this is not what has happened in this matter, which has forced Mr. Klayman to move to disqualify the Panel in order to try to preserve his sacrosanct due process rights.

In this regard, if this matter is not stayed, which it must be pursuant to the precedent set by <u>every single other jurisdiction</u> facing the issue of reciprocal discipline, this matter must be transferred to another Panel and Court so that Mr. Klayman has a chance at a fair, neutral, and unbiased proceeding. Thus, Respondent's Brief is thus being timely filed to make a record why no reciprocal discipline is warranted, as Mr. Klayman cannot now expect to be treated fairly by this Panel, with a just determination of whether reciprocal discipline should be imposed.

## II.     Procedural History and Background of the Underlying Disciplinary Action

As set forth above, this matter should respectfully be stayed, or at a minimum, transferred to another Court so that Mr. Klayman has a chance at a fair, neutral, and unbiased proceeding.

**And, given the space limitations, Mr. Klayman respectfully requests that be a thorough  review of his briefs and proposed findings of fact before the Board and the District of Columbia Court of Appeals, App. 1 – 126, 522-591 to get a full understanding of the facts at issue and exactly why no reciprocal discipline is warranted. So that the Court has the entire record of**

**the underlying disciplinary action, Mr. Klayman will send a USB drive containing the entire record, as it is too voluminous to be filed electronically. Mr. Klayman respectfully requests that the reviewing body, and hopefully not this biased and prejudiced Panel, thoroughly review and digest this record, and in particular both sets of Mr. Klayman's proposed findings of fact and the hearing transcript of the testimony of his seven material witnesses, including Ms. Sataki's union representative, Mr. Timothy Shamble.**

Furthermore, it is clear that reciprocal discipline is completely and totally unwarranted, as the underlying Suspension Order is fatally flawed and unsupported by any evidence, much less the requisite "clear and convincing" evidence standard. *In re Vohra*, 68 A. 3d 766, 784 (D.C. 2013). This is conclusively shown through the actions of both The Florida Bar and the Pennsylvania Bar over eleven (11) years ago when the Complainant, Elham Sataki ("Ms. Sataki") simultaneously filed her identical Complaint before these state bars as well as the District of Columbia Bar. Both The Florida Bar and the Pennsylvania Bar dismissed Ms. Sataki's Complaint, initially filed in November of 2010, while, in stark contrast as discussed below, the District of Columbia Office of Disciplinary Counsel ("ODC") sat on it for nearly seven (7) years, long after she had abandoned it by ODC's own policy rules, only then to have ODC institute a disciplinary proceeding for the first

time with a Specification of Charges filed on July 20, 2017 (the "Sataki Matter"). App. 244.

Of particular importance to this instant matter is the fact that Disciplinary Counsel-In-Charge, Anthony P. Sodroski from the Pennsylvania Office of Disciplinary Counsel, has confirmed that the Ms. Sataki had submitted a Complaint to the Pennsylvania Bar in October of 2011, and that it was closed in that same month without adjudication. App. 243. This is of critical importance, as this unequivocally shows that the Pennsylvania Office of Disciplinary Counsel had long ago conducted a review the allegations of the Complainant and decided that it was without merit. Nothing else could explain why the Complaint would have been dismissed and this matter closed in the same month. This confirms that the same thing also occurred in Florida, where there are no longer any records due to the fact that over a decade has now elapsed due to ODC's unconscionable and prejudicial delay in instituting this case. Indeed, as no disciplinary action was taken by The Florida Bar and Mr. Klayman has remained a member in continuous good standing for nearly 45 years, it is clear that Florida dismissed the identical Complaint as well. App. 314. This is simply a case of "two plus two equals four." If it is undisputed that both The Florida Bar and the Pennsylvania Bar were already presented with the same Complaint from Ms. Sataki, and it is also undisputed that no disciplinary action was taken, then the only possible conclusion is that they

8

determined Ms. Sataki's complaint to be meritless. It would be fundamentally unjust to reach any other conclusion, or to conclude otherwise, where the enormous delay in adjudicating the disciplinary proceeding against him in the District of Columbia was due entirely to ODC's partisan actions, App. 244, and inactions as explained below, and not due to conduct by Mr. Klayman at all.

Crucially, the imposition of reciprocal discipline is no mere formality, particularly under these circumstances where an identical Complaint has already been filed by Ms. Sataki in Florida and Pennsylvania and summarily dismissed, as set forth above. *In re Reciprocal Discipline of Rokahr*, 2004 S.D. 66 (2004) is particularly instructive. In *Rokahr*, the attorney was licensed to practice in both South Dakota and Nebraska. *Id*. at P2. Disciplinary complaints were filed against Rokahr with in both jurisdictions, similar to the facts here. *Id*. at P6 – P7. In Nebraska, an investigation was done, and the Nebraska disciplinary referee found that Rokahr had committed three ethical violations and ordered a six-month suspension. *Id*. at P6. In South Dakota, however, the Disciplinary Board of South Dakota found that merely an admonition was appropriate. *Id*. at P7. Once the Nebraska proceeding ultimately concluded, Rokhar sent notice to South Dakota of the suspension, and thus arose the issue of whether South Dakota was bound to impose a reciprocal six-month suspension. The South Dakota Supreme Court correctly declined to do so. In doing so, it properly reasoned:

> Each jurisdiction has its own statutes and rules. If the District's proceedings, based on its own standards and a careful evaluation of the attorney's conduct in light of those standards, conclude with the selection of one sanction, then it would surely be irrational to impose, instead, a different sanction which was selected on the basis of a different factual record under another jurisdiction's laws and rules. *Id*. at P14.

Furthermore, the South Dakota Supreme Court also found that full faith and credit must be given to an independent investigation: "There is also the question of whether an attorney disciplinary decision of a separate jurisdiction must be given full faith and credit in this jurisdiction. Indeed, Rokahr raised this same argument as a defense to the Nebraska Disciplinary proceeding, contending that because the South Dakota Disciplinary Board had already investigated the complaint based upon the same set of facts, no further discipline should be imposed." *Id*. at P15. The South Dakota Supreme Court importantly also invoked precedent from the District Columbia Court of Appeals in reaching their decision, citing *In re Cerroni*, 683 A.2d 150, 151 (D.C. 1996) ("In terms of discipline, the Board determined that it was not required to follow the doctrine of reciprocal discipline because the Hearing Committee had already conducted proceedings on the matter.").

Here, it is indisputable that Ms. Sataki had filed an identical Complaint against Mr. Klayman in Florida and Pennsylvania in 2011, and that both of these bars at the time made the decision not to pursue the matter, as the Complaints lacked merit and did not state any bona fide ethical violations on their face. Under

*Rokahr*, this should conclude the question of reciprocal discipline, as full faith and credit must be given to Florida and Pennsylvania's decisions not to pursue and dismiss this Complaint back in 2011. Given that this extraordinary and highly prejudicial delay was caused solely and unequivocally by ODC – who literally resurrected an abandoned Complaint for their own apparent ideological and political purposes after seven (7) years. This type of situation is the precise reason that doctrines such as statutes of limitations and laches were formulated – to protect citizens and in this case members of the bar who have been victimized by unexplained and undue and in this matter gross unconscionable delay out of their own control.

## SUMMARY OF THE ARGUMENT

There is simply no basis for the Court to impose reciprocal discipline. Each and every one of the factors that the Court must consider pursuant to *Selling v. Radford*, 243 U.S. 46 (1917) mandate that the Court decline to impose reciprocal discipline against Mr. Klayman.

## ARGUMENT

In deciding whether reciprocal discipline is warranted, courts look at four different factors. These four factors are whether (1) the procedure was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or (2) there was such an infirmity of proof establishing the misconduct as to give rise

to the clear conviction that this Court could not, consistent with its duty, accept as final the conclusion on that subject; or (3) the imposition of the same discipline by this Court would result in grave injustice; or (4) the misconduct warrants substantially different discipline." *Selling v. Radford*, 243 U.S. 46 (1917). Each of these factors weigh strongly against imposition of any reciprocal discipline.

## I.    There Was a Significant Deprivation of Due Process under the Doctrine of Laches and the Statue of Limitations

It is important to recognize that the events at issue in the Sataki Matter involves events that occurred in 2010 – twelve (12) years ago. Even more egregiously, this matter was not even instituted until 2017 – seven (7) years after the Complaint had been filed by the Complainant! App. 244.Thus, there was a <u>minimum</u> of (7) year delay before this case was even instituted. During those seven (7) years, having had no contact from ODC, Mr. Klayman very reasonably believed that the Sataki Matter had been closed, particularly given the fact that the Complainant, Ms. Sataki had filed identical Complaints in Pennsylvania and Florida and they were summarily dismissed as being frivolous and meritless. App. 93. Mr. Klayman therefore had discarded his records pertaining to his representation of Ms. Sataki, as case records need only be kept for five (5) years in the District of Columbia[1] and in Pennsylvania[2], as well as Florida, making his

---

[1]      https://www.dcbar.org/For-Lawyers/Legal-Ethics/Ethics-Opinions-210-Present/Ethics-Opinion-283#footnote11

12

defense after the Sataki Matter was resurrected by ODC *sua sponte* subject to extreme prejudice. As just one example among many of this extreme prejudice, one need only look to the attached ethics opinion of Professor Ronald Rotunda, who would have testified in the case, but in the interim years he passed away, prejudicing Mr. Klayman further. App. 157. Another material and crucial witness, Arlene Aviera, Ms. Sataki's psychologist who was aware of all of the details of Mr. Klayman's representation of Ms. Sataki, Mr. Klayman in addition to Ms. Sataki having met and communicated with her on many occasions, contracted terminal cancer during this egregious and time barred delay, as set forth in the attached briefs, and thus could not testify. Dr. Aviera's testimony would have been crucial because she contemporaneously took detailed notes and records concerning Ms. Sataki and her legal proceedings. Mr. Klayman met with both Dr. Aviera and Ms. Sataki on numerous occasions to be of assistance, and Dr. Aviera would have testified that Mr. Klayman had diligently represented Ms. Sataki's interests, but that when Ms. Sataki sought to take advantage of her friendship with Mr. Klayman and got too personal – i.e. when Ms. Sataki asked Mr. Klayman to buy her a car – that Mr. Klayman had advised Ms. Sataki to get new counsel, which she refused to do. Also of crucial importance is that Dr. Aviera could have testified as to Ms. Sataki's lack of candor, since she had experienced and witnessed it first-hand, and

---

[2] Pa. R. Prof'l. Cond. 1.15

also that Ms. Sataki's mental and other issues were not caused by Mr. Klayman, but by her own doing.

This is exactly why Mr. Klayman on numerous occasions sought discovery from Dr. Aviera and others, including in his February 15, 2018 Motion to Notice and Have Issued Subpoenas Duces Tecum to Take the Depositions of Elham Sataki and Arlene Aviera. App. 262. In that motion, Mr. Klayman wrote, "[i]t is thus believed that the deposition testimony of…Ms. Aviera will disclose crucial exculpatory evidence necessary for Respondent's defense, and reveal that he acted properly at all times and even sought to get Ms. Sataki other counsel."

Tellingly, even this simple request was vehemently opposed by ODC and then denied by the AHHC despite discovery clearly being allowed and an integral part of the attorney discipline process, particularly in a case such as this one where ODC delayed seven years to even file a Specification of Charges, resulting in passage of time causing memories to fade, documents to be discarded and lost, and witnesses to become unavailable. *See* Board on Professional Responsibility Rules, Chapter 3.

Then, taking advantage of the AHHC's refusal to allow Mr. Klayman <u>any</u> <u>discovery</u>, and the fact that their delay had caused Dr. Aviera to be unavailable to testify due to illness, ODC and Ms. Sataki on the eve of the commencement of the hearings in this proceeding, very conveniently "discovered" so called records from

Dr. Aviera that were previously undisclosed and introduced them into the record. The AHHC did not care that these "cherry picked" so called records from Dr. Aviera constituted unsubstantiated hearsay by virtue of her not being available to authenticate them (and thus should have been inadmissible), much less an inaccurate representation of the facts. Mr. Klayman therefore renewed his request for discovery at the hearing, citing this significant due process violation, yet was still denied by the highly partisan and biased AHHC:

> At this point, for the record, as your Honor may recall, I had requested to be able to depose Dr. Aviera. That would have alleviated this issue, and I was denied. That's why I also needed her file, because this is just selective things that are being produced by Bar Counsel from her file, not the whole file. So this is a highly prejudicial area of testimony for her to be testifying, A, without my having discovery, which I requested early on, and B without Dr. Aviera to testify. App. 301.

Thus, everything introduced by ODC was unsubstantiated, unauthenticated hearsay, as Dr. Aviera could not appear to authenticate the records, and Mr. Klayman had no opportunity to cross examine her either. They simply came into "evidence" improperly.

Even more, Mr. Klayman was not even allowed to take the deposition of Ms. Sataki, despite the seven (7) year delay caused by ODC in even filing the Specification of Charges. Had Mr. Klayman been allowed to depose Ms. Sataki, he would have been able to avoid the severe prejudice that resulted from ODC and Ms. Sataki conspiring to introduce a litany of alleged records for the first time

literally on the eve of the hearing, without giving Mr. Klayman any opportunity to review them, as set forth above. And, he would have been able to uncover fraudulently withheld exculpatory evidence in the form of a video interview of Ms. Sataki publicizing her case, despite claiming at the hearing that she did not approve of publicity in her case, as set forth in detail below.

Even further compounding this prejudice caused by ODC's delay, the reason for the seven (7) year delay in even instituting the Sataki Matter was because the Complainant, Ms. Sataki, had actually abandoned her Complaint and chosen not to proceed further with it. This is shown in a letter from ODC to Ms. Sataki dated July 7, 2011, where ODC sent to Ms. Sataki Mr. Klayman's responses to her allegations and advised her, "[i]f we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations." App. 260.  Despite the lack of response from Ms. Sataki, ODC did not close its case, but instead waited literally years, far beyond this Circuit's applied doctrine of laches for disciplinary proceedings would have allowed, to *sua sponte* resurrect the Sataki Matter, going so far as to use an investigator to literally hunt  Ms. Sataki down to coax if not pressure her to pursue her claims against Mr. Klayman. This is shown in an email from ODC's H. Clay Smith III to Kevin O'Connell stating:

> I am trying to locate a complainant that has dropped off the map. Ms. ElhSataki…. **She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she** filed. My letter to her dated 7/7/11 was not responded to, but was not

returned by the USPS either. I recently tried to contact her by telephone, but her number is not in service. I'll appreciate your efforts to locate her and to provide some reliable contact information.  App. 261. (emphasis added).

It is truly troubling that neither the Board nor the D.C. Court of Appeals cared  that Ms. Sataki had made the choice to drop her Complaint against Mr. Klayman, and ODC still hired an investigator to hunt her down in 2014 to coax her to move forward with her claims against Mr. Klayman. Still the case was incredibly not instituted until three years later in 2017. App. 244. This conclusively shows that ODC's purpose here was not to get "justice" for the Complainant, but instead was to manipulate and use the Complainant to fulfill their own goal and agenda to try to remove Mr. Klayman from the practice of law due, as set forth below, apparently due to his conservative public interest advocacy, Republican Party affiliation, and litigation. No matter how many times Mr. Klayman brought this incontrovertible fact up during the pendency of the Sataki Matter, it fell on deaf ears, as the Board and D.C. Court of Appeals showed themselves as unwilling to hold ODC accountable for unconscionable delay and any of the litany of egregious ethical violations that they committed, for which they incorrectly claim are immune from legal scrutiny.

All this goes to show that reciprocal discipline in the Sataki Matter must, at the outset, must be denied due to the doctrines of laches, and in particular due to the completely unjustified and highly prejudicial nature of the delay.

The DCCA has found that attorney disciplinary proceedings are "quasi-criminal in nature." *In re Williams*, 513 A.2d 793, 796 (D.C. 1986). Thus, "[t]he accusatorial quality of attorney discipline proceedings, coupled with their grave consequences, demand the provision of due process safeguards." *Id*. The *Williams* court held that an undue delay that impaired a respondent's defense could result in a due process violation. "A delay coupled with actual prejudice could result in a due process violation, in which case we would be unable to agree with a finding that misconduct had actually been shown." *Id*. at 797.

Furthermore, this proceeding is already time barred in Florida, Texas, and Pennsylvania – all jurisdictions where Mr. Klayman is admitted to practice - as a result of ODC's unconscionable delay. *See Gamez v. State Bar of Tex.*, 765 S.W.2d 827, 833 (Tex. App. 1988); *The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001); Fla. Bar Rule 3-7.16(a)(1); Pennsylvania Disciplinary Board Rules and Procedures 85.10 (Stale Matters); *In re Iulo*, 564 Pa. 205, 766 A.2d 335 (2001).

Then, in *In re Ekekwe-Kauffman*, 210 A.3d 775 (D.C. 2019), the DCCA analyzed this fundamental principle even further. In *Ekekwe-Kauffmann*, the DCCA was also faced with a seven-year delay, but in that case, the Respondent only made general allegations of prejudice and thus "has not identified the missing witnesses, made a proffer of their anticipated testimony, or explained her attempts to find them." *Id*. at 786. Identical to *Ekekwe-Kauffman*, there was a (7)-year delay

by ODC is even filing a Specification of Charges. App. 244. This was an incredibly prejudicial, unexplained delay solely at the hands of ODC that renders enforcement of discipline completely inequitable and unjust. There was absolutely nothing justifiable about the delay in this matter, and it has severely prejudiced Mr. Klayman's ability to present a full defense, as witnesses became unavailable due to death and illness during the seven-year delay caused solely by ODC.

This was further emphasized in the legal ethics opinion of one of the preeminent professional ethics experts, Ronald Rotunda, who had wanted and planned to testify on Mr. Klayman's behalf, pro bono, but sadly passed away during the extremely prejudicial delay of seven (7) years caused by ODC:

> *In Florida Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. l 1978) (per curiam), the Florida supreme court threw out charges because the prosecutor because of the Bar's delay in violation of the Florida rules… One can summarize this case as the Bar delaying finalization of two cases (where the Bar was disappointed with the recommended discipline) because it was confident it would secure a conviction in a third case still in the pipeline in the hope of securing greater overall disc line. The Court said, 'Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee 's report which it finds loo lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate. App. 157.

Thus, the Court must decline to impose reciprocal discipline on this basis alone, notwithstanding the lack of merit of the entire ODC partisan inspired disciplinary proceeding.

## II.    The Imposition of Reciprocal Discipline Would Result in a Grave and Manifest Injustice

Mr. Klayman respectfully requests and implores the eventual unbiased reviewing  Panel and Court  to carefully review the attached briefs and Proposed Findings of Fact as they meticulously outline and detail the prosecutorial misconduct, gross injustices, fraudulent conduct, and egregious misconduct by ODC and Ms. Sataki with regard to perjury and the suborning of perjury, that gave rise to and resulted in the D.C. Court of Appeals' suspension order. App. 1 – 126, 522 – 591. Indeed, as set forth above, both the Pennsylvania Bar and The Florida Bar already considered Ms. Sataki's Complaint against Mr. Klayman through neutral and unbiased eyes and summarily dismissed them as completely meritless and frivolous. App. 93. This should tell the Court now all it needs to know.

Regrettably, however, this is not what happened at the D.C. Court of Appeals, which effectively and improperly summarily adopted, that is "rubber stamped," without itself apparently delving into the record, a fatally flawed Board Report and Recommendation. In its Order, the D.C. Court of Appeals wrote, ""[w]e accept the Board's conclusion that Mr. Klayman violated the Rules of Professional Conduct, and we adopt the Board's recommended sanction," "[w]e

'accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record,'" "[o]ur cases do not appear to make clear whether our review on this issue is deferential or de novo…We need not decide the issue, because we agree with the Board's conclusion," and "[w]e conclude that the Hearing Committee and the Board acted reasonably by choosing to largely credit E.S.'s testimony over that of Mr. Klayman." App. 71. This ignored the well-established precedent that under Board Rule 11.5, charges against Mr. Klayman must be proved by "clear and convincing" evidence. *In re Vohra*, 68 A. 3d 766, 784 (D.C. 2013).

If the D.C. Court of Appeals was going to ignore Mr. Klayman's facts, witnesses, and arguments – which it admittedly did - then why did it take an unconscionable nearly twenty (20) months to issue a decision? If its intention was to simply adopt wholesale the Report, it could have done so immediately. The only explanation is that the D.C. Court of Appeals was acting in a partisan punitive fashion and took advantage of the fact that Mr. Klayman had been "temporarily suspended" without due process - as Mr. Klayman was (1) denied his Sixth Amendment right to counsel of choice, (2) denied a bona fide review of the record, (3) was provided with absolutely no facts or law explaining why he had been "temporarily suspended and (4) denied the right to even petition for rehearing en banc - since January of 2021 and thus wanted to extend Mr. Klayman's

"temporary suspension" period. Even more, the suspension order is also factually and legally deficient and fatally flawed, and does not contain **one record cite** to even attempt to justify its findings. App. 266 - 295. This shows that there was no bona fide review of the record. The suspension order is wholly conclusory, which is the by-product of the Panel of the  D.C. Court of Appeals deciding to ignore Mr. Klayman's facts, witnesses, and unrefuted testimony, and has resulted in a minimum thirty-eight (38) months total suspension, comprising a twenty month "temporary suspension" which occurred without even a hearing before the D.C. Court of Appeals, and an eighteen (18) month actual suspension period tacked onto that, incredibly exceeding even the Boards' recommended suspension by about twenty (20) months.

Mr. Klayman took the time and effort to have seven (7)  irrefutable material witnesses testify compellingly on his behalf, including the distinguished retired federal judge, the Honorable Stanley Sporkin, Gloria Allred, Tim Shamble, Keya Dash, Joshua Ashley Klayman, posthumously ethics expert Professor Ronald Rotunda through his written opinion, and himself. It is incomprehensible that at every single level of this proceeding, the testimony provided by these material and unbiased witnesses was simply ignored and given no weight, despite the fact that it was all uncontroverted testimony based on personal contemporaneous knowledge. Yet, Ms. Sataki – ODC's only material witness, who was thoroughly impeached -

was just taken at her coached word. This simply makes no sense. Even though the D.C. Court of Appeals was forced to acknowledge yet still downplay the sworn testimony of the Honorable Stanley Sporkin, a distinguished retired federal judge, former Chief Counsel of the Central Intelligence and head of Enforcement at the Securities and Exchange Commission, who while being in bad health and in a wheelchair, for which he later died, took it upon himself at great pains to travel to the hearing, with the aid of his wife and son, to testify on Mr. Klayman's behalf without being subpoenaed. Judge Sporkin testified under oath that over the many years Mr. Klayman had appeared in cases before him, he came to see Mr. Klayman as an honest and ethical person that had no reason to doubt Mr. Klayman's character. App. 271 - 272. And, as importantly, during Mr. Klayman's representation of Ms. Sataki Judge Sporkin testified that he had discussed with Mr. Klayman his case strategy and agreed with it. App. 272. While the panel is forced to concede this, it accords Judge Sporkin's learned testimony no weight at all, as it obviously did not comport with its apparent predetermined mindset and objective to improperly suspend Mr. Klayman from the practice of law in the District of Columbia, **despite there being absolutely no finding of dishonesty by Mr. Klayman**.

Given the frankly unbelievable injustice after injustice set forth above, it is crucial for Mr. Klayman to provide some real-world context and a highly likely

explanation as to how and why the D.C. attorney disciplinary apparatus likely has acted in this manner.  It is indisputable that our society has become more and more politically and ideologically polarized and people more and more dogmatic in their beliefs. Either you are a friend or a foe. There is no longer a middle ground. Nowhere is this more evident than in the District of Columbia, and this type of combative mentality has regrettably infected the leftist and totally Democrat D.C. attorney disciplinary apparatus, where attorneys such as Mr. Klayman, the founder of Judicial Watch and Freedom Watch, App. 313,  who are strong conservative and/or Republican  public interest advocates, are no longer welcome as members of the D.C. bar by its wholly partisan Democrat left-wing leadership and have instead become targets.[3] Mr. Klayman understands that this is a bold statement, but

_____

[3] The Court can look to the members of the D.C. attorney disciplinary apparatus' political contributions as shown in FEC public records as further evidence of their partisan predilections. For instance DC Bar Disciplinary Counsel Fox has donated heavily to Barack Obama and Joe Biden, as well as other leftist candidates. Former assistant bar counsel Elizabeth Herman also donated heavily to Barack Obama and Joe Biden.

Michael Tigar an avowed communist who incredibly sat on the Ad Hoc Hearing Committee also donated thousands upon thousands of dollars to leftist political causes and candidates, including the Clintons, as well as ActBlue and the Democratic Congressional Campaign Committee.

Matthew Kaiser, the chairman of the Board on Professional Responsibility, has donated thousands and thousands of dollars to leftist causes, including Barack Obama, Joe Biden, and Hillary Clinton. Recently, it has been revealed that Mr. Kaiser is lead counsel  a civil lawsuit which he filed against Donald Trump, *Garza v. Trump et al*, 1:23-cv-00038 (D.D.C.), apparently now believing that the self-

it is one that is completely supported by objectively verifiable facts. This was regrettably evident at each stage of the disciplinary proceeding against Mr. Klayman, which is set forth in *seriatim* below.

*First,* ODC had previously been run by Bar Disciplinary Counsel Wallace "Gene" Shipp prior to his retirement in 2017. During Mr. Shipp's tenure, ODC had been what it was supposed to be – a fair, unbiased, and neutral body. After Mr. Shipp retired, Hamilton Fox III ("Fox") took over, everything changed, and ODC became weaponized and morphed into a highly partisan weaponized  tool to attempt to remove conservative and Republican activist attorneys like Mr. Klayman from the practice of law. This explains why Ms. Sataki's Complaint sat dormant and thus abandoned for seven years until Fox took over, as clearly the neutral Mr. Shipp felt it was completely meritless, and then Fox saw an opportunity to try to destroy the founder of Judicial Watch and Freedom Watch, Mr. Klayman, once he took hold of ODC.

---

conferred absolute immunity that shields him from suit should not apply to the former president.

It is no coincidence that Mr. Klayman has sued these politicians in the course of his public interest advocacy and litigation, which helps explain the animosity that these members of the D.C. attorney discipline apparatus openly displayed towards him. In fact, a review of the AHHC recommendation shows a fixation on Mr. Klayman naming Hillary Clinton as a member of the Broadcasting Board on Governors in a *Bivens* Complaint brought on behalf of Ms. Sataki along with all the other governors.

It is clear that Fox ordered ODC and his deputies Elizabeth Herman and Julia Porter, as well as Assistant Bar Disciplinary Counsel Clay Smith, to resurrect the abandoned Sataki Complaint in order to try to remove Mr. Klayman from the practice of law.

It is extremely telling that when ODC made the choice to resurrect Ms. Sataki's Complaint in 2017, Mr. Klayman was involved in several high-profile cases that ran counter to ODC's leftist politics. For instance, Mr. Klayman had filed a RICO Complaint against Hillary Clinton, Bill Clinton, and the Clinton Foundation in the U.S. District Court for the Southern District of Florida in 2015. *Klayman v. Clinton et al*, 9:15-cv-80388 (S.D. Fl.). Mr. Klayman was also representing clients in lawsuits against President Obama, Black Lives Matter and its leaders, Louis Farrakhan, and Al Sharpton over their roles in inciting violence against law enforcement officers, resulting in the Micah Johnson mass shooting that left five police officers dead. *Klayman v. Obama et al*, 3:16-cv-2010 (N.D. Tx.); *Zamarripa v. Farrakhan et al*, 3:16-cv-3109 (N.D. Tx.). Mr. Klayman also was representing Kiara Robles in the U.S. District Court for the Northern District of California in a lawsuit against ANTIFA, after Ms. Robles had been violently attacked and assaulted at a Milo Yiannopoulos event was attacked by ANTIFA. *Robles v. ANTIFA et al*, 17-cv-4864 (N.D. CA.). Lastly, Mr. Klayman had been retained by Cliven Bundy to represent him after he was indicted following a

standoff with federal law enforcement officials at his ranch in Nevada in 2014. It is no coincidence that ODC chose to resurrect Ms. Sataki's abandoned Complaint at this time, as this, in retrospect, can only be explained, given the facts, as a calculated effort to try to silence Mr. Klayman's conservative public interest advocacy and litigation.

Recently, it has been revealed that Fox has personally gone after other Trump affiliated Republican legal counsel, such as Jeff Clark and Rudy Giuliani, often gloating to the media about his personal involvement. App. 240. This is incredibly telling because it is almost unheard of for Bar Disciplinary Counsel to personally handle and litigate cases and not delegate them to his Deputy or Assistant Bar Disciplinary Counsel, so the fact that he chose to personally take on these matters shows conclusively what Fox's motivation is  about.

*Second*, at the hearing committee level, Mr. Klayman was faced with a "stacked deck" in the form of a biased and skewed AHHC which included even an avowed proud communist and ideological foe of Mr. Klayman, Michael Tigar. Bob Woodward wrote in his book about the Supreme Court, titled *The Brethren,* that Tigar in his early career had been fired, at the urging of FBI Director J. Edgar Hoover, from his High Court clerkship by Justice William Brennan for his subversive communist ties. App. 207.  Tigar's recently latest recently published book, *Mythologies of State and Monopoly Power*, a Marxist rant against capitalist

law, is testament to his time with Fidel and the Castro brothers. This book received on its back cover endorsements from Angela J. Davis, an infamous communist from Berkeley and Bernardine Dohrn, also a communist and on top of that a convicted domestic terrorist who was on the FBI's Ten Most Wanted List, among others of Tigar's ideological ilk:

> In this brilliant collection of essays, Michael Tigar lays bare mythologies about the most important issues of our time—racism, criminal justice, free speech, worker rights, and international human rights. Beautifully written with Tigar's characteristic wit, passion, and deep knowledge of jurisprudence and literature, *Mythologies of State and Monopoly Power* explores important issues through the lens of his extraordinary personal and professional experience, and through his analysis of some of the most important cases decided by the nation's courts. This book is a must-read for anyone interested in law, history, and the pursuit of justice. – Angela J. Davis

> *Mythologies* is an incisive, unsparing, creative and brilliant critique of capitalist law and its dire human consequences. This book tears the cover off what power says about justice, and shows us what power does. Michael Tigar has written a must-read for prisoners, law students, activists, artists, lawyers, and anyone concerned with where we are and how to fight back. You'll never forget his fictional debate between Lucy Parsons and Clarence Darrow. – Bernardine Dohrn

His proud thank you letters from Fidel and a photo with his equally communist revolutionary brother Raul are contained in App. 210. It did not matter to the AHHC that Mr. Klayman presented seven (7) material witnesses that conclusively refuted every single one of ODC's manufactured arguments and that ODC only had one (1) material witness – Ms. Sataki – who was impeached repeatedly as set forth below. Not coincidentally, Tigar was one of a number of

leftist law professors, who filed an ethics complaint against Trump White House Counselor Kellyanne Conway. App. 296. Joining Mr. Tigar was the committee chair, Anthony Warren Fitch, also of the ideological left. He at every step of the way seemed to defer to Mr. Tigar and appeared and acted as if he was in awe of him. An actual review of the record will show this.

*Third*, at the Board level, presiding over this matter was its Chairman Matthew Kaiser, who was associated with the leftist legal publication "Above the Law," and wrote complementary columns extolling the virtues of an "honest" Hillary Clinton, but trashing Donald Trump, who Mr. Klayman had supported.[4] Recently, it has been revealed that Mr. Kaiser is lead counsel a civil lawsuit which he filed against Donald Trump, *Garza v. Trump et al*, 1:23-cv-00038 (D.D.C.), apparently now believing that the self-conferred absolute immunity that shields him from suit should not apply to the former president. In other words, if Mr. Klayman tries to sue Mr. Kaiser for egregious violations of constitutional rights, it is a frivolous, sanctionable lawsuit, but if Mr. Kaiser wants to sue Donald Trump, the same principles of absolute immunity do not apply. This "heads I win, tails you lose" behavior is indicative of the exact type of partisan conduct that has infected and weaponized the entire District of Columbia attorney disciplinary apparatus.

---

[4]  https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/;
https://abovethelaw.com/2016/07/trump-and-tyranny/

This unsurprisingly resulted in a fatally flawed and skewed Report from the Board which gave absolutely no weight and credence to any of Mr. Klayman's witnesses, legal arguments, or even uncontroverted facts. Importantly, Mr. Klayman presented seven material witnesses and ODC only Ms. Sataki, who was caught not telling the truth,  as coached to do so by ODC, and thus impeached on many occasions.

*Fourth,* further showing that the disciplinary proceeding was tainted as highly and not facts or legally based, is the fact that during the Trump years in particular, ethics complaints were filed by the likes of Tigar, accepted and initiated against Trump White House Counsellor Kellyanne Conway[5] over remarks she made on cable news, against former Trump Attorney General William Barr[6] (the complaint was outrageously and incredibly filed by all prior presidents of the District of Columbia Bar as well as a former senior bar counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[7] and Josh Hawley[8] over their role in advocating for President

---

[5] https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html

[6] https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag

[7] https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/

[8] https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

Trump in the last presidential election, Professor John Eastman[9] who served as a legal counsel for President Trump, and of course former U.S. Attorney Rudy Giuliani[10] over his representation of President Trump, to name just a few. Indeed, it appears that every attorney who has any link to Trump, no matter how tenuous, is being targeted for prosecution. Most recently, Jenna Ellis, in similar fashion, was censured by the Colorado Bar for statements that she made in the media regarding the 2020 presidential election.[11][12]

     To the contrary, when a complaint was filed against fellow leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's 33,000 emails, many classified, and illegally retained on a private server, which complicity is not even in dispute, ODC summarily and quickly rejected a complaint filed by former Justice Department

---

[9]    https://www.reuters.com/legal/ex-top-justice-dept-officials-testimony-sought-ethics-hearing-trump-ally-clark-2022-10-06/

[10]    https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

[11]    https://www.nbcnews.com/politics/donald-trump/former-trump-lawyer-jenna-ellis-censured-colorado-2020-statements-rcna74092

[12] There has been and remains an overt effort by some Democrat and leftist state bars such as DC's to remove conservative, pro-Trump and Republican lawyers from the practice of law as they are more than a thorn in the side of the Democrat and leftist establishment. No more is this true than with the compromised DC Bar disciplinary apparatus

lawyer and conservative lawyer and public interest advocate Ty Clevenger, who was also pursued by ODC with the goal of disbarring him as well.[13]

*Fifth*, as the final proof of institutional bias, the Court need not look any further than the completely disparate "selective prosecutorial" treatment afforded by the D.C. attorney discipline apparatus to one Kevin Clinesmith in handling *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.). In that case, Kevin Clinesmith—the former senior FBI lawyer and admittedly anti-Trump partisan who dishonestly falsified a surveillance document in the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC, and only temporarily suspended for <u>five months</u> after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. Clinesmith also did not submit any affidavit under Rule 14(g) for five (5) months after he was suspended. Despite this, not only did the D.C. attorney disciplinary apparatus fast-track if not whitewash his case—clearly in order to minimize his temporary suspension period —the D.C. Court of Appeals let Clinesmith off with barely a slap on the wrist  with "time served" in just  seven (7) months. And importantly, the Court imposed no reinstatement provision on Clinesmith, as it has

---

[13] Ty Clevenger, State bar prosecutors are flouting the law, protecting Hillary Clinton and her lawyers, LawFlog, available at: https://lawflog.com/?p=1389

for Mr. Klayman, despite him literally being a convicted felon over make false statements to the government. App. 217.

On the other hand, Mr. Klayman, without due process, was "temporarily suspended" years ago without a hearing and due process, which temporary suspension incredibly lasted twenty (20) months, while the D.C. Court of Appeals, which oversees ODC, intentionally dragged its feet, and then suspended him for another incredible eighteen (18) months as a result of contrived ethical "violations" -- while the original recommendation of the Board was only for eighteen (18) months -- with no showing of dishonesty, and of course, no criminal conviction or even any showing of dishonesty. The rank discriminatory difference in treatment here is truly extraordinary if not mind blowing, and what's even worse is that the D.C. attorney disciplinary apparatus, having conferred itself with "absolute immunity," believes that it is above the law and therefore can and will continue to engage in this type of conduct with regard to other conservative and Republican activist members of the D.C. Bar, as set forth above.

In sum, while it is clear that Mr. Klayman must prevail on the merits and substance alone, this rank partisanship must also be factored in by this Honorable Court, as it is the regrettable state of the toxic politics in the District of Columbia and its attorney discipline apparatus in particular. This helps to explain the almost unbelievable treatment that Mr. Klayman received throughout this twelve (12) year

and counting saga, where his facts and evidence simply did not matter, and it was already predetermined that ODC should attempt to remove him from the practice of law.

## III.    There Was Clearly No Clear and Convincing Evidence of Any Misconduct

### A.    There Was No Failure to Abide By Ms. Sataki's Wishes.

Chief among the alleged ethical violations manufactured by ODC and "rubber stamped" by the Board and the D.C. Court of Appeals was a purported failure to abide by Ms. Sataki's decisions regarding the use of publicity in her case. As the record conclusively showed, this was absolutely not the case, as Ms. Sataki agreed to the use of publicity at the time – which she even admitted at the Hearing, and then personally participated in publicizing her case at the time and even after the fact.

First and foremost, at the AHHC hearing in this matter, Ms. Sataki herself was forced to admit that she had approved and agreed with the use of publicity:

Q: **Did you ultimately agree with Mr. Klayman about the publicity?** A**: I did**. App. 303.

Mr. Klayman also provided testimony from numerous witnesses who showed that Ms. Sataki's belated claim was false. Chief among these witnesses was Tim Shamble ("Mr. Shamble"), Ms. Sataki's union representative who worked closely with Mr. Klayman's in his representation Ms. Sataki. This means that Mr.

34

Shamble was deeply involved in Mr. Klayman's representation and therefore had contemporaneous personal knowledge of the intricate details of the events in question. The record is indisputably shows that Mr. Shamble, Mr. Klayman, and Ms. Sataki at the time discussed strategy all together and as a group, Ms. Sataki and they decided that the use of publicity would be beneficial to help Ms. Sataki achieve her desired outcome. And, even more, as the final straw which shows the egregious error by the D.C. Court of Appeals is the undisputed fact that Ms. Sataki personally participated with Mr. Shamble in publicizing her case:

> Mr. Shamble and Ms. Sataki went together on one occasion to publicize her situation. "I remember one time. The VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this." Tr. 893. The article that both Mr. Shamble and Ms. Sataki distributed was called ""Government War on a Freedom Loving Beauty. Exclusive, Larry Klayman Goes to Bat for Harassed Broadcaster Fighting for a Free Iran." App. 90.

Mr. Shamble also testified as to why he believed the use of publicity was a good strategy. He testified that publicity was a helpful tool in dealing with an agency as notoriously difficult and anti-labor as VOA. App. 89. Specifically, he testified "[w]e've done it. It's something that you can use to pressure managers, if they're intractable, you know, to try to get them to come to some sort of agreement. We have our own website, so we use it, too." App. 90. The reason that publicity was often used, according to Mr. Shamble, was that BBG, of which VOA is a

subcomponent, has been ranked the worst agency in government, and is very difficult to negotiate any settlement with because of its management's attitude and approach to employees.

Furthermore, Mr. Klayman also provided the same uncontroverted testimony that the use of publicity was discussed and approved as a group. "So that was the reason for the publicity. She agreed to it, Tim agreed to it, and there will be other witness(es) that will testify in this proceeding that she agreed to the publicity." App. 305.

Even further buttressing the testimony of Mr. Shamble and Mr. Klayman were numerous other witnesses who had contemporaneous personal knowledge. This included Keya Dash - ("Mr. Dash declared under oath that he was present when the use of publicity to coax the BBG into settlement was discussed with Ms. Sataki, and that Ms. Sataki approved of its use."); This also included Joshua Ashley Klayman, Mr. Klayman's sister and herself a distinguished Wall Street lawyer ("Ms. Sataki openly discussed the VOA case with Ms. Klayman many times. [Ms. Joshua Ashley Klayman testified] "Yes, quite openly. And I met her multiple times. It wasn't that I just met her one time. Yes, she was quite open with what the circumstances of her challenges were…. an, she was very, very open, which -- I'm not a litigator. I don't really know anything about litigations, but I was surprised that she was so open." App. 307. Furthermore, and again, she testified

that she thought Ms. Sataki was using Mr. Klayman. "I mean, I vacillated between kind of liking her and being suspicious of her, quite frankly, as your sister…she was very forward in terms of requesting different things for her personally." App. 113.

Lastly, and as even more clearly conclusive evidence that Ms. Sataki at all times not only approved of publicity, but also that she went out of her way to personally publicize her own case, is the fact that Mr. Klayman incredibly learned during the Board briefing process that Ms. Sataki had participated in making a documentary about her case, with intimate personal details about her, against Voice of America ("VOA"), which further undercuts any possible false claim that Ms. Sataki did not agree to publicize her case.[14]  The video, which is in Ms. Sataki's Iranian native language, Farsi, was translated by one of Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. App. 309 - 312. To be certain of and confirm the content, Mr. Klayman had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. App. 309 - 312. Mr. Moslehi translates this "smoking gun" as follows:

> Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.
> (displaying Elham [Sataki]'s photo) former broadcaster of VOA.

---

[14] https://www.youtube.com/watch?v=e3g5f61muZ4

Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.

(displaying photo of Mehdi Falahati) broadcaster for the VOA network
VOA: Voice of America

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty.

This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner·. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at

him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.

Caption displaying Falahati and [Sataki] with written scripts.

The lawsuit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

Unsurprisingly, Ms. Sataki did not disclose this to the AHHC and Mr. Klayman's defense team had to find this themselves during the appellate briefing process. This clearly fraudulent conduct was obviously done in concert with ODC, who must have known about this crucial evidence and chose not to disclose it. This clear fraud grossly prejudiced Mr. Klayman because it was not part of the record at the AHHC hearing or the Board level, and the D.C. Court of Appeals refused a motion to remand this matter back to the Board to open the record to review this video shows its inherent bias on this and other issues – a clear violation of Mr.

Klayman's due process and other rights. What would be wrong with trying to get to the truth, that is unless this does not comport with the predetermined narrative? This apparent fraud is one of the principal bases of Mr. Klayman's Superior Court Rule 60 Complaint to vacate the Suspension Order, which has given rise to stays in other jurisdictions, which substance is incorporated herein by reference. App. 127 - 242.

The second, and even more bizarre and troubling alleged violation concerned the fact that the *Bivens* lawsuit filed on behalf of Ms. Sataki named Hillary Clinton as a Defendant – a fact that the D.C. attorney discipline apparatus took great umbrage at every step of the way. Completely ignored is the fact that Ms. Clinton was Secretary of State and as such was the head of the Voice of America's Board of Governors at the time, meaning that she was clearly a properly named Defendant. Even more egregious is the fact that the *Bivens* Complaint also named a conservative personal friend of Mr. Klayman, the conservative Blanquita Collum, who was also a governor, as a Defendant. App. 142. This conclusively shows that Mr. Klayman had no political goal in mind and was simply trying to obtain an optimal result for his client. Unsurprisingly, this fact was completely ignored. This underscored the political and ideological bias inherent in the flawed, and now, time barred disciplinary proceeding.

In any event, based on the foregoing, it is more than abundantly clear that the primary and case determinative alleged ethical violation found by the D.C. Court of Appeals was completely unsupported by the record, much less the standard of clear and convincing evidence.

**B.     There Was No Conflict of Interest.**

Another primary phony  "ethical violation" contrived by ODC and then "rubber stamped" was based on Mr. Klayman's "emotional interest" in Ms. Sataki – which was then twisted by ODC and the Board as a conflict-of-interest violation.

This was a truly bizarre turn, as "emotional interest" is simply not an ethical violation. If it was a violation, lawyers would be prohibited from representing friends, family members, or even spouses who they care about and love – or basically anyone that is not a complete stranger. It is clear that no such prohibition exists. Attorneys are people who have feelings and emotions. There is no ethical prohibition against this. For example, the Supreme Court of Nevada found that there was no conflict of interest where a child represented his father in divorce proceedings with his mother. "Because several of the Nevada Rules of Professional Conduct     permit    an     attorney    to represent a family member…and    no rule prohibits Mark's    conduct   in   this   case,   no   ethical   breach   "infects   the litigation,"… which would provide a basis for Marie to bring a motion to disqualify Mark." *Liapis v. Second Judicial Dist. Court*, 128 Nev. 414, 420-21

(2012). If there is no conflict of interest in representing one's father against one's mother, there certainly is not a conflict of interest in representing a friend that the attorney cared deeply about, as was the case here.

This is particularly true where there was no sexual component to the relationship, as was the case here with Mr. Klayman and Ms. Sataki. And, even if there had been a sexual relationship, which there was not here, bar associations around the country have had the foresight to include provisions allowing such relationships for spouses and significant others. For instance, in Florida, sexual relationships with clients are not prohibited unless that relationship "**exploits or adversely affects the interests of the client or the lawyer-client relationship**." Fl. St. Bar Rule 4-8.4. And, in Pennsylvania, "[a] lawyer shall not have sexual relations with a client **unless a consensual relationship existed between them when the client-lawyer relationship commenced**." Pa. R. Prof'l Cond. 1.8. Again, importantly, there was not even a sexual relationship between Ms. Sataki and Mr. Klayman, so it is truly the "theatre of the absurd" that this type of ethical violation was found by the DCCA, where the only factual findings were that Mr. Klayman developed a friendship with and deeply cared for Ms. Sataki. Tellingly, the Specification of Charges which belatedly began this time barred and meritless disciplinary proceeding made no such charge. App. 244.

Thus, ODC and the Board had to disingenuously strain to manufacture an ethical violation and settled on an alleged and contrived conflict of interest. However, the record clearly reflects that when Ms. Sataki had become more than self-centered and abusive during the course of Mr., Klayman's representation, even asking Mr. Klayman to buy her a car, App. 308, Mr. Klayman realized that it was ethical and prudent for him to suggest that she find other counsel, as legal representation became untenable. Indeed, Mr. Klayman realized that both parties needed to move on and that is why Mr. Klayman took Ms. Sataki to Gloria Allred and Tim Shea. App. 92. However, despite this, it was Ms. Sataki who instructed Mr. Klayman to continue representing her. Thus, even in the unlikely event that the "emotional interest" at issue could possibly constitute a conflict of interest violation, it is uncontroverted that she would have waived any such violation by asking Mr. Klayman to continue to represent her. This was even admitted by the Board in its Report where it wrote Mr. Klayman "repeatedly communicated his feelings to [Ms. Sataki]" and "she asked him to continue with the representation."

And, when ultimately Ms. Sataki did not, for whatever reason, get the result she wanted, angry and unhinged, she struck back at Mr. Klayman, sending him the below offensive email which mocked and disparaged his religion and falsely accused him of taking bribes:

> I do not know if you are Christian or Jewish, because whichever suits you best, you become one. But I believe in karma and what you have

done with my case and losing it. ´ Ms. Sataki also wrote: And what you have done with my case and losing it and not stopping working on it when I ordered you, one day you'll answer to God, even if you throw your life and play with people life. I am nobody, just a little girl who was retaliated and harassment by some VOA employee and you seed (sic) that you can help me. Not only did you not help me, but destroyed  my life to nothing….

Mr. Klayman are you happy now that you've complete destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party. App. 110.

    Exacerbating this already blatant and egregious violation, the D.C. Court of Appeals in an overt effort to tar Mr. Klayman, injected the non-existent innuendo of sex where none was ever alleged in the Specification of Charges or testified to by even Ms. Sataki, that "Whether or not his feelings were sexual or romantic in nature, Mr. Klayman had strong feeling for E.S. For example, he wrote that he had 'fallen in love with (E.S.). would always love her and was feeling real pain," because she did not share his feelings.  App. 79. The last part of this statement is totally false, as Mr. Klayman never wrote that he was feeling real pain "because she did not share his feelings." What the record does show is that Mr. Klayman made it clear to Ms. Sataki that he did not want to be with her and did not want to be her boyfriend, which was contemporaneously recorded in emails. App. 99. There was absolutely no allegation of a sexual component  in the Specification of Charges or before the AHHC. This innuendo was improperly inserted for no reason

other than to apparently smear Mr. Klayman. And there is not ethical violation to simply love someone.

### C.    Mr. Klayman Did Not Reveal Any Client Confidences

As set forth above, notwithstanding that Ms. Sataki was forced to admit that she approved the publicity and participated directly in distributing it, is that she herself went on Iranian television to broadcast the same alleged confidential facts. App. 309 - 312. Thus, it is incomprehensible how Mr. Klayman could possibly have been found to have revealed confidential information.

### D.    Mr. Klayman Kept Ms. Sataki Informed Every Step of the Way

One of the most non-sensical and bizarre "findings" of the D.C. Court of Appeals is that Mr. Klayman failed to obtain informed consent by filing a motion to disqualify the Honorable Colleen Kollar-Kotelly during the course of his representation of Ms. Sataki. Not only is a lawyer permitted some discretion in litigation, but the record also clearly reflects that Ms. Sataki was fully informed of this motion and did not object. App. 97. What the record actually shows is that Ms. Sataki was "kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way."

### E.    Absence of a Written Fee Agreement.

The D.C. Court of Appeals chose to sidestep this issue and not even address it, probably because a myriad of emails from Mr. Klayman stated that he was

45

representing Ms. Sataki free of charge. App. 94. The issue of the contingency only arose when Ms. Sataki, at the end of the representation, became more abusive, rejected other counsel to represent her, but wanted to continue with Mr. Klayman as her lawyer.  But this never went into effect in any event. App. 108.

**F.    There Was No Failure to Cease Representation**

The record similarly shows that Mr. Klayman did not fail to cease representation of Ms. Sataki in a timely fashion. Mr. Klayman did not take steps to litigate Ms. Sataki's case further and only acted to preserve Ms. Sataki's appellate rights. App. 98. And it was good that Mr. Klayman did so, because Ms. Sataki filed an untimely notice of appeal *pro se* only a few months later. App. 97. And, then years later Ms. Sataki – after she was literally hunted down by ODC for ulterior and improper reasons - then asked ODC to prosecute her sexual harassment claims!  App. 302.

Furthermore, letters purportedly terminating Mr. Klayman's representation were admittedly sent to the incorrect addresses, which Mr. Klayman never received from her. App. 571. Mr. Klayman also had a duty to confirm Ms. Sataki's purported "desires" in the August 4, 2010 letter, as it was clearly not written by her, before terminating all of Ms. Sataki's rights on appeal, for which he could have been accused of legal malpractice.

*///*

46

## **CONCLUSION**

Based on the foregoing, it is abundantly clear that no reciprocal discipline is respectfully warranted. And, Mr. Klayman already did more than time served in any event with a twenty (20) month temporary suspension tacked onto another eighteen (18) months of additional suspension[15].  Under the factors enumerated in *Selling*, this entire twelve (12) year proceeding worked a "grave injustice," which is only one of factors which the Court must strongly consider in reaching a just decision.

Finally, as Mr. Klayman cannot receive a fair and just decision by the current Panel, which should be disqualified to sit and render judgment in this proceeding under 28 U.S.C. § 144, it must be transferred to another Panel if not correctly stayed at this time to allow Respondent's DC Superior Court Rule 60 Complaint to set aside the Suspension Order, based on fraud and other prosecutorial conduct,  to be fully litigated as a matter of his due process and equal protection constitutional rights.

And finally, and most importantly, there was and remains no clear and convincing evidence of any ethical violation by Mr. Klayman, period.

Respondent reserves the right to supplement this pleading.

---

[15] And, in any event, Mr. Klayman has not practiced in the District of Columbia as an attorney representing clients for much longer than even the eighteen-month suspension period. A review of his Court's case dockets confirms this.

Dated: March 15, 2023               Respectfully Submitted,

                                    */s/ Larry Klayman*
                                    Larry Klayman, Esq.
                                    Klayman Law Group, P.A.
                                    7050 W. Palmetto Park Rd
                                    Boca Raton, FL, 33433
                                    Tel: (561) 558-5336
                                    Email: leklayman@gmail.com

                                    *Plaintiffs-Appellant Pro Se*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because this document contains 12,150 words.

2.      This document complies with the typeface and the type-style requirements of Fed. R. App. P. 27(d)(1)(E) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 15.28 in 14-point Times New Roman.

                                    /s/ Larry Klayman, Esq.